**BLUMENTHAL & NORDREHAUG**
Norman B. Blumenthal (State Bar #068687)
Kyle R. Nordrehaug (State Bar #205975)
Aparajit Bhowmik (State Bar #248066)
2255 Calle Clara
La Jolla, CA 92037
(858) 551-1223
Fax: (858) 551-1232

**GERARD & ASSOCIATES**
Robert B. Gerard, Esq. (State Bar #96296)
1516 Front St
San Diego, CA 92101
Telephone: (619) 232-2828
Facsimile: (619) 232-4219

**LAW OFFICES OF PATRICK MISSUD**
Patrick Missud, Esq. (State Bar #219614)
91 San Juan Ave
San Francisco, CA 94112

**LAW OFFICES OF ROBERT FELLMETH**
Robert Fellmeth, Esq. (State Bar #49897)
5998 Alcala Park
San Diego, CA 92110
Telephone: (619) 260 4806
Facsimile: (619) 260 4753

FILED
08 MAR 28 PM 4:27
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY: DEPUTY

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

'08 CV 592 BEN RBB

| | |
|---|---|
| JAMES WILSON, REBECCA LORENZO, WAHEEDA KHAN, JORGE LOPEZ, and SUSIE KHUU, on Behalf of Themselves and All Others Similarly Situated<br><br>Plaintiffs<br><br>v.<br><br>D.R. HORTON, INC., WESTERN PACIFIC HOUSING, INC. d/b/a D.R. HORTON, AMERICA'S BUILDER, DHI MORTGAGE COMPANY, LTD., L.P., and DOES 1-10,<br><br>Defendants. | CASE NO. ____________<br><br><u>CLASS ACTION</u><br><br>COMPLAINT FOR (1) VIOLATION OF THE CALIFORNIA BUSINESS & PROFESSIONS CODE SECTIONS 17200 ET SEQ., (2) VIOLATION OF THE CALIFORNIA BUSINESS & PROFESSIONS CODE SECTIONS 17500 ET SEQ., (3) VIOLATION OF THE SHERMAN ANTITRUST ACT, 15 U.S.C. §1, AND (4) VIOLATION OF THE CARTWRIGHT ACT, CALIFORNIA BUSINESS & PROFESSIONS CODE SECTIONS 16720, ET SEQ. |



CR

## I. INTRODUCTION

Plaintiffs James Wilson, Rebecca Lorenzo, Waheeda Khan, Jorge Lopez, and Susie Khuu, on behalf of themselves and all others similarly situated (collectively "Plaintiffs"), allege on information and belief, against Defendants D.R. Horton, Inc. ("D.R. Horton, Inc."); D.R. Horton, Inc.'s wholly owned subsidiaries doing business as D.R. Horton America's Builder in California, including, but not limited to Western Pacific Housing, Inc. ("Horton"); and, DHI Mortgage Company, Ltd., L.P. ("Horton Mortgage"), (collectively "Defendants"), as follows:

1. Except for the violations set forth in Count Three of this Complaint for violation of the Sherman Antitrust Act, this class action is brought on behalf of all California residential home buyers who purchased a home located in California from D.R. Horton, Inc. or from one of D.R. Horton, Inc.'s wholly owned subsidiaries d/b/a D.R. Horton America's Builder during the four (4) years prior to the filing of this Complaint and through the end date of the Class Period as shall be determined by the Court, and who received a mortgage loan for such purchase that was originated, processed and/or brokered by DHI Mortgage Company, Ltd., L.P. ("Horton Mortgage"). Plaintiffs allege that these buyers were all, as a result of the uniform business practices of Defendants, unfairly or deceptively convinced to finance their purchase agreement through Horton Mortgage. This anti-competitive lending scheme was devised to take advantage of the market of captive, locked-in D.R. Horton, Inc. home-buyers. In so doing, Defendants have unfairly and deceptively cheated to compete to the detriment of this California Consumer Class and California's competing financial lending institutions and brokers in competition with Horton Mortgage. As to Count Three, this Class Action is brought on behalf of all residents of the United States who purchased a home located in the United States from Horton, during the four (4) years prior to the filing of this Complaint and through the end of the Class Period as shall be determined by the Court, and who received a mortgage loan for such purchase that was originated, processed, and/or brokered by Horton Mortgage.

2. D.R. Horton, Inc. is the largest homebuilding company in the United States, based on homes closed during the twelve (12) months ended September 20, 2007. For this period, D.R. Horton, Inc. closed 41,370 homes with an average closing price of approximately $259,200.

3. D.R. Horton, Inc.'s homebuilding operations are by far the most substantial part of D.R. Horton, Inc.'s business, comprising approximately 90% of consolidated revenues, which accounted for

$11.3 billion in revenues in fiscal 2007. The sale of detached homes generated approximately 81%, 80%, and 83% of home sales revenues for D.R. Horton, Inc. in fiscal years 2007, 2006 and 2005, respectively.

4. D.R. Horton, Inc.'s consolidated revenues for fiscal 2007 consisted of $11.09 billion from homebuilding operations and an additional $207.7 million in revenue from the associated mortgage brokerage services that were performed by Horton Mortgage. As a result, Defendants were not only manufacturing homes, but also were manufacturing loans.

5. The homes built by D.R. Horton, Inc. were sold to the Class Members by various wholly owned subsidiaries of D.R. Horton, Inc., including, but not limited to Western Pacific Housing, Inc., which do business as D.R. Horton, America's Builder ("Horton").

6. Through Horton Mortgage, Horton provided mortgage brokerage services to Horton's customers, which included all of the Class Members. As a matter of practice, Horton Mortgage did not retain or service the mortgages Horton Mortgage originated but, rather, acted solely as a mortgage broker and sold the mortgages and related servicing rights of the Class Members to investors.

7. During the year ended September 30, 2007, approximately 95% of Horton Mortgage's loan volume related to homes sold by D.R. Horton, Inc.'s homebuilding operations.

8. The Horton home purchase agreement required a deposit upon execution and the submission of a loan application to Horton Mortgage.

9. While home loans with far better terms and conditions than the home loans offered by Horton Mortgage were available to the Class Members from Horton Mortgage's competitors, the Defendants were able to coerce each and every Class Member to finance their home purchases through Horton Mortgage through a concerted refusal to deal with Horton Mortgage's competitors and with tied-in market power which allowed Horton to threaten the Class Members with loss of their deposits and home purchase if they did not finance their Horton home purchase through Horton Mortgage. This market power was substantially enhanced by the taking of the deposit before the exercise of Defendants' coercive market power. Given the unique nature of a real property purchase, the market power of Defendants is further enhanced as to this unique market of Horton's home sales and tied-in financing. Expressly excepted from all claims herein asserted are any and all claims for construction defects, injury to the person or property other than those set forth herein, breach of contract and any and all other claims not specifically set forth herein, as California

is a primary jurisdiction state that allows for the splitting of claims in more than one lawsuit and the assertion of the claims set forth herein as a result shall have no res judicata effect on any claims not specifically set forth herein. The only extraterritorial claim asserted outside California is the claim for violation of the United States Sherman Antitrust Act.

## II. THE SCHEME

10. In furtherance of their affiliated and consolidated financial relationship, Horton, as part of each purchase agreement, required each consumer seeking a loan for a Horton home purchase to apply to Horton Mortgage for the loan. In fact, the combination in restraint of trade between Horton and Horton Mortgage went so far as to count "cash" sales against a salesperson since such sales caused Horton Mortgage's "capture" rate to drop. Horton falsely and fraudulently represented that the submission of the loan application to Horton Mortgage would not "compel" the use of Horton Mortgage. Defendants also made false and fraudulent claims of a "discount" between $5,000-$10,000 off of the borrower's closing costs if the purchaser used Horton Mortgage. Defendants continued to combine their efforts to conceal the true cost of the mortgage product from each customer until such time as each Class Member was locked-in so that switching costs would be prohibitive. The true facts were that there was no true option to use alternative lenders, as any attempt to do business with alternative lenders was met with threats of loss of the home purchase and non-refundable deposit, along with stonewalling alternative lenders. The "discounts" were also illusory as no real economic advantage was given to the members of the Class because Horton ultimately made up for the false claim of a "discount" with higher costs to the consumer that were imposed by Horton Mortgage on the mortgage and lending side. These disproportionately higher costs completely offset the amount of the illusory "discount." Many of the offsetting costs charged were so well hidden that they came as a complete surprise to members of the Class. The "discount," therefore, in reality, was in truth a "penalty" for each Class Member who all financed their home loans with Horton Mortgage. Thus, the mischaracterization of this penalty as an "optional discount" was both illusory and deceptive.

11. The Defendants' market power over the home purchasers was so strong that Defendants were able to successfully coerce the Class Members to use Horton Mortgage for their loan with threats of the loss of the deposit and/or other funds paid towards the purchase price of the home for any Class Member that

wanted to use an alternate lender. The purpose of these threats by Horton's sales representatives was to cause these home buyers to use Horton Mortgage for their home loan, to the exclusion of the competitive lenders, so as to eliminate all competition. For those Class members who became so dissatisfied with the loan offered by Horton Mortgage before closing, that they were willing to accept the loss of the illusory $5,000-$10,000 "discount" in order to obtain financing from another lender, Horton refused to deal with the alternate lenders and threatened to have the Class Members' deposit forfeited and the sale cancelled if Horton Mortgage was not used for the loan. Similarly, if the Class Member had paid Horton for any upgrades for the home, Horton also threatened to have these funds forfeited if another lender was selected. These threats were only withdrawn when the Class Member relented and agreed to use the mortgage services of Horton Mortgage. As a result, as a matter of custom and practice, any Class Members who attempted to obtain a home mortgage loan from another financial institution directly without using Horton Mortgage as a conduit was threatened with the loss of the deposit, the loss of upgrade amounts placed toward the purchase price of the home, and the loss of the opportunity to buy the home by Horton.

12. Horton also cheated to compete by unfairly and deceptively using market power to coerce Class Members to purchase the tied mortgage products from Horton Mortgage, even though these loans were substantially worse in economic value than loans that could then be obtained from other lending institutions on the open market, without Horton Mortgage being used as the conduit. After closing, Horton Mortgage sold these inflated loans to other financial institutions and reaped substantial ill-gotten gains in the form of the broker fees and yield spread premiums that were imbedded in the over-priced loans. The Defendants' concerted refusal to deal with other lenders and Defendants' use of market power over the home sale of this unique product and deposit loss allowed Horton Mortgage to unfairly and illegally capture a substantial percentage of the market for these financial services and deprived the Class members of an even and balanced playing field wherein all financial institutions were permitted the chance to compete fairly and honestly for the Class Members' business. To illustrate, 95% percent of DHI Mortgage loans in 2007 were produced from the "captive business" provided by Horton's homebuilding operations and between 60% and 75% of Horton's homes were financed through Horton Mortgage, including "cash sales" as part of the percentage that were not financed through Horton Mortgage, which results in the Horton Mortgage share of loans placed on Horton home sales to be substantially higher than these percentages. By virtue of unfairly

preying on the locked-in and captive business market, Horton Mortgage was able to manufacture anti-competitive loans with unfairly high closing costs; above market fees and charges; and, higher than average interest rates and/or interest rates that were adjustable, rather than fixed, all of which cumulatively provided a far worse economic investment for Class Members than loans that could have been obtained from other financial institutions offering more traditional and secure mortgage products in the open market, without using Horton Mortgage as a conduit.

13. Defendants also bolstered their multi-faceted scheme to cheat to compete and anti-competitive practices with stonewalling tactics, involving Defendants' concerted refusal to deal with other lenders, which forced Class Members to obtain financial services from Horton Mortgage, rather than from other available lending institutions. In the event that a Class Member was able to secure a mortgage from an alternate lending institution, the closing roadblocks created by Horton included, but were not limited to, intentionally failing to communicate and cooperate with the alternate lending institution. Even though better alternatives were available from other financial institutions, under the threat of losing their home, the deposit and/or other funds paid to Horton towards the purchase price of the home, these Class Members were coerced to use Horton Mortgage as the conduit lender and purchase the tied mortgage product.

14. As part of the scheme, Defendants' sales agents were encouraged to deceive and take advantage of Class Members through bonuses and commissions which provided incentives for agents to pressure Class Members to use only Horton Mortgage. Defendants accomplished this scheme by tying in sales peoples' bonuses to their "capture rates" for Horton Mortgage, with "cash" sales going against them for bonus purposes and by allowing sales agents to pad Class Members' bills with unnecessary fees, hidden charges, and interest rate/loan package manipulation as part of the closing, well after deposits were received and subject to forfeiture. The information on the true cost of the mortgage product was concealed from Class Members. By virtue of this threat of forfeiture, Horton Mortgage artificially added closing costs that were significantly higher than the closing costs originally quoted to the members of the Class by Horton.

15. As a result of Defendants' concerted refusal to deal and market power over the sale of these unique homes, Defendants were able to illegally, unfairly and deceptively cause the members of the Class to use Horton Mortgage for the financing of home purchases from Horton, in violation of California Business and professions Code § 17200, *et seq*, Cal. Bus. & Prof. Code § 17500, *et seq*, the Sherman Anti-

trust Act 15 U.S.C. 1 and the Cartwright Act, Cal. Bus. & Prof. Code § 16720.

## III. DEFENDANTS' PARTICIPATION

16. At all times, D.R. Horton, Inc. not only knew about the acts and practices of the subsidiaries alleged herein, and the coercion of their home buyers to finance their home purchases through Horton Mortgage, but also knowingly participated in the creation, design, direction and implementation of the scheme whereby home buyers were forced to finance their purchase through Horton Mortgage, under the direct threat of forfeiting substantial sums paid to Horton in the form of a deposit. D.R. Horton, Inc., therefore, ratified and participated in the scheme for which D.R. Horton, Inc. had the power and control to continue or discontinue.

17. This scheme could not have occurred but for the participation of Defendant D.R. Horton, Inc. in the planning, devising, developing and implementing of the uniform and systematic requirements that were illegally, unfairly and deceptively imposed upon D.R. Horton, Inc.'s homebuying consumers, and the exertion of D.R. Horton's market power to coerce Class Members to accept the tied product offered by the Horton Mortgage subsidiary. D.R. Horton, Inc. received and retained substantial revenues through this scheme. As a result, Defendant D.R. Horton, Inc., is jointly and severally liable to Plaintiffs and the other Class Members as a willing and knowing participant in this scheme. There exists, at all times mentioned herein, an unjust and illegal unity of interest in this scheme between defendants D.R. Horton, Inc., D.R. Horton, Inc.'s wholly owned homebuilding subsidiaries doing business as D.R. Horton America's Builder which include but are not limited to Western Pacific Housing, Inc. ("Horton"), and DHI Mortgage Co. ("Horton Mortgage"). All Defendants worked jointly, cooperatively, and in combination to perpetrate this illegal scheme described herein and each profited and retained the ill-gotten gains acquired through the scheme in restraint of trade, which injured the competition. In particular, the distinct business entities of Defendant D.R. Horton, Inc., Defendants Horton and Horton Mortgage operated in combination because D.R. Horton, Inc. dominated and controlled the wholly owned subsidiaries and directed the activities of the wholly owned subsidiaries in such a manner so as to perpetrate the illegal, unfair and deceptive conduct described herein. At all relevant times, D.R. Horton, Inc. knew that the uniform, systematic pattern and practice of requiring that consumers use Horton Mortgage for the financing of home purchases from Horton

was an illegal, unfair and deceptive trade practice but continued to ratify, participate in and profit from the alleged scheme.

18. Each Defendant acted as the agent of each other Defendant and/or aided and abetted the wrongful conduct of each other Defendant. Accordingly, each Defendant is jointly and severally liable for the acts of all other Defendants.

## IV. JURISDICTION AND VENUE

19. This Court has personal jurisdiction over Defendant D.R. Horton, Inc. because Defendant D.R. Horton, Inc. conducts a substantial amount of business in the State of California, and in particular, the Southern District of California, D.R. Horton, Inc. has designated a registered agent for service of process in California with the California Secretary of State, D.R. Horton, Inc. owns real property located in the State of California, and D.R. Horton, Inc. has generally appeared in courts located in the State of California. During the relevant time period, D.R. Horton, Inc. did sufficient business in, had sufficient contacts with, and intentionally availed themselves of the laws and market of the State of California through the manufacture of not only homes, but also anti-competitive home loans designed for the captive business provided by D.R. Horton's homebuilding operations. This Court has personal jurisdiction over Defendant Western Pacific Housing, Inc. because Western Pacific Housing, Inc. conducts a substantial amount of business in the State of California, and in particular, the Southern District of California, Western Pacific Housing, Inc. has designated a registered agent for service of process in California with the California Secretary of State, Western Pacific Housing, Inc. owns real property located in the State of California, and Western Pacific Housing, Inc. has generally appeared in courts located in the State of California. This Court has personal jurisdiction over Defendant DHI Mortgage Company Ltd., L.P. because DHI Mortgage Company Ltd., L.P. conducts a substantial amount of business in the State of California, and in particular, in the Southern District of California, DHI Mortgage Company Ltd., L.P. is licensed with the California Department of Corporations as a residential mortgage lender with offices in California, DHI Mortgage Company Ltd., L.P. has designated a registered agent for service of process in California with the California Secretary of State, DHI Mortgage Company Ltd., L.P. owns real property located in the State of California, and DHI Mortgage Company

Ltd., L.P. has generally appeared in courts located in the State of California.

20. This case is also a class action within the meaning of 28 USC §1332(d)(1), as amended by the Class Action Fairness Act of 2005, because at least one class member is a citizen of a state different from Defendants. Plaintiffs and members of the class, as to Counts 1, 2 & 4, all reside in the state of California. D.R. Horton, Inc. is a Delaware corporation with a principal place of business in Texas. Western Pacific Housing, Inc. is a Delaware corporation with a principal place of business in Texas. DHI Mortgage Company, Ltd., L.P. is a partnership organized under the laws of Texas with a principal place of business in Texas. The amount in controversy with respect to the claims for the entire class as alleged herein exceeds $5,000,000, exclusive of interest and costs.

21. Venue is proper in this Court because Plaintiffs James Wilson and Susie Khuu reside in San Diego County, California. Further, the acts upon which this action are based occurred in part in this district. Plaintiffs James Wilson and Susie Khuu and numerous Class members reside in this district, purchased homes from Horton, and were injured and/or subjected to harm in this venue because they were unfairly and deceptively tricked into accepting the financial services of Horton Mortgage in this venue. Defendant received substantial compensation and profits from this scheme perpetrated in this district, engaged in transactions and/or breached obligations imposed by law in this district. Thus, Defendants' liability arose in part in this district.

## V. THE PARTIES

22. Plaintiff James Wilson is an adult individual who resides at 2162 View Crest Glen, Escondido, California 92026.

23. Plaintiff Rebecca Lorenzo is an adult individual who resides at 2345 New Brighton Lane, Stockton, California 95209.

24. Plaintiff Waheeda Khan is an adult individual who resides at 10935 Cliffside Drive, Stockton, California 95209.

25. Plaintiff Jorge Lopez, is an adult individual who resides at 2614 Breaker Way, Stockton, California 95209.

26. Plaintiff Susie Khuu is an adult individual who resides at 3957 30th Street, Unit 207, San

Diego, California 92104.

27. Defendant D.R. Horton, Inc., is a Delaware corporation with its principal place of headquarters at D.R. Horton Tower, 301 Commerce Street, Suite 500, Fort Worth, Texas 76102, and doing business in California

28. Defendant Western Pacific Housing, Inc. d/b/a D.R. Horton, America's Builder ("Horton"), is a wholly owned subsidiary of D.R. Horton, Inc., with a principal place of business at 4515 Seton Center Parkway, Suite 110, Austin, Texas, 78759, and with a California office at 1210 Central Blvd., Brentwood California 94513.

29. Defendant DHI Mortgage Company, LTD., L.P. ("Horton Mortgage"), is a wholly owned subsidiary of D.R. Horton, Inc., with a principal place of business at 301 Commerce Street, Suite 500, Fort Worth, Texas 76102, and with California offices at 1240 Central Blvd., Suite A, Brentwood, California 94513 and 5790 Fleet Street, Suite 220, Carlsbad, California, 92009.

30. The true names and capacities, whether individual, corporate, subsidiary, partnership, associate or otherwise of defendant Does 1 through 10, inclusive, are unknown to Plaintiffs, who therefore sue these defendants by such fictitious names. The Plaintiffs will seek leave to amend this Complaint to allege the true names and capacities of Does 1 through 10, inclusive, when they are ascertained.

31. Defendants named in this Complaint, including Does 1 through 10, inclusive, are responsible in some manner for one or more of the events and happenings that proximately caused the injuries and damages hereinafter alleged.

32. Defendants named in this Complaint, including Does 1 through 10, inclusive, are, and at all times mentioned herein were, the agents, servants, and/or employees of each of the other defendants and that each defendant was acting within the course of scope of his, her or its authority as the agent, servant and/or employee of each of the other defendants. Consequently, all the defendants are jointly and severally liable to the Plaintiffs and the other members of the Class, for the losses sustained as a proximate result of Defendants' conduct.

///

///

## VI. DEFENDANTS' SCHEME AS APPLIED TO THE NAMED PLAINTIFFS

33. On or about September 29, 2007, Plaintiff James Wilson entered into a Home Purchase Agreement ("Purchase Agreement") with Horton, pursuant to which Plaintiff Wilson agreed to purchase a new condominium from Horton, located in Horton's "La Boheme" community in San Diego, California and by the terms of the agreement was required to apply for a loan through Horton Mortgage. Plaintiff Wilson paid Horton a $20,000 deposit.

34. Mr. Wilson attended an auction held by Horton Mortgage where only registered bidders with $5,000 in cash or a cashier's check would be permitted to attend the sale of new units at projects in San Diego, California. Plaintiff Wilson paid the $5,000 bid and was offered the opportunity to purchase a condominium from Horton. At the time, Plaintiff Wilson entered into the purchase agreement with Horton, Plaintiff Wilson paid an additional $15,000 as a deposit towards the purchase price of the condominium, and was informed that the date for the close of escrow would be thirty (30) days thereafter. Horton also assured Plaintiff Wilson that any closing costs that would be charged by Horton would not exceed $6,000. Plaintiff Wilson then, as required by the purchase agreement, applied for a loan through Horton Mortgage. Although Horton had previously represented that Plaintiff Wilson's closing costs would not exceed $6,000, Mr. Trembly, from Horton, just prior to the closing, informed Plaintiff Wilson that his closing costs would amount to approximately $12,000. In order to avoid paying these higher closing costs, Plaintiff Wilson then attempted to finance his home purchase through Bank of America. At Bank of America, Plaintiff Wilson was offered a fixed interest rate of 5% and no closing costs. Despite the best efforts of Mr. Wilson and his representative at Bank of America, Horton would not cooperate and refused to deal with either Mr. Wilson or his representative at Bank of America. Knowing that Mr. Wilson was under the severe time constraint imposed by the purchase agreement to either obtain financing or else forfeit the $20,000 paid for the deposit and the home purchase, Horton failed and refused to cooperate with Bank of America. Plaintiff Wilson was, as a result of Horton's concerted refusal to deal, unable to obtain the loan from Bank of America within the time frame specified by Horton. Horton thereby caused Mr. Wilson to return to Horton Mortgage to accept the tie-in loan of Horton Mortgage with much higher fees and far worse terms and conditions than what Mr. Wilson could have obtained from Bank of America. Whereas Plaintiff Wilson was to obtain a home

loan from Bank of America with an interest rate of 5%, Horton Mortgage placed Plaintiff Wilson in a home loan with an interest rate of 7%. Additionally, Horton added closing costs of $14,000 to the purchase price of the home. Horton also forced Plaintiff Wilson to pay an additional $4,000 in miscellaneous fees. Plaintiff Wilson had no choice but to accept the tied-in loan or loose the deposit and the home.

35. On or about January 25, 2006, Plaintiff Rebecca Lorenzo entered into a Home Purchase Agreement ("Purchase Agreement") with Horton, pursuant to which Plaintiff Lorenzo agreed to purchase a new home from Horton, located in Horton's "Valverde Villages" in Stockton, California and by the terms of the agreement was required to apply for a loan through Horton Mortgage. Plaintiff Lorenzo paid Horton a $7,500 deposit.

36. Plaintiff Lorenzo was purchasing her home from Horton as a first time home buyer. After she paid her $7,500 deposit to Horton, in order to convince Plaintiff Lorenzo to obtain a home loan from Horton Mortgage, Horton offered her a purported "discount" of $5,000 off of the closing costs. Horton informed Plaintiff that she would only be eligible for this "discount," however, if she obtained her home loan from Horton Mortgage. Horton also informed Plaintiff Lorenzo that Horton would forfeit the $7,500 paid as a deposit and cancel the sale of the home if she financed the home purchase with any provider other than Horton Mortgage. As a result of the offered "discount" and the direct threat of losing both the $7,500 deposit and home purchase if Plaintiff Lorenzo did not purchase the tied-in product, Plaintiff Lorenzo did not consider financing her home loan with any other mortgage provider. The loan from Horton Mortgage contained inflated fees and higher than average interest rates compared to other loans available on the open market at that time. As a result, the purported $5,000 "discount" was illusory. The rates and total charges imposed by Horton Mortgage completely offset the economic benefit of the $5,000 "discount." Effectually, the $5,000 "discount" only served to deceptively convince Plaintiff Lorenzo not to seek the mortgage services from any other financial institution and to ultimately accept the anti-competitive loan product offered by Horton Mortgage. The other facet of the scheme that caused Plaintiff Lorenzo to accept the anti-competitive loan product was the threat that she would lose her $7,500 deposit and the opportunity to purchase the home if she did not obtain a loan from Horton Mortgage. As a result, Plaintiff Lorenzo was coerced into obtaining an anti-competitive loan package

consisting of two (2) anti-competitive loans as the tied-in product from Horton Mortgage. The first loan funded eighty percent (80%) of the home purchase with a teaser interest rate that was negative amortizing and fixed at 1.5% for one (1) year and adjustable thereafter. The second loan funded twenty (20%) of the home purchase with an interest rate that adjusts between 9.75-10.5%.

37. On or about December 11, 2005, Plaintiff Waheeda Khan entered into a Home Purchase Agreement ("Purchase Agreement") with Horton, pursuant to which Plaintiff Khan agreed to purchase a new home from Horton, located in Horton's "Valverde Villages" in Stockton, California and by the terms of the agreement was required to apply for a loan through Horton Mortgage. Plaintiff Khan paid Horton a $7,500 deposit.

38. In addition to the purchase deposit, Plaintiff Khan also paid an upgrade deposit of $4,739 to purchase the home with various enhanced features and amenities. When Plaintiff Khan signed the purchase agreement with Horton, she was offered a purported "discount" of $5,000 off of the closing costs. She was told she would only be eligible for this "discount," however, if she obtained her home loan through Horton Mortgage. In order to avoid paying an extra $5,000 for closing costs by choosing a different lender, Plaintiff Khan decided to apply for a home loan with Horton Mortgage. The loan package that Horton Mortgage presented to Plaintiff Khan contained many inflated fees, as well as higher than average interest rates. The terms and conditions of the loan were so unsatisfactory, when compared with other loans available on the open market, that Plaintiff Khan was willing to forgo the $5,000 "discount" and find another loan from a different financial institution. Plaintiff Khan recognized that the $5,000 "discount" would not be economically beneficial. The loan that Plaintiff Khan would have to accept in order to obtain this "discount" was so cost prohibitive that the "discount" was completely offset by hidden fees and high closing costs. With her high credit rating, Plaintiff Khan intended to refuse the loan from Horton Mortgage, along with the $5,000 "discount," and obtain a loan from another provider. After applying at several institutions, Plaintiff Khan was offered a loan with far better terms and conditions by Washington Mutual. Even though Horton would require an extra $5,000 towards closing costs from Plaintiff Khan for accepting the loan from Washington Mutual, the loan offered by Washington Mutual still presented a far better economic option. This loan would have provided Plaintiff Khan with a monthly payment of approximately $1,300, versus the $1,738.80 monthly

payment required by the loan offered by Horton Mortgage. Nevertheless, Plaintiff Khan was ultimately forced into accepting the loan from Horton Mortgage by Horton's anti-competitive practices. In order to capture Plaintiff Khan's business for Horton Mortgage, Horton threatened to withhold the $7,500 deposit she paid towards the purchase price, forfeit the down payment of $4,739 she made towards the upgrade, and also cancel the sale of the home, if Plaintiff Khan funded her home purchase with the loan from Washington Mutual. As a result, in order to avoid losing these substantial out-of-pocket expenses, as well as the opportunity to purchase the home, Plaintiff Khan relented and accepted the loan from Horton Mortgage. Although the loan from Horton Mortgage contained extremely unsatisfactory terms and conditions, Plaintiff Khan simply could not afford to completely lose the deposit and payment already made for the upgrades and have the sale of the home cancelled. While the acceptance of the Horton Mortgage loan qualified her for the $5,000 "discount," Horton completely recouped this purported $5,000 discount by charging Plaintiff Khan excessive fees and above market closing costs, including but not limited to a charge of $3,000 in broker fees, which resulted in a loan that caused an additional out of pocket cost of nearly $15,000. Moreover, the loan from Horton Mortgage that Plaintiff Khan was forced to accept also came with a higher monthly payment than the loan she was prepared to accept from Washington Mutual.

39. On or about May 28, 2006, Plaintiff Jorge Lopez entered into a Home Purchase Agreement ("Purchase Agreement") with Horton, pursuant to which Plaintiff Lopez agreed to purchase a new home from Horton, located in Horton's "Valverde Village" community in Stockton, California and by the terms of the agreement was required to apply for a loan through Horton Mortgage. Plaintiff Lopez paid Horton a $13,500 deposit.

40. In addition to the deposit, Plaintiff Lopez also paid to Horton $10,000 towards upgrades to purchase a home that would include various enhanced features and amenities. As a mortgage consultant himself, however, Plaintiff Lopez fully intended to obtain his own home loan, rather than accept a home loan offered by Horton Mortgage. In order to capture Plaintiff Lopez's business for Horton Mortgage, Horton offered Plaintiff Lopez a purported "optional discount" of $10,000 if Plaintiff Lopez would obtain the home loan from Horton Mortgage. Nevertheless, Plaintiff Lopez declined the purported "discount" and attempted to secure funding for his home purchase elsewhere. In response,

Horton used its market power and threatened to forfeit the $10,000 he paid for the upgrade, the $13,500 he paid as the deposit, and also cancel the sale of the home, if Plaintiff Lopez secured a home loan from a company other than Horton Mortgage. Plaintiff Lopez could not afford to lose these substantial sums that he had already paid to Horton and lose the opportunity to purchase the home. As a result, Plaintiff Lopez was forced to accept the loan offered by Horton Mortgage. If he had not been threatened by Horton Mortgage, Plaintiff Lopez could have obtained a loan with a fixed interest rate of 5.75%. Instead, in order to avoid losing the deposit, funds paid for the upgrades, and the opportunity to purchase the home, Plaintiff Lopez accepted the loan from Horton Mortgage with an interest rate of 6.25% that is fixed for five (5) years, but adjustable thereafter. In addition to imposing these unfavorable terms, Horton Mortgage also charged Plaintiff Lopez closing costs of $14,000. In so doing, the purported "discount" that Plaintiff Lopez received for using Horton Mortgage was completely offset by the exorbitant amount of closing costs that were charged by Horton Mortgage.

41. On or about October of 2007, Plaintiff Susie Khuu entered into a Home Purchase Agreement ("Purchase Agreement") with Horton, pursuant to which Plaintiff Khuu agreed to purchase a new home from Horton, located in Horton's "La Boheme" community in San Diego, California and by the terms of the agreement was required to apply for a loan through Horton Mortgage. Plaintiff Khuu paid Horton an $8,000 deposit.

42. Plaintiff Khuu was purchasing her home from Horton as a first time home buyer. After she paid her deposit, Horton made several representations to convince Plaintiff Khuu to accept a home loan from Horton Mortgage. First, Horton informed Plaintiff Khuu that if she obtained her home loan from Horton Mortgage, Plaintiff Khuu would pay no more than $3,000 in closing costs. According to Horton, the closing costs could be kept below $3,000 because the relationship between Horton and Horton Mortgage allowed many of the associated costs to allegedly be "absorbed." Horton also represented that because Plaintiff Khuu was obtaining the home with the assistance of an affordable home program, she would have to use Horton Mortgage to finance the purchase. Finally, Horton represented that if Plaintiff Khuu delayed closing with Horton or obtained a loan from any other lender, Horton would completely forfeit the approximately $8,000 she paid as a deposit to Horton and lose the opportunity to purchase the property. As a result of the low closing costs offered and the threat of losing

her deposit and her home, Plaintiff Khuu did not consider financing her loan with any other mortgage provider. Even though Horton represented that Plaintiff Khuus' closing costs would not be greater than $3,000, the loan that Horton Mortgage presented to Plaintiff Khuu contained closing costs amounting to $7,000. When she asked why the closing costs were more than doubled, Horton Mortgage represented that closing costs could never be as low as the amount originally quoted by Horton. When Plaintiff Khuu confronted Horton with this discrepancy, the Horton representative explained that the low closing cost of $3,000 was "mistakenly" quoted to her because Horton's computer system was old, needed updates, and closing costs are very "complicated." As a result of the tie-in, Plaintiff Khuu had no choice but to accept this loan.

## VII. ANTITRUST INJURY

43. Defendants illegally linked the new home purchase as the tying product to the mortgage product as the tied product. Through the unlawful acts and practices described above Defendants have harmed competition, consumers and innovation by causing consumers to pay supracompetitive prices for the tied mortgage product once they are locked-in with the new home sale and have paid their deposit.

44. By preventing purchasers of the tied product, new homes from D. R. Horton from obtaining mortgage loans from Defendants' competitors, Defendants have been able to charge these purchasers supracompetitive prices for their mortgage loans and have harmed competition and affected a substantial volume of commerce in the market for the market for mortgage loans for new homes.

45. Normally, markets for home loans are characterized by intense competition and narrow profit margins. The new home sales provide Defendants with market power because these are unique products characterized by unique desirability, geographic location and high switching costs, which lock-in the purchaser.

46. The market power of the home construction defendants in the tying home construction relevant market is substantial and is buttressed by the nature of real property as a set of unique commodities subject to such purchase. It is further enhanced by consumer reliance in committing to the purchase with a deposit prior to transaction completion and before coercive imposition of the tied product. Such market power has effectively forced consumers into the purchase of an unwanted tied

product or service from defendant DHI Mortgage in an arrangement by all Defendants for their mutual benefit. There is a non-insubstantial market in the tied mortgage business at issue. The coerced purchase of a separate product or service from an unwanted seller compelled by that same or related seller, or by another seller conspiring with that unwanted seller, constitutes a per se tie-in offense under 15 USC Section 1. Such a restraint here coerces the purchase of the tied product unreasonably in restraint of trade, distorting free consumer choice in the tied market, injuring other mortgage firms potentially competing for such business, injuring affected consumers, and harming competition. The arrangement described in this Complaint also constitutes a concerted refusal to deal between the defendants, wherein they jointly and severally have unreasonably combined to boycott, bar or disadvantage other legitimately competing mortgage firm providers from access to the home construction customers of the home construction defendants. Such tie-ins and concerted refusals to deal constitute per se antitrust offenses, and are otherwise unreasonable, in violation of 15 U.S.C. Section 1.

47. Plaintiffs and the Class, along with competition, have been injured by this anticompetitive conduct in restraint of trade and will continue to suffer injury unless the relief prayed for herein is granted.

## VIII. CLASS ACTION ALLEGATIONS

48. As to Counts 1, 2 & 4, this is a class action filed on behalf of all California residential mortgage borrowers who, within four (4) years of the filing of this Class Action Complaint, purchased a home from Horton and received a mortgage loan for such purchase that was originated, processed and/or brokered by Horton Mortgage, wherein the borrower(s) financed their purchase through Horton Mortgage (the "Class"). Upon information and belief, the scope of this class definition, including its temporal scope, may be further refined after discovery of Defendants' books and records. As to Count 3, this Class Action is brought on behalf of all residents of the United States who purchased a home located in the United States from Horton, during the four (4) years prior to the filing of this Complaint and through the end of the Class Period as shall be determined by the Court, and who received a mortgage loan for such purchase that was originated, processed, and/or brokered by Horton Mortgage.

49. This Class Action meets the statutory prerequisites for the maintenance of a Class Action

as set forth in F.R.C.P. 23, in that:

(a) The persons who comprise the Class are so numerous that the joinder of all such persons is impracticable and the disposition of their claims as a class will benefit the parties and the Court;

(b) Nearly all factual, legal, statutory, declaratory and injunctive relief issues that are raised in this Complaint are common to the Class and will apply uniformly to every member of the Class;

(c) The claims of the representative Plaintiffs are typical of the claims of each member of the Class. Plaintiffs, like all other members of the Class, were illegally, unfairly and deceptively coerced by Defendants, in a restraint of trade that actually injures competition, into purchasing the supracompetitively priced mortgage product from Horton Mortgage, through a multi-faceted scheme that included, *inter alia*, (i) deceptively characterizing the penalty for choosing Horton Mortgage as the lender as an"optional discount;" (ii) unfairly restricting the Plaintiffs' ability to choose an alternate lender with the threat of the loss of the deposit, other sums paid toward the purchase price of the home and/or the threat of the cancellation of the sale of the home; and, (iii) illegally using market power against the locked-in and captive Plaintiffs to force them to accept the supracompetitive loan product offered by Horton Mortgage; and,

(d) The representative Plaintiffs will fairly and adequately represent and protect the interest of the Class, and have retained counsel who are competent and experienced in Class Action litigation. There are no material conflicts between the claims of the representative Plaintiffs and the members of the Class that would make class certification inappropriate. Counsel for the Class will vigorously assert the claims of all Class Members.

50. In addition to meeting the statutory prerequisites to a Class Action, this action is properly maintained as a Class Action pursuant to F.R.C.P. 23, in that:

(a) Without class certification and determination of declaratory, injunctive, statutory and other legal questions within the class format, prosecution of separate actions by individual members of the Class will create the risk of:

1) Inconsistent or varying adjudications with respect to individual members

of the Class which would establish incompatible standards of conduct for the parties opposing the Class; or,

2) Adjudication with respect to individual members of the Class which would as a practical matter be dispositive of interests of the other members not party to the adjudication or substantially impair or impede their ability to protect their interests.

(b) The parties opposing the Class have acted on grounds generally applicable to the Class, making appropriate class-wide relief with respect to the Class as a whole in that the Defendants routinely engaged in unfair and deceptive business practices as described above; and,

(c) Common questions of law and fact exist as to the members of the Class and predominate over any question affecting only individual members, and a Class Action is superior to other available methods for the fair and efficient adjudication of the controversy, including consideration of the following:

1) Whether Defendants' multi-faceted scheme to cheat to compete by coercing the members of the Class to accept the mortgage product of Horton Mortgage constituted an unlawful, unfair and/or deceptive business practice within the meaning of Cal. Bus. & Prof. Code § 17200, et seq.;

2) What measure of restitution is appropriate;

3) What measure of injunctive relief is appropriate; and,

4) Whether Defendants' conduct constituted an illegal tying arrangement in violation of the Sherman Antitrust Act and/or the Cartwright Act.

51. This Court should permit this action to be maintained as a Class Action pursuant to F.R.C.P. 23 because:

(a) The questions of law and fact common to the Class predominate over any question affecting only individual members;

(b) A Class Action is superior to any other available method for the fair and efficient adjudication of the claims of the members of the Class;

(c) The members of the Class are so numerous that it is impractical to bring all members of the Class before the Court;

(d) Plaintiffs, and the other Class Members, will not be able to obtain effective and economic legal redress unless the action is maintained as a Class Action;

(e) There is a community of interest in obtaining appropriate legal and equitable relief for the common law and statutory violations and other improprieties, and in obtaining adequate compensation for the damages and injuries which Defendants' actions have inflicted upon the Class;

(f) There is a community of interest in ensuring that the combined assets and available insurance of Defendants are sufficient to adequately compensate the members of the Class for the injuries sustained;

(g) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making final class-wide relief appropriate with respect to the Class as a whole; and

(h) The members of the Class are readily ascertainable from the business records of Defendants. To the extent that Defendants have failed to maintain records sufficient to establish the basis for the exemption, Defendants are estopped, as a matter of law, to assert the existence of the exemption.

## IX. CLAIMS FOR RELIEF

## COUNT 1

**(Violation of California Business & Professions Code Section 17200 et seq. )**

52. Plaintiffs incorporate by reference the allegations set forth above.

53. The California Unfair Competition Act ("UCL") (Bus. & Prof. Code §§ 17200, et seq.) prohibits acts of unfair competition, which include any "unlawful, unfair, or fraudulent business act or practice.

54. By the actions described above, Defendants violated and continue to violate the UCL in that they have engaged and continue to engage in unlawful, unfair and deceptive business practices within the meaning of the UCL.

55. California Business and Professions Code Section 17200 prohibits any "fraudulent business act or practice." Members of the public were likely to be deceived by Defendants' business practices alleged herein, and Defendants have thus engaged in a fraudulent business act or practice.

56. Business and Professions Code Section 17200 further prohibits any "unfair... business act or practice." As detailed in the preceding paragraphs, Defendants engaged in a multi-faceted scheme to deceptively convince California consumers to procure financial services from Horton Mortgage. Defendants' conduct caused substantial injury to Plaintiffs and the Class Members. Defendants' conduct violates California and federal antitrust law and also violates the policy or spirit of the antitrust laws, and otherwise restrains and harms competition as set forth herein. Any possible justification for Defendants' conduct was, and are, vastly outweighed by the adverse effects of such conduct. Defendants, therefore, received an unfair competitive advantage over other providers of home mortgage services who did not engage in the same deceptive, unfair and unlawful conduct. As a result, Defendants also engaged in unfair business practices prohibited by California Business & Professions Code Section 17200, et seq.

57. Business and Professions Code Section 17200 further prohibits any "unlawful... business act or practice." Under California's unfair competition law, "unlawful" practices are any "practices forbidden by law, be it civil or criminal, federal, state, or municipal, statutory, regulatory, or court-made." As detailed herein, Defendants' conduct violates 15 U.S.C. §1 and California Business & Professions Code §16270. As a result, Defendants also engaged in "unlawful" business practices prohibited by California Business & Professions Code Section 17200, et seq.

58. As a result of Defendants' unfair, deceptive and unlawful acts and practices, Plaintiffs and the Class Members have been injured in amounts to be proven at trial and Defendants should be ordered to make restitution to Plaintiffs and the Class members.

**COUNT 2**

**(Violation of California Business & Professions Code Section 17500 et seq.)**

59. Plaintiffs incorporate by reference the allegations set forth above.

60. California Business & Professions Code § 17500, et seq. prohibits any person, firm or corporation from making any statement "which is untrue or misleading..." Defendants' statements that the mortgage products provided by Horton Mortgage to home purchasers were "optional" and with a "discount" were untrue and misleading. The mortgage products were neither optional nor discounted, because as detailed herein, the mortgage products were in fact forced upon the members of the Class and

were penalties, not discounts. The statements were made by Defendants to induce sales and were known by Defendants to be untrue and misleading, or with the exercise of reasonable care should have been known to be untrue and misleading. Defendants had no intent to provide the mortgage product as represented.

61. Defendants representations that the mortgage product was "optional" and with a "discount," when in fact the opposite was true, is likely to deceive a reasonable consumer. Defendants representations caused injury to the Plaintiffs and the members of the Class because they did not receive a mortgage product that was either "optional" or with a "discount," but rather received a mortgage product that was a coerced and with a penalty. As a result of Defendants' representations, Plaintiffs and Class Members residing in California have been injured in amounts to be proven at trial and Defendants should be ordered to make restitution to Plaintiffs and the California Class members.

**COUNT 3**

**(Violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. §1)**

**(Violations Resulting from Unlawful Tying of the new home and the mortgage product)**

62. Plaintiffs re-allege and incorporate by reference each of the allegations set forth above on behalf of the Classes.

63. D.R. Horton, Inc. has conditioned the sale of its new houses (the tying product) upon a customer's selection of a Horton Mortgage (the tied product). D.R. Horton, Inc has made extensive use of this tying arrangement and has thereby violated section 1 of the Sherman Act (15 U.S.C. §1).

63. D.R. Horton, Inc. has appreciable and substantial economic power in the market for the tying product. D.R. Horton, Inc., as the largest homebuilder in the United States, occupies a dominant position in the relevant market, and has substantial economic power with respect to new home buyers. The tying product is an inherently unique product in a market where there is a shortage of supply and for which there is no adequate substitute.

64. D.R. Horton, Inc. also has substantial and appreciable market power in the tied market as the result of D.R. Horton, Inc.'s "lock-in" achieved by imposing high switching costs. D.R. Horton, Inc. prevents purchasers of Horton homes from obtaining the information necessary to evaluate actual cost of

Horton mortgages in comparison to other competitive loan products until after purchasers already had agreed to purchase the house and paid a nonrefundable deposit. As alleged above, D.R. Horton, Inc. deprived prospective purchasers of new homes of essential information regarding Horton Mortgages by affirmatively misrepresenting the actual costs of Horton Mortgages, telling purchasers they were to receive a discount and by concealing the actual costs of Horton Mortgages in comparison to other less expensive competitive mortgage products.

65. The nonrefundable deposit collected by D.R. Horton, Inc. created a substantial switching cost which further locked the new home purchasers into the tied-in product. Once the purchasers have paid this deposit they were locked because switching to a different house in order to avoid having to obtain a Horton Mortgage would result in a substantial forfeiture and would not be economically feasible. This market power allowed Defendants to affect a substantial amount of commerce in the market for the tied service, the purchase mortgage loans for the new houses sold by Defendants.

66. The tying product and the tied product are separate and distinct from one another.

67. D.R. Horton, Inc.'s tying arrangement was successful. D.R. Horton, Inc. was able to force purchasers of new homes from D.R. Horton, Inc. to also obtain Horton Mortgages. If D.R. Horton, Inc. had not imposed the tying arrangement, purchasers of new homes from D.R. Horton, Inc. would have obtained loans from other lenders.

68. By imposing the tying arrangements, defendants have harmed competition in the market for the tied product and affected a substantial volume of commerce in the market for that product. Defendants' tying arrangements have caused injury to Plaintiffs by wrongfully forcing them to pay supracompetitive prices for mortgage loans and has caused injury to competing lenders who have been foreclosed from competing to provide mortgage loans to borrowers who purchase new homes from D.R. Horton, Inc.

69. There is no appropriate or legitimate business justification for D.R. Horton, Inc.'s conduct that would counterbalance the clear anticompetitive effects of its tying conduct, including the foreclosure of competition in the tied market. D.R. Horton, Inc., combined with its applicable subsidiaries Horton and Horton Mortgage, to effectuate the illegal tying arrangement and to use the economic power obtained over locked-in home buyers to impose supracompetetative prices for the tied

product onto the members of the Class.

70. This unlawful conduct has harmed competition and has damaged Plaintiffs and the alleged Class and is in violation of the Sherman Antitrust Act, 15 U.S.C. §1, *et seq.*

**COUNT 4**

**(For Violation of the Cartwright Act, Cal. Bus. & Prof. Code §§16270, et seq.)**

**(Violations Resulting from Unlawful Tying of the new home and the mortgage product)**

71. Plaintiffs re-allege and incorporate by reference each of the allegations set forth above on behalf of the Classes.

72. D.R. Horton, Inc. conditioned the sale of its new houses (the tying product) upon a customer's selection of a Horton Mortgage (the tied product). D.R. Horton, Inc made extensive use of this tying arrangement and has thereby violated the Cartwright Act, Cal. Bus. & Prof. Code §§16270, *et seq*.

73. D.R. Horton, Inc. had appreciable and substantial economic power in the market for the tying product. D.R. Horton, Inc., as the largest homebuilder in the United States, occupied a dominant position in the relevant market, and had substantial economic power with respect to new home buyers. The tying product is an inherently unique product in a market where there is a shortage of supply and for which there is no substitute due to geographic desirability.

74. D.R. Horton, Inc. also has substantial and appreciable market power in the tied market as the result of D.R. Horton, Inc.'s "lock-in" achieved by imposing high switching costs. D.R. Horton, Inc. prevented purchasers of Horton homes from obtaining the information necessary to evaluate actual cost of Horton mortgages in comparison to other competitive loan products until after purchasers had already agreed to purchase the house and paid a nonrefundable deposit. As alleged above, D.R. Horton, Inc. deprived purchasers of new homes of essential information regarding Horton Mortgages loans by affirmatively misrepresenting the actual costs of Horton Mortgages, telling purchasers they were to receive a discount and by concealing the true costs of Horton Mortgages in comparison to other less expensive competitive mortgage products.

75. The nonrefundable deposit collected by D.R. Horton, Inc. created a substantial switching

cost which further locked the new home purchasers into the tied products. Once the purchasers paid this deposit they were locked because switching to a different house in order to avoid having to obtain a Horton Mortgage would result in a substantial forfeiture and would not be economically feasible. This market power allowed Defendants to affect a substantial amount of commerce in the market for the tied service, the purchase mortgage loans for the new houses sold by Defendants.

76. The tying product and the tied product are separate and distinct from one another.

77. D.R. Horton, Inc.'s tying arrangement was successful. D.R. Horton, Inc. was able to force purchasers of new homes from D.R. Horton, Inc. to also obtain Horton loans. If D.R. Horton, Inc. had not imposed the tying arrangement, purchasers of new homes from D.R. Horton, Inc. would have obtained loans from other lenders.

78. By imposing the tying arrangements, defendants have harmed competition in the market for the tied product and affected a substantial volume of commerce in the market for that product. Defendants' tying arrangements have caused injury to Plaintiffs by wrongfully forcing them to pay supracompetitive prices for mortgage loans and has caused injury to competing lenders who have been foreclosed from competing to provide mortgage loans to borrowers who purchase new homes from D.R. Horton, Inc.

79. There is no appropriate or legitimate business justification for D.R. Horton, Inc.'s conduct that would counterbalance the clear anticompetitive effects of its tying conduct, including the foreclosure of competition in the tied market. D.R. Horton, Inc., combined with its applicable subsidiaries Horton and Horton Mortgage, to effectuate the illegal tying arrangement and to use the economic power obtained over locked-in home buyers to impose supracompetetative prices for the tied product onto the members of the Class.

80. This unlawful conduct has harmed competition and has damaged Plaintiffs and the alleged Class and is in violation of the Cartwright Act, Cal. Bus. & Prof. Code §§16270, *et seq.* .

## X. PRAYER FOR RELIEF

Plaintiffs pray for relief as follows;

1. For disgorgement and restitution to Plaintiffs and all Class Members under Count 1;

2. For actual damages and treble damages to Plaintiffs and all Class Members under Count 2 and Count 3;

3. For attorneys' fees and the costs of suit incurred herein;

4. For prejudgment interest as allowed by law;

5. For equitable and injunctive relief; and

5. For such other relief as the Court deems just and proper.

BLUMENTHAL & NORDREHAUG

DATED: March 27, 2008

Norman B. Blumenthal

Robert Gerard, Esq.
GERARD & ASSOCIATES
1516 Front Street
San Diego, California 92101

Patrick Missud
91 San Juan Avenue
San Francisco, California 94112

Robert Fellmeth
LAW OFFICES OF ROBERT FELLMETH
5998 Alcala Park
San Diego, CA 92110

Attorneys for Plaintiffs

**JURY DEMAND**

Plaintiffs demand a trial by jury.

BLUMENTHAL & NORDREHAUG

DATED: March 27, 2008

Norman B. Blumenthal

Robert Gerard, Esq.
GERARD & ASSOCIATES
1516 Front Street
San Diego, California 92101

Patrick Missud
LAW OFFICES OF PATRICK MISSUD
91 San Juan Avenue
San Francisco, California 94112

Robert Fellmeth
LAW OFFICES OF ROBERT FELLMETH
5998 Alcala Park
San Diego, CA 92110

Attorneys for Plaintiffs

K:\D\NBB\Wilson v. DR Horton\p-Complaint-05.wpd

**UNITED STATES DISTRICT COURT**
SOUTHERN DISTRICT OF CALIFORNIA
SAN DIEGO DIVISION

**# 149205 - KD**

**March 28, 2008**
**16:33:27**

**Civ Fil Non-Pris**
USAO #.: 08CV0592
Judge..: ROGER T BENITEZ
Amount.: $350.00 CK
Check#.: BC 11388

**Total-> $350.00**

FROM: CIVIL FILING
WILSON, ET AL V. D.R. HORTON,

JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

FILED 08 MAR 28 PM 4:27

**I. (a) PLAINTIFFS**

James Wilson, Rebecca Lorenzo, Waheeda Khan, Jorge Lopez, and Susie Khuu

**(b)** County of Residence of First Listed Plaintiff: San Diego
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Norman Blumenthal, Blumenthal & Nordrehaug,
2255 Calle Clara, La Jolla, CA 92037, Tel: (858) 551-1223

**DEFENDANTS**

D.R. Horton, Inc., Western Pacific Housing, Inc. d/b/a D.R. Horton America's Builder, DHI Mortgage Company, Ltd., L.P., and Doe

County of Residence of First Listed Defendant: Fort Worth, TX
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

Attorneys (If Known)

**'08 CV 592 BEN RBB**

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant) (For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury

PERSONAL INJURY
- ☐ 362 Personal Injury - Med. Malpractice
- ☐ 365 Personal Injury - Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 444 Welfare
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 440 Other Civil Rights

**PRISONER PETITIONS**
- ☐ 510 Motions to Vacate Sentence

Habeas Corpus:
- ☐ 530 General
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

**FORFEITURE/PENALTY**
- ☐ 610 Agriculture
- ☐ 620 Other Food & Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 R.R. & Truck
- ☐ 650 Airline Regs.
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Mgmt. Relations
- ☐ 730 Labor/Mgmt.Reporting & Disclosure Act
- ☐ 740 Railway Labor Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Empl. Ret. Inc. Security Act

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 400 State Reapportionment
- ☒ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of Information Act
- ☐ 900Appeal of Fee Determination Under Equal Access to Justice
- ☐ 950 Constitutionality of State Statutes

**V. ORIGIN** (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing (**Do not cite jurisdictional statutes unless diversity**): 15 U.S.C. 4

Brief description of cause: Sherman Antitrust Act claim

**VII. REQUESTED IN COMPLAINT:** ☑ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 **DEMAND $**

CHECK YES only if demanded in complaint: **JURY DEMAND:** ☑ Yes ☐ No

**VIII. RELATED CASE(S) IF ANY** (See instructions): JUDGE ______ DOCKET NUMBER ______

DATE 03/28/2008 SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # 149205 AMOUNT 350 APPLYING IFP 3/28/08 JUDGE ______ MAG. JUDGE ______

JS 44 Reverse (Rev. 11/04)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

## Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I. (a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II. Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

**III. Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV. Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V. Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

**VI. Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553
Brief Description: Unauthorized reception of cable service

**VII. Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII. Related Cases.** This section of the JS 44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.