Valentine S. Hoy VIII, State Bar No. 121766
John T. Brooks, State Bar No. 167793
LUCE, FORWARD, HAMILTON & SCRIPPS LLP
600 West Broadway, Suite 2600
San Diego, California 92101-3372
Telephone No.: 619.236.1414
Fax No.: 619.232.8311

Attorneys for D.R. Horton, Inc., Western Pacific Housing, Inc., and DHI Mortgage Company, Ltd.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES WILSON, REBECCA LORENZO, WAHEEDA KHAN, JORGE LOPEZ, and SUZIE KHUU, on behalf of themselves and All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>D.R. HORTON, INC., WESTERN PACIFIC HOUSING, INC. d/b/a/ D.R. HORTON, AMERICA'S BUILDINGER, DHI MORTGAGE COMPANY, LTD., L.P. and DOES 1-10,<br><br>Defendants. | Case No. 08 CV 592 BEN RBB<br><br>The Hon. Roger T. Benitez<br>Dept. 3<br><br>**EXHIBITS TO REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTIONS TO DISMISS, MOTIONS TO STRIKE, AND MOTION TO COMPEL ARBITRATION**<br><br>**EXHIBITS A-C**<br><br>Date: June 9, 2008<br>Time: 10:30 a.m.<br>Dept.: 3<br><br>Complaint Filed: March 28, 2008 |

Defendants D.R. Horton, Inc., Western Pacific Housing, Inc., and DHI Mortgage Company, Ltd., hereby submit the following exhibits in support of their Request for Judicial Notice in Support of Motions to Dismiss, Motions to Strike, and Motion to Compel Arbitration:

Exhibits A-C

A. U.S. Census Bureau, "New Residential Sales in September 2007," available at http://www.census.gov/const/newressales_200709.pdf.

B. U.S. Census Bureau, "New Houses Sold by Price," available at http://www.census.gov/const/quarterly_sales.pdf.

C. Purchase Agreement for plaintiff Wilson.

DATED: May 5, 2008 LUCE, FORWARD, HAMILTON & SCRIPPS LLP

By: s/Valentine S. Hoy
Valentine S. Hoy
Attorneys for Defendants D.R. Horton, Inc., Western Pacific Housing, Inc., and DHI Mortgage Company, Ltd.
E-mail: vhoy@luce.com

101092110.1

# EXHIBIT A

# U.S. Census Bureau News
# Joint Release
# U.S. Department of Housing and Urban Development

**U.S. Department of Commerce • Washington, D.C. 20233**


**FOR IMMEDIATE RELEASE THURSDAY, OCTOBER 25, 2007 AT 10:00 A.M. EDT**

CB07-148


Erica Filipek or Raemeka Mayo
Manufacturing and Construction Division
(301) 763-5160


## NEW RESIDENTIAL SALES IN SEPTEMBER 2007

Sales of new one-family houses in September 2007 were at a seasonally adjusted annual rate of 770,000, according to estimates released jointly today by the U.S. Census Bureau and the Department of Housing and Urban Development. This is 4.8 percent (±10.3%)* above the revised August rate of 735,000, but is 23.3 percent (±8.0%) below the September 2006 estimate of 1,004,000.

The median sales price of new houses sold in September 2007 was $238,000; the average sales price was $288,000. The seasonally adjusted estimate of new houses for sale at the end of September was 523,000. This represents a supply of 8.3 months at the current sales rate.

***New Residential Sales data for October 2007 will be released on Thursday, November 29, 2007, at 10:00 A.M. EST.***
***Our Internet site is: http://www.census.gov/newhomesales***

## EXPLANATORY NOTES

These statistics are estimated from sample surveys. They are subject to sampling variability as well as nonsampling error including bias and variance from response, nonreporting, and undercoverage. Estimated average relative standard errors of the preliminary data are shown in the tables. Whenever a statement such as "2.5 percent (±3.2%) above" appears in the text, this indicates the range (-0.7 to +5.7 percent) in which the actual percent change is likely to have occurred. All ranges given for percent changes are 90-percent confidence intervals and account only for sampling variability. If a range does not contain zero, the change is statistically significant. If it does contain zero, the change is not statistically significant; that is, it is uncertain whether there was an increase or decrease. The same policies apply to the confidence intervals for percent changes shown in the tables. Changes in seasonally adjusted statistics often show irregular movement. It takes 5 months to establish a trend for new houses sold. Preliminary new home sales figures are subject to revision due to the survey methodology and definitions used. The survey is primarily based on a sample of houses selected from building permits. Since a "sale" is defined as a deposit taken or sales agreement signed, this can occur prior to a permit being issued. An estimate of these prior sales is included in the sales figure. On average, the preliminary seasonally adjusted estimate of total sales is revised about 4 percent. Changes in sales price data reflect changes in the distribution of houses by region, size, etc., as well as changes in the prices of houses with identical characteristics. Explanations of confidence intervals and sampling variability can be found on our web site listed above.

* 90% confidence interval includes zero. The Census Bureau does not have sufficient statistical evidence to conclude that the actual change is different from zero.

# EXHIBIT B

**Table Q1. New Houses Sold by Sales Price: United States**

[Thousands of houses. Components may not add to total because of rounding. Value of improved lot included in sales price]

| Period | Total | Under $125,000 | $125,000 to $149,999 | $150,000 to $199,999 | $200,000 to $249,999 | $250,000 to $299,999 | $300,000 to $399,999 | $400,000 to $499,999 | $500,000 to $749,999 | $750,000 and over |
|---|---|---|---|---|---|---|---|---|---|---|
| | Number of houses[1] | | | | | | | | | |
| ANNUAL DATA | | | | | | | | | | |
| 2004 | 1,203 | 133 | 137 | 254 | 181 | 131 | 165 | 90 | 82 | 31 |
| 2005 | 1,283 | 104 | 122 | 246 | 200 | 152 | 203 | 111 | 99 | 45 |
| 2006 | 1,051 | 64 | 97 | 208 | 162 | 138 | 174 | 84 | 80 | 43 |
| 2007 | 776 | 38 | 68 | 162 | 125 | 102 | 121 | 65 | 62 | 32 |
| RSE (%) | 3 | 15 | 10 | 5 | 6 | 6 | 7 | 9 | 8 | 13 |
| QUARTERLY DATA | | | | | | | | | | |
| 2004: 1st quarter | 314 | 39 | 39 | 66 | 49 | 34 | 44 | 20 | 17 | 7 |
| 2nd quarter | 329 | 41 | 36 | 70 | 50 | 38 | 44 | 22 | 20 | 7 |
| 3rd quarter | 292 | 33 | 37 | 64 | 42 | 27 | 36 | 25 | 19 | 9 |
| 4th quarter | 268 | 27 | 27 | 56 | 43 | 29 | 37 | 21 | 20 | 8 |
| 2005: 1st quarter | 328 | 31 | 34 | 66 | 51 | 35 | 47 | 29 | 25 | 9 |
| 2nd quarter | 351 | 31 | 32 | 73 | 55 | 42 | 54 | 29 | 25 | 11 |
| 3rd quarter | 326 | 28 | 33 | 67 | 45 | 37 | 55 | 25 | 25 | 11 |
| 4th quarter | 277 | 21 | 30 | 47 | 47 | 35 | 45 | 23 | 21 | 8 |
| 2006: 1st quarter | 285 | 18 | 26 | 57 | 42 | 39 | 46 | 23 | 21 | 12 |
| 2nd quarter | 300 | 19 | 29 | 60 | 45 | 40 | 50 | 22 | 23 | 11 |
| 3rd quarter | 250 | 15 | 26 | 55 | 40 | 28 | 35 | 20 | 19 | 12 |
| 4th quarter | 216 | 15 | 20 | 41 | 33 | 28 | 37 | 18 | 17 | 8 |
| 2007: 1st quarter | 213 | 10 | 17 | 42 | 33 | 30 | 36 | 19 | 17 | 9 |
| 2nd quarter | 235 | 12 | 21 | 52 | 37 | 30 | 36 | 19 | 18 | 10 |
| 3rd quarter | 181 | 9 | 18 | 37 | 31 | 26 | 25 | 14 | 14 | 7 |
| 4th quarter[r] | 146 | 8 | 14 | 33 | 24 | 16 | 23 | 13 | 11 | 5 |
| 2008: **1st quarter[p]** | **142** | **9** | **14** | **29** | **28** | **20** | **20** | **10** | **8** | **5** |
| RSE (%) | 6 | 18 | 15 | 10 | 9 | 9 | 10 | 13 | 15 | 20 |
| | Percent distribution | | | | | | | | | |
| ANNUAL DATA | | | | | | | | | | |
| 2004 | 100 | 11 | 11 | 21 | 15 | 11 | 14 | 7 | 7 | 3 |
| 2005 | 100 | 8 | 10 | 19 | 16 | 12 | 16 | 9 | 8 | 4 |
| 2006 | 100 | 6 | 9 | 20 | 15 | 13 | 17 | 8 | 8 | 4 |
| 2007 | 100 | 5 | 9 | 21 | 16 | 13 | 16 | 8 | 8 | 4 |
| QUARTERLY DATA | | | | | | | | | | |
| 2004: 1st quarter | 100 | 12 | 12 | 21 | 16 | 11 | 14 | 7 | 5 | 2 |
| 2nd quarter | 100 | 13 | 11 | 21 | 15 | 11 | 13 | 7 | 6 | 2 |
| 3rd quarter | 100 | 11 | 13 | 22 | 14 | 9 | 12 | 8 | 7 | 3 |
| 4th quarter | 100 | 10 | 10 | 21 | 16 | 11 | 14 | 8 | 8 | 3 |
| 2005: 1st quarter | 100 | 9 | 10 | 20 | 16 | 11 | 14 | 9 | 8 | 3 |
| 2nd quarter | 100 | 9 | 9 | 21 | 16 | 12 | 15 | 8 | 7 | 3 |
| 3rd quarter | 100 | 9 | 10 | 21 | 14 | 11 | 17 | 8 | 8 | 4 |
| 4th quarter | 100 | 7 | 11 | 17 | 17 | 13 | 16 | 8 | 8 | 3 |
| 2006: 1st quarter | 100 | 6 | 9 | 20 | 15 | 14 | 16 | 8 | 7 | 4 |
| 2nd quarter | 100 | 6 | 10 | 20 | 15 | 13 | 17 | 7 | 8 | 4 |
| 3rd quarter | 100 | 6 | 10 | 22 | 16 | 11 | 14 | 8 | 8 | 5 |
| 4th quarter | 100 | 7 | 9 | 19 | 15 | 13 | 17 | 8 | 8 | 4 |
| 2007: 1st quarter | 100 | 5 | 8 | 20 | 16 | 14 | 17 | 9 | 8 | 4 |
| 2nd quarter | 100 | 5 | 9 | 22 | 16 | 13 | 15 | 8 | 8 | 4 |
| 3rd quarter | 100 | 5 | 10 | 20 | 17 | 14 | 14 | 8 | 8 | 4 |
| 4th quarter[r] | 100 | 5 | 10 | 23 | 16 | 11 | 16 | 9 | 7 | 3 |
| 2008: **1st quarter[p]** | **100** | 6 | **10** | **21** | 19 | 14 | **14** | 7 | 6 | 3 |

- Represents zero. A Represents an RSE that is greater than or equal to 100 or could not be computed.
[p]Preliminary. [r]Revised. NA Not available. RSE Relative Standard Error.
Z Less than 500 units or less than 0.5 percent.

[1]Houses for which sales price was not reported have been distributed proportionally to those for which sales price was reported.

# EXHIBIT C

Property: La Boheme
Residential Unit: 1135

PURCHASE AGREEMENT
AND ESCROW INSTRUCTIONS

By and Between

Western Pacific Housing Inc.,
a Delaware corporation

("Seller")

AND

James A Wilson

(Buyer)

THIS CONTRACT CONTAINS A BINDING ARBITRATION PROVISION. YOU SHOULD CONSULT LEGAL COUNSEL WITH ANY QUESTIONS ABOUT ANY OF THE PROVISIONS OF THIS CONTRACT.

Property: La Boheme
Residential Unit: 1135

# Purchase Agreement and Escrow Instructions

**BUYER:**
James A Wilson
21102 View Crest Glen
Escondido, CA 92026

**SELLER:**
Western Pacific Housing Inc., a Delaware Corporation, dba D.R. Horton, America's Builder
5790 Fleet Street Suite 210
Carlsbad, CA 92009
(760) 929-1600

**ESCROW HOLDER:**
First American Title Company
11512 El Camino Real , Suite 350
San Diego, CA 92130

**TITLE COMPANY:**
First American Title Company
411 Ivy Street
San Diego, CA 92101

**DATE:** 09-29-2007

**1. AGREEMENT TO BUY AND SELL.** Buyer's signature on this document and delivery of the Deposit to Seller constitutes an "**Offer**" to purchase the Property described below. Seller's signature on this document and unrestricted release of the Deposit to Seller constitutes "**Acceptance**" of the Offer. Upon Acceptance, Seller agrees to sell and Buyer agrees to purchase the Property on the terms and conditions set forth in this Purchase Agreement and Escrow Instructions ("**Purchase Agreement**").

**2. ADDRESS OF PROPERTY.**

| Street | City | Zip |
|---|---|---|
| 3850 Ohio Street # 235 | San Diego, Ca 92104 | |

The residence is plan type 2B1 ("**Residence**"). The Property is a (check one only):

☐ Planned Development or Standard Subdivision:

Lot No. N/A of Tract No. N/A, as shown on a Map recorded or to be recorded in the Official Records of N/A County, California.

☒ Condominium:

Residential Unit No. 1135, an undivided Interest In the Common Area and any Exclusive Use Easements shown on the Condominium Plan.

**3. OCCUPANCY.** Buyer does X does not ___ intend to occupy the Property as his/her residence.

**4. PURCHASE PRICE AND ESTIMATED CASH DUE AT CLOSING.** Buyer shall pay the following:

| | | | |
|---|---|---|---|
| a. | Purchase Price | $ | |
| | Note: | The Purchase Price does not reflect options, upgrades, etc. which the parties may later agree upon. | |
| b. | Less: | Estimated New Loan Amount | $ |
| c. | Less: | Secondary Financing (if any) | $ |
| d. | Equals: | **Down Payment** | $ |
| e. | Plus: | Estimated Buyer Closing Costs, Prepaid Expenses and Impounds Due at Closing | $ |
| f. | Less: | Deposit received from Buyer ☑ Personal Check ☐ Other Form of Payment | $ |
| g. | Equals: | **Total Estimated Cash Required from Buyer at Close of Escrow** | $ |

James A Wilson

## The Deposit

**5. DEPOSIT.** "**Deposit**" Includes all funds paid by Buyer that are applicable to the Purchase Price. Deposits will be held, and Deposits paid by check will be un-cashed, pending Acceptance. If there is no Acceptance, Buyer's Deposit shall be returned to Buyer. Upon Acceptance, if a Deposit check is returned for non-sufficient funds, Seller may, in its sole discretion, either deem this Purchase Agreement terminated, or seek replacement funds from Buyer. No interest shall be payable to Buyer on the Deposit. If Seller has posted a bond, cash deposit or other security instrument acceptable to the Department of Real Estate ("**Security**"), under the provisions of California Business and Professions

Code Section 11013.2 or 11013.4 and Seller has obtained a final subdivision public report covering the Property, the Deposit shall be released by Escrow Holder to Seller at Seller's request, without further instruction from Buyer.

## Escrow Procedures and Requirements

6. ESCROW.

6.1 Opening of Escrow. Within 5 days after Acceptance, Seller shall deliver this Purchase Agreement to the Escrow Holder listed above for the purpose of opening an escrow ("**Escrow**"). Escrow Holder's additional instructions are attached as an Addendum. If any provision in the Escrow Instructions Addendum conflicts with any other provisions of this Purchase Agreement, the provisions in this Purchase Agreement control.

6.2 Buyer's Duty to Cooperate. Upon Acceptance, Seller will incur daily carrying and other costs attributable to holding the Property off the market. Accordingly, Buyer agrees to cooperate with Seller to use his/her best efforts and to diligently take any action necessary to timely close Escrow, including without limitation, by promptly cooperating in good faith with all time frames for performance under this Purchase Agreement, including all time frames for selecting options and providing all requested documents to lender, Escrow Holder and Title Company. Buyer acknowledges that Buyer's failure to so cooperate shall constitute a default under this Purchase Agreement.

6.3 Title Company and Escrow Holder. By Buyer's execution of this Purchase Agreement, Buyer and Seller have mutually agreed to use the Title Company and Escrow Holder designated on the first page of this Purchase Agreement.

6.4 Close of Escrow; Estimated Closing Date; Closing Date.

(a) Close of Escrow. The close of escrow shall occur upon the recordation of the Grant Deed

("**Close of Escrow**").

(b) Closing Date. Escrow shall close on ("**Closing Date**"):

☒ *[Check if Residence is already constructed]* October 19, 2007; or

☐ *[Check if Residence is not completed]* The date set forth in the Closing Date Notice (as defined in **Paragraph 6.4**(c) below) to Buyer that the Residence is ready for occupancy. It is estimated that the Residence will be completed and that either a notice of completion will be filed or a certificate allowing occupancy of the Residence will be issued on October 19, 2007 ("**Estimated Closing Date**").

Due to the variables in the development of the Project, the date on which Escrow actually closes may be before or after the Estimated Closing Date. Seller agrees that it will complete construction in accordance with the standards set forth in **Paragraph 8.1** on or prior to the date which is 12 months after the date of Acceptance of this Purchase Agreement, provided that Seller is in no event responsible for any delays due to events beyond Seller's control, including, without limitation, Acts of God, fire, earthquake, terrorist acts and inclement weather, shortages of labor or supplies, moratoria, inability to obtain permits or approvals, utility stoppage or shortages, financing shortages and delays caused by governmental agencies. Except for amounts that may be claimed for liquidated damages, if Escrow has not closed within 12 months after the date of Acceptance, Buyer's Deposit shall be returned to Buyer within 15 days after expiration of such 12-month period. Upon the return of the Buyer's Deposit, Seller shall not have any further obligations to Buyer under this Purchase Agreement, unless Seller is then in default under its provisions.

(c) Notice of Closing Date and Deliveries. Seller or Escrow Holder will notify Buyer (orally or in writing) of the date for the Close of Escrow at least 5 business days before the pending date for the Close of Escrow ("**Closing Date Notice**"). Buyer shall deliver to Escrow Holder all cash and all documents required to close Escrow no later than the required date for such deliveries set forth in the Closing Date Notice. If Buyer fails to close Escrow by the Closing Date by reason of a default by Buyer, Seller may make a claim for liquidated damages in accordance with the provisions of **Paragraph 10** of this Purchase Agreement. Buyer agrees to execute all other documents and to take all other actions as are necessary to close the Escrow in accordance with this Purchase Agreement.

(d) Delay in Escrow Closing. If this Escrow does not close upon the Closing Date specified in the Closing Date Notice due to Buyer's default, Seller will be harmed due to carrying costs for the Property. If Seller does not terminate this Purchase Agreement, Seller may agree to extend the Closing Date, in its sole and absolute discretion, on the condition that Buyer pay Seller's carrying costs in the amount of $ 200.00 per day ("**Extension Payment**"). If Seller approves an extension, Buyer shall deposit into Escrow the applicable Extension Payment, or at Seller's option, Buyer shall pay the Extension Payment at the Close of Escrow as extended by the agreement of Buyer and Seller. Acceptance of Extension Payments will not constitute a waiver by Seller of any default by Buyer in failing to close the Escrow, and Seller's rights to liquidated damages. Any Extension Payment made by Buyer shall not be applicable to the Purchase Price but, if paid prior to the Closing Date, shall be handled in the same manner as the Deposit and liquidated damages under **Paragraph 10**.

(e) Third Party Charges. If certain charges are incurred by Seller on Buyer's behalf and paid from the Deposit or other funds of Buyer held under this Purchase Agreement ("**Third Party Charges**"), such charges shall be handled in the same manner as the Deposit. Seller's estimate of the amounts of the Third Party Charges is set forth below. Because these amounts are estimates of what would be due upon termination of this Purchase Agreement prior to the Close of Escrow, these amounts may not be the actual amounts due at Close of Escrow.





Buyer's Initials Buyer's Initials

| | |
|---|---|
| • Credit Report (per report) | $ 100.00 |
| • Appraisal Fees: (per appraisal) | $ 350.00 |
| • Escrow Services: | $ 500.00 |
| • Preliminary Title Report: | $ 300.00 |
| • Loan Processing Services: | $ 400.00 |
| • Homebuyer's Manual, if not returned | $ 100.00 |
| • Other: | $ 100.00 |
| ESTIMATED TOTAL: | $ 1,850.00 |

(f) Completion of Residence. Seller shall complete the Residence such that the Residence is ready for occupancy by Buyer within two (2) years after the date of Buyer's Offer, subject to extensions for circumstances reasonably beyond Seller's control as determined by California law. Notwithstanding any provision in this Purchase Agreement to the contrary, including but not limited to **Paragraph 10.3**, nothing herein shall limit Buyer's remedies if Seller defaults under this **Paragraph 6.4(f)**.

## Financing and Loan Approval

7. FINANCING PROVISIONS *[Check either Paragraph 7.1 or 7.2]*.

7.1 ☐ Financing Not Required: Buyer will provide all cash to close Escrow without obtaining a loan. Within 5 days after Buyer signs this Purchase Agreement, Buyer shall submit to Seller proof satisfactory to Seller that Buyer now has, or will have prior to Close of Escrow, cash sufficient to close Escrow. Within 3 days after any request by Seller, Buyer shall also provide evidence that sufficient funds are available for Buyer to close Escrow.

7.2 ☒ Financing Required: Buyer will apply and qualify for and obtain financing sufficient to close Escrow in the approximate "**Estimated New Loan Amount**" set forth in **Paragraph 4(b)**, above ("**New Loan**"). Buyer shall use his or her best efforts to qualify for and obtain institutional financing at the rates and terms available to Buyer.

(a) Loan Application. Within 5 days after Buyer's Offer, Buyer shall submit a completed loan application for the New Loan to DHI Mortgage ("**Seller's Approved Lender**") and a lender selected by Buyer ("**Buyer's Lender**"), if any. Buyer shall advise Seller of the lender it has elected to use to close the Escrow prior to the applicable date set forth in **Paragraph 7.2(b)** below. Buyer shall take all required steps to allow prompt processing of the application for the New Loan, including fully responding to any requests from the lender(s) for documents or information within 3 days. Nothing set forth herein shall compel Buyer to accept any financing approved by Seller's Approved Lender that is not acceptable to Buyer.

(b) Buyer To Obtain Loan Approval. *[Check appropriate box]*:

☒ ***Estimated Closing Date is less than 60 days***: Within 20 days after the Offer, but not less than 20 days prior to the Estimated Closing Date, Buyer shall deliver to Seller written evidence satisfactory to Seller that Buyer has obtained final unconditional loan approval for the Estimated New Loan Amount.

☐ ***Estimated Closing Date is more than 60 days***: Within 20 days after the Offer, Buyer shall deliver to Seller written evidence satisfactory to Seller that Buyer has obtained conditional credit approval. Within 45 days after the Offer, Buyer shall deliver to Seller final unconditional loan approval for the Estimated New Loan Amount, subject only to the lender's approval of the value of the Property through an appraisal.

7.3 **NO FINANCING CONTINGENCY**. IT IS UNDERSTOOD AND AGREED THAT BUYER WILL OBTAIN ITS OWN FINANCING OF ALL OR A PORTION OF THE PURCHASE PRICE FOR THE PROPERTY. BUYER ACKNOWLEDGES THAT THE SALE AND PURCHASE OF THE PROPERTY IS NOT CONTINGENT UPON BUYER'S ABILITY TO OBTAIN FINANCING OF THE PURCHASE PRICE. BUYER EXPRESSLY ACKNOWLEDGES AND AGREES THAT SELLER HAS MADE NO REPRESENTATION OR WARRANTY TO BUYER, EXPRESS OR IMPLIED, AS TO THE AVAILABILITY OF FINANCING OR BUYER'S ABILITY TO QUALIFY FOR SUCH FINANCING; AND SELLER HAS NO RESPONSIBILITY TO PROVIDE OR OTHERWISE PARTICIPATE IN THE PROCUREMENT OF SUCH FINANCING.

Buyer's Initials Buyer's Initials Seller's Initials

7.4 **Acknowledgment**. Buyer acknowledges and agrees that while there is no financing contingency regarding Buyer's purchase of the Property, Seller will require Buyer to meet the deadlines and fulfill Buyer's obligations set forth in **Paragraphs 7.1 and 7.2** above. Buyer's failure to meet the dates, deadlines and obligations set forth in **Paragraphs 7.1 and 7.2** above, and any substitution of another lender for Buyer's Lender without Seller's consent, will be a default under this Agreement and will entitle Seller to unilaterally terminate this Agreement and retain Buyer's Deposit as provided in **Paragraph 10** hereof. Upon any termination of this Agreement by Seller as provided herein, Buyer shall be deemed to have waived and released any right Buyer may have to purchase the Property and/or any claim or interest in the same, and all rights and obligations of the parties shall be terminated and of no further force and effect.

Buyer's Initials Buyer's Initials Seller's Initials



Buyer's Initials Buyer's Initials

7.5 Authorizations Given By Buyer; Re-verification. Buyer, by execution of this Purchase Agreement, authorizes Seller to investigate Buyer's credit, including obtaining a credit report, authorizes Seller to disclose to the lender(s) information about Buyer, authorizes Seller to obtain information from the lender(s), including copies of all applications and other documents, and agrees to cooperate with Seller in obtaining information about the New Loan from the lender. Upon the request of Seller, Buyer shall provide to Seller written re-verification of its financing approvals or sufficiency of cash.

## Construction of The Residence

8. CONSTRUCTION.

8.1 Standard Residence. The Residence under construction shall be constructed in substantial conformance with the standard plan on file with and approved by the appropriate governmental authority. Seller is not building the Residence specifically for Buyer, nor to the precise specifications or design of any model home. The fixtures, furnishings, landscaping and other features shown in any model home are not included under this Purchase Agreement unless specifically set forth herein. Seller reserves the right to make any changes or substitutions to the standard plan specifications, construction, materials and fixtures which are substantially equal in utility and quality to the original plans and specifications, and which meet with the approval of the appropriate governmental authorities having jurisdiction, as Seller deems necessary or desirable, without Buyer's consent.

8.2 Occupancy. Buyer shall not be entitled to possession of the Property or receive keys to the residence until after the Close of Escrow.

8.3 Entry Upon Property. Prior to the Close of Escrow, Buyer shall not alter the Property or the Residence, install any improvements on the Property, show or advertise the Property to prospective purchasers or tenants or place any signs at or near the Property, without the prior written consent of Seller and compliance with all requirements of Seller with respect to such entry, including signing an entry permit. All upgrades to the Property prior to the Close of Escrow must be approved in writing by Seller and installed or constructed by Seller or its authorized agents, representatives or independent contractors. If Buyer alters the Property or the Residence prior to the Close of Escrow without written consent of Seller, Seller may immediately remove same and Buyer shall be liable for all damages caused by such unauthorized work and changes to the Property.

8.4 Limited Warranty; Disclaimer of Implied Warranties. Buyer has received samples of the following prior to signing this Purchase Agreement: (a) a homeowner's manual entitled "**10-4-1 Limited Homeowner's Manual and Customer Care Guide**" ("**Homeowner's Manual**") which contains Seller's 10-4-1 Limited Warranty ("**Limited Warranty**"); (b) manufacturer's warranties (some or all of which may be provided at the Walk-Through). The Limited Warranty, manufacturer's warranties, and any other express written warranty provided to you by the Seller are referred to collectively as "the Warranties." The Warranties become effective upon Close of Escrow. Except for these Warranties, Seller does not make any other representations, promises or warranties concerning the Property, including, without limitation, warranties of merchantability, fitness for a particular purpose, quality of construction or otherwise, and to the fullest extent permitted by law Buyer waives all implied warranties relating to the Property.

**I/WE HAVE READ AND UNDERSTAND THE FOREGOING PROVISIONS PERTAINING TO THE WARRANTIES AND ACKNOWLEDGE AND AGREE THAT EXCEPT AS PROVIDED IN THE WARRANTIES, SELLER DISCLAIMS ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO, THAT THE PROPERTY WAS DESIGNED AND CONSTRUCTED IN A REASONABLY WORKMANLIKE MANNER, FITNESS FOR A PARTICULAR PURPOSE, AND MERCHANTABILITY.**

Buyer's Initials Buyer's Initials Seller's Initials

8.5 Buyer Walk-Through. Prior to Close of Escrow, Seller will provide Buyer with at least 72 hours notice of the date the Property is available for orientation and inspection ("**Walk-Through**"). If Buyer fails to attend the Walk-Through, Seller may complete its own inspection of the Property and close escrow. If Buyer fails to attend the Walk-Through, Buyer's later claims of reasonably observable deficiencies may be rejected by Seller as having occurred after Close of Escrow and therefore not Seller's responsibility. Seller reserves the right to perform such work after the Close of Escrow.

8.6 Optional Items and Upgrades. The selection and cost of all options and upgrades shall be set forth in an Addendum to this Purchase Agreement and/or in a separate agreement(s) between Buyer and Seller or an authorized third party provider. The availability and prices of options and upgrades are subject to change without prior notice. Seller reserves the right to add or delete any optional items from the Seller's list of optional items at any time without prior notice to Buyer. In addition, once certain stages of the construction process are complete ("**Cut-Off Dates**"), some options and upgrades increase in price or are no longer available. Information concerning these Cut-Off Dates and additional costs will be provided to Buyer upon request. Accordingly, Buyer shall select and pay for all options and upgrades when requested to do so by Seller. If Buyer selects options and upgrades but fails to make color, style or material selections prior to Seller's construction cut-off dates, Seller may either not install them, or install colors, styles and materials of Seller's choice. Seller will only supply options on Seller's approved list. If Buyer fails to make any options selections, Seller shall install standard items.

8.7 Destruction of the Property Prior to Close of Escrow. If the Property is destroyed or materially damaged, other than by Buyer's act or omission, prior to the Close of Escrow, then either Buyer or Seller may terminate this Purchase Agreement and the Deposit, less any applicable Third Party Charges, shall be returned to Buyer within 15 days thereafter.

8.8 Claims Under California Civil Code Section 895 et seq. California Civil Code Section 895 et seq. (the "**Statute**") establishes residential construction standards and provides mechanisms for resolution of claims of violations of these standards.

(a) SB 800 Booklet. A booklet containing Sections 895 through 945.5 of the Civil Code ("**SB 800 Booklet**"), which includes the Statute has been provided to Buyer by Seller. You should read the Statute carefully and seek legal advice if you have any questions. By initialing below Buyer acknowledges that s/he has received and initialed a copy of the SB 800 Booklet.

Buyer's Initials Buyer's Initials Seller's Initials

(b) Notice of Claims. If Buyer or Buyer's successors (the "**Claimant**") claim that the Property or the Residence violates any of the Standards, Claimant must provide notice to Seller's agent under Civil Code Section 912(e). The name and address of Seller's agent are available upon request from the California Secretary of State:

California Secretary of State
Special Filings
P.O. Box 942877
Sacramento, California 94277
or by telephone at (916) 653-3984

By initialing below, Buyer acknowledges and agrees that Seller has provided Buyer with access to the name and address of the contact person for notice of any claimed violations of the Standards.

Buyer's Initials Buyer's Initials Seller's Initials

(c) Statutory Non-Adversarial Procedures. Seller has elected to use the "**non-adversarial procedures**" which are set forth in the Statute at Sections 910 through 938. Seller has recorded or will record a notice of these procedures on the Property at or prior to the Close of Escrow. According to the terms of the Statute, the non-adversarial procedures will not apply if the Seller does not, or cannot comply with the requirements in the Statute. In such case, disputes will be resolved through mediation and, if that is not successful, then arbitration as provided in this Purchase Agreement.

Buyer's Initials Buyer's Initials Seller's Initials

(d) Receipt of Purchase Documents. Buyer acknowledges that he or she has received or may in the future receive certain documents in conjunction with Buyer's purchase of the Property, including, but not limited to, those referenced in the Receipt of Documents. Buyer agrees to keep and maintain all such documents, to provide any subsequent buyer with all such documents, as required by the Statute, and to instruct any subsequent buyer to provide to their subsequent buyers a complete copy of all documents.

(e) Affiliated General Contractor. Seller is using an affiliated general contractor, as described in Section 911 of the Statute ("General Contractor"), to construct the Project. All deliveries, notices and elections set forth in this Section 8.8 are hereby deemed to apply to, and be made by General Contractor as well as Seller. All notices provided to the General Contractor shall be delivered to the address set forth in **Paragraph 8.8(b)** above.

Closing

## 9. CLOSING.

9.1 **Title**. At the Close of Escrow, title to the Property shall be conveyed to Buyer subject to: **(a)** standard exceptions and exclusions of the Title Policy, **(b)** current real property taxes, special taxes and any assessments; **(c)** any declarations of covenants, conditions and restrictions; **(d)** all other reservations, covenants, conditions, restrictions, easements, rights and rights of way of record or placed of record prior to the Close of Escrow; **(e)** the New Loan in favor of Buyer's lender, if any; and **(f)** a Notice of Non-Adversarial Procedure under California Civil Code Section 912(f). Upon the Close of Escrow, Seller shall cause to be issued a standard coverage owner's policy of title insurance ("**Title Policy**") issued by the Title Company in Buyer's favor describing the Property and with coverage in the amount of the Purchase Price and containing the exceptions described above.

9.2 **Prorations**. Real property taxes, special taxes and assessments, including assessments for any homeowners association(s), shall be prorated between Buyer and Seller as of the Close of Escrow.

9.3 **Buyer and Seller Closing Costs**. Buyer and Seller shall pay the closing costs allocated below:

| Buyer | Seller | Closing Costs |
|---|---|---|
| ☒ | ☐ | Escrow Fees |
| ☒ | ☐ | Title Policy (CLTA) |
| ☒ | ☐ | City Transfer Taxes |
| ☒ | ☐ | County Document Transfer Taxes |
| ☒ | ☐ | Lender's Closing Costs and Charges |





Buyer's Initials Buyer's Initials

**Pre-Closing Disputes**

**10. LIQUIDATED DAMAGES; ARBITRATION.**

10.1 Default by Buyer. If Buyer breaches or fails to perform any of its obligations under this Purchase Agreement, Seller may provide written notice of such breach or failure to Buyer and Buyer shall have 5 days from the date of such written notice to cure such breach, except that this provision shall not apply to extend the Closing Date. If Buyer fails to cure the breach within the 5 day period after Seller gives Buyer such notice, Seller may pursue its remedies for a Buyer's default.

10.2 BUYER'S BREACH; LIQUIDATED DAMAGES. IF BUYER DEFAULTS UNDER ANY TERMS OR PROVISIONS UNDER THIS PURCHASE AGREEMENT AND SUCH DEFAULT RESULTS IN THE FAILURE TO CLOSE ESCROW OR IF BUYER IS IN DEFAULT AND SUCH DEFAULT IS A MATERIAL BREACH OF THIS PURCHASE AGREEMENT, SELLER, IN ITS SOLE AND ABSOLUTE DISCRETION, SHALL BE RELEASED FROM ITS OBLIGATION TO SELL THE PROPERTY TO BUYER AND SHALL HAVE THE RIGHT TO UNILATERALLY TERMINATE THIS PURCHASE AGREEMENT. IN ADDITION, SELLER MAY PURSUE ANY REMEDY AT LAW OR IN EQUITY THAT IT MAY HAVE AGAINST BUYER ON ACCOUNT OF SUCH DEFAULT; PROVIDED, HOWEVER, THAT BY PLACING THEIR INITIALS HERE, BUYER ______, ______ AND SELLER ______ AGREE THAT:

(a) SELLER WILL BE DAMAGED AND WILL BE ENTITLED TO COMPENSATION FOR THESE DAMAGES, BUT SUCH DAMAGES WILL BE DIFFICULT TO DETERMINE AND BUYER DESIRES TO LIMIT THE AMOUNT OF DAMAGES FOR WHICH BUYER MIGHT BE LIABLE. IN ADDITION, BOTH BUYER AND SELLER WISH TO SAVE THE TIME AND MONEY INVOLVED IN A LAWSUIT OR ARBITRATION TO DETERMINE DAMAGES;

(b) AN AMOUNT NOT TO EXCEED THE DEPOSIT, SHALL CONSTITUTE LIQUIDATED DAMAGES PAYABLE TO SELLER IF BUYER DEFAULTS UNDER ANY TERMS OR PROVISIONS UNDER THIS PURCHASE AGREEMENT AND SUCH DEFAULT RESULTS IN THE FAILURE TO CLOSE ESCROW OR IF BUYER IS IN DEFAULT AND SUCH DEFAULT IS A MATERIAL BREACH OF THIS PURCHASE AGREEMENT;

(c) THE PAYMENT OF SUCH LIQUIDATED DAMAGES TO SELLER SHALL CONSTITUTE THE EXCLUSIVE REMEDY OF SELLER ON ACCOUNT OF ANY DEFAULT BY BUYER, EXCEPT FOR ANY RIGHTS WHICH SELLER MAY HAVE UNDER PARAGRAPH 6.4(D) OF THIS PURCHASE AGREEMENT; AND

(d) SELLER WAIVES ITS RIGHTS TO SPECIFIC PERFORMANCE OR OTHER DAMAGES.

(e) LIQUIDATED DAMAGES SHALL BE PAYABLE TO SELLER OUT OF BUYER'S DEPOSIT ACCORDING TO THE FOLLOWING PROCEDURES. TO MAKE A CLAIM OF BUYER'S DEFAULT AND DEMAND FOR LIQUIDATED DAMAGES, SELLER SHALL GIVE WRITTEN NOTICE ("SELLER'S NOTICE") BY ANY MEANS AUTHORIZED FOR SERVICE BY CODE OF CIVIL PROCEDURE SECTION 116.340 TO ESCROW HOLDER AND TO BUYER THAT BUYER IS IN DEFAULT UNDER THIS PURCHASE AGREEMENT AND THAT ESCROW HOLDER DISBURSE BUYER'S DEPOSIT(S) TO SELLER UNLESS, WITHIN 20 DAYS OF RECEIPT OF THE SELLER'S NOTICE, BUYER NOTIFIES ESCROW HOLDER AND SELLER IN WRITING THAT BUYER OBJECTS TO THE DISBURSEMENT OF LIQUIDATED DAMAGES TO SELLER (THE "BUYER'S NOTICE"). IF SELLER HAS HAD THE USE OF ANY OF BUYER'S PURCHASE MONEY UNDER AUTHORITY OF A PURCHASE MONEY BOND, SELLER SHALL IMMEDIATELY UPON MAKING SELLER'S NOTICE AND DEMAND, DESCRIBED ABOVE, TRANSMIT TO THE ESCROW HOLDER AN AMOUNT EQUAL TO ALL OF THE DEPOSITS PAID BY BUYER. IF BUYER FAILS TO GIVE BUYER'S NOTICE WITHIN THE TIME REQUIRED: (I) ESCROW HOLDER SHALL PROMPTLY REMIT THE LIQUIDATED DAMAGES AMOUNT TO SELLER, AND (II) SELLER SHALL BE RELIEVED OF ANY OBLIGATION TO SELL THE PROPERTY TO BUYER.

10.3 SELLER'S BREACH; LIQUIDATED DAMAGES. IF SELLER DEFAULTS UNDER THIS PURCHASE AGREEMENT AND FAILS TO CURE SUCH DEFAULT WITHIN 5 DAYS AFTER NOTICE THEREOF FROM BUYER, AND SUCH DEFAULT RESULTS IN THE FAILURE TO CLOSE ESCROW, BUYER, IN ITS SOLE AND ABSOLUTE DISCRETION, SHALL HAVE THE RIGHT TO UNILATERALLY TERMINATE THIS PURCHASE AGREEMENT AND PURSUE ANY REMEDY AT LAW OR IN EQUITY THAT IT MAY HAVE AGAINST SELLER; PROVIDED, HOWEVER, THAT BY PLACING THEIR INITIALS HERE, BUYER ______, ______ AND SELLER ______ AGREE THAT (A) UPON ANY SUCH DEFAULT BY SELLER, BUYER WILL BE DAMAGED AND WILL BE ENTITLED TO COMPENSATION FOR THESE DAMAGES, BUT SUCH DAMAGES WILL BE DIFFICULT TO DETERMINE AND SELLER DESIRES TO LIMIT THE AMOUNT OF DAMAGES FOR WHICH SELLER MIGHT BE LIABLE, (B) BOTH BUYER AND SELLER WISH TO SAVE THE TIME AND MONEY INVOLVED IN A LAWSUIT OR ARBITRATION TO DETERMINE DAMAGES, AND (C) UPON SUCH A DEFAULT BY SELLER, BUYER SHALL BE ENTITLED TO THE RETURN OF THE DEPOSIT PLUS AN ADDITIONAL AMOUNT PAID BY SELLER EQUAL TO THE AMOUNT OF THE DEPOSIT PAID BY BUYER UNDER PARAGRAPH 4(f) OF THIS PURCHASE AGREEMENT (COLLECTIVELY, "BUYER'S LIQUIDATED DAMAGES"). BUYER'S LIQUIDATED DAMAGES AND BUYER'S RIGHT TO TERMINATE THIS PURCHASE AGREEMENT SHALL CONSTITUTE BUYER'S SOLE AND EXCLUSIVE REMEDY FOR DAMAGES IN THE EVENT OF A DEFAULT BY SELLER WHICH RESULTS IN THE FAILURE TO CLOSE ESCROW AND BUYER SPECIFICALLY WAIVES ANY RIGHT TO BRING AN ACTION AGAINST SELLER FOR SPECIFIC PERFORMANCE. IF SELLER FAILS TO DEPOSIT AN AMOUNT EQUAL TO THE DEPOSIT PAID BY BUYER UNDER PARAGRAPH 4(g) WITHIN 20 DAYS AFTER RECEIPT OF BUYER'S NOTICE OF DEFAULT, THIS SECTION SHALL BE VOID AND OF NO EFFECT.

(a) <u>NOTICE OF DEFAULT AND DEMAND FOR LIQUIDATED DAMAGES</u>. BUYER SHALL GIVE WRITTEN NOTICE ("BUYER'S NOTICE") BY ANY MEANS AUTHORIZED FOR SERVICE BY CODE OF CIVIL PROCEDURE SECTION 116.340 TO ESCROW HOLDER AND TO SELLER THAT SELLER IS IN DEFAULT UNDER THE PURCHASE AGREEMENT AND THAT ESCROW HOLDER DISBURSE THE AMOUNTS DESCRIBED ABOVE TO BUYER UNLESS, WITHIN 20 DAYS OF RECEIPT OF THE BUYER'S NOTICE, SELLER NOTIFIES ESCROW HOLDER AND BUYER IN WRITING THAT SELLER OBJECTS TO THE DISBURSEMENT OF LIQUIDATED DAMAGES TO BUYER (THE "SELLER'S NOTICE"). IF SELLER FAILS TO GIVE SELLER'S NOTICE WITHIN THE TIME REQUIRED: (I) ESCROW HOLDER SHALL PROMPTLY REMIT BUYER'S LIQUIDATED DAMAGES AMOUNT TO BUYER, AND (II) BUYER SHALL BE RELIEVED OF ANY OBLIGATION TO PURCHASE THE PROPERTY FROM SELLER.

(b) <u>NO CONSEQUENTIAL DAMAGES</u>. IN NO EVENT SHALL SELLER BE LIABLE FOR ANY CONSEQUENTIAL DAMAGES AS A RESULT OF A DEFAULT BY SELLER UNDER THIS PURCHASE AGREEMENT.

10.4 <u>ARBITRATION OF DISPUTES</u>. If there is an objection to a claim under Paragraph 10.2, the Deposit shall only be disbursed to Seller as liquidated damages if there is a determination by a court of law that Buyer has defaulted under this Purchase Agreement or, if there is an objection to a claim under Paragraph 10.3, then Buyer's Liquidated Damages shall only be disbursed to Buyer if there is a determination by a court of law that Seller has defaulted under this Purchase Agreement; provided, however, that by initialing in the space provided below Buyer and Seller agree that the controversy, and the disposition of such funds deposited into the Escrow as provided in Paragraph 10.2 and 10.3 shall be settled by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association and subject to the following terms: (a) the fee to initiate the arbitration shall be borne by Seller; provided, however, that the costs of the arbitration shall be borne as determined by the arbitrator; (b) the arbitrator shall be neutral and impartial and shall be appointed within 30 days after Buyer or Seller gives written notice to Escrow Holder in compliance with Paragraph 10.2(e) or 10.3(a) above; (c) the arbitration shall be conducted in the County where the Property is located, unless the parties agree to another location; and (d) subject to any limitations on specific performance set forth above, the arbitrator shall be authorized to provide all recognized remedies available in law or equity for any cause of action that is the basis of the arbitration. Judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. If the dispute subject to the arbitration is whether a default has occurred under this Purchase Agreement and there is a determination by the arbitrator that a default has occurred, Escrow shall be cancelled and the rights and duties under this Purchase Agreement shall automatically terminate, including any duty by Seller to sell the Property to Buyer or obligation of Buyer to purchase the Property from Seller. Upon a determination of Buyer's default, the amount claimed as liquidated damages shall be disbursed as provided above, and any remaining Deposit shall be disbursed to Buyer; provided, however, that if the arbitrator determines that any dispute raised by Buyer as to the amount of liquidated damages claimed by Seller cannot be determined at the same time as the dispute regarding Buyer's default, the dispute as to the amount of liquidated damages shall be resolved by a subsequent arbitration in the same manner as described herein.

NOTICE: BY INITIALING IN THE SPACE BELOW YOU ARE AGREEING TO HAVE ANY DISPUTE ARISING OUT OF THE MATTERS INCLUDED IN PARAGRAPH 10.4 DECIDED BY NEUTRAL ARBITRATION AS PROVIDED BY CALIFORNIA LAW AND YOU ARE GIVING UP ANY RIGHTS YOU MIGHT POSSESS TO HAVE THE DISPUTE LITIGATED IN A COURT OR JURY TRIAL. BY INITIALING IN THE SPACE BELOW YOU ARE GIVING UP YOUR JUDICIAL RIGHTS TO DISCOVERY AND APPEAL, UNLESS SUCH RIGHTS ARE SPECIFICALLY INCLUDED IN THE "ARBITRATION OF DISPUTES" PROVISION. IF YOU REFUSE TO SUBMIT TO ARBITRATION AFTER AGREEING TO THIS PROVISION, YOU MAY BE COMPELLED TO ARBITRATE UNDER THE AUTHORITY OF THE CALIFORNIA CODE OF CIVIL PROCEDURE. YOUR AGREEMENT TO THIS ARBITRATION PROVISION IS VOLUNTARY.

WE HAVE READ AND UNDERSTAND THE FOREGOING AND AGREE TO SUBMIT DISPUTES ARISING OUT OF THE MATTERS INCLUDED IN THE "ARBITRATION OF DISPUTES" PROVISION TO NEUTRAL ARBITRATION. (CODE OF CIVIL PROCEDURE SECTION 1298).

Buyer's Initials Buyer's Initials Seller's Initials

**Post-Closing Disputes**

**11. MEDIATION AND ARBITRATION OF POST-CLOSING DISPUTES.** The parties want to promptly and efficiently resolve any controversy, claim or dispute between them asserted after the Close of Escrow. Accordingly, any and all disputes arising between Buyer and Seller (including any affiliated general contractor of seller as defined in California Civil Code Section 911) after the Close of Escrow concerning this Purchase Agreement or the Property (**"Post-Closing Dispute"**), which are not resolved under the Warranties or under the non-adversarial procedures in the Statute described in **Paragraph 8.8** above, shall be resolved in accordance with the procedures set forth below. To provide for consistency with the Limited Warranty, to the extent that the provisions of this Paragraph are inconsistent with the provisions of any Declaration of Covenants; Conditions and Restrictions recorded against the Property by Seller, the provisions of this Paragraph shall control.

11.1 <u>Mediation</u>. Subject to **Paragraph 11.2** below, and except for actions in small claims court or Post-Closing Disputes that have already been mediated, Buyer and Seller agree to submit all Post-Closing Disputes to mediation with Judicial Arbitration and Mediation Services (**"JAMS"**), prior to commencing arbitration. The cost of mediation shall be paid by Seller, but each party shall bear its own attorneys' fees and costs.

11.2 <u>Arbitration</u>.





Buyer's Initials Buyer's Initials

**(a)** Agreement to Arbitrate. Subject to **Paragraph 11.1** above, Buyer and Seller agree to resolve all Post-Closing Disputes exclusively through binding arbitration in the county in which the Property is located. This arbitration provision shall apply to Post-Closing Disputes of any kind or nature regardless of when, after the Close of Escrow, the Post-Closing Dispute first arose, or the nature of the relief sought.

**(b)** Waiver of Trial by Judge or Jury. By agreeing to resolve all Post-Closing Disputes through binding arbitration, Buyer and Seller each give up the right to have their respective claims and defenses decided by a judge or a jury. Instead all claims and defenses will be decided by the arbitrator, or by the appeal arbitrator(s), if applicable.

**(c)** Rules Applicable to All Cases. The arbitration will be conducted by JAMS in accordance with the JAMS rules (**"JAMS Rules"**) then applicable to the claims presented, as supplemented by this paragraph. The following supplemental rules shall apply to all arbitration proceedings and shall govern in the event of a conflict between the rules set forth below and the rules of JAMS Rules.

(i) *Qualifications and Appointment of Arbitrators.* The arbitrator shall be neutral, impartial and either a retired judge or a member or former member of the California State Bar with at least 15 years experience as a practicing lawyer. The arbitrator shall be selected in accordance with the JAMS Rules, but no later than 60 days after a notice of claim is filed.

(ii) *JAMS Fees; Attorney Fees and Costs.* All fees charged by JAMS and the arbitrator shall be advanced by the Seller. If the Seller is the prevailing party in the arbitration, the arbitrator may, in his or her discretion and only to the extent permitted by law and the JAMS Minimum Standards of Procedural Fairness, direct the Buyer to reimburse the Seller all or part of the JAMS fee and arbitrator's fee advanced by the Seller. Each party shall bear its own attorneys fees and costs.

(iii) *Preliminary Procedures.* If state or federal law requires the Buyer or Seller to take steps or procedures before commencing an action in court, then the Buyer or Seller must take such steps or follow such procedures, as the case may be, before commencing the arbitration. For example, Post-Closing Disputes pursuant to California Civil Code Section 895 et. seq. as hereafter amended may be subject to the non-adversarial procedures set forth in California Civil Code Section 910 through 938, prior to the initiation of any arbitration or small claims court proceeding against Seller. In addition, nothing contained herein shall be deemed a waiver or limitation of the provisions of California Civil Code Sections 1368.4, 1375, 1375.05 or 1375.1.

(iv) *Participation by Other Parties.* Buyer and Seller, to the extent either such party is defending a claim in the arbitration, may, if it chooses, have all necessary and appropriate parties included as parties to the arbitration.

(v) *Rules of Law.* The arbitrator must follow California substantive law, including statutes of limitations, but strict conformity with the rules of evidence is not required except that the arbitrator shall strictly conform to all laws relating to privilege and work product. The arbitrator shall be authorized to provide all recognized remedies available at law or equity for any cause of action.

**(d)** Additional Rules Applicable To Certain Cases. In any arbitration in which a claim of Buyer or Seller exceeds two hundred fifty thousand dollars ($250,000) in value, the following additional rules will supplement the JAMS Rules, and govern in the event of a conflict between the following rules and the rules set forth above, the JAMS Rules, or both.

(i) *Qualifications of Arbitrator.* In addition to the requirements of **Paragraph 11.2(c)** above, the arbitrator shall be a retired judge of the California Superior Court, a California Court of Appeal, or the California Supreme Court.

(ii) *Rules of Law.* The California Evidence Code shall apply.

(iii) *Written Decision.* Within 30 days after the hearing is closed, the arbitrator must issue a written decision. If either Buyer or Seller requests it, the arbitrator must issue a reasoned award.

**(e)** Procedure for Appeal of Certain Cases. In any arbitration in which a claim or arbitration award of Buyer or Seller exceeds five hundred thousand ($500,000) in value, Buyer and Seller hereby adopt and agree to the JAMS Optional Appeal Procedure. The following additional rules will supplement the JAMS Optional Appeal Procedure and govern in the event of a conflict between the following rules and the JAMS Optional Appeal Procedure.

(i) *Right of Appeal.* There shall be no right to appeal unless the oral evidence received by the arbitrator was preserved in a manner such that it can be converted to an accurate and reliable written transcript.

(ii) *Appellate Panel.* An appeal shall be decided by one neutral appeal arbitrator unless either party, within the time permitted for the appointment of the appeal arbitrator, elects to have the appeal decided by a panel of 3 appeal arbitrators. Any party who elects to have an appeal decided by a panel of 3 appeal arbitrators agrees to be solely responsible for the cost of having 2 additional appeal arbitrators. The sole appeal arbitrator, or at least one member of any panel of 3 arbitrators, shall have prior experience as a member of an appellate panel of the California Court of Appeal.

(iii) *Issues on Appeal.* The only issues that may be considered on appeal are: (1) the award of money was excessive; (2) the award of money was insufficient; (3) the arbitrator awarded non-monetary relief that was inappropriate; (4) a party who received non-monetary relief should have received other or additional relief. A majority of

the appeal arbitrators may affirm the arbitration award or make any alternative award they find to be just, but they must not reject the arbitrator's decisions (a) that a particular party is entitled to relief of some nature or amount or (b) that a particular party is responsible to provide relief of some nature or amount.

(iv) *Expenses and Costs on Appeal.* The fees charged by JAMS and the appeal arbitrator(s) shall be advanced by the Seller, except as provided in **Paragraph 11.2(c)(ii)** above. The party who files the appeal must, at its sole expense, provide JAMS and all non-appealing parties with a certified copy of the hearing transcript, and must provide JAMS with copies of all documentary evidence and all other tangible evidence received by the arbitrator. If more than one party appeals, the appealing parties must share equally the cost of the transcript and copies of all other documentary and tangible evidence received by the arbitrator. The appeal arbitrators may, within 30 days of their determination award costs of the nature provided in the Federal Rules of Appellate Procedure. If the Seller is the prevailing party on appeal, the appeal arbitrator(s) may, in his, her or their discretion and only to the extent permitted by law and JAMS Minimum Standards Of Procedural Fairness, include all or part of the JAMS fee and arbitrator's fee advanced by the Seller in the award of costs on appeal.

(v) *New Evidence.* The appeal arbitrators must not receive new evidence. The appeal arbitrators must make their decision based only on the evidence that was presented to the arbitrator, except that the appeal arbitrators may visit any site involved in the Post-Closing Dispute.

(f) Federal Arbitration Act. Buyer and Seller acknowledge that because many of the materials and products incorporated into the home are manufactured in other states, this Purchase Agreement evidences a transaction involving interstate commerce and the Federal Arbitration Act (9 U.S.C. §1, et seq.) now in effect and as it may be hereafter amended will govern the interpretation and enforcement of the arbitration provisions of this Purchase Agreement.

(g) Final and Binding Award. The decision of the arbitrator or, if an appeal is heard, the decision of the appeal arbitrators, shall be final and binding. A petition to confirm, vacate, modify or correct an award may be filed in any court of competent jurisdiction in the county in which the Property is located, but the award may be vacated, modified or corrected only as permitted by the Federal Arbitration Act.

**11.3 Agreement to Arbitrate BY INITIALING IN THE SPACE BELOW, BUYER AND SELLER AGREE TO HAVE ALL POST-CLOSING DISPUTES DECIDED BY NEUTRAL ARBITRATION IN ACCORDANCE WITH THE FEDERAL ARBITRATION ACT AND THE CALIFORNIA ARBITRATION ACT, TO THE EXTENT THE CALIFORNIA ARBITRATION ACT IS CONSISTENT WITH THE FEDERAL ARBITRATION ACT, AND BUYER AND SELLER ARE GIVING UP ANY RIGHTS BUYER AND SELLER MIGHT POSSESS TO HAVE THE DISPUTE LITIGATED IN A COURT OR JURY TRIAL. BY INITIALING IN THE SPACE BELOW BUYER AND SELLER ARE GIVING UP THEIR RESPECTIVE JUDICIAL RIGHTS TO DISCOVERY AND APPEAL, UNLESS THOSE RIGHTS ARE SPECIFICALLY INCLUDED IN THIS PURCHASE AGREEMENT. IF BUYER OR SELLER REFUSES TO SUBMIT TO ARBITRATION AFTER AGREEING TO THIS PROVISION, BUYER OR SELLER MAY BE COMPELLED TO ARBITRATE UNDER THE FEDERAL ARBITRATION ACT AND THE CALIFORNIA ARBITRATION ACT, TO THE EXTENT THE CALIFORNIA ARBITRATION ACT IS CONSISTENT WITH THE FEDERAL ARBITRATION ACT.**

**I/we have read and understand the foregoing and agree to submit disputes to binding arbitration.**

Buyer's Initials Buyer's Initials Seller's Initials

**12. ADDITIONAL PROVISIONS**

**12.1 No Contingency.** The Close of Escrow is not contingent upon the sale of any residences or other property owned by Buyer.

**12.2 Severability.** If any portion of this Purchase Agreement is declared by any court of competent jurisdiction to be invalid, illegal or unenforceable, such portion shall be deemed severed from this Purchase Agreement, and the remaining parts of this Purchase Agreement shall remain in full force and effect.

**12.3 No Waiver.** Seller's waiver of any term or provision of this Purchase Agreement shall not be construed as a waiver of any other term or provision of this Purchase Agreement, or of any subsequent performance required under this Purchase Agreement.

**12.4 Notices.** With the exception of Seller's or Escrow Holder's notice to Buyer of the Closing Date, or as otherwise expressly provided for in this Purchase Agreement or by law, all notices, instructions, demands and other communications given hereunder shall be set forth in writing and shall be personally served or delivered, pre-paid, by a recognized overnight courier, addressed to the party's and/or Escrow Holder's address set forth on the signature page of this Purchase Agreement. All such written notices, instructions, demands and other communications shall be deemed delivered upon personal delivery, or 2 business days after deposit with an overnight courier, except that if Escrow Holder has attempted to deliver a notice and Buyer and/or Seller refuses to accept same, such party shall be deemed to have received such notice. Notices of construction defect claims under the Statute shall be served upon Seller at the address specified in **Paragraph 8.8(b)** above.

**12.5 Successors and Assigns.** This Purchase Agreement and the rights of Buyer hereunder may not be assigned, sold, transferred or hypothecated by Buyer voluntarily, involuntarily, or by operation of law without Buyer's first having obtained Seller's written consent, which may be withheld in Seller's sole discretion. This Purchase Agreement and the rights, duties and obligations of the parties shall be binding upon and shall inure to the benefit of the successors and

assigns of Seller and, subject to the preceding sentence, to the heirs, executors, administrators, successors and permitted assigns of Buyer.

12.6 <u>Counterparts</u>. This Purchase Agreement may be signed in one or more counterparts, each of which independently shall have the same effect as if it were the original, and all of which together shall constitute one and the same Purchase Agreement.

12.7 <u>Survival</u>. All obligations referred to herein to be performed at a time or times after the Close of Escrow, all provisions hereof relating to a time after the Close of Escrow, and all representations and acknowledgments contained herein, shall survive the Close of Escrow and the delivery of Seller's Grant Deed.

12.8 <u>Applicable Law</u>. This Purchase Agreement shall be construed and enforced in accordance with the laws of the State of California, except where federal law is expressly made applicable.

12.9 <u>Broker; Seller's Exclusive Agent</u>. Buyer represents and warrants that, except for any cooperating broker identified on the "**Disclosure Regarding Real Estate Agency Relationships**" provided by Seller to Buyer, Buyer has engaged no broker or finder in connection with this transaction, and agrees to defend and hold Seller harmless from claims by any broker or finder inconsistent with this representation and warranty. Buyer is aware that Seller's salesperson is an agent of the Seller exclusively and acknowledges receipt of the Disclosure Regarding Real Estate Agency Relationships.

12.10 <u>Time is of the Essence</u>. Time is of the essence of this Purchase Agreement and failure of Buyer to perform within the time limits described above will allow Seller to terminate this Purchase Agreement.

12.11 <u>Addenda</u>. The Addenda that are checked below are incorporated into this Purchase Agreement and are part of this Purchase Agreement. Please read these carefully.

- ☒ Escrow Holder's General Escrow Instructions
- ☒ General Disclosure Addendum
- ☒ Project Specific Disclosure Addendum
- ☒ Common Interest Subdivision
- ☒ Notice of Affiliated Business Arrangement Addendum
- ☐ ______________________
- ☐ ______________________
- ☐ ______________________
- ☐ ______________________
- ☐ ______________________
- ☐ ______________________

12.12 <u>Entire Agreement</u>. This Purchase Agreement contains the entire agreement between the parties and the entire escrow instructions between Escrow Holder and the parties. All prior statements and representations, whether oral or written, are hereby superseded by this Purchase Agreement. The terms of this Purchase Agreement may not be contradicted by evidence of any prior agreement or contemporaneous oral agreement. Buyer and Seller further intend that this Purchase Agreement shall constitute the complete and exclusive statement of its terms. No addition or modification of any terms of this Purchase Agreement shall be effective unless set forth in writing and signed by Buyer and Seller. No sales agent or representative of Seller has authority to modify the terms of this Purchase Agreement.

12.13 <u>Buyer Remedy Regarding Disclosures</u>. After acceptance of this Purchase Agreement, Seller may in good faith provide additional disclosures or corrected disclosures regarding the Property. If such disclosure is material, Buyer may, prior to Close of Escrow, terminate this Purchase Agreement and receive a refund of the Deposit, provided Buyer gives Seller written notice of termination within 3 days after delivery in person, by facsimile, or 5 days after mailing, of such additional or corrected disclosure.

12.14 <u>Offer and Acceptance</u>. Buyer acknowledges that Buyer has carefully read and understands each and every provision of this Purchase Agreement. Execution of this Purchase Agreement by Buyer and by Seller's sales agent or representative shall constitute only receipt for the Deposit and Offer, which offer shall not be binding unless accepted by Seller, as evidenced by the execution of this Purchase Agreement by a duly authorized officer of Seller. Seller reserves the right to refuse to accept such Offer for any reason whatsoever, at its sole and absolute discretion. Buyer acknowledges that Seller's sales agents and representatives are not authorized to accept this Offer, and that receipt of the Deposit by Seller's sales agent or representative shall not constitute an Acceptance of this Offer by Seller.

12.15 <u>Right of Buyer to Terminate Offer</u>. Seller is hereby granting Buyer 3 days after the date of Buyer's signature set forth below to review this Purchase Agreement and all other documents set forth on the Receipt for Documents signed by Buyer concurrently with this Purchase Agreement. During this time Buyer may terminate its Offer under this Purchase Agreement and cancel any Escrow by delivering a notice of termination to Escrow Holder and Seller by recognized overnight courier addressed to the party's and/or Escrow Holder's address set forth on the signature page of this Purchase Agreement, or by personal service. If Buyer elects to terminate its Offer and this Purchase Agreement, all of Buyer's deposits shall be refunded to Buyer within 15 days of such notice, any Escrow shall be canceled at Seller's expense and the parties shall have no further rights or obligations with respect to the Property under this Purchase Agreement. BUYER'S FAILURE TO DELIVER A NOTICE OF TERMINATION AS SET FORTH ABOVE SHALL CONSTITUTE BUYER'S ELECTION NOT TO TERMINATE THIS PURCHASE AGREEMENT UNDER THE PROVISIONS OF THIS PARAGRAPH 12.15.

**AGENT'S RECEIPT FOR BUYER'S DEPOSIT**
(AGENT'S SIGNATURE DOES NOT CONSTITUTE SELLER'S SIGNATURE OR ACCEPTANCE OF THIS PURCHASE AGREEMENT)

Date: 9/29/07

(Sales Agent's Signature)

**BUYER**

(Signature)

(Signature)

(Signature)

(Signature)

Offer Date: 9-29-07

**BUYER'S PHONE NUMBERS:**

(Home) (760) 732-1791 (Work) (619) 544-2541 ___ (Extn.)

(Home) (___) ________ (Work) (___) ________ ___ (Extn.)

(Home) (___) ________ (Work) (___) ________ ___ (Extn.)

(Home) (___) ________ (Work) (___) ________ ___ (Extn.)

(Buyer's Fax No.) (___) ________

**BUYER'S DESIGNATED MAILING ADDRESS:**

2762 View Crest Glen
(Street Address, No. / P.O. Boxes)
Escondido Ca 92026
(City, State and Zip)

**BUYER'S E-MAIL ADDRESS:**

N/A

**ACCEPTANCE BY SELLER**

Western Pacific Housing, Inc., a Delaware corporation

By:
Title: Tara A. Taylor
Asst. Secretary
Acceptance Date:

**SELLER'S DESIGNATED MAILING ADDRESS/PHONE:**
5790 Fleet Street, Ste. 210
(Street Address, No. / P.O. Boxes)
Carlsbad, CA 92008
(City, State and Zip)

ACCEPTANCE BY [redacted]

The undersigned hereby agrees to (i) accept the Instructions contained in this Purchase Agreement, (ii) be the Escrow Holder under the Purchase Agreement for the fees therein described, and (iii) be bound by said instructions in the performance of its duties as Escrow Holder.

Dated: 9/29, 2007 By: Scott Tomplins / DR
Escrow Officer





Buyer's Initials Buyer's Initials

Project: La Boheme
Residential Unit: 1135

## ESCROW INSTRUCTIONS ADDENDUM

This Escrow Instructions Addendum ("**Addendum**") is attached to and forms a part of the Purchase Agreement and Escrow Instructions between Seller and Buyer (the "**Purchase Agreement**") for the purchase by Buyer of the Property described in the Purchase Agreement and constitutes instructions to the Escrow Holder identified on the first page of the Purchase Agreement. Any capitalized terms not otherwise defined in this Addendum shall have the meanings set forth in the Purchase Agreement.

1. **GOOD FUNDS.** In accordance with 12413.1 of the California Insurance Code, no title insurance company or controlled escrow holder can disburse funds from an escrow account until such funds have been collected, i.e., are "good funds". Consequently, the funds required from Buyer and any Lender to be deposited immediately prior to the Close of Escrow must be in the form of a wire transfer or cashier's check. Any other form of check deposited will be subject to a 3 to 7 day clearance period prior to the Close of Escrow and the disbursement of funds may delay the closing. If any check submitted to the Escrow Holder is dishonored for payment, Escrow Holder is authorized to notify all principals and/or their respective agents of such nonpayment.

2. **ADDITIONAL FEES.** Each party shall reimburse Escrow Holder for any special messenger, courier, express mail or bank wire fees incurred on their behalf. The fees agreed to be paid for Escrow Holder's services are for ordinary and usual services only, and should there be any extraordinary or unusual services rendered by Escrow Holder, the parties herein agree to pay reasonable compensation to Escrow Holder for same. The fees charged by Escrow Holder for services from third party providers may include a "mark up" over the direct cost of such services to reflect the averaging of direct, administrative and overhead charges of Escrow Holder for such services.

3. **ADDRESS OF RECORD.** All documents and funds due the parties are to be mailed to the addresses set out in the Purchase Agreement, unless otherwise instructed. Buyer's address following the Close of Escrow shall be deemed to be the new property address unless Escrow Holder is notified to the contrary by Buyer. Buyer and Seller's signatures on any documents and/or instructions pertaining to this Escrow indicate Buyer and Seller's unconditional approval of same. The parties authorize you to destroy these instructions and records in this Escrow at any time after 10 years from the date of Close of Escrow.

4. **DEPOSIT OF FUNDS.** All funds received in this Escrow shall be deposited with other escrow funds in an escrow trust account or accounts of Escrow Holder, with any financial institution insured by a federal agency of the United States Government ("**Depository Institution**"). The Depository Institution may be an affiliate of Escrow Holder. Any funds deposited in this Escrow are insured only to the limit provided by the Federal Deposit Insurance Corporation. The maintenance of such escrow accounts with some Depository Institutions may result in Escrow Holder's being provided with an array of bank services, accommodations or other benefits by the Depository Institution. Escrow Holder or its affiliates also may elect to enter into other business transactions with or obtain loans for investment or other purposes from the Depository Institution. Said funds will not earn interest unless the instructions otherwise specifically state that funds shall be deposited in an interest bearing account and Escrow Holder may charge a reasonable fee for establishing such an account. All disbursements shall be made by Escrow Holder's check unless otherwise instructed in writing. Escrow Holder is authorized to transfer any Buyer's funds on deposit under any reservation instrument executed by Buyer to this Escrow for credit to the Buyer's account.

5. **NOTICE OF CANCELLATION.** If for any reason this Escrow cannot be closed within the period of time set forth in the Purchase Agreement, Escrow Holder shall nevertheless close it as soon as possible thereafter unless notice of cancellation is given by either party. Any notice of cancellation affecting this Escrow, for whatever reason and whenever given, may be given only in writing delivered to Escrow Holder. On receipt of such notice, Escrow Holder shall within 3 business days mail one copy to the other party. Except for demand of cancellation pursuant to any liquidated damages provision in the Purchase Agreement, unless written objection thereto shall be received by Escrow Holder as provided in the Purchase Agreement, Escrow Holder is authorized to comply with any instructions in such notice and to cancel the Escrow upon payment of Escrow Holder's cancellation charges. In the event written objection is received within the time stated or in the event conflicting claims are made upon Escrow Holder in this Escrow, Escrow Holder may refuse to take further action hereunder and may interplead the parties in any court of competent jurisdiction, in which case Escrow Holder shall be entitled to its costs as further provided in **Paragraph 17** below.

6. **PROPERTY TAX INFORMATION.** The Property may be presently assessed with other property and that the real property taxes, special taxes and assessments may not be segregated by the time this Escrow closes. If the real property taxes, special taxes and assessments are segregated and a tax bill is issued for the Property prior to the Close of Escrow, at the Close of Escrow, Escrow Holder shall prorate the above-mentioned taxes based on the most-recent tax bill for the Property. If no segregated tax bill is issued for the Property prior to the Close of Escrow, then Escrow Holder shall prorate the same based upon Seller's determination of the amount of real property taxes, special taxes and assessments applicable to the Property for the then-current fiscal year, which Seller shall submit to Escrow Holder in writing prior to the Close of Escrow. All prorations and adjustments are to be made on the basis of a 30 day month. Escrow Holder and Seller are not liable or responsible for the accuracy or adequacy of the figures provided by Seller to be used for these proration purposes.

7. **SUPPLEMENTAL TAXES.** Any supplemental assessment billing will be sent to Buyer directly by the County Tax Assessor and will be in addition to the normal tax installments. Buyer shall have the sole responsibility for the payment of all taxes and assessments, if any, related to the period after the Close of Escrow shown on supplemental tax bill. The supplemental tax bill is payable in accordance with the instructions contained therein. If the supplemental taxes are not paid before the date they become delinquent, a penalty will be due. If Buyer has an impound account for tax purposes, Buyer is aware that monthly payment to such account may be increased to reflect the increase in tax liability as indicated on the supplemental tax bill. Escrow Holder is not responsible for determining if Buyer's Lender's request for

impound funds is sufficient to include payment of contemplated supplemental taxes and it will be the responsibility of Buyer to contact its Lender with regard to payment of those supplemental taxes.

8. **NO WITHHOLDING.** Section 1445 of the INTERNAL REVENUE CODE provides that a transferee of a U.S. real property interest must withhold tax if the transferor (i.e., Seller) is a foreign person. Similarly, §§ 18622, 18805 and 26131 of the California REVENUE AND TAXATION CODE provide that a transferee of a California real property interest must withhold tax if the funds from the transferee are to be disbursed either to a transferor with a last known address outside of the State of California or to the financial intermediary of the transferor, if the transferor is a non-resident of California. To inform Buyer that withholding of tax is not required in connection with this transaction, Seller certifies that (a) Seller is not a foreign corporation, foreign partnership, foreign trust or foreign estate, and (b) Seller's known street address and its principal place of business are both within the State of California. Buyer and Seller acknowledge that Escrow Holder has provided notice of these provisions, and, in light of the representations of Seller made herein, that Escrow Holder will take no action regarding the withholding.

9. **AUTHORIZATION TO FURNISH COPIES.** Escrow Holder shall furnish a copy of this Purchase Agreement, any amendments hereto, closing statements and/or any other documents deposited in the Escrow to Seller, to Buyer, the Lender, and/or Buyer's attorney, upon request of Seller, of Buyer, the Lender or Buyer's attorney, as the case may be.

10. **INSURANCE POLICIES.** In all matters relating to insurance, Escrow Holder may assume that each policy required to be obtained by Buyer is in force and that the necessary premium has been paid. Escrow Holder is not responsible for obtaining fire, hazard or liability insurance for Buyer, unless Escrow Holder has received specific written instructions to obtain such insurance prior to Close of Escrow from the Buyer or Buyer's lender.

11. **TAXPAYER IDENTIFICATION NUMBER REPORTING AND DISCLOSURE.** Federal law requires Escrow Holder to report Seller's taxpayer identification number ("TIN"), forwarding address, and the gross sales price to the Internal Revenue Service ("IRS"). To comply with the USA PATRIOT Act, certain taxpayer identification information (including, but not limited to, the TIN) may be required by Escrow Holder from certain persons or entities involved (directly or indirectly) in the transaction prior to closing. Federal and state laws require that certain forms include a party's TIN and that such forms or copies of the forms be provided to the other party and to the applicable governmental authorities. Parties to a real estate transaction involving seller-provided financing are required to furnish, disclose, and include the other party's TIN in their tax returns. Escrow Holder is authorized to release a party's TINs and copies of statutory forms to the other party and to the applicable governmental authorities in the foregoing circumstances. The parties agree to hold Escrow Holder harmless against any fees, costs, or judgments incurred and/or awarded because of the release of their TIN as authorized herein.

12. **RETENTION OF FUNDS.** If for any reason funds are retained in Escrow following the closing, Escrow Holder may deduct a monthly charge therefrom for its acting as custodian thereof. If there is no action taken on the Escrow within 6 months after the Close of Escrow, Escrow Holder's agency obligation shall terminate at Escrow Holder's option, and all documents, monies or other items held by Escrow Holder in the Escrow shall be returned to the party or parties depositing the same, subject to Escrow Holder's obligation to retain the records set forth in **Paragraph 3**.

13. **PRELIMINARY CHANGE OF OWNERSHIP FORM.** Buyer is required to furnish a Preliminary Change of Ownership form with the Grant Deed and the County Recorder may charge a penalty if the form is not filed or is unacceptable. Escrow Holder will furnish the required form to Buyer, but will not accept responsibility for its acceptance or rejection.

14. **ESCROW HOLDER NOT LIABLE.** Escrow Holder shall not be liable for the sufficiency or correctness as to form, content, manner of execution or validity of any instruments or reports deposited in this Escrow or ordered by Escrow Holder as an accommodation to the parties, or as to identity, authority or rights of any person executing the same or for failure to comply with any of the provisions of any agreements or other instruments filed herein and referred to herein. Escrow Holder shall not be concerned with any matters relating to construction, warranties or other agreements made between Buyer and Seller over which Escrow Holder has no control and/or which agreements may survive Close of Escrow.

15. **DEMANDS.** Escrow Holder shall pay at the Close of Escrow, from Seller's funds, any demand for reconveyance, releases or satisfactions of any encumbrances of record and any taxes, payment and/or release which are necessary to place title in condition to close this Escrow.

16. **SUPPLEMENTAL INSTRUCTIONS.** Any amended, supplemental or additional escrow instructions shall be subject to the conditions contained in this Addendum and must be in writing signed by Buyer and Seller and delivered to Escrow Holder. Such supplemental instructions may be executed in counterparts.

17. **CONFLICTING DEMANDS OR DISPUTES.** If conflicting demands or notices are made or served upon Escrow Holder or any controversy arises between the parties hereto or with any third party growing out of or relating to this Escrow, Escrow Holder shall have the absolute right to withhold all further proceedings in this Escrow until receipt of satisfactory written notice of the settlement of the controversy by agreement of the parties hereto, or by final judgment of an arbitrator or court of competent jurisdiction and/or Escrow Holder may interplead the parties in any court of competent jurisdiction. All parties to this Escrow hereby jointly and severally promise and agree to pay promptly on demand, as well as to indemnify Escrow Holder and hold Escrow Holder harmless from and against, all litigation and interpleader costs, damages, judgments, attorney's fees, expenses, obligations and liabilities of every kind which, in good faith, Escrow Holder may incur or suffer in connection with or arising out of this Escrow unless Escrow Holder is found or adjudged to have engaged in willful misconduct or negligence. Buyer and Seller shall each bear their respective attorneys' fees and costs. Notwithstanding any of the foregoing provisions of this **Paragraph 17**, and in accordance with DRE Regulation 2791(c)(4)(C), only Seller and not Buyer shall indemnify and hold Escrow Holder harmless from any claim by Buyer arising out of payment of purchase money (as defined in DRE Regulation 2791(a)) to Seller pursuant to a waiver by Buyer of the right to a determination of default by a court or arbitrator.



Buyer's Initials    Buyer's Initials

ESCROW HOLDER CONDUCTS ESCROW BUSINESS UNDER CERTIFICATE OF AUTHORITY NO. 350 ISSUED BY THE CALIFORNIA DEPARTMENT OF INSURANCE.



Buyer's Initials Buyer's Initials

Project: La Boheme
Residential Unit: #35

## COMMON INTEREST SUBDIVISION ADDENDUM

This Common Interest Subdivision Addendum ("**Addendum**") is attached to and forms a part of the Purchase Agreement and Escrow Instructions executed between Buyer and Seller ("**Purchase Agreement**") for the Property described in the Purchase Agreement. Any capitalized terms not otherwise defined herein shall have the meanings set forth in the Purchase Agreement. If there is a conflict between the Purchase Agreement and the terms and provisions of this Addendum, the terms and provisions of this Addendum shall control.

1. **HOMEOWNER ASSOCIATION(S).** Buyer will become a member of the following homeowners association(s) ("Association(s)") at Close of Escrow:

Project Association: La Boheme Owners Association

Upon the recordation of Seller's Grant Deed, Buyer will automatically become a "Member" of the applicable Association(s) referenced above.

2. **CAPITAL CONTRIBUTION(S).** Buyer agrees at Close of Escrow to pay through escrow to the Association(s) the capital contribution(s) set forth in the CC&Rs (described below). These amounts are currently estimated to be equal to:

Project Association: $ 688.00 to $888.00 based on Square Footage

These amounts are subject to adjustment at the Close of Escrow if the amounts have been calculated based upon the amount of monthly assessments to the Association(s) if there are changes in the amount of assessments prior to the Close of Escrow.

These funds represent "start-up" funds for operating the common areas and/or property owned by the applicable Association and are not a prepayment of assessments or a part of the Purchase Price for the Property. Upon a subsequent resale of the Property by Buyer to another purchaser, Buyer will not obtain a refund of his or her Capital Contribution(s) from the Association(s).

3. **ASSESSMENTS.** Buyer will be required to pay the assessments of each Association and that such assessments shall be prorated between Buyer and Seller as of the Close of Escrow. Buyer acknowledges his or her understanding that the regular assessments are subject to change from time to time by the Association(s) Board(s) of Directors and the Association(s)' budgets may anticipate changes when new phases are brought into the project.

4. **DECLARATIONS.** The Property to be conveyed under the Purchase Agreement is subject to the Declaration of Covenants, Conditions and Restrictions ("**CC&Rs**") for each of the above described Associations.

5. **CONDITIONS TO CLOSE.** In addition to the conditions set forth in the Purchase Agreement, the Close of Escrow is subject to satisfaction of each of the following requirements, which are conditions precedent to Buyer's obligation to close Escrow under the Purchase Agreement:

5.1 Blanket Encumbrances. Any and all blanket encumbrances, as defined in Section 11013 of Business and Professions Code against the Property have been fully released and reconveyed. For purposes of compliance with Section 11013.2(a) of the Business and Professions Code, a release from a blanket encumbrance resulting from a deed of trust or mortgage against the Property shall require satisfaction of either of the following: (i) an instrument has been duly recorded unconditionally reconveying and releasing the Property from the lien or charge of such deed of trust; or (ii) the Buyer is notified that an agreement or demand constituting a release agreement as defined in Regulation 2791.1(b)(2)(A) has been duly deposited with the Escrow Holder and available to the Buyer on request for each such deed of trust, and the Buyer will be provided a policy of title insurance insuring the Buyer against loss by reason of each such deed of trust;

5.2 Notice of Completion or Bond. Seller has either (i) recorded a Notice of Completion, as defined in Section 3093 of the Civil Code, for the construction of all common facilities, improvements, landscaping and other structures situated on the Phase in which the Property is located, if any or (ii) has deposited with Escrow Holder a bond, cash deposit or other financial security in a form and in an amount acceptable to the Department of Real Estate together with appropriate instructions under the provisions of California Business and Professions Code Section 11018.5 to assure lien-free completion of the scheduled improvements which are not completed and paid for as of the date of furnishing the financial security to assure completion;

5.3 Maintenance Assessment Bond. In compliance with DRE Regulation 2792.9(a)(2), prior to the first close of an escrow for the sale of a Lot or Condominium in the Phase in which the Property is located, a Maintenance Assessment Bond in favor of the applicable



Buyer's Initials Buyer's Initials

Association(s) in an amount equal to 6 monthly installments of the Regular Assessments levied by the applicable Association(s) for each Lot or Condominium in this phase, has been deposited with Escrow Holder, together with a copy of Real Estate Form 643, executed by both Seller and Escrow Holder. Escrow Holder shall not release said Bond(s) until (a) escrows have closed on 80% of all Lots or Condominiums In the phase in which the Property Is located; and (b) Escrow Holder has received a certified copy of a resolution of the Board of Directors of the applicable Association(s), adopted not less than thirty (30) days prior to its receipt, stating that Seller Is not delinquent in the payment of any Assessments for which Seller is obligated;

**5.4** **Undivided Interest in Common Area**. Buyer's undivided interest in the Common Area (if any) has been or is being conveyed to Buyer with title to the Property;

**5.5** **Subordination**. The Title Company, as a condition of the Close of Escrow, will issue to Buyer an owner's policy of title insurance insuring that each monetary encumbrance of record, including but not limited to deeds of trust and mortgages, encumbering all or any portion of the Property and of the Project, will, Immediately after closing, be subordinate to the Declaration(s) for the Association(s) described above, together with a Subdivision Map Act Endorsement No. 116.7;

**5.6** **Mechanics' Liens**. The statutory period for recordation of any mechanic's liens against the Property has expired, or alternately Buyer Is provided with a Policy of Title Insurance and endorsement, insuring Buyer against unrecorded mechanic's liens;

**5.7** **Conveyance of Association Property**. If applicable, title to any "Association Property" for the applicable Phase has been conveyed free of liens to the Association; and

**5.8** **Notice of Non-Adversarial Procedure**. Escrow Holder shall have confirmed that a Notice of Non-Adversarial Procedure under California Civil Code Section 912(f) covering the Property and, if applicable, any Association Property in the Phase in which the Property is located has been recorded.

# La Boheme Assessments Schedule - 1/23/07

| Lot # | Plan # | Budget Letter | sq ft | Assessment | Capital Contribution | |
|---|---|---|---|---|---|---|
| 1106 | 001D | B | 795 | $343.00 | $686.00 | We are now at phase 2 amounts |
| 1127 | 002F | D | 1040 | $370.00 | $740.00 | |
| 1129 | 002E | D | 1023 | $370.00 | $740.00 | |
| 1135 | 02B1 | H | 1361 | $411.00 | $822.00 | |
| 1136 | 001G | C | 907 | $357.00 | $714.00 | |
| 1202 | 002B | E | 1097 | $379.00 | $758.00 | |
| 1213 | 01D1 | I | 1472 | $421.00 | $842.00 | |
| 1227 | 002F | D | 1040 | $370.00 | $740.00 | |
| 1228 | 002B | E | 1097 | $379.00 | $758.00 | |
| 1229 | 002E | D | 1023 | $370.00 | $740.00 | |
| 1235 | 002B | E | 1097 | $379.00 | $758.00 | |
| 1305 | 002F | D | 1040 | $370.00 | $740.00 | |
| 1313 | 001D | B | 795 | $343.00 | $686.00 | |
| 1320 | 01B1 | B | 827 | $343.00 | $686.00 | |
| 1326 | 001B | A | 694 | $330.00 | $660.00 | |
| 1329 | 002E | D | 1023 | $370.00 | $740.00 | |
| 1404 | 02E3 | F | 1134 | $386.00 | $772.00 | |
| 1408 | 01D2 | C | 920 | $357.00 | $714.00 | |
| 1411 | 01D2 | C | 920 | $357.00 | $714.00 | |
| 1413 | 01D2 | C | 920 | $357.00 | $714.00 | |
| 1419 | 01D2 | C | 920 | $357.00 | $714.00 | |
| 1421 | 01D2 | C | 920 | $357.00 | $714.00 | |
| 1424 | 01D2 | C | 920 | $357.00 | $714.00 | |
| 1430 | 02E3 | F | 1134 | $386.00 | $772.00 | |
| 1432 | 01D2 | C | 920 | $357.00 | $714.00 | |
| 2101 | 002C | C | 985 | $357.00 | $714.00 | |
| 2110 | 02E2 | D | 1022 | $370.00 | $740.00 | |
| 2112 | 02B3 | F | 1123 | $386.00 | $772.00 | |
| 2114 | 02E2 | D | 1022 | $370.00 | $740.00 | |
| 2222 | 002B | E | 1040 | $379.00 | $758.00 | |
| 2320 | 02E2 | D | 1022 | $370.00 | $740.00 | |
| 2406 | 01D2 | C | 920 | $357.00 | $714.00 | |

Project: La Boheme
Residential Unit: 1135

## NOTICE OF AFFILIATED BUSINESS ARRANGEMENT ADDENDUM

This Notice of Affiliated Business Arrangement Addendum (**"Addendum"**) is attached to and forms a part of the Purchase Agreement and Escrow Instructions (**"Purchase Agreement"**), executed between Buyer and Seller for the Property described in the Agreement. Any capitalized terms not otherwise defined herein shall have the meaning as set forth in the Agreement. If there is a conflict between the Purchase Agreement and the terms and provisions of this Addendum, the terms and provisions of this Addendum shall control.

FROM: Western Pacific Housing, Inc.,
dba D.R. Horton, America's Builder
5790 FLEET ST. SUITE 210
Carlsbad, CA 92008
**[Seller]**

This is to give you notice that Seller, has a business relationship with:

| | |
|---|---|
| DHI Mortgage Company, LTD.<br>5790 Fleet St. Suite 220<br>Carlsbad, CA 92008 | D.R. Horton Insurance Agency, Inc.<br>301 Commerce Street Suite 500<br>Fort Worth, TX 76102 |

The nature of this business relationship is that these companies are corporate affiliates, each being wholly or partially owned by, or by a subsidiary of, the same parent corporation. Because of this relationship, this referral may provide Seller, a financial or other benefit.

Set forth below is the estimated charge or range of charges by each company for settlement services listed. You are **NOT** required to use these companies as a condition of your purchase of the Property from Seller. THERE ARE FREQUENTLY OTHER SETTLEMENT SERVICE PROVIDERS AVAILABLE WITH SIMILAR SERVICES. YOU ARE FREE TO SHOP AROUND TO DETERMINE THAT YOU ARE RECEIVING THE BEST SERVICES AND THE BEST RATE FOR THESE SERVICES.

| DHI MORTGAGE COMPANY, LTD. | |
|---|---|
| **Service** | **Charge or Range** |
| Loan Origination Fee: | 0 – 1.5% of Loan Amount |
| Underwriting Fee: | $0.00 - $430.00* |
| Loan Processing Fee: | $0.00 - $490.00* |
| Appraisal Fee: | $350.00-$450.00* |

*These fees may vary depending upon whether the loan is originated or brokered by DHI Mortgage.

NOTE: A Good Faith Estimate of all settlement charges will be provided to you at or within three business days after loan application. You may be entitled to additional builder discounts paid by the Seller to reduce your settlement charges as set forth in the Allowance for Closing Costs (and Options) Addendum.

| D. R. HORTON INSURANCE AGENCY, INC. |
|---|
| D.R. HORTON INSURANCE AGENCY, INC. is a licensed insurance agent that offers policies of property insurance as agent for one or more insurance companies qualified to transact insurance business in the State of California. You will be provided a separate proposal or quote of the terms and conditions of any policy of insurance offered by D.R. HORTON INSURANCE AGENCY, INC. in which you express an interest. The quote will set out the estimated premium and other charges, or range of charges, by D.R. HORTON INSURANCE AGENCY, INC. for its insurance products or services. |

**ACKNOWLEDGMENT:**
I/we have read this disclosure form and understand that Seller is, referring me/us to purchase the above-described settlement service(s) from DHI MORTGAGE COMPANY, LTD., and D.R. Horton Insurance Agency, Inc. and may receive a financial or other benefit as the result of this referral.

James A. Wilson — Buyer — 09-29-07 — Date

Shawn Wilson — Buyer — 10-10-07 — Date

Updated 8/21/07

Project: La Boheme
Residential Unit: 1135

**NOTICE OF ACCESS TO DATABASE REGARDING**
**THE LOCATION OF SEX OFFENDERS DISCLOSURE ADDENDUM**

This Notice Of Access To Database Regarding The Location Of Sex Offenders Disclosure Addendum ("Addendum") is attached to and forms a part of the Purchase Agreement and Escrow Instructions executed between Buyer and Seller ("Purchase Agreement") for the Property described in the Purchase Agreement. Any capitalized terms not otherwise defined herein shall have the meanings set forth in the Purchase Agreement.

The "Notice Of Access To Database Regarding The Location Of Sex Offenders Disclosure" contained in the General Disclosure Addendum attached as an addendum to the Purchase Agreement is hereby replaced by the following disclosure:

**Notice: Pursuant to Section 290.46 of the Penal Code, information about specified registered sex offenders is made available to the public via an Internet Web site maintained by the Department of Justice at www.meganslaw.ca.gov. Depending on an offender's criminal history, this information will include either the address at which the offender resides or the community of residence and ZIP Code in which he or she resides.**

**Seller has not and will not check for any offenders in this area. It is your responsibility to check for offenders in the area in or around the Project.**



Buyer's Initials Buyer's Initials

# STATEMENT OF INFORMATION

For confidential use by the Title Company in searching the records in connection with its ORDER NO. ____

**MY FULL NAME**

James Arthur Wilson
(FIRST NAME) (FULL MIDDLE NAME — IF NONE, INDICATE) (LAST NAME)

Birthplace Grandrapids Michigan Year of Birth 4-27-47

I have lived continuously in the U.S.A. since 1947

(If married, complete the following:)

Full name of wife/husband Sharyn Lois Wilson
(FIRST NAME) (FULL MIDDLE NAME — IF NONE, INDICATE) (LAST NAME)

Birthplace Brooklyn New York Year of Birth 01-24-48

HE/SHE has lived continuously in the U.S.A. since ____

We were married on July 4th 1999 at Lego land Carlsbad
(DATE) (PLACE)

Wife's maiden name Sharyn Lois Zakell

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
MY SOCIAL SECURITY NUMBER — MY HUSBAND'S/WIFE'S SOCIAL SECURITY NUMBER

X0902293
MY DRIVERS LICENSE NUMBER — MY HUSBAND'S/WIFE'S DRIVERS LICENSE NUMBER

Have you ever used or been known by any other name(s)? No

If so what name(s) ____

**RESIDENCES AND OCCUPATIONS, BUSINESS, PARTNERSHIPS DURING PAST 10 YEARS**

## RESIDENCES

| NUMBER AND STREET | CITY | FROM (DATE) | TO (DATE) |
|---|---|---|---|
| 2162 View Crest Glen | Escondido | 1998 | Present |
| | | | |

## OCCUPATIONS

| | FIRM NAME | DATES | ADDRESS |
|---|---|---|---|
| (Husband's) | ~~James~~ Solar Turbines | 1988 to present | 2200 Pacific Hwy S.D. |
| (Wife's) | AT&T | 1999 to present | S.D. |
| | | | |

(If more space needed, use reverse side of form)

## BUSINESS OWNED

| FIRM NAME | DATES | ADDRESS | TAX I.D. NO. |
|---|---|---|---|
| | | | |
| | | | |

## PARTNERSHIP AFFILIATES

| NAME | DATES | ADDRESS | TAX I.D. NO. |
|---|---|---|---|
| | | | |
| | | | |

**ANY FORMER MARRIAGE OR MARRIAGES**

(If no former marriage or marriages, write "None" ____ Otherwise, please complete the following:)

Name of former wife ____

Deceased ____ Divorced ____ When ____ Where ____

Name of former husband ____

Deceased ____ Divorced ____ When ____ Where ____

(If more space needed, use reverse side of form)

Judgments and liens against parties or entities listed are as follows: ____ (If none write "None")

IMPROVEMENTS: ☐ SINGLE RESIDENCE ☒ MULTIPLE RESIDENCE ☐ COMMERCIAL

OCCUPIED BY: ☐ OWNER ☐ LESSEE ☐ TENANTS

Date 09-29-07 ANY PORTION OF NEW LOAN FUNDS TO BE USED FOR CONSTRUCTION ☐ YES ☐ NO

THE STREET ADDRESS of the property in this transaction is: 3060 Ohio Street #135, San Diego 92104
(INDICATE STREET, AVENUE OR DRIVE) (CITY)

I declare under penalty of perjury that the foregoing is true and correct.

Business Phone (760) 644-3982 James A. Wilson SIGNATURE

Home Phone (760) 752-7797 Sharyn Wilson SIGNATURE

(If married, both husband and wife should sign)

**The filling out of this form will help protect you and will speed the completion of your order. Should you want to know why, an explanation will be found on the other side.**

2005 (6/89)

# RECEIPT FOR PUBLIC REPORT

The Laws and Regulations of the California Real Estate Commissioner require that you as a prospective purchaser or lessee be afforded an opportunity to read the public report for this subdivision before you make any written offer to purchase or lease a subdivision interest or before any money or other consideration toward purchase or lease of a subdivision interest is accepted from you.

In the case of a preliminary or interim public report, you must be afforded an opportunity to read the public report before a written reservation or any deposit in connection therewith is accepted from you.

In the case of a conditional public report, delivery of legal title or other interest contracted for will not take place until issuance of a final public report. Provision is made in the sales agreement and escrow instructions for the return to you of the entire sum of money paid or advanced by you if you are dissatisfied with the final public report because of a material change. (See California Business and Professions Code Section 11012.)

**DO NOT SIGN THIS RECEIPT UNTIL YOU HAVE RECEIVED A COPY OF THE PUBLIC REPORT AND HAVE READ IT.**

I read the Commissioner's Public Report on 119378LA-A01,
(FILE NUMBER)

MAP NO. 15113 "LA BOHEME" (PHASE 2).
(TRACT NUMBER OR NAME)

I understand the public report is not a recommendation or endorsement of the subdivision, but is for information only.

The issue date of the public report which I received and read is: August 3, 2006.

Sharyn Wilson James D Wilson
(SIGNATURE)

09-29-07
(DATE)

2162 View North Glen
Es Ca 92026
(ADDRESS)

STATE OF CALIFORNIA — DEPARTMENT OF REAL ESTATE RE 614E (Rev. 6/05)

Community: La Boheme
Residential Unit: 1135

# RECEIPT OF DOCUMENTS AND INFORMATION

**RECEIPT FOR PUBLIC REPORT.**

The Law and Regulations of the Real Estate Commissioner require that you, as a prospective purchaser or lessee, be afforded an opportunity to read the public report for this subdivision before you make any written offer to purchase or lease a subdivision interest or before any money or other consideration toward purchase or lease a subdivision interest is accepted from you. In the case of a preliminary subdivision public report, you must be afforded an opportunity to read the report before a written reservation of any deposit in connection therewith is accepted from you. DO NOT SIGN THIS RECEIPT UNTIL YOU HAVE RECEIVED A COPY OF THE REPORT AND HAVE READ IT:
I have read the commissioner's public report on:

| 119378 LA 401 | La Boheme |
|---|---|
| (File No.) | (Tract No. Or Name) |

I understand the report is not a recommendation or endorsement of the subdivision, but is for information purposes only. The date of the public report, which I received and read, is:

| Jan. 23, 2006 | Aug. 3, 2006 |
|---|---|
| (Date Issued) | (Date Amended) |

Name James A. Wilson
Address 2162 View Crest Glen Es. Ca. 92026

Name Sharyn Wilson
Address 2162 View Crest Glen Escondido, CA 92026

*Sub divider is required to retain this receipt for three years.*

## Receipt of Documents:

Buyer hereby acknowledges receipt of the following documents (indicate documents delivered to Buyer):

| Draft | Final | |
|---|---|---|
| ☐ | ☒ | 1. Amended Final Public Report from the California Dept. of Real Estate |
| ☐ | ☒ | 2. 1st Amended and Superseded CC&Rs of the La Boheme Owners Association |
| ☐ | ☒ | 3. Articles of Incorporation LaBoheme Owners Association |
| ☐ | ☒ | 4. Bylaws of the La Boheme Owners Association |
| ☐ | ☒ | 5. Second Superseding Condominium Plan |
| ☐ | ☒ | 6. Revised/Approved Budget of the La Boheme Owners Association |
| ☐ | ☒ | 7. Property Disclosure Report (PDR) w/ Natural Hazard Disclosure Statement |
| ☐ | ☒ | 8. Homeowner's Manual and Customer Care Program Guide (including the fit and finish warranty and maintenance requirements) |
| ☐ | ☒ | 9. SB800 Booklet containing Civil Code Section 895 et. seq. |
| ☐ | ☒ | 10. Notice of Non-Adversarial Procedures |
| ☐ | ☒ | 11. DR Horton Limited 10-4-1 Warranty |
| ☐ | ☒ | 12. La Boheme Owners Association Rules & Regs and Architectural Guidelines |

BUYER AGREES TO RETAIN ALL DOCUMENTS RECEIVED IN CONNECTION WITH THE PURCHASE OF THE PROPERTY AND PROVIDE SUCH DOCUMENTS TO ANY SUBSEQUENT PURCHASER OF THE PROPERTY. Buyer acknowledges that it has received all of the documents listed above and may receive other documents provided in conjunction with the purchase of the Property (collectively, the "Documents"). Buyer shall maintain a full and complete copy of the Documents and agrees to provide any subsequent Buyer with a complete copy of the Documents including, but not limited to, a copy of the Maintenance Manual provided or to be provided by Seller to Buyer, any contractual warranties provided by Seller to Buyer and a copy of all manufactured products maintenance and limited warranty information. Buyer should instruct any subsequent buyer to provide to their subsequent buyers a complete copy of the Documents.

| | |
|---|---|
| James A. Wilson | Sharyn Wilson |
| Buyer | Buyer |
| James A. Wilson | SHARYN WILSON |
| Print Name | Print Name |
| 09-29-07 | 10-10-07 |
| Dated | Dated |

# DISCLOSURE REGARDING
## REAL ESTATE AGENCY RELATIONSHIPS
(As required by the Civil Code)

When you enter into a discussion with a real estate agent regarding a real estate transaction, you should from the outset understand what type of agency relationship or representation you wish to have with the agent in the transaction.

### SELLER'S AGENT

A Seller's agent under a listing agreement with Seller acts as the agent for the Seller only. A Seller's agent or a subagent of that agent has the following affirmative obligations:
To the Seller:
(a) A Fiduciary duty of utmost care, integrity, honesty, and loyalty in dealings with the Seller.
To the Buyer and the Seller:
(a) Diligent exercise of reasonable skill and care in performance of the agent's duties.
(b) A duty of honest and fair dealing and good faith.
(c) A duty to disclose all facts known to the agent materially affecting the value of desirability of property that are not known to, or within the diligent attention and observation of, the parties.

An agent is not obligated to reveal to either party any confidential information obtained from the other party that does not involve the affirmative duties set forth above.

### BUYER'S AGENT

A selling agent can, with a Buyer's consent, agree to act as agent for the Buyer only. In these situations, the agent is not the Seller's agent, even if by agreement the agent may receive compensation for services rendered, either in full or in part from the Seller. An agent acting only for a Buyer has the following affirmative obligations:
To the Buyer:
(a) A fiduciary duty of utmost care, integrity, honesty, and loyalty in dealings with the Buyer.
To the Buyer and the Seller:
(a) Diligent exercise of reasonable skill and care in performance of the agent's duties.
(b) A duty of honest and fair dealing and god faith.
(c) A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the parties.

An agent is not obligated to reveal to either party any confidential information obtained from the other party that does not involve the affirmative duties set forth above.

### AGENT REPRESENTING BOTH SELLER & BUYER

A real estate agent, either acting directly or through one or more associate licensees, can legally be the agent of both the Seller and the Buyer in a transaction, but only with the knowledge and consent of both the Seller and the Buyer.

In a dual agency situation, the agent has the following affirmative obligations to both the Seller and the Buyer:
(a) A fiduciary duty of utmost care, integrity, honesty and loyalty in the dealings with either the Seller or the Buyer.
(b) Other duties to the Seller and the Buyer as stated above in their respective sections.
In representing both Seller and Buyer, the agent may not, without the express permission of the respective party, disclose to the other party that the Seller will accept a price less than the listing price or that the Buyer will pay a price greater than the price offered.

The above duties of the agent in a real estate transaction do not relieve a Seller or a Buyer from the responsibility to protect his or her own interests. You should carefully read all agreements to assure that they adequately express your understanding of the transaction. A real estate agent is a person qualified to advise about real estate. If legal or tax advice is desired, consult a competent professional.

Throughout your real property transaction you may receive more than one disclosure form, depending upon the number of agents assisting in the transaction. The law requires each agent with whom you have more than a casual relationship to present you with this disclosure form. You should read its contents each time it is presented to you, considering the relationship between you and the real estate agent in your specific transaction.

This disclosure form includes the provisions of sections 2079.13 to 2079.24, inclusive, of the Civil Code set forth on the reverse hereof. Read it carefully

I/WE ACKNOWLEDGE RECEIPT OF A COPY OF THIS CONFIRMATION.

BUYER/SELLER James A Wilson Date 09-29-07 Time ____________ AM/PM

BUYER/SELLER Sharyn Wilson Date 10-10-07 Time ____________ AM/PM

AGENT Minoru Y. Miyashiro (Please Print) By [signature] (Associate Licensee or Broker-Signature) Date 9/29/07

> This Disclosure form must be provided in a listing, sale, exchange, installment land contract, or lease over one year, if the transaction involves one-to-four dwelling residential property, including a mobile home, as follows:
> (a) From a Listing Agent to a Seller: Prior to entering into the listing.
> (b) From an Agent selling a property he/she has listed to a buyer: Prior to the Buyer's execution of the offer.
> (c) From a Selling Agent to a Buyer: Prior to the Buyer's execution of the offer.
> (d) From a Selling Agent (in a cooperating real estate firm) to a Seller: Prior to presentation of the offer to the Seller.
>
> It is not necessary or required to confirm an agency relationship using a separate Confirmation form if the agency confirmation portion of the Real Estate Purchase contract is properly completed in full. However, it is still necessary to use this Disclosure form.

2079.13 As used in Sections 2079.14 to 2079.24, inclusive, the following terms have the following meanings:

(a) "Agent" means a person acting under provisions of title 9 (commencing with Section 2295) in a real property transaction, and includes a person who is licensed a a real estate broker under Chapter 3 (commencing with Section 10130) of Part 1 of Division 4 of the Business and Professions Code, and under whose license a listing i executed or an offer to purchase is obtained.

(b) "Associate licensee" means a person who is licensed as a real broker or salesperson under Chapter 3 (commencing with Section 10130) of Part 1 of Division 4 c the Business and Professions Code and who is either licensed under a broker or has entered into a written contract with a broker to act as the broker's agent in connectio with acts requiring a real estate license and to function under the broker's supervision in the capacity of an associate licensee.

The agent in the real property transaction bears responsibility for his or her associate licensees who perform as agents of the agent. When an associate licensee owes a dut to any principal, or to any buyer or seller who is not a principal, in a real property transaction, that duty is equivalent to the duty owed to that party by the broker for whom th associate licensea functions.

(c) "Buyer" means a transferee in a real property transaction, and includes a person who executes an offer to purchase real property from a seller through an agent, c who seeks the services of an agent in more than a causal, transitory, or preliminary manner, with the object of entering into a real property transaction. "Buyer" include vendee or lessee.

(d) "Dual agent" means an agent acting, either directly or through an associate licensee, as agent for both the seller and the buyer in a real property transaction.

(e) "Listing agreement" means a contract between an owner of real property and an agent, by which the agent has been authorized to sell the real property or to fin or obtain a buyer.

(f) "Listing agent" means a person who has obtained a listing of real property to act as an agent for compensation.

(g) "Listing price" is the amount expressed in dollars specified in the listing for which the seller is willing to sell the real property through the listing agent.

(h) "Offering price" is the amount expressed in dollars specified in an offer to purchase for which the buyer is willing to buy the real property.

(i) "Offer to purchase" means a written contract executed by a buyer acting through a selling agent which becomes to contract for the sale of the real property upo acceptance by the seller.

(j) "Real property" means any estate specified by subdivision (1) or (2) of Section 761 in property which constitutes or is improved with one to four dwelling units, an leasehold in this type of property exceeding one year's duration, and mobile homes, when offered for sale or sold through an agent pursuant to the authority contained i Section 10131.6 of the Business and Professions Code.

(k) "Real property transaction" means a transaction for the sale of real property in which an agent is employed by one or more of the principals to act in the transaction, and includes a listing or an offer to purchase.

(l) "Sell," "sale," or "sold" refers to a transaction for the transfer of real property from the seller to the buyer, end includes exchanges of real property between th seller end buyer, transaction for the creation of a real property sales contract within the meaning of Section 2985, and transactions for the creation of a leasehold exceedin on year's duration.

(m) "Seller" means the transferor in a real property transaction, and includes an owner who lists real property with an agent, whether or not a transfer results, or wh receives an offer to purchase real property of which he or she is the owner from an agent on behalf of another. "Seller" includes both a vendor and a lessor.

(n) "Selling agent" means a listing agent who acts alone, or an agent who acts in cooperation with a listing agent, and who sells or finds and obtains a buyer for th real property, or an agent who locates property for a buyer or who finds a buyer for a property for which no listing exists and presents an offer to purchase to the seller.

(o) "Subagent" means a person to whom an agent delegates agency powers as provided in Article 5 (commencing with Section 2349) of Chapter 1 of Title { However, "subagent" does not include an associate licensee who is acting under the supervision of an agent in a real property transaction.

2079.14 Listing agents and selling agents shall provide the seller and buyer in a real property transaction with a copy of the disclosure form specified in Section 2079.16, and, excep as provided in subdivision (c), shall obtain a signed acknowledgment of receipt from that seller or buyer, except as provided in this section or Section 2079.15, as follows:

(p) The listing agent, if any, shall provide the disclosure form to the seller prior to entering into the listing agreement.

(q) The selling agent shall provide the disclosure form to the seller as soon as practicable prior to presenting the seller with an offer to purchase, unless the sellin agent previously provided the seller with a copy of the disclosure form pursuant to subdivision (a).

(r) Where the selling agent does not deal on a face-to-face basis with the seller, the disclosure form prepared by the selling agent may be furnished to the seller (an acknowledgment of receipt obtained for the selling agent from the seller) by the listing agent, or the selling agent may deliver the disclosure form by certified mail addressed t the seller at his or her last known address, in which case no signed acknowledgment of receipt is required.

(s) The selling agent shall provide the disclosure form to the buyer as soon as practicable prior to execution of the buyer's offer to purchase, except that if the offer t purchase is not prepared by the selling agent, the selling agent shall present the disclosure form to the buyer not later than the next business day after the selling ager receives the offer to purchase from the buyer.

2079.15 In any circumstance in which the seller or buyer refuses to sign an acknowledgment of receipt pursuant to Section 2079.14, the agent, or an associate licensee agent for a agent, shall set forth, sign, and date a written declaration of the facts of the refusal.

2079.17 (a) As soon as practicable, the selling agent shall disclose to the buyer and seller whether the selling agent is acting in the real property transaction exclusively as the buyer' agent, exclusively as the seller's agent, or as a dual agent representing both the buyer and the seller. This relationship shall be confirmed in the contract to purchase end se real property or in a separate writing executed or acknowledged by the seller, the buyer, and the selling agent prior to or coincident with execution of that contract by the buye and the seller, respectively.

(b) As soon as practicable, the listing agent shall disclose to the seller whether the listing agent is acting in the real property transaction exclusively as the seller's agent, or a a dual agent representing both the buyer and seller. This relationship shall be confirmed in the contract to purchase and sell real property or in a separate writing executed c acknowledged by the seller and the listing agent prior to or coincident with the execution of that contract by the seller.

(t) The confirmation required by subdivision (a) and (b) shall be in the following form.

| | |
|---|---|
| Real Estate Disposition Corporation is the agent of (check one): | ______________________ is the agent of (check one): |
| (Name of Listing Agent) | Name of Selling Agent if not the same as the Listing Agent) |
| ☒ the seller exclusively; or | ☐ the buyer exclusively; or |
| ☐ both the buyer and seller. | ☐ the seller exclusively; or |
| ☐ both the buyer and seller. | ☐ both the buyer and seller. |

(u) The disclosures and confirmation required by this section shall be in addition to the disclosure required by Section 2079.14.

2079.18 No selling agent in a real property transaction my act as an agent for the buyer only, when the selling agent is also acting as the listing agent in the transaction.

2079.19 The payment of compensation or the obligation to pay compensation to an agent by the seller or buyer is not necessarily determinative of a particular agency relationshi between an agent and the seller or buyer. A listing agent and a selling may agree to share any compensation or commission paid, or any right to any compensation c commission for which an obligation arises as the result of a real estate transaction, and the terms of any such agreement shall not necessarily be determinative of a particul relationship.

2079.20 Nothing in this article prevents an agent from selecting, as a condition of the agent's employment, a specific form of agency relationship not specifically prohibited by thi article if the requirements of Section 2079.14 and Section 2079.17 are complied with.

2079.21 A dual agent shall not disclose to the buyer that the seller is willing to sell the property at a price less than the listing price, without the express written consent of the seller. dual agent shall no disclose to the seller that the buyer is willing to pay a price greater than the offering price, without the express written consent of the buyer.

This section does not alter in any way the duty or responsibility of a dual agent to any principal with respect to confidential information other than price.

2079.22 Nothing in this article precludes a listing agent from also being a selling agent, and the combination of these functions in one agent does not, of itself, make that agent a du agent.

2079.23 A contract between the principal and agent may be modified or altered to change the agency relationship at any time before the performance of the act which is the object c the agency with the written consent of the parties to the agency relationship.

2079.24 Nothing in this article shall be construed to either diminish the duty of disclosure owed buyers and sellers by agents and their associate licensees, subagents, and employee or to relieve agent and their associate licensee, subagent, and employees from liability for their conduct in connection with acts governed by this article or for any breach of fiduciary duty or a duty of disclosure.



Buyer's Initials Buyer's Initials

# CONFIRMATION

## REAL ESTATE AGENCY RELATIONSHIPS

(As required by the Civil Code)

Subject Property Address 3450 Third Street #235 San Diego, CA 92104

The following agency relationship(s) is/are hereby confirmed for this transaction:

**LISTING AGENT:** Real Estate Disposition Corporation

Is the agent of (check one):

☒ the Seller exclusively; or

☐ both the Buyer and Seller

**SELLING AGENT:** ____________

(if not the same as Listing Agent)

Is the agent of (check one):

☐ the Buyer exclusively; or

☐ the Seller exclusively; or

☐ both the Buyer and Seller

I/WE ACKNOWLEDGE RECEIPT OF A COPY OF THIS CONFIRMATION.

| | | | |
|---|---|---|---|
| Seller Tara A. Taylor, Asst. Secretary | Date 9/29/07 | Buyer [signature] | Date 9-29-07 |
| Seller ____________ | Date ____________ | Buyer [signature] | Date 9-29-07 |
| Agent Minoru J Miyashiro (Please Print) | | By [signature] (Associate Licensee or Broker-Signature) | Date 9/29/07 |
| Agent ____________ (Please Print) | | By ____________ (Associate Licensee or Broker-Signature) | Date ____________ |



Buyer's Initials [initials] Buyer's Initials [initials]

Project: La Boheme
Lot/Residential Unit: 136

## GENERAL DISCLOSURES ADDENDUM

This General Disclosures Addendum ("Addendum") or "General Disclosures" is attached to and forms a part of the Purchase Agreement and Escrow Instructions executed between Buyer and Seller ("Purchase Agreement") for the Property described in the Purchase Agreement. Any capitalized terms not otherwise defined herein shall have the meanings set forth in the Purchase Agreement. If there is a conflict between the Purchase Agreement and the terms and provisions of this Addendum or General Disclosures, the terms and provisions of this Addendum or General Disclosures shall control.

The General Disclosures set forth the general information which you need to be aware of in connection with your purchase of the Property. You will also receive a disclosure which sets forth information about the specific Project in which you are purchasing the Property. Buyer is advised to review all disclosures which you receive since these disclosures may impact your decision to purchase a Residence. While Seller has endeavored to provide a comprehensive list of what may be important to you, the disclosures provided by Seller are not an exhaustive and complete list. You are encouraged and advised to conduct your own independent investigations regarding the Residence, the Project, the surrounding land uses and any other matter that may be of significance to you. All references to "Residence" in this Addendum shall refer to the entire Property, as applicable.

### A. ABOUT YOUR PURCHASE

1. **Property Documents**. In connection with your purchase of your new Residence, you will receive numerous disclosures and other documents, all of which are important to your decision to purchase a home. You should review all of this information very carefully.

2. **Homeowners' Manuals**. Buyer acknowledges that on or about the time Buyer closes Escrow, Buyer will receive a Homeowners Manual containing certain operating instructions and maintenance requirements and schedules for certain components of Buyer's Residence, including, without limitation, information relating to mold and mildew. Buyer must review and comply with any and all operating instructions, maintenance requirements and schedules for Buyer's Residence contained in such Homeowners Manual. Under California Civil Code Section 907 a homeowner is also obligated to follow all reasonable maintenance obligations. Buyer's failure to do so may reduce or defeat Seller's liability for construction defect claims pursuant to Civil Code § 895 et seq.

3. **Benefit of Home Ownership**. Seller is not making any representations, guarantees or warranties to you with respect to the tax benefits, investment or other benefits of home ownership, or regarding appreciation or depreciation in the value or equity which you may receive. You should make your own independent determination of all these issues before you proceed to purchase the Property.

4. **Sales Price**. The Seller reserves the right, at any time and without notice, to increase or decrease the sales price and/or to modify the terms and conditions of sale of other homes in the Project. For example, Seller may offer price reductions, financing incentives, reduced interest rates, decorator allowances, additional features, and other similar incentives (collectively the "incentives") to other purchasers of Residences in the Project without any obligation to offer such incentives to you and Seller shall not have any obligation or liability whatsoever to notify you of any price changes that directly or indirectly affect the value of the Property. Buyer shall not hold Seller responsible for any fluctuations in the purchase price of homes within the Project. Buyer agrees that Buyer shall have no claims against Seller for any possible change (decrease or increase) in the purchase price of homes within the Project or any other terms of purchase, including upgrades or other concessions or incentives offered by Seller to other purchasers of homes within the Project and/or the construction of any additional floor plans on any of the Lots in the Project.

5. **Financing**. Seller offers financing for your new home purchase through DHI Mortage Company, Ltd., L.P., a related entity. You may also select your lender independently. However, Seller has not reviewed or approved any lender's sales or marketing materials, and does not make any representations or warranties whatsoever regarding any matters set forth therein or your ability to obtain any financing under any particular terms. You are strongly encouraged to make your own independent evaluation of the rates and loan programs offered by all lenders. You understand that the interest rate and loan fees for the loan applied for will be determined at the time of the Close of Escrow and may be higher or lower than on the date you signed the Purchase Agreement to purchase your home. You also acknowledge that the interest rate, loan fees estimates or quotations that may have been provided to you are for illustrative purposes only and do not constitute a binding commitment. If Buyer has chosen to make a loan with a lender with whom Seller has arranged a loan commitment, the interest rate quoted may not be available unless the loan closes by a certain date. Seller is not responsible if, for any reason, including construction delays, your loan does not close on time to obtain a guaranteed rate.

6. **Closing Date**. Buyer acknowledges that the date specified in the Purchase Agreement for the Closing Date is only a target Closing Date. Seller does not have any responsibility in the event that Buyer elects to move out of its existing residence prior to the actual Closing Date.

7. __Seller's 10.4.1. Limited Warranty__. The homeowner's manual will also contain Seller's 10-4-1. Limited Warranty for your Property. This Limited Warranty is given to you in place of and in lieu of all other warranties or guarantees, written or oral, whether express or implied. The Limited Warranty provided an express limited warranty for all components of your Residence (except Manufactured Products which are covered by the manufacturer's warranties) for either 10 years, 4 years or 1 year, depending upon the component. The Limited Warranty is subject to the terms, conditions and exclusions contained in the warranty. For example, any damage caused by your failure to properly maintain your home as provided in the homeowner's manual is excluded from coverage under the Limited Warranty. YOU SHOULD READ THE LIMITED WARRANTY CAREFULLY AND SEEK LEGAL ADVICE IF YOU HAVE ANY QUESTIONS REGARDING ITS IMPACT ON THE PROPERTY YOU ARE PURCHASING.

8. __DHI Mortgage Company, Ltd., L.P.__. DHI Mortgage Company, Ltd., L.P. is an affiliate of Seller and may provide financing for Residences acquired within the Project. You will be required to sign a separate disclosure regarding DHI Mortgage Company's affiliation with Seller.

9. __DRH Realty Company__. DRH Realty Company, Inc. is an affiliate of Seller. If you elect to use DRH Realty Company, Inc. in connection with the sale of your existing home, you will be required to sign a separate disclosure.

10. __Title to the Property__. Prior to signing the Purchase Agreement, Buyer should consult with an attorney regarding the manner in which title to the Residence should be taken. Sales agents are prohibited by law from giving advice on this matter.

11. __Agency Confirmation__. The real estate agent identified on the Real Estate Agency Disclosure provided to you by Seller is both the listing agent and the selling agent for the Property, and is the agent of Seller exclusively. All sales agents and representatives employed by Seller are and shall be agents and representatives of Seller exclusively and will not be the agents or representatives of Buyer.

12. __Marketing Activity__. Seller may continue to market homes in your Project for sale after you move into your Residence. Seller may also use its model homes to market homes in other Projects. Seller's marketing activities may include operating a model home complex, displaying signs, balloons, flags, banners and conducting on-site events and other promotional activities. The ongoing marketing of Residences may cause you some inconvenience and may disrupt your enjoyment of your Residence.

13. __Construction Activities__. There may be ongoing construction surrounding the Project which may result in noise and traffic, excessive dust and dirt, restrictions of egress and ingress into and around Project or your home, erected scaffolding, building materials and debris located within and adjacent to the construction area (such as nails and screws that could affect your vehicle and bicycle tires), and parking restrictions during construction hours due to construction employee vehicles and deliveries. Further, due to the ongoing construction and sales activity, public infrastructure, public and private utilities (e.g., water, electricity, telephones, cable television, sewers, storm drains, etc.) within the Project and/or servicing your home may be temporarily interrupted and/or adversely affected. You agree to exercise extreme caution and to observe all signs which may be posted when driving through a construction zone. You also acknowledge and agree that, prior to entry onto the portions of the Project, you will be required to sign a Construction Pass. If you have any questions concerning the construction schedule for the Project, you should consult with your sales agent. However, Buyer acknowledges that any scheduling information provided is only an estimate and is subject to change.

14. __Model Homes__. Seller may have constructed model homes to reflect typical exterior elevations, floor plans, workmanship and methods of construction. Model homes also illustrate possibilities for future interior decoration and exterior landscaping and hardscape items. Your home will not be constructed to the precise specifications or design of any model home. The exterior elevations, architectural treatments, floor plans and colors shown on the master plot plans on display at the office of the Seller may be different than those displayed in the models. Room dimensions and electrical outlet placement may also vary from models and the Plans. The models have also been professionally decorated to show various decor ideas. Decoration items (such as furnishings, draperies, built-in shelves and lighting) and landscaping and hardscaping (such as entryways, patios and spas) are displayed only to suggest ideas to buyers. All such options and upgrades displayed in the models (including, decorator items, landscaping and hardscaping) are not included in the purchase price for your home unless expressly agreed to in writing by Seller. From time to time, due to unavailability and other production considerations, it is necessary for Seller to make substitutions of materials, appliances and other items in homes from those materials and items displayed in the models.

15. __Dimensions and Square Footages are Estimates Only__. Residence dimensions and square footages are approximate. You should be aware that any statement regarding the dimensions of rooms or square footages of homes or other areas are approximates only. You may not rely upon any written brochures and other sales documents or oral statements by Seller or Seller's agents regarding the exact square footage of your Residence, Lot or Unit.

16. __Elevations and House Plans__. In order to provide diversity for the street scene, Seller's architect may have produced more than one exterior elevation for the front, side and rear of each floor plan. Due to this and due to certain variations caused by construction techniques and methods, you may notice size, scale and proportional interior and exterior changes from the model home or other homes in

the Project from your particular elevation. These may include such items as ceiling heights, sloped ceilings, veneer treatments, window locations, window types and sizes, gutter and downspouts, interior and exterior wall and roof lines, color schemes and front porch dimensions. It is the responsibility of Buyer to inspect the property and consider the differences in the elevations and other features of your Residence prior to Close of Escrow. Buyer acknowledges that he or she has had the opportunity to review the floor plan and elevation and interior details for the home he or she is purchasing, all as shown on the building plans located in the sales office. Seller may alter, add or delete any house plans for Residences to be constructed in the development.

17. No Guarantee About Development. Seller does not make any representation that the Project will be developed as proposed. Seller reserves the right, at any time and without notice, to modify its development plan for the Project, including, but not limited to, changing the style, size, square footage, density, exterior elevations, color schemes, construction schedule and/or phasing of the homes in Project. The model homes are displayed for illustrative purposes only and such display does not constitute a commitment to complete the development with the same or similar homes. Seller may also sell all or any of the property in the development to another builder, who may change the house plans, square footage, elevations, features, materials or designs of the Residences.

18. Buyer Information and As-Built Conditions. In connection with your purchase of a home in the Project, Seller may provide you with sales literature, which may include such information as elevations, lot dimensions, set-backs, house orientation, driveway locations, utility structures, rear yard dimensions, easements, etc. This information is intended for general informational purposes. There may be discrepancies between this information which is provided to you and the actual as-built conditions. If there are such discrepancies, the as-built conditions will control.

19. No Guarantee of View. Seller is not selling any Residence based upon a view. Seller does not guarantee or make any representation whatsoever concerning the view, if any, that the Property currently enjoys. Additionally, any view which a Residence may currently enjoy may change in the future for many reasons including future development, growth of trees and other landscaping and installation of improvements which may impact or impair any views.

20. Future Improvements. Each home has restrictions with regards to the ability of an Owner to install decks, patio covers and other improvements. These restrictions may be imposed by the City, County or other governmental agency having jurisdiction over the Residence. There may also be utility or other easements, set back requirements and other restrictions which may restrict your ability to add any improvements. Your Residence may also be covered by covenants, conditions and restrictions which impose additional requirements and/or require you to obtain approval of an Architectural Committee. Buyer understands that Buyer is responsible for determining whether a future improvement can be constructed.

21. Government Restrictions on Alterations of Property. Restrictions may exist with respect to utility easements and/or City or County rights-of-way on or adjacent to Buyer's property. Thus, Buyer is advised to consult the appropriate governmental department to determine whether there are any restrictions or required permits pertaining to alterations of the property before commencing any landscaping or improvements.

## B. ABOUT YOUR RESIDENCE

22. Front Doors. Front doors will vary by elevation and floor plan. Standard doors included with the purchase of your home will vary in style to suit different elevations. Certain door styles, such as those distressed or antiqued for decorative accent, may differ in appearance from the doors installed on the model homes.

23. Color Variations.

Paint - Buyer should confirm with his or her sales representative what interior colors will be used in the home. Regarding white walls, it must be remembered that there are many shades of white. Buyer should not assume that the home would be painted any shade of white shown in the model homes. Model interior paint colors are chosen by the model decorators and are not necessarily what will be used in your residence.

Tile – Certain tiles have a color variance from tile to tile.

Grout – Colored tile grout may be used as a decorator feature on certain tiled areas. Buyer is advised that the color/shade may vary in any area of a particular installation due to the wide variety of tiles available, job site conditions and finishing techniques. The elements of nature including, but not limited to, sun, temperature, food, or chemical reactions may, combined with the aging process, change the color of the grout in varying degrees from time to time. In the event of repairs or replacement of tile or grout in the future, the replacement grout and/or tile probably will not match the color of the original tile or tile grout. The use of colored grout may result in a discoloration, flecking, and/or cracked appearance in the ceramic tile.

Marble – Because marble is a natural material, the color and pattern of any marble installed may vary from the models or Design Center sample. Buyer is aware that there may be variations in color and pattern of the marble installed in Buyer's home.

Cabinets and Woodwork – There will be a variance in the color and grain of Buyer's cabinets and woodwork throughout the home due to the natural contrast of the wood, and stained cabinets will have additional variance due to different woods and grains. Similarly, the color of any natural wood cabinets installed may vary from the samples displayed in the Models or Design Center. Buyer is aware that the consistency in color and grain of the wood cabinets in Buyer's home is not warranted nor guaranteed.

24. **Wood Stain Color**. The wood stain finish used on your cabinets, stairs, or any wood surface may differ from the stain color in the models and, in fact, the stain color in your home may even differ from cabinet to cabinet or stair fitting to stair rail. This is due to the natural variation of color and texture of the grain in the wood itself.

25. **Variations in Natural Materials**. Natural materials such as granite and natural stone products are composed of various mineral contents and are formed over millions of years. They are products of exceptional beauty and durability. Marble is less dense and more porous than granite. Great care must be taken to prevent damage to marble and other natural stone products. Please see the manufacturer's recommendations for cleaning and maintenance. Because these are natural products, they are subject to variation in color veining, spotting, holes, cloudiness, texture and cracking. Some may vary significantly in filler and sheen. The samples are actual pieces of natural stone which indicate general color and character; however, no two pieces can be expected to match even when taken from the same box. You should view the stone prior to purchase and any questions regarding these materials must be resolved prior to installation. Oven fired and glazed tile products can have significant variations in color, especially between field and trim tile.

26. **Driveways and Garages**. The shape and dimensions of the garages and driveways for the Residences in the Project may not be standardized. Driveways may vary in size, shape and/or configuration from the model driveways. Some of the garages may require Buyer to maneuver a lengthy driveway to enter and exit the garages. Parking of vehicles in the garages may also require Buyer to maneuver a vehicle back and forth in order to enter the garage. There may be certain obstacles (i.e. pillars, your Residence, fencing, improvements, etc.) that may make it difficult to maneuver a vehicle into and out of the driveway and garage. Seller is not responsible for any damage to any Residence, landscaping, pillars, fencing or any other improvement incurred during Buyer's or Buyer's guests or visitors maneuvering of the driveway and/or parking of a vehicle in the garages. It may not be possible to maneuver certain types of vehicles on the driveways and into the garage. Not all garages will accommodate all vehicles (especially full size models and sport utility vehicles) due to the shape, size, configuration and location of the garages, driveways and Residences. Also, parking of the maximum number of cars for which a garage was designed may block or make it difficult to access any storage area (if any) in the garage or to the Residence from the garage. Buyer acknowledges that it is his or her responsibility to determine whether the size and location of car spaces in the garage of the floor plan of the Residence selected by Buyer are adequate and appropriate to park the Buyer's vehicles. The Declaration includes additional parking restrictions; please check the Declaration for additional restrictions on parking in the Project.

27. **Drywall**. Some shadowing in your drywall may occur at different times of the day or night depending upon the lighting in your home, especially on curved walls.

28. **Air Conditioning**. If your Residence includes an air conditioner and condenser, the air conditioning condenser may be located in a different area than shown in the models or on other plans or exhibits. The specific location of compressors at the Project may result in sound transmission that may affect your home.

29. **Certification of Water Heater Strapping**. Seller hereby certifies that any water heater installed by Seller for Buyer's Residence has been braced, anchored or strapped to resist falling or horizontal displacement due to earthquake motion in accordance with the provisions of §§19210 et seq. of the California Health and Safety Code.

30. **Satellite Dishes**. Satellite dish antennas may be installed and used within the Project in accordance with any CC&Rs and any other recorded restrictions and governmental requirements. However, Seller has provided no assurances or guarantees that any satellite dish or other antenna installed within the Project will remain unobstructed. You should understand that antennae signals may become obstructed by the installation and maintenance of improvements within and outside of the Project including homes, walls, fences, trees and other landscaping.

31. **Building Code Changes**. Periodically, governing agencies change building codes and other requirements; therefore, as construction proceeds, future homes may be constructed differently in order to meet these updated or revised regulations. Seller reserves the right to change elevations, designs, or other elements of the construction process at its sole discretion.

32. **Electrical Outlets in Garage**. The Uniform Building Code adopted in California requires that electrical outlets in garages be provided with ground fault interrupter circuits. These circuits are not

intended for use with any appliances, especially refrigerators, freezers and aquariums or on any service that an interruption of electrical power would cause a problem. Seller strongly recommends that purchaser not use garage circuits for appliances or for any service (such as freezers) that would be harmed by an interruption of electrical power. Seller cannot be held responsible for the contents of appliances which are damaged because of the ground fault interrupter switches shutting off power, nor can we be held responsible for damage to the appliance units themselves. Please check with an electrician for further information.

33. Fencing. You should be aware of what fencing or walls have been or will be constructed surrounding your Residence, if any, and the fences you will be required to maintain. The exact size, type and location of your fence or wall will be determined at the time of fencing installation.

34. Concrete Products. Cracks will occur in your stucco and plaster exterior. This is normal in all cementitious materials. Certain elevations incorporate a "smooth trowel" plaster finish. You should be aware that this finish is particularly susceptible to cracking. Cracking does not affect the structural integrity of your home and is part of the natural look of stucco and plaster. Poured on grade concrete is prone to a certain amount of cracking as it cures over time. Such cracks can be minimized by scoring, but they cannot be completely avoided.

35. Utilities. Buyer shall be responsible for initiating the commencement of any service from a utility company such as water, electricity, telephone and cable television (if available) upon or after the Closing Date. If Seller receives any bills for utilities that are attributable to the period after the Close of Escrow, Buyer shall reimburse Seller for such payments within ten (10) days after receipt of a statement from Seller. Seller is not affiliated with the cable company or with any other utility companies (i.e., water, gas, electricity, telephone service, etc.), and has no control over the rates or the services furnished, or the water pressure available at your Residence. Seller does not make any representations as to when or if cable services will be available nor as to the quality of television reception or cable services. Seller has no control over timing of meter sets once final inspection has been performed. Seller also has no control over the location and placement of public utility structures and facilities. All locations of the utility structures and facilities are final, and the Owners shall not tamper, move or damage these structures and facilities. Please check with your sales representative to determine whether any utility structures or facilities are located within or in the vicinity of the Residence you are purchasing.

36. Drainage. If you remove, modify or otherwise alter the established drainage patterns or devices on your Residence, you may cause significant and permanent damage to your Residence and/or other Residences, including but not limited to, damage to the foundation of your Residence or adjacent slopes. You should take precautions by using licensed professionals (e.g., landscape architects, civil engineers, geotechnical engineers, general contractors, etc.) to assure that Improvements such as walkways, landscaping, patios, decks, planters, etc. are constructed so as not to alter the established drainage of your Residence. Seller shall not be responsible for any modifications or changes to the established drainage for the Property.

37. Cross Unit Drainage Facilities. There may be cross unit drainage facilities in your yard area. If so, you are responsible for maintaining and cleaning any cross unit drainage facilities situated within your yard to prevent any obstruction and blockage.

38. Soils/Geology. A soils and geological report for this subdivision is on file with the City or County in which the Property is located, and upon request, a copy will be made available in the sales office for Buyer's review. In order to minimize the possibility of moisture intrusion into the soils of the Property, Buyer agrees not to alter the grading and not to alter any drainage devices on the Property. Buyer acknowledges that drainage devices may be located underground which may not be visible to or otherwise disclosed to Buyer. Before constructing any improvements on the Property (including, without limitation, additions, retaining and other walls, landscaping, exterior concrete flat work, swimming pools and spas), Buyer agrees to obtain the recommendations and guidance of appropriate qualified experts as to whether any special design and construction criteria should be employed.

39. Professional Design of Improvements. Before you begin any grading, excavating, filling or constructing any improvements to your Residence (e.g., pools, spas, planters, sidewalks, decks, patios, patio covers, landscaping, etc.), you should engage the services of a qualified, licensed professional and you should take necessary precautions in designing and installing such improvements to avoid damage to your home and other improvements which may result from existing soils conditions. You should also obtain a geology report prior to constructing a swimming pool or spa. Too often a homeowner's contractor will utilize a standardized set of calculations and construction plans that are not specifically designed for pools and spas that are to be built at the top or toe of a slope or on expansive soils. These conditions require special design considerations.

40. Fire Prevention. Your home may be equipped with a fire sprinkler system to aid in the detection and control of residential fires. Fire sprinkler systems require routine maintenance by each homeowner to ensure the system is functioning properly. Smoke detectors have been installed in all homes in accordance with the requirements of the local agency. Smoke detectors must be maintained by Buyer and backup batteries replaced in accordance with manufacturer's recommendations provided to you at the orientation. Emergency contact is not automatically made when a smoke alarm is sounding, so Buyer is charged with calling the proper emergency number upon the occurrence of an emergency.

41. **Mold and Mildew**. Mold is a type of fungus which occurs naturally in the environment and is necessary for the natural decomposition of plant and other organic material. It spreads by means of sharing in microscopic spores borne on the wind, and is found everywhere life can be supported. Residential home construction is not, and cannot be, designed to exclude mold spores. If the growing conditions are right, mold can grow in your Residence.

Whether or not Buyer experiences mold growth depends largely on how Buyer manages and maintains Buyer's Residence. Buyer will need to take actions to prevent conditions which cause the mold or mildew. It is the responsibility of each Buyer to ensure that it has taken the necessary precautions to prevent mold from becoming a problem in such Buyer's Residence. This is part of the responsibility of home ownership. Buyer agrees to assume responsibility for the steps outlined in the Section of the Homeowner's Manual entitled "Mold Prevention" to prevent, detect or treat mold or to reduce the adverse effects of mold. Buyer further acknowledges that if there is any water damage or water intrusion to Buyer's Residence, Buyer will take immediate action to prevent conditions which cause mold or mildew to develop. Buyer will also immediately notify Seller of such water intrusion if Buyer believes that the problem may have been caused by Seller.

42. **Animals**. Please check your Declaration about the limits and restrictions on the keeping of animals in your Residence or within the Project.

## C. ABOUT YOUR NEIGHBORHOOD

43. **Schools**. Buyer acknowledges that Buyer has conducted his or her own investigation of the present and future availability of school facilities, and has made his or her decision to purchase the Property in reliance on such investigation, and not upon any representation made by Seller or Seller's agents. Due to the rate of population change, the School Districts may find it necessary to change boundaries and designated schools periodically, prior to or after the Close of Escrow. Seller has no control or responsibility for any such change(s) should one or more occur.

44. **Non-Disclosure Of Neighbor's Plans**. During the course of the purchase of their homes, some buyers disclose information to Seller regarding their potential plans for their homes, (e.g., landscape, hardscape, add-ons, repainting plans, etc.) and/or information about their personal lifestyles (e.g., pets, interests, hobbies, etc.) Seller will not disclose such information to prospective neighbors. Should you wish to obtain any information about your prospective neighbors, Seller will, upon your written request, attempt to place you in contact with your prospective neighbors, but makes no warranty that Seller will be able to do so or that the information which you may obtain will be accurate.

45. **Adjoining Land Uses**. Buyer may have received written disclosures which depict the current and proposed land uses for the properties which adjoin the Project. Land uses are subject to change, and consequently, Seller cannot guarantee whether any information so disclosed is current. Also, land planning and zoning matters are complex and therefore the information which may have been supplied by Seller is not complete. If Buyer is concerned about the type of development that may occur on the adjoining properties, Buyer should discuss nearby land uses with the City/County Planning Department and otherwise conduct his or her own investigation of those matters.

## D. ENVIRONMENTAL/HAZARDS/GOVERNMENTAL REQUIREMENTS

46. **Disposal of Toxic and Other Substances**. Water that enters a storm drain flows directly to natural sources of water, including waterways, creeks, drains, rivers, lakes and that erosion has an impact on the environment. Unlike the water in the sewer system in the Residence which is being purchased by Buyer, which flows to wastewater treatment plants, water that enters a storm drain flows directly, without any treatment, to waterways, creeks, streams, rivers, lakes and/or oceans. Accordingly, the National Pollution Discharge Elimination System, the Regional Water Quality Control Board Orders covering the Project, and the policies and ordinances of the City prohibit discharging anything other than natural rain water into storm drainage systems, including gutters and streets which drain into storm drains. Toxic chemicals or hydrocarbon compounds such as gasoline, motor oil, antifreeze, solvents, paints, paint thinners, wood preservatives, fertilizers, lawn clippings, yard waste, detergents, pet waste, and other such materials and pollutants shall not be discharged into any street, public or private, gutters, or into storm drains or storm water conveyance systems. Buyer further acknowledges that the disposal of such pollutants and materials into a storm drain system may result in significant penalties and fines and that Buyer may be responsible for any activities by Buyer's contractors (e.g., painters, landscapers, etc.) who dispose of such pollutants from Buyer's Residence, Lot or Unit into a storm drain system. Use and disposal of pesticides, fungicides, herbicides, insecticides, fertilizers, and other such chemicals shall meet all federal, state, and City requirements and requirements of any other governmental agencies having jurisdiction over the Property. All Buyers within the Project are required to comply with such restrictions. Buyers are encouraged to consult with the City or County, other governmental authorities, and the refuse hauler in the area of the Project concerning the proper disposal of any toxic or hazardous materials. Dumping any such materials into sewers, gutters or storm drains is against the law.

47. **Earthquake and Earthquake Insurance**. Your home is not warranted against damage due to earthquakes. Each Owner is responsible for conducting his or her own investigation, if any,

regarding the potential for earthquakes. If Buyer elects to obtain earthquake insurance for Buyer's Residence, Buyer is advised to contact their own earthquake insurance carrier.

48. Flooding. Buyer acknowledges that Buyer's Residence is not warranted against damage due to floods. Buyer is responsible to conduct Buyer's own investigation regarding the potential for floods. Buyer is advised to review the Natural Hazard Disclosure provided by Seller.

49. Drought. The continued availability of water at current levels is not within the control of Seller. Past drought conditions have caused the water district to severely limit the water supply to landscaping and other nonessential usages. Due to fluctuating conditions, the amount of available water may be reduced in the future. Seller makes no representations about continued water availability.

50. Air Quality. Buyer is advised and acknowledges that each home is constructed using hundreds of components made of natural and/or man-made materials and that any material or combination of materials could cause an allergic reaction. Seller has no control over individual allergic reactions and Buyer hereby takes responsibility for testing the air quality within the home to ascertain whether or not the materials/components affect Buyer, Buyer's family members, or other occupants.

51. Gases. The aging process of the soil and other elements created by nature, as well as manmade building materials, many times create unwanted and undesired gases and other contaminants in homes, both new and used. Also, since the increased awareness and need for energy conservation, the UBC (specifically the energy Title 24 standards), have created homes which allow less outside air infiltration and therefore trap these unwanted gases in different degrees depending on how each person lives within his/her residence. Measurements of such unwanted gases (such as Radon) are reported to be in the air we breathe and can affect our health, and as such Seller recommends frequent airing of Buyer's residence by simply opening the windows to introduce outside air that is uncontaminated by such trapped gases. By making such a recommendation, Seller does not undertake any obligations to Buyer in regard to the effects that any such contaminants may have on Buyer, Buyer's family, or other occupants of Buyer's home.

52. Proposition 65 Warning. The Safe Drinking Water and Toxic Enforcement Act of 1986, also known as Proposition 65, requires that all businesses (including all builders of residential homes) provide a warning to the public of the dangers of potential harm by exposure to chemicals known to the State of California to cause cancer or birth defects. As of April 16, 2004, the State of California had listed more than 700 such chemicals known to cause cancer or reproductive toxicity. Buyer acknowledges that Buyer has seen, read and understood the Prop 65 warning sign in Seller's sales office pertaining to the homes in this development.

> WARNING: THIS AREA CONTAINS CHEMICALS KNOWN TO THE STATE OF CALIFORNIA TO CAUSE CANCER, BIRTH DEFECTS OR OTHER REPRODUCTIVE HARM.

The United States Environmental Protection Agency, the California Air Resources Board, and other agencies have measured the presence of formaldehyde in the indoor air of homes in California. Levels of formaldehyde that present a significant cancer risk have been measured in most homes. Formaldehyde is present in the air because it is emitted by a wide variety of building materials and home products purchased by the builder from material suppliers. These materials include carpeting, pressed wood products, insulation, plastics, and glues.

Materials included in the construction of this house will expose you to formaldehyde, a substance known to the State of California to cause cancer.

The homes in this development have not been tested. It is not feasible to test every home to ascertain the level of formaldehyde present. Most homes that have been tested elsewhere do contain formaldehyde, although the concentrations vary from home to home with no obvious explanation for the differences. One of the problems is that many suppliers of building materials and home products do not provide information of chemical ingredients to the builders. In the absence of specific information on these homes, we believe that a warning is necessary.

In addition, the home that you are purchasing may contain one or more other chemicals known to the State of California to cause cancer or other reproductive harm. Because the development and construction of a home involves numerous contractors, subcontractors and trades, and numerous types of materials are incorporated into a completed home, it is impossible to accurately isolate all of the chemicals which may have been used in the manufacturing of materials or which might be contained in the various materials incorporated into a home.

Seller is willing to share information it has obtained and will provide, upon request, a list of known material suppliers which may be contacted for further information, and whether any inquiry has been made by Seller. You may also contact the California Building Industry Association (916-445-6951), or the State of California Office of Environmental Health Hazard Assessment (916-445-6900), which is the administrative agency for Proposition 65.

53. **Notice Of Access To Database Regarding The Location Of Sex Offenders.** In compliance with applicable California law, Seller hereby gives the following notice to you:

Notice: The California Department of Justice, sheriff's departments, police departments serving jurisdictions of 200,000 or more and many other local law enforcement authorities maintain for public access a data base of the locations of persons required to register pursuant to paragraph (1) of subdivision (a) of Section 290.4 of the Penal Code. The database is updated on a quarterly basis and a source of information about the presence of these individuals in any Project. The Department of Justice also maintains a Sex Offender Identification Line through which inquiries about individuals may be made. This is a "900" telephone service. Callers must have specific information about individuals they are checking. Information regarding Projects is not available through the "900" telephone service."

Seller has not and will not check for any offenders in this area.

## E. TAXES, SPECIAL TAXES AND ASSESSMENTS

54. **Real Property Taxes.** Your purchase of the Property constitutes a "change in ownership" for real property tax assessment purposes, which will trigger a reassessment of your Residence by the County Tax Assessor. The result will be a real property tax increase based upon the purchase price of the Property, effective as of the date of Close of Escrow. After the Close of Escrow, you will receive and are responsible for paying any supplemental real property tax bill ("Supplemental Assessment") covering the tax increase attributable to you for the period from the Close of Escrow to the following June 30. Buyer hereby acknowledges and agrees that neither Seller nor any of its authorized agents, representatives, employees or sales persons have made any representations or warranties regarding the amount of the Supplemental Assessment or the assessed value. Should Buyer have any questions or concerns relating to the Supplemental Assessment, Buyer agrees, prior to the Close of Escrow, to consult with the County Assessor or Buyer's legal or other advisors to satisfy such questions or concerns.

55. **Assessments.** Your Residence may be subject to special taxes and assessments for community facilities districts, landscaping and lighting districts and other purposes. You should review all of your sales information carefully to understand all of the taxes and assessments you may be obligated to pay.

## F. GENERAL

56. **Mandatory Alternative Dispute Resolution.** The Declaration includes certain provisions which require certain disputes between the Owners and/or any homeowners association with the Seller and related parties to be resolved through mandatory alternative dispute resolution procedures. By using such procedures to resolve disputes, there will be no jury trials awarded in connection with the disputes resolved under these procedures. Construction defect claims other than claims under the Warranties will be subject to the non-adversarial procedures set forth in Civil Code Section 910 through 938 in lieu of the mediation process described in the Agreement.

57. **Changes in Governing Documents.** Modifications may be made to the Governing Documents you received and in the rights of certain parties including the homeowners in the Project as a result to accommodate the requirements of certain governmental and quasi-governmental agencies, including without limitation the FHA, VA, FNMA, FHLMC, and GNMA federally sponsored mortgage guarantee entities, the California Department of Real Estate and Seller.

58. **Buyer Obligation To Investigate.** Nothing contained herein is intended to be a complete disclosure of all facts, which Buyer may wish to consider in buying a home in the Project. Buyer is still obligated to conduct his/her own full investigation of all facts relevant to him/her in deciding where and when to buy. Buyer is hereby advised to seek the advice of independent tax, legal, and financial consultants.

59. **Disclosure To Subsequent Purchasers.** When Buyer sells his/her home, Buyer is required to provide to the subsequent purchaser(s) any documents provided in conjunction with the original sale of the house, including, but not limited to, information that Buyer has regarding the home, the Project, and overall Community, the information set forth in this and any other disclosures provided by Seller to Buyer and any other information that may be of value to the subsequent purchaser(s), including, but not limited to, the CC&Rs.

60. **Terms And Definitions.** All capitalized terms not otherwise defined herein shall have the meanings set forth in the Agreement.

**BUYER FURTHER ACKNOWLEDGES THAT BUYER HAS REVIEWED ALL OTHER DOCUMENTS PROVIDED BY SELLER TO BUYER IN CONNECTION WITH THE PROJECT. THIS DISCLOSURE CONTAINS INFORMATION THAT HAS A LEGAL IMPACT ON THE PURCHASE OF YOUR PROPERTY. YOU ARE ADVISED TO HAVE THIS REVIEWED BY AN ATTORNEY. BUYER'S INITIALS AT THE BOTTOM OF EACH PAGE ARE EVIDENCE OF BUYER'S REVIEW AND APPROVAL OF EACH MATTER CONTAINED ON THAT PAGE.**



BUYER'S INITIALS BUYER'S INITIALS

Prepared: 7/14/2006

Project:: La Boheme
Residential Unit: 1135

## PROJECT SPECIFIC DISCLOSURES ADDENDUM

This Project Specific Disclosures Addendum ("**Addendum**") or "Project Specific Disclosures" is attached to and forms a part of the Purchase Agreement and Escrow Instructions executed between Buyer and Seller ("**Purchase Agreement**") for the Property described in the Purchase Agreement. Any capitalized terms not otherwise defined herein shall have the meanings set forth in the Purchase Agreement. If there is a conflict between the Purchase Agreement and the terms and provisions of this Addendum or Project Specific Disclosures, the terms and provisions of this Addendum or Project Specific Disclosures shall control.

### INTRODUCTION

The Project Specific Disclosures set forth the general information which you need to be aware of in connection with your purchase of Property within this Project. You will also receive a disclosure which sets forth the general information about your purchase and about the Property. You are advised to review all disclosures which you receive since these disclosures may impact your decision to purchase a Residence. While Seller has endeavored to provide a comprehensive list of what may be important to you, the disclosures provided by Seller are not an exhaustive and complete list. Seller has no control over much of the information covered in this Addendum, and information is subject to change without notice. Since individual sensitivities may vary with respect to conditions at or nearby the Project, Buyer is encouraged and advised to conduct Buyer's own independent investigations regarding the Residence, the Project, the surrounding land uses and any other matter that may be of significance to you. The following information concerning the Project is accurate only as of the date of this statement, which is set forth above. Buyer should verify the information contained herein by contacting the individuals, agencies or firms identified for the most up-to-date information.

All distances mentioned herein are approximations only and, to the extent that such distances are material to Buyer, Buyer should independently verify such distances. All references to "Residence" in this Addendum shall refer to the entire Property, as applicable.

### PROJECT GOVERNANCE

1. <u>Association and Governing Documents</u>. You are purchasing a Residence which is situated within the project commonly known as La Boheme ("**Project**"). If developed as planned, the Project will consist of two hundred twenty-four (224) Residences. When you purchase a Residence in the Project, you will automatically become a member of the La Boheme Owners Association, a California nonprofit mutual benefit corporation ("**Association**") which has been formed to manage and govern all of the Project and you will be subject to the Declaration of Covenants, Conditions and Restrictions of La Boheme ("**Declaration**"). Western Pacific Housing, Inc., a Delaware corporation ("**Seller**") is the Declarant under the Declaration. The Declaration sets forth, among other items, the duties and responsibilities of the Association, the assessment and lien rights of the Association, use restrictions and maintenance responsibilities for the Association and the owners of Residences and architectural control provisions over your Residence. The rights of the Association are also set forth in the Bylaws of the La Boheme Association ("**Bylaws**") and Articles of Incorporation of La Boheme Owners Association ("**Articles**"). The Association will also establish architectural guidelines ("**Architectural Guidelines**") and rules and regulations ("**Rules and Regulations**") governing the Project. (Herein the Declaration, Bylaws, Articles, Architectural Guidelines and Rules and Regulations and any Supplementary Declarations which may be recorded are referred to as the "**Governing Documents.**")

The Association will own in fee the Association Property within the Project. This will include the parking garage and recreational facilities.

In addition to being responsible for managing and maintaining the Association Property and Common Area, the Association will be responsible for (a) architectural control over the Project, (b) the collection of assessments as described in the Declaration, (c) the enforcement of the use restrictions set forth in the Declaration, and (d) the enforcement of rules and regulations for the Project.

2. <u>Changes in Governing Documents</u>. Notwithstanding the fact that you have received a copy of the Governing Documents for the Project, certain changes may be made in those documents and correspondingly in the rights of certain parties including the Residence owner as a result to accommodate the requirements of certain governmental and quasi-governmental agencies, including without limitation the FHA, VA, FNMA, FHLMC, and GNMA federally sponsored mortgage guarantee entities, the California Department of Real Estate and Seller.

3. <u>Condominium Ownership</u>. The Property you are purchasing is a condominium under California law, which includes a Residential Unit together with an undivided interest in the Common Area for your Phase ("**Condominium**"). The Condominium and the Common Area are shown on the applicable Condominium Plan for your Phase. You will, to the extent shown in the Condominium Plan covering your Condominium and described in your grant deed, have the exclusive right to the use and enjoyment of a portion of the Common Area and/or Association Property designated as an appurtenant Exclusive Use

Easement. The Exclusive Use Easements may consist of a balcony, patio or roof deck. The Association has certain rights to conduct periodic inspection and maintenance of these areas, pursuant to the Declaration. You will also have an easement over the Association Property subject to the Exclusive Use Easements in the Condominium Plan, the Declaration and your grant deed. You are responsible for maintaining those portions of your Residential Unit and appurtenant Exclusive Use Easement Areas as described in the Declaration.

4. <u>Condominium: Mixed Use</u>. The Project is a mixed-use Project and will include two to six Commercial Condominiums. The Owners of the Commercial Condominiums will be members of the Association and subject to the Declaration and other Governing Documents. The Declaration specifically excludes any easement or right of the Commercial Condominium Owners to use the Recreational Facilities and any other portion of the Common Area other than those areas necessary to access or service the Commercial Unit. The Commercial Condominium Owners will not contribute to the cost of capital improvements to the Recreational Facilities or any other areas for which they are not contributing to fund ongoing maintenance and reserves. The Declaration sets forth certain restrictions for the use of the Condominiums. Some of these use restrictions apply only to the Commercial Condominium Owners and some of the use restrictions apply only to the Residential Condominium Owners. There are certain issues that require only the consent of the Commercial Condominium Owners, which are described in the Declaration.

Pursuant to the Bylaws, at least one Commercial Unit Owner will be a Board member. For additional information concerning the Commercial Owners' participation on the Board, you should carefully review the Bylaws.

The Commercial Condominiums may generate noise, traffic and other nuisances associated with commercial activity, including, without limitation, early morning or late night hours, deliveries and other activities. Certain Commercial Condominiums may be used for restaurant purposes, which may generate food odors in the vicinity of the Project. Parking for patrons of these businesses is provided in the parking garage for the Project; however, such patrons may also occupy available public street parking in the vicinity of La Boheme, if any, which may minimize public parking available for residents and their guests.

For owners of the Residential Condominiums, living in close proximity to the Commercial Condominiums will affect day-to-day living experiences. Residential Condominium owners will experience more noise, smells and general traffic than they may be accustomed to in a typical residential neighborhood where commercial uses are located in a separate area. Residents may feel more comfortable with their doors and windows closed to minimize the noise and smells entering their Condominiums. Even though the Commercial Condominium owners and their patrons are excluded from the residential areas at La Boheme, residents living in close proximity to commercial businesses have the added responsibility of helping keep their community secure by getting to know their neighbors, keeping entrances and exits closed and locked and watching for nonresidents who attempt to enter the residential areas.

5. <u>Change In Number of Commercial Units</u>. Seller has processed a map waiver through the City of San Diego to obtain a certificate of compliance to permit 6 Commercial Condominiums in La Boheme.

6. <u>Urban Living</u>. La Boheme is situated in an urban environment. Living in La Boheme is different from a typical suburban neighborhood where residential, industrial and commercial uses commonly occur in separate areas. The urban environment concentrates these various uses together in close proximity. Therefore, you will be surrounded by other people living, working, vacationing and even loitering in your neighborhood.

With urban living, your daily living experiences inside your Condominium will be different than suburban living experiences. For example, while enjoying your Condominium in the evening, you may hear your neighbors watching television or talking. Sounds coming from La Boheme can actually bounce off of neighboring buildings to create an "echo" effect. You may smell what your neighbors are cooking for dinner or food being prepared in a nearby restaurant. You may hear honking horns or conversations from the street below or construction on a building a block away. You may look out your window and see neighboring buildings with other people living or working inside. When retiring to bed at night, you may hear music and people from a nearby nightclub which is open late into the night.

You will also notice the effects of urban living while enjoying the surrounding neighborhood. For example, while walking your dog in the neighborhood, you may have to travel a distance to find grassy areas. Transient or homeless individuals may approach you on the sidewalk. When friends come to visit you at La Boheme, they may need to find street parking and walk several blocks to reach your building. You may find that running errands by foot is faster and easier than driving and finding parking in the area. If you drive to other locations nearby, you may need to pay for parking at a meter or in a private lot or you may not find parking available at all.

The North Park neighborhood is experiencing rapid growth with many new residential and commercial projects under construction. As the number of area residents and workers increase, your urban living experiences will change as well. Seller encourages you to spend time in the area to experience the urban environment and consider whether urban living is right for you and your family.

7. Density Issues. Residents at La Boheme will be living in close proximity to one another. The proximity of the other Condominiums may result in decreased privacy within the Condominiums and Exclusive Use Easement Areas. You may need to close your windows and doors and any window coverings to achieve the privacy you desire. Additionally, you will share common hallways and elevators with your neighbors at La Boheme in order to access your Condominium. You will also use the common hallways in order to deposit your trash into the common trash chutes. When you park your car in the parking garage, you may need to walk a distance to the elevator and then an additional distance from the elevator to your door. The hallways, elevators and parking garage are maintained by the Association. You will not be able to decorate or store personal items within these areas.

8. Insulation. Insulation will be installed in the Residence in accordance with applicable governmental requirements. Insulation to be installed will be as follows:

| Area Insulated | Type of Insulation | Thickness | Manufacturer R-Value of Insulation |
|---|---|---|---|
| Exterior Walls of Living area (excluding garage): | Batt | 6" | R-13 |
| Common Walls (if applicable): | Batt | 6" | R-13 |
| Interior Walls (optional): | Batt | 6" | R-13 |
| Ceilings: | Batt | 12" | R-19 |

The higher the R-value, the greater the insulating power. Other areas of the Residence may contain insulation type materials; however, these materials have no influence on the thermal effectiveness of the Residence. However, insulation may be of lesser thickness and R-value than indicated in certain areas where the design and or construction of the Residence do not permit greater thickness. Examples of such locations where the thickness and R-value may vary include locations where the studs are placed in the walls, at corners and windows where the roof trusses attached to outside walls. These figures and insulation characteristics are based upon information from the manufacturer, installer and/or supplier of the insulation and Seller hereby disclaims all responsibility or liability for the accuracy thereof.

9. Affordable Housing Areas. The Project has been planned to provide certain Residential Units as market rate residential housing and certain Residential Units as affordable housing. In connection with the overall development of the Project, at least 45 affordable housing units are required to be built within the Project pursuant to that certain Disposition and Development Agreement between the Redevelopment Agency of the City of San Diego ("Agency") and Seller. Under the DDA, the affordable housing units will be offered for sale to qualified median and moderate income households. All of the owners in the Project will be members of the La Boheme Owners Association and will be subject to the Declaration of Covenants, Conditions and Restrictions of La Boheme, regardless of whether the home is a market rate residential housing unit or an affordable housing unit. For further information concerning the details and benefits of the affordable housing units planned for the Project, please refer to the DDA which is available at the Sales Office or contact the Agency for more information.

10. Air Quality. Buyer is advised and Buyer acknowledges that each Residence is constructed using hundreds of components made of natural and/or man-made materials and that any material or combination of materials could cause an allergic reaction. Seller has no control over individual allergic reactions.

11. Airport. The San Diego International Airport - Lindbergh Field is approximately 3 miles from the Project. North Island Air Station is approximately 4 miles from the Project. Currently Lindbergh Field operates 24 hours a day with takeoff restrictions to the hours from 6:30 a.m. to 11:30 p.m. each day. The hours of operation at North Island may vary from time to time. Times of operation of the airports may be subject to future change by the San Diego Regional Airport Authority and the Navy. The property Buyer is purchasing is correctly subject to direct overflights and is subject to noise and other nuisances from aircraft operating to and from Lindbergh Field. There are also discussions regarding the possible expansion of Lindbergh Field, but Seller makes no representation or warranty as to when or if this may occur or how it may affect the Project. Neither Buyer nor Seller will have any control over the operations at either airport, including, but not limited to, the types of aircraft, flights, the flight patterns of the aircraft, airport layout, nighttime operations, flight plans, frequency of flights, aircraft navigational lights, radar towers, facilities and related equipment. Prior to entering into a Purchase Agreement for the purchase of a Residence, Buyer should visit the Project at different times of the day to determine whether aircraft noise will affect Buyer's use and enjoyment of Buyer's Residence.

12. Apartments. Several apartment buildings ("Apartment Units") are located in the general vicinity of the Project. The impacts from the Apartment Units may include traffic, noise, lights and other impacts associated with such Apartment Units.

13. Brass Plumbing/Light Fixtures/Hardware. Although the manufacturers apply the finest protective coatings available to the plated surface of their products, chrome, brass, bronze or other finishes have their limitations. In time, the protective lacquer may deteriorate from exposure to weather, perspiration, cleaning agents, frequency of use and other factors. Tarnishing or excessive wear of these finishes is a normal process which is unavoidable. Subject to California Civil Code section 895 et seq.,

these finishes cannot be guaranteed and products will not be repaired or replaced under the manufacturer's warranties for tarnishing or wear of finishes.

14. Cell Phone Reception. Buyer acknowledges that Seller has no control over the quality of cell phone reception in the vicinity of the Project or at Buyer's Residence.

15. Church(es)/Worship Center. The Project is located in close proximity to Our Saviors Lutheran Church. There may be increased activity at the church during certain times, especially on Sundays. Activities at the church may cause increased traffic and congestion in the area. The church also has bells which ring periodically which may create some disturbances or annoy certain residents. The church plays music which may also create some disturbances or annoy certain residents.

16. Coffee Shop. The Caffé Calabria Coffee Shop is located directly adjacent to the La Boheme project. In addition to conducting standard coffee shop business, Caffé Calabria also roasts its own coffee beans. Roasting coffee beans creates strong, pungent odors that may be detectible both inside and outside of Buyer's Unit. Buyer is advised to visit the La Boheme Project at various times to determine whether the coffee roasting odors will affect Buyer's enjoyment of his or her Unit.

17. Facilities Coordinator. A facilities coordinator will be available during limited hours at La Boheme. The facilities coordinator will not provide all of the services of a full service concierge. If Owners in the Project determine they would like to have a full service concierge, or would like to increase the hours of the facilities coordinator it would require an increase in the budgets to provide funds for such services which may necessitate a vote of the Owners.

18. Day-Care Center for Children. A day-care center currently is operating in close proximity to the Project ("Day-Care Facility"). There may be noise, traffic and increased activity as a result of the Day-Care Facility. Seller has no control over the Day-Care Facility and makes no representation that the Day-Care Facility will continue to be operated in the future.

19. Easements. The Project is subject to easements and/or rights in favor of utility companies, public agencies and/or other persons or entities. These easements and rights may include access onto the Project by utility companies or public agencies for purposes of installing, constructing, inspecting, maintaining and repairing their facilities which are customary for residential developments (including, but not limited to, water lines, sewer lines, electrical lines and facilities, natural gas pipelines, telephone lines and facilities, cable television lines, street lights, clustered mailboxes, traffic signs, and fire hydrants). These facilities may be located above ground or below ground. Seller cannot control the location of these facilities. The location of a utility company's and/or a public agency's facilities is subject to change without notice. Buyer should confirm the as-built location of all facilities affecting Buyer's Residence at the time of Buyer's walk through inspection. Buyer understands and agrees that all as-built locations are final. Additionally, Buyer should review the title report for Buyer's Residence to determine what easements and/or other rights, if any, affect Buyer's Residence.

20. Electricity Shortage, Increased Costs and Delays. Buyer understands and accepts that California has faced a serious statewide electricity shortage which resulted in significant increases in the costs for energy and utilities, as well as rolling black-outs, service interruptions, service and maintenance problems from the utilities providers, and other related inconveniences such as delays in the establishment of electricity and utility services, bankruptcy filings by utilities providers and delays in the issuance of certificates of occupancy. Such interruptions and inconveniences could occur again in the future. Buyer understands and accepts that such shortages and delays may, in turn, cause delays in the Close of Escrow. Furthermore, Buyer recognizes and accepts that the electricity shortage, increased costs and delays are not isolated to California and may, directly or indirectly, affect other states in which Seller builds.

Seller has no control or influence over the electricity shortage, increased costs, delays or any related problems and Buyer understands and accepts that Seller shall have no responsibility or liability for any such problems or delays, including, but not limited to, any delays in the close of escrow. Buyer should contact the utilities providers and their local, state and federal governmental agencies for further information.

21. Elevators. The Project is located in a multi-story building. Those Owners living on the upper levels will likely rely on elevators to access their Residence. During the busy morning and evening hours especially, residents and their guests may have to wait for elevators. Electrical outages, service, maintenance, and similar events may occasionally render elevators unavailable. It is also possible that elevators may malfunction while carrying passengers, causing inconveniences such as delay or temporary confinement. Buyer acknowledges Seller has no control over the elevators. If there is ever a fire in the Project, you should refer to the posted fire escape plan regarding emergency exiting procedures and routes. Residences located adjacent to elevator shafts may experience noise and/or vibrations associated with the movement of the elevators up and down the shafts. It is Buyer's responsibility to familiarize himself/herself with the location of his/her Residence and to determine the effect of such noise and vibrations.

22. Encroachment Agreements. Certain areas of the Project, which may include, but not limited to, certain enhanced paving, sidewalk underdrains, street trees and tree grates and irrigation, balconies,

pedestrian bridge, and portions of the parking garage, are situated within a public right-of-way owned by the City of San Diego, are located outside of the boundaries of the legal lot within which the Project is located, and will be subject to certain encroachment agreements issued by the City ("Encroachment Agreements"). Depending on the type of Encroachment Agreement required by the City, the Encroachment Agreements may provide that, if the Association is requested to do so by the City, the Association must remove the encroachment at the Association's cost and expense. If necessary, the Association has the right, under the Declaration, to levy a special assessment to cover any costs arising from claims under the Encroachment Agreements.

23. <u>Energy Conservation (Title 24): Air Conditioning Disclaimer</u>. Heating and cooling units installed in the Residences are designed to meet guidelines for the State of California's Title 24. This is an energy conservation law which is designed to help reduce the overall use of energy in Buyer's Residence. The Title 24 law describes the amount of cooling capacity as well as the minimum efficiency ratings for each geographical location in the State of California. In complying with Title 24, the optional cooling units installed in Buyer's Residence are designed for maximum efficiency. Due to the Title 24 geographical requirements, on extremely warm days, Buyer's inside room temperature may be warmer than Buyer's thermostat selection. This is due to design restrictions imposed by Title 24 and not to any design or installation defect of Seller or its contractor.

Care should be taken to keep all objects, including, but not limited to, sticks, toys, fingers or other debris from entering the vents or any other openings on the air conditioning equipment placed outside the Residence. Children should not play or otherwise come near the air conditioning equipment.

24. <u>Energy Conservation (Title 24): Hot Water Disclaimer</u>. Due to compliance with the energy-saving requirements in the State of California's Title 24, it may take a few minutes for hot water to reach the faucet in Buyer's Residence. Title 24 is an energy conservation law which is designed to help reduce the overall use of energy in Buyer's Residence. Any delay in the production of hot water to Buyer's faucet is due to design restrictions imposed by Title 24 and not due to any design or installation defect of Seller or its contractor.

25. <u>Environmental</u>. Environmental site investigations have been conducted on the Project site. Historical use of the Project site includes a former dry cleaners and other commercial activities. Uses of adjacent properties have included operations by several dry cleaners and a gasoline station/service center, which could have potentially released chemicals detected in soil vapors in low levels. Underground storage tanks and soils impacted by petroleum hydrocarbons were encountered during construction. The tanks and contaminated soils were removed from the Project site in accordance with applicable law, ordinances and regulations under the supervision and approval of the County of San Diego, Department of Environmental Health ("DEH"). The DEH concluded that no further action related to the petroleum releases at the site is required. Based on available information, residual contamination, if any, will not result in significant human health impacts to future site occupants. Additional information may be obtained from the County of San Diego DEH at (619) 338-2222.

26. <u>Exterior Paint</u>. Great care and consideration has gone into selecting the exterior colors of the Project. The color scheme has been pre-selected. Even though Seller strives to match the color of the exterior of the Project to the color chart in the sales office, variations may occur. In addition, colors can change over time due to exposure to the elements and may appear different in different light. Seller reserves the right to revise the designated color schemes at its sole discretion.

27. <u>Exterior Pre-cast and Foam Trim</u>. Some architectural relief has been created through the use of pre-cast appliqués or foam trim appliqués covered by stucco. Uses include, but are not limited to corbels, and window and door trim. Since the underlying materials are more delicate and do not possess the structural integrity of other underlying building materials, these areas may be more susceptible to damage. Buyer must use extreme caution when working adjacent to these appliqués. Buyer must NEVER use these appliqués for support surfaces.

28. <u>Fire Sprinkler System</u>. Buyer's Residence will be equipped with a fire sprinkler system that is required by the City of San Diego Fire Marshall. The sprinkler systems are heat sensitive and should not be exposed to an open flame. Buyer acknowledges that Seller is not responsible for any damage to such Buyer's Residence caused by the activation of the sprinkler system. The purpose of the sprinkler system is to aid in the control of fires. Seller makes no warranties as to the effectiveness of the sprinklers. The fire sprinkler system will require routine maintenance by each Owner to ensure the system is functioning properly. Buyer acknowledges that it is Buyer's sole responsibility to maintain the sprinkler system in Buyer's Residence.

29. <u>Fire Station: Permanent</u>. A fire station is situated at 4011 32nd Street. This fire station may create noise, traffic congestion and other nuisances. Seller has no control over the fire station and whether it will continue to operate as a fire station. There is no representation made about Buyer's safety merely by the presence of the fire station.

30. <u>Freeways/Highways</u>. Portions of the Project are located in close proximity to Interstate 805. In addition, there are other regional, local arterial and interior roads in the vicinity of the Project that may cause noise within the Project or traffic congestion on the roadways near the Project. These road system improvements are subject to modifications, approvals, and improvements made by the State or County.

For example, alignments may be changed, proposed extensions may be deleted or changed and roadway improvements within the vicinity of the Project may be added. Owners may experience noise from use of these roads as well as other problems associated with traffic congestion in the area of the Project.

31. Future Adjacent Land Uses. Seller makes no representations about future land uses on adjacent or nearby properties. Plans for redevelopment of any adjacent property could have an effect on the Project. Seller does not control the land use or zoning of the adjacent properties. Because general plans and zoning are subject to change, we encourage Buyer to check with the Planning Department or any other appropriate City of San Diego Planning Department regarding proposed land uses in the surrounding vicinity of the Project.

32. Gates. The Project will be equipped with entry gates. The entry gate will remain open at a minimum until completion of sales and construction of the Project. Seller may alter the completion and/or construction schedules at its discretion. No additional security should be implied by the fact that there is gated access to the Project. Seller shall have control over the entry gates and shall be responsible for maintenance and repair until all sales of Residences in the Project have been completed, or until Seller determines when the Association should take responsibility for control, maintenance and repair of the gates.

33. Heavy Furnishings or Equipment in the Residence. Prior to installation or transportation of any heavy furnishings or equipment into the Residence, Buyer should consult with a structural engineer or other qualified professional to confirm that the heavy furnishings or equipment will not exceed the structural design of the Residence and that the flooring system in the Project will not be overloaded, damaged or otherwise adversely affected by such heavy furnishings or equipment. Heavy furnishings or equipment include, without limitation, water beds, safes, weight benches, heavy exercise equipment, large fish tanks and pool tables. Seller will not be responsible for any damages, loss or injury arising out of or in connection with Buyer's heavy furnishings or equipment.

34. Homeless in Area. It is possible that homeless individuals may live in areas around the Project. Buyer acknowledges that Seller has no control over the presence of homeless individuals in the areas around the Project.

35. Hotel. The North Park Inn is located approximately one-half (1/2) mile from the Project. The Project may be subject to traffic or noise generated by the North Park Inn and its users.

36. Initial Capital Contribution. In addition to regular assessments, each Buyer of a Residence must pay an initial capital contribution in an amount as provided in the Purchase Agreement and/or the Declaration to the Association when purchasing a Residence. Buyer's payment is not a prepayment of assessments or part of the purchase price of the Residence. If Buyer sells Buyer's Residence, Buyer will not be entitled to a refund of these amounts from the Association. However, if Buyer sells Buyer's Residence in the future, Buyer can require a buyer to pay Buyer these amounts as part of Buyer's Purchase Agreement.

37. Mailboxes. Mailboxes in the Project are clustered in groups pursuant to the requirements of the U.S. Postal Service and installed by Seller. Seller has no control over the placement of the clustered mailboxes, either initially or in the future. The Association shall have the responsibility to maintain, repair and replace the mailboxes. Buyer is responsible for maintaining the mailbox key.

38. Metal Fencing. Seller will install a metal fence around the perimeter of the patio area of the ground floor Units. The fence will be approximately three to five feet in height and will be visible from the Units and from the exterior of the Project. The Association will be responsible for the maintenance, repair and replacement of the fence. The fence is not being installed for security reasons, and Seller makes no representation or warranty as to Buyer's safety or increased security as a result of the fence.

39. Moving In/Large Items. The parking garages in the Project do not provide overhead clearance necessary to accommodate high-profile vehicles such as delivery trucks and moving vans. Instead, moving vans and large delivery trucks must stop near one of the parking garage entrances or at the curb to load or unload. Delivery vehicles will not be permitted to remain unattended at any entrance to the Project. During loading and unloading, a representative of the Association or its Manager may be present to ensure that deliveries do not unreasonably interfere with access by other residents. Buyer agrees to consult with a representative of the Association or its Manager to arrange an acceptable move-in date and time. Buyer further agrees that if Buyer, Buyer's family, agents, contractors, employees or guests cause any damage to Improvements in the Project, Buyer will be solely responsible for the cost of repairing such damage. When required by the Association or the Association's management company, Buyer agrees to pay a non-refundable cash fee to pay the cost of scheduling and monitoring moving and deliveries, and a refundable cash deposit to cover the repair of any such damage. Buyer should be aware that moving fees charged by moving companies may be increased because Buyer's Residence may be located far away from the area where moving trucks are able to unload. Buyer should review the Association Rules & Regulations relating to move-in procedures.

40. Noise. Since the Project is situated in an urban area, there will be noise generated from occurrences, facilities and transportation vehicles including trains, police cars, fire trucks and

ambulances. There may also be special events from time to time which will generate traffic noise and other nuisances. Buyer is responsible for investigating noise levels in and around the Project. Seller makes no guaranty as to these matters now or in the future.

**41.** Noise from Amenities. Residences in the vicinity of Project amenities such as entry gates, and recreation facilities will likely experience higher than normal noise from pedestrian traffic and other disturbances associated with the use of these facilities. Buyer acknowledges that noise generated from the use of Project amenities are not within Seller's control.

**42.** Noise from Busy Street. The Project is located in the vicinity of University Avenue, El Cajon Boulevard and 30th Street. Buyer may experience noise from the use of such streets as well as other problems associated with traffic congestion in the area of the Project. Buyer is responsible for investigating noise levels in and around the Project and acknowledges such noise is beyond Seller's control.

**43.** Sound Transmission and Attenuation. Buyer acknowledges that elimination of all sound transmission between Residences is impossible to attain and is not promised by the Seller. Residences within this Project have been designed and constructed to attenuate (i.e. lessen) the transmission of sound between Residences and shared walls and floors. Within the Project, Buyer is advised and hereby acknowledges that the Residences are subject to sound and noise transmission from the surrounding Residences as well as surrounding and adjacent properties resulting from, among other things, walls, floor-ceiling construction, plumbing lines and systems, including jetted tubs, ventilation ducts, and HVAC systems, and that despite sound attenuation measures, such systems can generate noise which probably will be audible in Buyer's Residence. Seller warrants to Buyer that the wall and floor assemblies meet the minimum design requirements of the California Noise Insulation Standards (CCR, Title 24), as prescribed in the 1997 Uniform Building Code (UBC). To assure that the typical wall and floor assemblies in this Project are functioning as envisioned in the design, an acoustical consultant was hired to conduct sound tests in one or more completed buildings. The sound tests of the completed buildings resulted in meeting the minimum performance requirement for Noise Isolation Class (NIC). A complete copy of the testing report is available upon request by Buyer, after construction of the model homes is completed.

Each Buyer is responsible for satisfying himself or herself as to the acoustics and noise attenuation between Residences in the Project. Except as set forth in the Declaration, Buyers shall not make penetrations into party walls and/or floor/ceilings; such penetrations would reduce the acoustical value of the walls and/or floors/ceilings. Additionally, no Buyer shall install any hard surface flooring (including, without limitation, tile or hardwood floors) or replace any flooring with any hard surface flooring unless such Buyer obtains the prior approval of the Association pursuant to CC&Rs. Hard surface flooring may not be installed in any bedroom. Furniture should be fitted with soft pads under the legs to control structure-borne noise from drawers, stereo equipment, telephones, etc. Owners are responsible for satisfying noise complaints from neighbors from all sources including hard heeled footsteps, noisy kitchen sources, washing machines, stereos, hot tubs, jetted tubs, exterior decks, common areas including pool etc. Owners should avoid running noisy equipment after 10:00 PM, particularly the equipment listed above, increasing the bass on stereo equipment and having noisy parties. The Association Rules adopted by the Association may contain noise control requirements, including, but not limited to, restrictions on running noisy equipment, increasing the bass on stereo equipment and having noisy parties.

In addition to sounds and noise from within La Boheme, living in an urban environment will expose you to sounds and noise from the surrounding areas. Your urban environment will include many more sound and noise sources than a typical suburban neighborhood. For example, construction sites; public transportation; police and ambulance sirens; honking horns; music from nightclubs, bars and restaurants; noise from individuals, especially those who are intoxicated, transient or those with mental health issues. The sounds and noises may be audible in your Condominium with the windows and doors opened or closed. Urban living involves exposure to many of these sounds and noises, as well as others, at all times of the day and night.

Sounds and noise from within and outside of La Boheme may reflect off of neighboring buildings causing an "echo" effect which directs sound into your Condominium. Sounds and noise may actually seem amplified as a result of this echo effect. The echo effect may be present when you initially move into your Condominium or it may not develop until later when other buildings are constructed. Seller has no control over sounds which echo around La Boheme or the construction of buildings in the vicinity of La Boheme which may contribute to the echo effect.

**44.** Park. There is a park site located at 4044 Ohio Street that is owned by the City of San Diego. The park site includes baseball fields, a playground, tennis courts, an indoor gymnasium, an outdoor gymnasium, a teen center, a senior center and a racquetball court. As a result, the Project may be subject to lighting, noise, traffic and other nuisances. Seller has no control over the use of the park or its hours of operation and makes no representations or warranties as to whether the park will continue to be used by the City for recreational facilities or any other uses. For further information, contact the City Parks and Recreation Department at 619-525-8219.

**45.** Parking Per Declaration. Buyer is required to park vehicle(s) in his/her assigned parking space. Buyer acknowledges that he/she has been advised to read the use restrictions set forth in the Declaration

carefully before determining to purchase a Residence, and to contact a sales representative if Buyer has any questions. In particular, Buyer should review the provisions of the Declaration that limit and restrict the parking of trailers, boats, and motor vehicles within the Project.

46. <u>Assignment of Parking Spaces</u>. When you purchase a Condominium at La Boheme, Seller will assign a parking space or spaces to you located in the subterranean parking garage which is owned and maintained by the Association. When you sell your Condominium, your rights to park in the assigned parking space will pass to the new owner of the Condominium. You may sell or otherwise transfer your rights to park in the assigned parking space(s) as set forth in the Declaration. You may also exchange your assigned space(s) with another such owner at La Boheme provided that you and the other owner enter an agreement detailing the exchange. The Association will note the exchange in its records.

Seller will provide the Association with the records of the assigned parking spaces. The Association may temporarily relocate your assigned space(s) to accommodate emergency repairs or other maintenance requirements for the Project. The parking space which you will receive will not be shown on your Grant Deed, and you will not receive title insurance covering the assigned parking space.

**NOTWITHSTANDING THE FOREGOING, PRIOR TO THE CLOSE OF ESCROW, SELLER RESERVES THE RIGHT TO RENUMBER AND RELOCATE SUCH PARKING SPACES DUE TO RECONFIGURATION OF THE PARKING GARAGE DURING THE COURSE OF CONSTRUCTION OR DUE TO ANY REQUIREMENTS IMPOSED BY THE CITY.**

Certain parking spaces in the parking garage will be used by the Owners and tenants of the Commercial Condominiums and their employees and patrons.

47. <u>Parking Space Dimensions and Configuration</u>. Buyers are advised that shape and dimensions of the parking spaces located within the parking garage are not standardized. Many of the parking spaces consist of tandem parking.

Due to the location of pillars and other projections in the parking garage, certain spaces may be smaller than others. Buyer is advised that any plans shown to Buyer relating to parking may be subject to change based upon the actual as built conditions of the parking garage. Due to shape, size and configuration of parking spaces, not all of the allocated spaces will accommodate all vehicles, especially full size models and sport utility models. Parking stall layouts may require back and forth maneuvering depending on location and size of owner's vehicle. In addition, the parking garage at La Boheme has limited overhead clearances and may not accommodate all vehicles. Buyer should consult with the Sales Representative as to the parking stall dimensions and location allocated to their Condominium prior to purchase. **BUYER ACKNOWLEDGES THAT IT IS HIS OR HER RESPONSIBILITY TO DETERMINE WHETHER THE SIZE OF HIS OR HER ASSIGNED PARKING SPACE(S) IS ADEQUATE AND APPROPRIATE TO PARK BUYER'S VEHICLE(S).**

48. <u>Handicap Parking at La Boheme</u>. The parking garage at La Boheme will include handicap parking spaces. Seller will assign these spaces to any buyers who qualify for handicap status as described in the Declaration upon the initial sale of the Condominiums and designate such assignment in the association's records. However, Seller does not guarantee that there will be enough handicap parking spaces to assign one to every buyer who qualifies for handicap status.

If an owner who is assigned a handicap parking space no longer qualifies for handicap status or thereafter sells the Condominium to an owner who does not qualify for handicap status, the Seller or the Association may exchange the handicap parking space for another assigned parking space in the garage, as described in the Declaration. The space you receive in exchange for the handicap space in the future may not be as desirable in its size or location within the parking garage.

49. <u>Guest Parking</u>. Buyer acknowledges that there is no guest parking in the parking garage. Seller makes no representations or warranty as to the availability of guest parking in the proximity of La Boheme. Street parking spaces on the block on which La Boheme is located may be metered or may not be available. Seller makes no guarantee that spaces will be available to you or your guests.

50. <u>Plumbing</u>. If drain lines become clogged, this may result in possible damage and inconvenience, and therefore must be maintained open and free-flowing at all times by Buyer. In addition, the plumbing drain lines have been routed above ground through the walls and ceiling in your Residence. Buyer may experience some noise due to the location of these pipes.

51. <u>Post-Tension Concrete System</u>. Due to expansive soil conditions, Buyer's Residence may be built using a post-tension concrete system ("**System**"). The System involves placing steel cables under high tension in the concrete slab located beneath the Residence. Therefore, any attempt to alter or pierce the foundation (e.g., sawing, cutting or drilling) could damage the integrity of the System and/or cause serious injury or damage to persons and personal property. Subject to California Civil Code Section 895 et seq., Seller shall not be responsible for any damage or injury resulting from or arising in connection with the alteration of the slab or foundation of any Residence in the Project. By acceptance of a deed to a Residence, Buyer agrees that: (i) Buyer shall not cut into or otherwise tamper with the System; (ii) Buyer shall not knowingly permit or allow any other person to cut into or tamper with the System so long as Buyer owns any interest in the Residence; (iii) Buyer shall disclose the existence of

the System to any person who rents, leases or purchases Buyer's Residence; and (iv) Buyer shall indemnify, defend, and hold Seller, and its officers, employees, contractors and agents harmless from and against any and all claims, damages, losses or other liability (including attorneys' fees and costs) arising from any breach of this covenant. Buyer acknowledges that he/she will not be able to install a floor safe.

52. Power Lines or Power Substation. Overhead power lines are located in and around the Project. The power lines are owned, operated and maintained by SDG&E. Power lines produce extremely low-frequency electromagnetic fields ("ELF-EMF") when operating. Please note that the size, nature, voltage and location of such overhead power lines are not within Seller's control and are subject to change. For some time, there has been speculation in the scientific community about health risks associated with living near ELF-EMF sources.

In 1992, the U.S. Congress authorized the Electric and Magnetic Fields Research and Public Information Dissemination Program ("EMF-RAPID Program") in the Energy Policy Act. The Congress instructed NIEHS, National Institutes of Health ("NIH") and the U.S. Department of Energy ("DOE") to direct and manage a program of research and analysis aimed at providing scientific evidence to clarify the potential for health risks from exposure to ELF-EMF. After review and analysis of the existing data, NIEHS reported to Congress on May 4, 1999, the following:

- "The scientific evidence suggesting that ELF-EMF exposures pose any health risk is weak."
- "Virtually all of the laboratory evidence in animals and humans and most of the mechanistic work done in cells failed to support a causal relationship between exposure to ELF-EMF at environmental levels and changes in biological function or disease status."
- "The NIEHS does not believe that other cancers or non-cancer health outcomes [from ELF-EMFs] provides sufficient evidence of a risk to currently warrant concern."

In California, the State Public Utilities Commission and the Department of Health Services are conducting an ongoing, joint research program initiated in 1989 to examine the possible health effects of exposure to electric and magnetic fields from electric power facilities. Their findings may determine whether regulatory action is warranted to reduce any health hazard.

Seller recognizes and discloses to Buyer that (a) no definitive research has said that ELF-EMF exposure is entirely safe; (b) ELF-EMF's impact on humans will undoubtedly continue to be an area of public concern; and (c) advocacy groups of different scientific orientations have opposing views on this subject with some arguing that ELF-EMFs are entirely safe and others arguing that there are correlations between ELF-EMF presence and serious diseases.

As a result, Seller hereby discloses that transmission lines may create health risks and may have financial or other adverse impacts on the homes or residents within the Project. In addition, there is a risk that certain pacemaker heart implant devices may not operate properly when in close proximity to certain electric power lines. The susceptibility of different types of pacemaker devices to electro-magnetic interference should be discussed with a physician.

Seller does not render an opinion or endorse any particular study, even including the NIEHS study. Seller's quotations of some portions of the NIEHS report do not represent an exhaustive description of the NIEHS report. Copies of the entire NIEHS study are available http://library.niehs.nih.gov/ or http://www.niehs.nih.gov/emfrapid/.

The NIEHS report contains a list of references, including an extensive bibliography, for potential buyers to consider for additional research. Indeed, more than 300 studies regarding these issues were reviewed by the NIEHS in the course of its study and are described in the report. Seller urges Buyer to research and review the literature available on the subject and to reach their own conclusions of safety as related to ELF-EMF exposures.

By signing this Addendum, Buyer acknowledges that Buyer has reviewed the particular sections of the disclosure regarding electromagnetic fields and Buyer's acknowledgement constitutes Buyer's waiver and release of Seller, its affiliates, parent companies, subsidiaries, employees, officers and directors from any loss, damage or claim whatsoever in any way related to exposure to ELF or EMFs.

Therefore, by executing a copy of this Addendum, Buyer expressly acknowledges and agrees that Seller shall have no responsibility for any costs, expenses, liabilities or obligations of any kind or nature whatsoever arising out of or in any way related to the transmission lines. For further information please contact the Customer Service Division of SDG&E.

53. Probation Office. There is a San Diego Probation office located across the street from the Project. Individuals who are on probation will be visiting the probation office and will frequently be in the vicinity of the Project.

54. **Public Transportation**. Public bus service in the area of the Project is currently made available through the San Diego Metropolitan Transit System. For schedules, fares and further information, please contact MTS at 619-233-3004.

55. **Recreational Facilities**. The Project includes recreational facilities consisting of a Jacuzzi/sauna, exercise facilities and a recreation room ("Recreational Facilities"). The use of these Recreational Facilities may cause noise, night light, the errant flight and/or entry of items of play and other disturbances to Buyer. Buyers living near the Recreational Facilities will likely experience higher than normal pedestrian traffic and other disturbances associated with the use of these facilities. Buyer acknowledges that the condition of the Recreational Facilities may change over time. The Association may change the hours of operation of, and access to the Recreational Facilities from time to time.

56. **Red Fire Ants**. According to the California Department of Food and Agriculture ("**CDFA**"), the Red Fire Ant has recently been found in several areas in California including the City. This ant is known for its aggressive behavior and harmful to plants, wildlife and humans. These ants will repeatedly sting anything that disturbs them. Children must be educated to stay away from fire ant mounds. The CDFA states that stings are usually not life threatening, but the stings are easily infected, and on rare occasions anaphylaxis (a systemic allergic reaction) can occur and may be life threatening. Fire ant mounds are unsightly, detract from the aesthetic value of home landscaping and may reduce land values. Fire ant mounds can reach eighteen inches in height depending on the type of soil. The average colony contains 100,000 to 500,000 workers and up to several hundred winged ants and queens. Fire ant mounds near the Residence should be identified immediately and treated with an ant bait insecticide or other recommended treatment. For more information concerning the symptoms and treatments for stings, and efforts to eradicate the Red Fire Ant, please contact the CDFA at (800) 675-2427.

57. **School: Existing Site**. North Park Elementary School is located ¾ mile from the Project and Garfield Elementary School is located 1 mile from the Project. Seller makes no representation whether these sites will continue to be used as elementary schools. There are fields at the schools which may be used for sports activities and other school event. The fields may be lighted at night. There may be noise, traffic and other congestion resulting from the use of the school site. Owners in the Project may be impacted by noise, lights, traffic and other impacts from such schools. For more information, please contact the San Diego Unified School District.

58. **Security Disclaimer**. Seller has not undertaken to provide any security for the Project or for any person, personal property or Residence in the Project.

Although on-site personnel provided by Seller or the Association including, but not limited to, any on-site manager, may be present at the Project, such on-site personnel will not be responsible for patrolling, monitoring or otherwise ensuring safety of residents, guests or the general public, particularly where the general public has open access to the Project.

Seller will install a limited number of cameras at each entry into the Project with monitors in a central office location in the Project. However, the cameras will NOT be monitored by any staff member or personnel.

Neither the gates in the Project, nor the elevators, nor the elevator lobbies will prevent unauthorized entries into the Project. Furthermore, no gate nor any elevator or elevator lobby will be staffed, nor are they intended to provide security or privacy for the Project or for any person, personal property or Residence in the Project. The gates to the parking garages are not monitored and Seller makes no representation regarding the security of any vehicles, bicycles or other personal property left in the garage.

All vehicles and bicycles should be kept locked at all times, and are subject to theft and vandalism.

By accepting and recording a deed to a Residence in the Project, Buyer understands, acknowledges and agrees that, except as stated in the Declaration, neither Seller nor the Association have made any representations or warranties concerning the safety of persons, vehicles, personal property or Residences in the Project. In addition, Buyer acknowledges and agrees that neither the Seller nor the Association is a provider of security and shall have no duty to provide security on or around the Project.

59. **Security System**. An electronic home security system may be installed in Buyer's new home as an optional item. The security system is marketed by AES Co. Seller disclaims any knowledge of the design, manufacture, installation or operation of the electronic home security system and disclaims all warranties, either expressed or implied, with respect to the home security system, including all implied warranties of merchantability and fitness for a particular purpose; in no event shall Seller be liable to Buyer for any damages directly or indirectly resulting from claims arising out of or in connection with the use or performance of the system; and Seller shall not be liable for any special, incidental or consequential damages even if Seller has been advised of the possibility of such damages. Employees of Seller are not authorized agents of the manufacturer of the electronic home security system and therefore any representations by such Seller employees should be disregarded.

It is the responsibility of Buyer to carefully review the specifications of any electronic security system to be installed in Buyer's Residence, including basic coverage areas, features and system use. Buyer is urged

to carefully review the operation procedures and the limited warranty for the security system provided by the manufacturer. Special attention should be directed to those paragraphs which limit the liability of manufacturer. Moreover, all arrangements for system activation, links (if any) to security services or public safety organizations are solely the responsibility of Buyer. Any and all questions regarding the design, manufacture, installation, service or limitations on liability of the system should be directed to Max Greene at 1220 Greenfield Drive, El Cajon, CA 92021, (619) 579-2898.

60. Staingrade Wood Disclosure. Due to changes which have been mandated by the California Air Quality Management Board (AQMD) in the materials that painting subcontractors use, the painting industry is experiencing problems with certain materials. Of primary concern at this time are the stains they are allowed to use for natural woods including cabinets and handrails. All manufacturers have had to reformulate their stains to meet the requirements of the AQMD, and the formulations they have developed no longer work in the same manner as the earlier stains. As a result, painting subcontractors are no longer able to match natural woods such as handrails to pre-finished kitchen cabinets. Painters can achieve only a reasonable approximation of the cabinet color. Neither Seller nor the painter can accept responsibility for creating exact matches on different types and finishes of woods. Buyer acknowledges and agrees that there may be differences in stain colors on all wood materials.

61. Storage Areas. The Project includes storage areas in the parking garage. Seller will assign to Buyer the exclusive right to use such storage space when Buyer purchases a Condominium ("Assigned Storage Space"). The Assigned Storage Space will not be conveyed in your deed. Seller will designate the Assigned Storage Space in the records of the Association. Seller, Buyer, and/or the Association will have the right to relocate Assigned Storage Space upon the occurrence of certain events as described in the Declaration. You are prohibited from using the storage areas for the storage of any hazardous materials or any other noxious, toxic, flammable or odorous substances and shall be subject to additional limitations set forth in the Association Rules. Underground parking structures are often damp and the Storage Spaces are not climate controlled. It is your responsibility to cover, seal, or otherwise protect your belongings within your Assigned Storage Space, if any, from damage from other owners, damp conditions, vandalism or other occurrences. The locks on the Assigned Storage Spaces are merely meant to act as a deterrent to theft, but do not provide any real protection against theft, vandalism or destruction of items stored in these areas. Neither Seller nor the Association are providing security for the storage areas and shall have no duty to do so.

62. Surrounding Uses. There are many different land uses currently occurring in the vicinity of the Project, including retail and commercial uses (including, restaurants, dry cleaners, banks, printing shops, bars and supermarkets), apartments, fitness centers, churches, and schools. All of these uses generate light and pedestrian and automobile traffic, and may generate noise in the vicinity of the Project in the evening and at night. Restaurants, bars and taverns may cause late night noise and other disturbances. Additional commercial businesses may be opened in the vicinity of the Project in the future. Buyer acknowledges that Seller has no control over the development of additional commercial businesses.

63. Traffic. Future development in the area may result in increased traffic flow around La Boheme. The commercial uses located on the first floor of La Boheme will generate additional pedestrian and vehicular traffic and parking needs around La Boheme as well. Traffic around La Boheme is different from traffic in a typical residential neighborhood because large city buses, taxicabs, tour buses and automobiles from nonresidents will be traveling through the neighborhood at all hours of the day and night.

64. Trash Chutes. The Project contains one trash chute in each building. Buyers must familiarize themselves with the location of the trash chute in their building relative to their Units. Buyer will need to carry their trash to the trash chute rooms for disposal. All trash and garbage must be bagged or otherwise sealed before disposing of it in any trash chute. The trash chute rooms may, at times, emit odors. Units located in proximity to trash chute rooms may experience noise associated with the disposal of trash, particularly items such as glass bottles, and especially during quiet hours. Trash collection costs are a part of Buyer's monthly assessments.

65. Underground Gas Line. A high-pressure natural gas line located under Ohio Street. The natural gas line is owned by SDG&E. Due to the close proximity of such pipeline to Buyer's Residence, potential impacts include the possibility of explosions or soil contamination from leakage of the gas. By acceptance of a deed to a Residence, Buyer acknowledges and agrees that Seller has no control over the use, maintenance or care of the pipeline.

66. Underground Utilities. All utilities servicing Buyer's Residence are underground including, but not limited to, water, sewer, gas, electric, cable and telephone.

67. Water District. The Project is located in the City of San Diego Water District. Buyer acknowledges that Seller has no control over the water district.

68. Water Softeners. Buyer is advised that he/she is subject to the rules and regulations of the City of San Diego Water District regarding the use of water softeners. For further information regarding regulations, call 619-815-3500.

69. **Wind**. All of Southern California is subject to periods of high winds. Wind speeds in the Project may exceed that experienced in other areas of the surrounding region. Buyer must ensure that any structures or other Improvements are constructed or designed to withstand high winds. Buyer is advised to consult with experienced architects and engineers in the design and specification of any structures or Improvements that Buyer plans to add to Buyer's Residence or Residence, as well as obtaining approval of your design from the Board.

70. **Window Tinting**. The manufacturer of dual glazed windows will not warrant these windows if a tinting has been added to them. Tinting causes heat gain between the glass panels which may result in the failure of the window. Such failure can result in water intrusion, cracks in the glass, or in extreme cases, the dual glass unit can explode. Subject to California Civil Code Section 895 et seq., you understand and agree that neither Seller nor the manufacturer of the windows and/or doors in your home will responsible for any repairs or replacement of any windows or door which has been tinted in any manner whatsoever. Certain tinting manufacturers provide independent warranties.

71. **Wiring for DSL, Internet and/or Similar Communication Services**. If wiring for a Digital Subscriber Line ("DSL"), high speed internet access and/or similar communication services is offered as an option for Residences in the Project, Buyer understands and accepts that selection of this option only equips the Residence with the capacity to receive such services. Seller does not provide DSL or other similar services; such services will be provided, if at all, by an unrelated third party service provider over which Seller has no control. Accordingly, the availability of DSL, high speed internet and/or communication services to Buyer upon move-in or at anytime in the future is not guaranteed. Further, if and when such services are provided, Seller cannot guarantee the continuity, speed or quality of services delivered. If Buyer is interested in selecting the wiring option, Buyer is strongly urged to directly contact the phone company, cable company and/or other communications service providers that serve area in which the Property is located to ascertain the availability and quality of any such services.



Buyer's Initials Buyer's Initials

# NATURAL HAZARD DISCLOSURE STATEMENT

This statement applies to the following property:

Property Address: TR 15113 (La Boheme Condominiums)
LOT Phase 1 - 135
3950 OHIO STREET #235, SAN DIEGO, CA 92104

APN Number:

The transferor and his or her agent(s) disclose the following information with the knowledge that even though this is not a warranty, prospective transferees may rely on this information in deciding whether and on what terms to purchase the subject property. Transferor hereby authorizes any agent(s) representing any principal(s) in this action to provide a copy of this statement to any person or entity in connection with any actual or anticipated sale of the property.

The following are representations made by the transferor and his or her agent(s) based on their knowledge and maps drawn by the state and federal governments. This information is a disclosure and is not intended to be part of any contract between the transferee and the transferor.

THIS REAL PROPERTY LIES WITHIN THE FOLLOWING HAZARDOUS AREA(S):

**A SPECIAL FLOOD HAZARD AREA** (Any type Zone "A" or "V") designated by the Federal Emergency Management Agency.

Yes _____ No__X__ Do not know and information not available from local jurisdiction _____

**AN AREA OF POTENTIAL FLOODING** shown on a dam failure inundation map pursuant to Section 8589.5 of the Government Code.

Yes _____ No__X__ Do not know and information not available from local jurisdiction _____

**A VERY HIGH FIRE HAZARD SEVERITY ZONE** pursuant to Section 51178 or 51179 of the Government Code. The owner of this property is subject to the maintenance requirements of Section 51182 of the Government Code.

Yes_____ No__X__

**A WILDLAND AREA THAT MAY CONTAIN SUBSTANTIAL FOREST FIRE RISKS AND HAZARDS** pursuant to Section 4125 of the Public Resources Code. The owner of this property is subject to the maintenance requirements of Section 4291 of the Public Resources Code. Additionally, it is not the state's responsibility to provide fire protection services to any building or structure located within the wildlands unless the Department of Forestry and Fire Protection has entered into a cooperative agreement with a local agency for those purposes pursuant to Section 4142 of the Public Resources Code.

Yes_____ No__X__

**AN EARTHQUAKE FAULT ZONE** pursuant to Section 2622 of the Public Resources Code.

Yes_____ No__X__

**A SEISMIC HAZARD ZONE** pursuant to Section 2696 of the Public Resources Code.

Yes _____ (Landslide Zone) Yes _____ (Liquefaction Zone)

No_____ Maps not yet released by state__X__

**THESE HAZARDS MAY LIMIT YOUR ABILITY TO DEVELOP THE REAL PROPERTY, TO OBTAIN INSURANCE, OR TO RECEIVE ASSISTANCE AFTER A DISASTER. THE MAPS ON WHICH THESE DISCLOSURES ARE BASED ESTIMATE WHERE NATURAL HAZARDS EXIST. THEY ARE NOT DEFINITIVE INDICATORS OF WHETHER OR NOT A PROPERTY WILL BE AFFECTED BY A NATURAL DISASTER. TRANSFEREE(S) AND TRANSFEROR(S) MAY WISH TO OBTAIN PROFESSIONAL ADVICE REGARDING THOSE HAZARDS AND OTHER HAZARDS THAT MAY AFFECT THE PROPERTY.**

Signature of Transferor(s) Tara A. Taylor Asst. Secretary Date 9/29/07

Signature of Transferor(s) _____ Date _____

Agent(s) [signature] Date 9/29/07

Agent(s) _____ Date _____

Check only one of the following:

☐ Transferor(s) and their agent(s) represent that the information herein is true and correct to the best of their knowledge as of the date signed by the transferor(s) and agent(s).

☒ Transferor(s) and their agent(s) acknowledge that they have exercised good faith in the selection of a third–party report provider as required in Civil Code Section 1103.7, and that the representations made in this Natural Hazard Disclosure Statement are based upon information provided by the independent third–party disclosure provider as a substituted disclosure pursuant to Civil Code Section 1103.4. Neither transferor(s) nor their agent(s) (1) has independently verified the information contained in this statement and report (PDR NUMBER 06SD0136 / CONTROL NUMBER 630385) or (2) is personally aware of any errors or inaccuracies in the information contained on the statement. This statement was prepared by the provider below:

Third–Party Disclosure Provider(s) [signature] Date Wednesday, August 23, 2006

Scott Roecklein, Sr. Vice President, First American Natural Hazard Disclosures

Transferee represents that he or she has read and understands this document. Pursuant to Civil Code Section 1103.8, the representations made in this Natural Hazard Disclosure Statement do not constitute all of the transferor's or agent's disclosure obligations in this transaction.

Signature of Transferee(s) James A. Wilson Date 9-27-07

Signature of Transferee(s) Shaun Wilson Date 10-10-07

Based on Public Record data as of the Report Date: Wednesday, August 23, 2006

EscrowNo: UNIT 135 LA BOHEME

PROPERTY DISCLOSURE SERVICES, INC.

# NEW HOME PDR® PACKAGE RECEIPT

| Report Number | Date of Report | Escrow Number |
|---|---|---|
| 06SD0136 | Wednesday, August 23, 2006 | UNIT 135 LA BOHEME |

Property Address: TR 15113 (La Boheme Condominiums)
LOT Phase 1 - 135
3950 OHIO STREET #235, SAN DIEGO, CA 92104

APN Number:

The undersigned hereby acknowledge receipt of the following documents:

Property Disclosure Report
(prepared by Property Disclosure Services, Inc.)

AND

Natural Hazard Disclosure Statement

**RECIPIENTS**

**Buyer(s):** James Wilson Date: 09-29-07

Sharyn Wilson Date: 10-10-07

**Buyer's Agent:** ______________________ Date: ______________

*This receipt is for the convenience of the seller and/or seller's agent involved in the transaction. The seller or their agent may want to have the buyer execute this form to be retained for their records.*




STANDARD PLAN




OPTION PLAN

UNIT 2B.1 - 2ND LEVEL - #1135

THIS DIAGRAM IS NOT TO SCALE. LOCATION OF STANDARD AND/OR OPTIONAL ITEMS MAY VARY DUE TO LOCATION OF PIPES, VENTS, ELECTRICAL, AND OTHER CONSTRUCTION IN WALLS AND CEILINGS. STANDARD AND OPTIONAL ITEM LOCATIONS MAY ALSO BE AFFECTED BY BUILDING CODE REGULATIONS. CEILING HEIGHTS MAY VARY AS REQUIRED TO PROVIDE HEATING AND VENTILATING SYSTEMS.

# LA BOHEME CONDOMINIUMS

for WESTERN PACIFIC HOUSING

DATE: 10.22.04

ARCHITECTS




STANDARD PLAN




OPTION PLAN

UNIT 2B.1 - 1ST LEVEL - #1135

THIS DIAGRAM IS NOT TO SCALE. LOCATION OF STANDARD AND/OR OPTIONAL ITEMS MAY VARY DUE TO LOCATION OF PIPES, VENTS, ELECTRICAL, AND OTHER CONSTRUCTION IN WALLS AND CEILINGS. STANDARD AND OPTIONAL ITEM LOCATIONS MAY ALSO BE AFFECTED BY BUILDING CODE REGULATIONS. CEILING HEIGHTS MAY VARY AS REQUIRED TO PROVIDE HEATING AND VENTILATING SYSTEMS.

# LA BOHEME CONDOMINIUMS

for WESTERN PACIFIC HOUSING

DATE: 10.22.04

ARCHITECTS

# CALIFORNIA CIVIL CODE

## Sections 895 Through 945.5

BUYER AND SELLER HEREBY ACKNOWLEDGE THAT THIS WRITTEN COPY OF THE ABOVE TITLE OF THE CIVIL CODE WAS PROVIDED TO BUYER PURSUANT TO CALIFORNIA CIVIL CODE SECTION 912(G).

BUYER'S INITIALS ______ SELLER'S INITIALS ______

BUYER'S INITIALS ______ SELLER'S INITIALS ______

# D.R. HORTON

# 10·4·1 LIMITED WARRANTY

Homeowner

## 10-YEAR STRUCTURAL WARRANTY

## 4-YEAR SYSTEMS WARRANTY

## 1-YEAR FIT AND FINISH WARRANTY

BUYER ACKNOWLEDGES THAT THIS WARRANTY WAS PROVIDED TO BUYER BEFORE SIGNING THE PURCHASE AGREEMENT AND ESCROW INSTRUCTIONS, THAT BUYER HAD THE OPPORTUNITY TO READ, AND HAS READ AND UNDERSTANDS THE SCOPE, TERMS, CONDITIONS, EXCEPTIONS AND EXCLUSIONS CONTAINED IN THIS WARRANTY. THIS WARRANTY IS THE ONLY WARRANTY EXPRESS OR IMPLIED, THAT IS APPLICABLE TO THE PROPERTY BEING PURCHASED BY BUYER.

BUYER'S INITIALS ______

BUYER'S INITIALS ______

This Warranty is not an Enhanced Protection Agreement, as defined by California Civil Code Section 901.

D.R. Horton 10·4·1 Limited Warranty
Copyright 2004 D.R. Horton, Inc.

**D.R. Horton**
**10·4·1 Limited Warranty**
(Homeowner)

Congratulations on the purchase of your new home. D.R. Horton, America's Builder, stands behind its workmanship by providing you with this Limited Warranty. In order to insure that you receive the maximum benefit of this Limited Warranty, however, you must take proper care of your new home. The Homeowner's Manual provided to you at the time of your purchase describes the maintenance that you need to perform. Failure to perform routine maintenance can result in the premature deterioration of many of the components of your home and defeat this Limited Warranty. Should you have any questions regarding this Limited Warranty or your maintenance obligations, your Customer Service Representative can assist you.

**WARRANTY**

Subject to the definitions, exclusions and limitations listed below, Seller provides the following warranty for the home you are purchasing:

- For 1 year from the Effective Date, Seller warrants your Residence against Deficiencies in the Fit and Finish Components (as defined in Section 1.6).
- For 4 years from the Effective Date, Seller warrants your Residence against failure of the Systems (as defined in Section 1.15).
- For 10 years from the Effective Date, Seller warrants your Residence against Unintended Water (as defined in Section 1.18).
- For 10 years from the Effective Date, Seller warrants your Residence against Structural Defects or Soils Related Issues (as defined in Section 1.14).
- For 10 years from the Effective Date, Seller warrants that all other functions or Components of your Residence structure will not cause damage as a result of materials or workmanship. Should such damage occur, Seller will repair or replace the Components.

Seller further warrants that your Residence has been constructed to meet the following Standards. Note that where a Standard is "significant" or "excessive", such Standards are further defined by reference to the National Association of Home Builders' performance standards, as such standards are adopted and set forth in the Homeowner's Manual.

**This Warranty is not an Enhanced Protection Agreement, as defined by California Civil Code Section 901.**


Copyright 2004 D.R. Horton, Inc.



JW
DW

- It materially complies with the design criteria of the Applicable Laws for fire protection.
- Fireplaces, chimneys, electrical and mechanical systems are constructed so as not to cause an unreasonable risk of fire.
- Heating is capable of maintaining a room temperature of 70 degrees Fahrenheit at a point three feet above the floor as measured in the center of each room.
- Air-conditioning, if any, is provided in a manner consistent with Title 24 of the California Code of Regulations (or its successor).
- Stucco, exterior siding, and other exterior wall finishes and fixtures do not contain significant cracks or separations.
- Roofing materials are installed so as to avoid materials falling from the roof.
- Ceramic tile and tile backing are installed in such a manner that the tile does not detach.
- The Residence has been constructed so as not to impair the occupants' safety because of public health hazards as determined by a duly authorized public health official, health agency, or governmental entity having jurisdiction.
- The paint and stains will not cause deterioration of the building surfaces for the length of time specified by the paint or stain manufacturer.
- Exterior pathways, driveways, hardscape, sidewalls, sidewalks, and patios do not contain cracks that display significant vertical displacement or that are excessive.
- Untreated steel fences and adjacent components will not cause unreasonable corrosion due to their installation.
- Untreated wood posts will not be installed in direct contact with soil, to prevent unreasonable decay to the wood.
- Dryer ducts are installed and terminated pursuant to manufacturer installation requirements.

**This Warranty is not an Enhanced Protection Agreement, as defined by California Civil Code Section 901.**


Copyright 2004 D.R. Horton, Inc.



JM
DW

- Attached Residences comply with inter-unit noise transmission standards set by the Applicable Laws.

- Manufactured Products are installed so as not to interfere with the Products' utility or the Products' "useful life." "Useful life" means the manufacturers' representation of how long a product is warranted or represented to last (which is no less than one year) through limited warranty or any written representations for the Manufactured Product, if the Product is maintained as recommended or required by the manufacturer.

- Irrigation systems and drainage operate so as not to damage landscaping or other external improvements or components.

- The landscaping shall survive for not less than one year.

Each of the above Standards is subject to the definitions, limitations and exclusions set forth in this Warranty, in the Homeowner's Manual and in Civil Code Section 895, et seq. The Homeowner's Manual includes specific performance standards for various Components of your Residence in the section for each Component which appears in italics in the Homeowner's Manual. If there is a conflict between the Homeowner's Manual and a Standard listed in this Limited Warranty, the Standards in this Limited Warranty shall govern. If any Standard in this Limited Warranty or the Homeowner's Manual conflicts with Civil Code Section 895, et seq., the Civil Code shall control.

## ARTICLE 1
## DEFINED TERMS

As used in this Warranty, the following terms shall have the meanings described below.

1.1 Applicable Laws: "Applicable Laws" means government building codes, regulations, and ordinances in effect at the time of issuance of building permits for construction of the Residence.

1.2 Close of Escrow or Effective Date: "Close of Escrow" and "Effective Date" mean the date of recordation of the grant deed conveying the Residence from Seller to the first subsequent Owner pursuant to a Final Public Report issued by the California Department of Real Estate.

**This Warranty is not an Enhanced Protection Agreement, as defined by California Civil Code Section 901.**


Copyright 2004 D.R. Horton, Inc.

1.3 Components: "Components" means the individual products, materials or features of your Residence which are covered by this Limited Warranty.

1.4 Fit and Finish: "Fit and Finish" means the non-structural, cosmetic appearance or alignment of the Fit and Finish Components.

1.5 Fit and Finish Components: "Fit and Finish Components" means cabinets, mirrors, flooring, interior and exterior walls, wall coverings, countertops, paint finishes and trim.

1.6 Fit and Finish Deficiency: "Fit and Finish Deficiency" means that a Fit and Finish Component does not meet standards of quality as measured by acceptable trade practices or applicable industry standards, subject to the terms, conditions and exclusions of this Limited Warranty.

1.7 Homeowner's Manual: "Homeowner's Manual" means the Homeowner's Manual and Customer Care Program Guide provided by Seller to Owner that sets forth the obligations of the Owner for maintenance of the Residence and contains the performance standards applicable to this Limited Warranty.

1.8 Manufactured Product. "Manufactured Product" means a product that is completely manufactured offsite, including, but not limited to, windows, doors, roofs, plumbing products and fixtures, fireplaces, electrical fixtures, HVAC units, countertops, cabinets, paint, and appliances.

1.9 Owner: "Owner" means the purchaser or owner of the Residence as reflected in the Purchase Agreement.

1.10 Purchase Agreement: "Purchase Agreement" means the Purchase Agreement and Escrow Instructions by and between Seller and Owner for the purchase of the Residence.

1.11 Residence: "Residence" means the property subject to the Purchase Agreement.

1.12 Seller: "Seller" means "Seller" as defined in your purchase agreement.

1.13 Standards: "Standards" means the criteria for construction defects set forth in California Civil Code Section 895, et seq. as further defined by the criteria contained within this Limited Warranty and in the Homeowner's Manual.

**This Warranty is not an Enhanced Protection Agreement, as defined by California Civil Code Section 901.**


Copyright 2004 D.R. Horton, Inc.


DW

1.14 Structural Defect or "Soils-Related Issues": "Structural Defect" or "Soils-Related Issues" means that the foundation, load-bearing components, slab, retaining walls or underlying soils of the Residence fail to meet the standards set forth in Civil Code Section 896(b) or (c).

1.15 Systems: "Systems" means the plumbing, sewer and electrical systems exclusively serving the Residence.

1.16 Systems Failure: "Systems Failure" means the inability of the Systems to function as intended.

1.17 Unforeseen Acts of Nature: "Unforeseen Acts of Nature" means a weather condition, earthquake, or manmade event such as war, terrorism, or vandalism, in excess of the design criteria expressed by the applicable building codes, regulations, and ordinances in effect at the time of original construction.

1.18 Unintended Water: "Unintended Water" means water that passes beyond, around, or through a component (such as a window, door, wall or roof) or the material that is designed to prevent that passage, as more particularly described with respect to various Components of the Residence in Civil Code Section 896(a).

1.19 Walk-Through: "Walk-Through" means the orientation and walk-through inspection of your Residence with a Seller representative, prior to Close of Escrow or occupancy for the purpose of familiarizing you with the features and appliances in your Residence and during which the condition of the Components will be inspected. If Fit and Finish Deficiencies are discovered during the Walk-Through, they must be identified and reported to the Seller representative. If such Deficiencies are not reported at the time of the Walk-Through, they may be excluded.

1.20 Warranty Period: "Warranty Period" means the applicable period of time set forth in the Section entitled "Warranty" above.

## ARTICLE 2
## SCOPE OF WARRANTY

2.1 Seller's Performance. During the Warranty Period, Seller will repair or replace the affected Components, as appropriate, at no charge to Owner. The decision whether to repair or replace the Components shall be within the sole discretion of Seller. When repair or

**This Warranty is not an Enhanced Protection Agreement, as defined by California Civil Code Section 901.**


Copyright 2004 D.R. Horton, Inc.



JW
DW

replacement is appropriate under this Warranty, such repair or replacement will occur within a reasonable amount of time.

2.2 Repair Materials/Subcontractors. All repairs or replacements will be made with Components identical to, or of an equal or better grade or quality than the Components used in the original construction of the Residence. Subject to the procedures set forth in Civil Code Sections 910 through 938, Seller has the right to choose the specific Components and the subcontractors used for repair or replacement work in its sole discretion. There could be color or texture variations with the new Components.

2.3 Assignment of Other Insurance and Warranties. In the event Seller repairs, replaces or pays the cost of repairing or replacing any Component covered by this Warranty for which Owner is covered by any other insurance or warranty, Owner hereby assigns to Seller all rights, proceeds or payments under such other insurance or warranty to the extent of the actual cost of repair or replacement incurred by Seller, and hereby authorizes Seller to file a claim against any insurance or warranty on Owner's behalf. Owner shall cooperate with Seller, at no out-of-pocket cost to Owner, with respect to such claim. To the extent permitted by Owner's insurance, Owner agrees to look only to Owner's insurance coverage for covered claims and to waive any right of subrogation to the extent of such insurance.

2.4 ***DISCLAIMER OF IMPLIED WARRANTIES***. EXCEPT FOR THIS WARRANTY, SELLER DISCLAIMS ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO THAT THE HOME WAS DESIGNED AND CONSTRUCTED IN A REASONABLY WORKMANLIKE MANNER, FITNESS FOR A PARTICULAR PURPOSE, AND MERCHANTABILITY.

Owners' Initials: [signature] [signature]

2.5 ***LIMITATION OF AVAILABLE REMEDIES***. OWNER AGREES THAT THE SOLE AND EXCLUSIVE REMEDIES FOR THE BREACH OF THIS WARRANTY SHALL BE REPAIR OR REPLACEMENT OF OR PAYMENT FOR THE WARRANTED COMPONENT, REPAIR OF ANY DAMAGES CAUSED BY THE REPAIR EFFORTS, RECOVERY OF THE REASONABLE COST OF REPAIRING AND RECTIFYING ANY DAMAGES RESULTING FROM THE BREACH OF WARRANTY, RECOVERY OF THE REASONABLE COST OF REMOVING AND REPLACING IMPROPER REPAIR BY THE BUILDER, RECOVERY OF THE REASONABLE RELOCATION AND STORAGE EXPENSES AND LOST BUSINESS INCOME, IF THE HOME WAS USED AS A PRINCIPAL PLACE OF BUSINESS

**This Warranty is not an Enhanced Protection Agreement, as defined by California Civil Code Section 901.**


Copyright 2004 D.R. Horton, Inc.

**LICENSED TO BE OPERATED FROM THE HOME, REASONABLE INVESTIGATIVE COSTS FOR EACH ESTABLISHED BREACH OF WARRANTY AND ALL OTHER COSTS AND FEES RECOVERABLE BY CONTRACT OR STATUTE. UNLESS SPECIFICALLY LISTED ABOVE, OWNER AGREES TO ASSUME ALL RISKS ARISING FROM A BREACH OF WARRANTY, INCLUDING BUT NOT LIMITED TO ANY ECONOMIC, CONSEQUENTIAL DAMAGES, AND EMOTIONAL DISTRESS DAMAGES. BY INITIALING BELOW, OWNER REPRESENTS THAT OWNER UNDERSTANDS THAT REPAIR OR REPLACEMENT UNDER THIS WARRANTY IS EXPRESSLY CONDITIONED UPON SELLER OR ITS AUTHORIZED AGENT BEING GRANTED A REASONABLE OPPORTUNITY TO REPAIR OR REPLACE SUCH COMPONENT, SUBJECT TO THE OWNER'S RIGHTS UNDER CIVIL CODE SECTIONS 910 THROUGH 938. OWNER AGREES THAT SELLER OR ITS AUTHORIZED AGENTS, NOT OWNER, SHALL DETERMINE THE MATERIAL AND METHODS TO BE USED IN EFFECTING SUCH REPAIR OR REPLACEMENT.**

Owners' Initials: ( ) ( )

**ARTICLE 3**
**EXCLUSIONS**

The following are not covered by this Warranty:

3.1 Wear and Tear. Loss or damage due to ordinary wear and tear.

3.2 Owner's Failure to Properly Maintain. Any loss or damage to a Component caused by lack of reasonable care and maintenance, failure to follow a manufacturer's or Seller's maintenance schedule, recommendations or commonly accepted Owner maintenance obligations. Seller has provided a description and list of suggested Owner's care and maintenance items and procedures in the Homeowner's Manual and a schedule for such maintenance. From time to time, Seller may perform a maintenance task for the benefit of Owner at no charge; however, performing a task on one or more occasions does not imply or require that Seller will perform a similar task at a later date, nor shall such performance be deemed to extend the Warranty Period.

3.3 Casualties or Unforeseen Acts of Nature. Any loss or damage to a Component caused by unforeseen acts of nature, casualties normally covered by homeowner's insurance, or any other cause not under the control of Seller such as fire, smoke, explosion, water escape, fluctuations in water pressure, flood, insects, and falling trees. Damage of this sort may be

**This Warranty is not an Enhanced Protection Agreement, as defined by California Civil Code Section 901.**


Copyright 2004 D.R. Horton, Inc.

covered by your homeowner's insurance. You should contact your insurance carrier immediately upon the occurrence of any such damage.

3.4 Abuse of Residence. Loss or damage caused either by the misuse, abuse, neglect or the use of the Residence in a manner which was not intended.

3.5 Materials Furnished by Owner. Any loss or damage caused by materials furnished or work done by or at the request of Owner, including any work done by anyone other than Seller or the employees, agents or subcontractors expressly selected by Seller.

3.6 Variations in Natural Materials. Variations occur in natural materials, such as stone, marble, wood grain and color of stained wood used in cabinets, paneling, siding, doors and wood trim, as well as on painted and other finished surfaces and in carpets. These variations are inherent characteristics of natural materials and the finishing process and, therefore, are not a Deficiency.

3.7 Failure to Give Timely Notice. Any loss or damage caused or made worse by Owner's failure to timely notify Seller of such loss or damage.

3.8 Failure to Mitigate Damages. Any loss or damage caused or made worse by Owner's unreasonable failure to minimize or prevent damages in a timely manner.

3.9 Refusal to Allow Repair. Any loss or damage caused by the Owner's failure to allow reasonable and timely access for inspections and repairs.

3.10 Owner or Third-Party Negligence. Any loss or damage caused or made worse by the negligence of Owner or any third party.

3.11 Consumer Products. Subject to Seller's obligations to install such products in a manner which does not interfere with their useful life, any failure or defect in a fixture, appliance, device or equipment which is a "Consumer Product" for purposes of the Magnuson-Moss Warranty Act (15 U.S.C. Sections 2301 through 2312). HORTON HEREBY ASSIGNS TO THE OWNER ALL RIGHTS UNDER THE MANUFACTURER'S WARRANTIES ON CONSUMER PRODUCTS INCLUDED IN THE HOME. Seller will deliver all such warranties to the Owner who will be responsible for mailing any required forms. The Owner is responsible for contacting each manufacturer/supplier to request service. Seller assumes no responsibility regarding "Consumer Product" warranties. The items in the home which are consumer products include, for example:


Copyright 2004 D.R. Horton, Inc.


JW
SW

heating/air conditioning system, central vacuum system, heat pump, thermostat, fireplace, range, range hood, microwave oven, refrigerator, trash compactor, dishwasher, exhaust fan, garbage disposal, ice maker, smoke alarm, fire extinguisher, burglar alarm, intercom, washer, dryer, freezer, water heater, hot tub, whirlpool bath, sump pump, chimes, garage door opener, kitchen center.

3.12 Successful Repair. Any loss or damage to a Component to the extent that such Component has been successfully repaired or corrected.

3.13 Released Violation. Any loss or damage for which liability has been released by Owner pursuant to a release agreement with Seller, a manufacturer or any other third party.

3.14 Warranty Period. Any loss or damage that occurs after the Warranty Period.

3.15 Statute of Limitations. Any Deficiency, loss or damage, Unintended Water or Structural Defect for which the time period for filing actions has expired under California law.

## ARTICLE 4
## PROCEDURES FOR REQUESTING WARRANTY SERVICE

4.1 How to Request Warranty Service. To assure quality and to allow Seller to maintain a complete file on your Residence, all requests for service under this Warranty should be submitted in writing to Seller. Please use a copy of the Service Request provided to you in your Homeowner's Manual or e-mail your service request by logging on to drhorton.com and following the format. You may also make a service request or request a service request form by calling Customer Service at (760) 929-1600.

ALL REQUESTS FOR WARRANTY SERVICE MUST BE SUBMITTED WITHIN 30 DAYS AFTER THE DISCOVERY OF A DEFICIENCY, LOSS, DAMAGE, OR STRUCTURAL DEFECT, OR AS SOON AS POSSIBLE TO PREVENT FURTHER DAMAGE, BUT IN NO EVENT LATER THAN THE EXPIRATION OF THE APPLICABLE WARRANTY PERIOD. UNINTENDED WATER MUST BE REPORTED IMMEDIATELY UPON DISCOVERY. If a problem is not reported in a timely manner, damage may be excluded for failure to give timely notice or failure to mitigate damages as set forth in Sections 3.7 and 3.8 herein.

**This Warranty is not an Enhanced Protection Agreement, as defined by California Civil Code Section 901.**


Copyright 2004 D.R. Horton, Inc.



JW

DW

4.2 Limited Warranty Service Schedule. Upon receipt of your request, Seller will schedule an appointment to inspect the problem and determine whether the item is covered by this Warranty. In most cases, Limited Warranty inspection appointments will be scheduled to take place at your home within 7 days of the receipt of the request.

If it is determined that the problem is covered by this Limited Warranty, Seller will attempt to schedule the repair work to commence within the next 7 calendar days. Repair work is generally done Monday through Saturday from 7:30 a.m. to 3:30 p.m.

4.3 Time for Corrective Work. Seller intends to fulfill its obligations for a particular claim for Deficiencies, loss, damage, Unintended Water or Structural Defects within (30) days of its receipt of a written request so long as Seller is given reasonable cooperation by Owner. Owner recognizes that a thirty (30) day period for certain covered repairs or replacements may be insufficient, however, so it may be necessary to extend the thirty (30) day period.

4.4 Service Requests Not Covered by Warranty. If Seller determines that a particular service request is not covered by this Warranty, Seller will provide Owner with a notification describing why the Owner's service request is not covered. Failure to send such a notice shall not be deemed evidence that a service request is a covered Deficiency, loss, damage, Unintended Water or Structural Defect. If a service request is governed by California Civil Code, Section 895, et seq., (excluding Section 900), the non-adversarial procedures described in Section 10 of the Purchase Agreement will apply to such service request, instead of the procedures set forth in this Article 4.

## ARTICLE 5
## GENERAL PROVISIONS

5.1 Applicable Law. This Warranty is made in the State of California and is to be interpreted and constructed in accordance with the cases and laws of California.

5.2 Interpretation. Whenever the context requires, the use herein of one gender includes both genders and the singular number includes the plural number.

5.3 Modification. No modification or change of this Warranty is valid unless it is in writing and signed by Owner and Seller.

5.4 Captions. Captions are inserted for convenience of reference only and do not define, describe or limit the scope or intent of this Warranty or any provisions hereof.

**This Warranty is not an Enhanced Protection Agreement, as defined by California Civil Code Section 901.**


Copyright 2004 D.R. Horton, Inc.

5.5 Time of the Essence. Time is of the essence on all matters of any nature arising under this Warranty.

5.6 Severability. Should any provision or portion of this Limited Warranty be declared invalid or in conflict with any law of the jurisdiction where your Residence is situated, the validity of all other provisions and portions shall remain unaffected and in full force and effect. This Warranty is intended to include a Fit and Finish Warranty under California Civil Code Section 900. To the extent of any conflicts between this Warranty and the requirements of Civil Code Section 900, the requirements of the statute shall control over the terms of this Warranty.

5.7 Transferability. This Warranty is transferable to subsequent Owners of the Residence throughout the Warranty Period. Regardless of any transfer, however, the Effective Date shall remain the same. Upon transfer of the Residence, it is the Owner's responsibility to provide the subsequent purchaser with a copy of the Warranty and to inform Seller of the transfer of the Residence.

## ARTICLE 6
## DISPUTE RESOLUTION

All disputes arising under this Limited Warranty will be resolved in accordance with the same procedures for Dispute Notification and Resolution as set forth in the Alternative Dispute Resolution provisions of your Purchase Agreement. The statutory non-adversarial procedures applicable to certain construction defect claims under California Civil Code Sections 910 through 938, as hereafter amended, shall not apply to any Fit and Finish claims under this Warranty.

**This Warranty is not an Enhanced Protection Agreement, as defined by California Civil Code Section 901.**


Copyright 2004 D.R. Horton, Inc.



JM
DW

**D.R. Horton**
**10·4·1 Limited Warranty**
(Homeowner)

**Note: Our sales staff or construction staff is not responsible for, nor are they qualified to make, judgments regarding service. All such commitments must be in writing and must come from our Customer Service Department. Seller is very proud of its service and trusts you will find our policy to be fair and reasonable. Proper service and a continuing program of Owner maintenance will keep your property in good condition both for your own comfort and to maximize its usefulness and durability.**

James A. Wilson 09-29-07
BUYER DATED

Dawn Wilson 10-10-07
BUYER DATED

NEW HOME ADDRESS:
3150 Ohio Street #205
San Diego, CA 92104

1979406.4

**This Warranty is not an Enhanced Protection Agreement, as defined by California Civil Code Section 901.**


Copyright 2004 D.R. Horton, Inc.

Project: La Boheme
Residential Unit: 1135

## ALLOWANCE FOR CLOSING COSTS AMENDMENT

| BUYER: | SELLER: |
|---|---|
| James A. Wilson & Sharyn Wilson | Western Pacific Housing, Inc., a Delaware |
| 2162 View Crest Glen | Corp., dba D.R. Horton, Inc., America's Builder |
| Escondido, CA 92026 | 5790 Fleet Street, Ste. 210 |
| | Carlsbad, Ca 92008 |
| | (760)929-1600 |

| ESCROW COMPANY: | TITLE COMPANY: |
|---|---|
| First American Title Company | First American Title Company |
| 11512 El Camino Real , Suite 350 | 411 Ivy Street |
| San Diego, CA 92130 | San Diego, CA 92101 |
| | DATE: 10-30-2007 |

This Allowance for Closing Costs Amendment ("**Amendment**") constitutes an amendment to that certain Purchase Agreement and Escrow Instructions, as modified by any previous amendments thereto ("**Purchase Agreement**"), entered into by and between Buyer and Seller for the purchase of the Property described in the Purchase Agreement. Any capitalized terms not otherwise defined herein shall have the meanings as set forth in the Purchase Agreement. If there is a conflict between the Purchase Agreement and the terms and provisions of this Amendment, the terms and provisions of this Amendment shall control.

1. **ALLOWANCE**. Buyer acknowledges receipt of a separate written Notice of Affiliated Business Arrangement Addendum from Seller informing Buyer that Seller has an affiliated business arrangement with DHI MORTGAGE COMPANY, LTD. ("**DHI Mortgage**") and that Buyer is not required to use this affiliated company as a condition of Buyer's purchase of the Property or Buyer's access to settlement services in connection with the purchase of the Property. However, if (i) Buyer does apply to DHI Mortgage for a loan to finance the purchase of the Property, (ii) the loan is approved, closed and funded by DHI Mortgage and (iii) Buyer closes Escrow by the Closing Date, Seller shall credit to Buyer at Close of Escrow an amount up to but not to exceed Ten Thousand Dollars ($10,000) ("**Maximum Credit**") to be applied towards the "**Covered Expenses**" (as defined below). If the amount of the Covered Expenses is less than the Maximum Credit, Buyer shall not be entitled to use the difference as a credit against any other costs or expenses and such amount shall be retained by Seller. Buyer acknowledges that if the conditions above are not met, this Addendum shall be of no force and effect and Buyer shall not be entitled to any of the Maximum Credit.

2. **COVERED EXPENSES**. As used in this Addendum, Covered Expenses shall mean the following closing costs incurred in connection with the closing, to the extent allowed by DHI Mortgage: (i) credit report fees, (ii) owner's and lender's title policy charges, (iii) deed of trust recording fees and recording taxes, (iv) escrow fees, (v) discount points to buy down the interest rate charged by DHI Mortgage for the Loan on the Property as allowed under **Paragraph 1** above and (vi) other permitted DHI Mortgage lender's fees.

This Amendment may be executed in counterparts, each of which when taken together, will constitute one fully executed original.

This Amendment has been made and executed as of the date set forth above.

I/we agree to the additional terms and conditions set forth above.

| | |
|---|---|
| [signature] | Western Pacific Housing, Inc., a Delaware corporation |
| Buyer | [signature] |
| [signature] Sharyn Wilson | By: |
| Buyer | Name: |
| | Title: LORI MILLS ASST. VICE PRESIDENT |



Buyer's Initials Buyer's Initials

Project: La Boheme
Residential Unit: 1135

# ALLOWANCE FOR CLOSING COSTS AMENDMENT

**BUYER:**

James A. Wilson & Sharyn Wilson
2162 View Crest Glen
Escondido, CA 92026

**SELLER:**

Western Pacific Housing, Inc., a Delaware Corp., dba D.R. Horton, Inc., America's Builder
5790 Fleet Street, Ste. 210
Carlsbad, Ca 92008
(760)929-1600

**ESCROW COMPANY:**

First American Title Company
11512 El Camino Real , Suite 350
San Diego, CA 92130

**TITLE COMPANY:**

First American Title Company
411 Ivy Street
San Diego, CA 92101
**DATE:** ✓ 10-30-07

This Allowance for Closing Costs Amendment ("**Amendment**") constitutes an amendment to that certain Purchase Agreement and Escrow Instructions, as modified by any previous amendments thereto ("**Purchase Agreement**"), entered into by and between Buyer and Seller for the purchase of the Property described in the Purchase Agreement. Any capitalized terms not otherwise defined herein shall have the meanings as set forth in the Purchase Agreement. If there is a conflict between the Purchase Agreement and the terms and provisions of this Amendment, the terms and provisions of this Amendment shall control.

1. **ALLOWANCE**. If Buyer closes Escrow by the Closing Date, Seller shall credit to Buyer at Close of Escrow an amount up to but not to exceed Two Thousand Dollars ($2,000) ("**Maximum Credit**") to be applied towards the "**Covered Expenses**" (as defined below). If the amount of the Covered Expenses is less than the Maximum Credit, Buyer shall not be entitled to use the difference as a credit against any other costs or expenses and such amount shall be retained by Seller. Buyer acknowledges that if the condition above is not met, this Amendment shall be of no force and effect and Buyer shall not be entitled to any of the Maximum Credit.

2. **COVERED EXPENSES**. As used in this Amendment, Covered Expenses shall mean the following closing costs incurred in connection with the closing, to the extent allowed by Buyer's Lender: (i) credit report fees, (ii) owner's and lender's title policy charges, (iii) deed of trust recording fees and recording taxes, (iv) escrow fees, (v) discount points to buy down the interest rate charged by Buyer's Lender for the Loan on the Property as allowed under **Paragraph 1** above and (vi) other permitted lender's fees.

This Amendment may be executed in counterparts, each of which when taken together, will constitute one fully executed original.

This Amendment has been made and executed as of the date set forth above.

I/we agree to the additional terms and conditions set forth above.

[signature: James A. Wilson]
Buyer

[signature: Sharyn Wilson]
Buyer

Western Pacific Housing, Inc., a Delaware corporation

By: [signature]
Name: LORI MILLS
Title: ASST. VICE PRESIDENT



[initials] Buyer's Initials [initials] Buyer's Initials

SD29

Project: La Boheme
Residential Unit: 1135

## AUCTION PURCHASE PRICE ADDENDUM (LA BOHEME)

**BUYER:**
James A Wilson
2162 View Crest Glen
Escondido, CA 92026

**SELLER:**
Western Pacific Housing, Inc.
5790 Fleet Street, Ste. 210
Carlsbad, Ca 92008

**ESCROW HOLDER:**
First American Title Company
11512 El Camino Real, Suite 350
San Diego, CA 92130

**DATE:** September 29, 2007

This Auction Purchase Price Addendum ("**Addendum**") is attached to and forms a part of the Purchase Agreement and Escrow Instructions ("**Purchase Agreement**"), executed between Buyer and Seller for the Property described in the Purchase Agreement. Any capitalized terms not otherwise defined herein shall have the meanings as set forth in the Purchase Agreement. If there is a conflict between the Purchase Agreement and the terms and provisions of this Addendum, the terms and provisions of this Addendum shall control.

1. **REVISED PURCHASE PRICE LANGUAGE.** Paragraph 4 of the Purchase Agreement is hereby deleted in its entirety and replaced with the following:

4. **Purchase Price and Estimated Cash Due at Closing.** Buyer shall pay the following:

a. Purchase Price Calculation:

| | |
|---|---|
| Winning Bid Price: | $ 385,000 |
| Plus Buyer's Premium (5%); | $ 19,250 |
| Equals **Purchase Price:** | $ 404,250 |

b. Less Estimated New Loan Amount: $ 384,037

c. Less Secondary Financing (if any): $______

d. Equals **Down Payment:** $ 20,213

e. Plus *Estimated* Buyer Closing Costs, Prepaid Expenses & Impounds $6,000.00

f. Less Buyer's **Deposit** (Check Applicable Box):

☑ Check if first property acquired at auction, in which case the Deposit shall be 5% of the Purchase Price or $5,000, whichever is greater. $ 5000

☐ Check if not first property acquired at auction, in which case the Deposit shall be 15% of the Purchase Price or $10,000, whichever is greater. $______

g. Equals Total Estimated Cash Required from Buyer at Close of Escrow: $ 21,213

2. **COUNTERPARTS.** This Addendum may be executed in counterparts, each of which when taken together, will constitute one fully executed original.

This Addendum has been made and executed as of the date set forth above, but will not be valid until executed by Seller's authorized officer of the company.

Buyer: [signature]

Buyer:

Dated: 09-29-07

Western Pacific Housing, Inc.,
a Delaware corporation

By: [signature]
Name: Tara A. Taylor
Title: Asst. Secretary



[initials] Buyer's Initials Buyer's Initials

Project: La Boheme
Residential Unit: 1135

## AUCTION FINANCING ADDENDUM

**BUYER:**
James A. Wilson
2110? View Crest Glen
Escondido, CA 92026

**SELLER:**
Western Pacific Housing, Inc.
5790 Fleet Street, Ste. 210
Carlsbad, Ca 92008

**ESCROW HOLDER:**
First American Title Company
11512 El Camino Real , Suite 350
San Diego, CA 92130

**DATE:** September 29, 2007

This Auction Financing Addendum ("**Addendum**") is attached to and forms a part of the Purchase Agreement and Escrow Instructions ("**Purchase Agreement**"), executed between Buyer and Seller for the Property described in the Purchase Agreement. Any capitalized terms not otherwise defined herein shall have the meanings as set forth in the Purchase Agreement. If there is a conflict between the Purchase Agreement and the terms and provisions of this Addendum, the terms and provisions of this Addendum shall control.

**1. REVISED FINANCING LANGUAGE.** Paragraphs 7.2(a) and 7.2(b) of the Purchase Agreement are hereby deleted in their entirety and replaced with the following:

7.2(a) Loan Application. Within three (3) days after Buyer's Offer, Buyer shall submit a completed loan application for the New Loan to DHI Mortgage ("**Seller's Approved Lender**") and a lender selected by Buyer ("**Buyer's Lender**"), if any. Buyer shall advise Seller of the lender it has elected to use to close the Escrow prior to the applicable date set forth in **Paragraph 7.2(b)** below. Buyer shall take all required steps to allow prompt processing of the application for the New Loan, including fully responding to any requests from the lender(s) for documents or information within one (1) day. Nothing set forth herein shall compel Buyer to accept any financing approved by Seller's Approved Lender that is not acceptable to Buyer.

7.2(b) Buyer to Obtain Loan Approval. ("**Loan Contingency Date**"): No later than October 12, 2007, Buyer shall deliver to Seller written evidence satisfactory to Seller that Buyer has obtained final unconditional loan approval for the Estimated New Loan Amount.

**2. COUNTERPARTS.** This Addendum may be executed in counterparts, each of which when taken together, will constitute one fully executed original.

This Addendum has been made and executed as of the date set forth above, but will not be valid until executed by Seller's authorized officer of the company.

Buyer: James A. Wilson

Buyer: ______________________

Dated: 09-29-07

Western Pacific Housing, Inc.,
a Delaware corporation

By: ______________________
Name: Tara A. Taylor
Title: Asst. Secretary



Buyer's Initials: JW Buyer's Initials: ______

Project: La Boheme
Residential Unit: 1135

# LA BOHEME MOVE-IN DISCLOSURE ADDENDUM

**BUYER:**

James A. Wilson
2160 View Crest Glen
Escondido, CA 92026

**SELLER:**

Western Pacific Housing, Inc.
5790 Fleet Street, Suite 210
Carlsbad, CA 92008

**ESCROW HOLDER:**
First American Title Company
11512 El Camino Real , Suite 350
San Diego, CA 92130

**DATE:** September 29, 2007

This La Boheme Move-In Disclosure Addendum ("**Addendum**") is attached to and forms a part of the Purchase Agreement and Escrow Instructions ("**Purchase Agreement**"), executed between Buyer and Seller for the Property described in the Purchase Agreement. Any capitalized terms not otherwise defined herein shall have the meanings as set forth in the Purchase Agreement. If there is a conflict between the Purchase Agreement and the terms and provisions of this Addendum, the terms and provisions of this Addendum shall control.

1. **MOVE-IN RULES AND REGULATIONS.** Buyer hereby acknowledges and agrees to abide by the following Rules & Regulations of the La Boheme Owners Association ("**Association**") regarding moving into the Property:

a. Buyer must coordinate Buyer's move-in with the Community Manager, Merit Property Management, Inc., who may be reached at (619) 683-3238. In order to move into the Property, Buyer must book an elevator with the Community Manager and submit a refundable $500.00 security deposit ("**Security Deposit**") made payable to La Boheme Owners Association. Move-in arrangements must be made at least one (1) week prior to the moving day. Buyer acknowledges and agrees that Buyer shall not contact the Community Manager before October 12, 2007 to schedule a move-in date; no move-in dates will be scheduled before that time.

b. Before the move-in date will be scheduled, Buyer must ensure that Buyer's mover has a Certificate of Insurance for workers' compensation and liability insurance with minimum coverage limits of $1,000,000, which insurance certificate must name La Boheme Owners Association and Merit Property Management, Inc. as additionally insured.

c. Buyer acknowledges and agrees that Buyer will be accompanied by a member of the Association's building staff on a pre-moving inspection and a post-moving inspection of the area traveled during the move to determine if any damage resulted from the move.

d. Move-in times are offered only twice each day in four (4) hour blocks each. Buyer acknowledges and agrees that due to the large number of auction buyers who will be closing on the Closing Date, Buyer may not be able to schedule a move-in date for approximately two (2) weeks following the Closing Date.

2. **COUNTERPARTS.** This Addendum may be executed in counterparts, each of which when taken together, will constitute one fully executed original.

This Addendum has been made and executed as of the date set forth above, but will not be valid until executed by Seller's authorized officer of the company.

James A. Wilson
Buyer

Buyer

Dated: 09-29-07

Western Pacific Housing, Inc.,
a Delaware corporation

By:
Name: Tara A. Taylor
Title: Asst. Secretary

Auction La Boheme Move-In Addendum
09/27/07



Buyer's Initials Buyer's Initials

WILSON 000070

TO: LORI MILLS AT: 17609299130

*First American Title Company*
*11512 El Camino Real Suite #350, San Diego, CA 92130*
*Phone - (858)509-2114 Fax - (866)209-0380*

## ASSIGNMENT OF BUYER'S INTEREST INSTRUCTION

To: **First American Title Company**
**Scott Tompkins, Escrow Officer**

Date: **October 10, 2007**
File No.: **DTR-2515396 (ST)**

Re: **3950 Ohio Street, Unit 235, San Diego, CA 92104**

**Assignment:** James A. Wilson, Buyer herein, assigns to James A. Wilson and Sharyn Wilson Husband and Wife as Joint Tenants:

1. All interest in and to all right to acquire title to the property which is the subject of this escrow.
2. All funds now on deposit to the account of the undersigned in this escrow. No consideration is to be paid to the undersigned through this escrow for or on account of this agreement.

**Agreement:** IT IS AGREED BETWEEN Western Pacific Housing, Inc., as Seller and James A. Wilson, as Buyer and James A. Wilson and Sharyn Wilson as Assignee, with respect to the Purchase Agreement and Joint Escrow Instructions dated September 29, 2007 in Escrow No. DTR-2515396 as follows:

1. Seller hereby releases Buyer from all claims and demands against Buyer with respect to the escrow instructions
2. Seller accepts assignee in place of Buyer as the substituted party to said escrow instructions and hereby agrees with Assignee to be bound by the terms of the escrow instructions in all respects as if Assignee was originally named therein as a party in place of Buyer.
3. Seller hereby acknowledges the above assignment and new Buyer and instructs Escrow Holder to prepare for our signature(s) the Grant Deed showing the Assignee as the new Buyer.
4. Assignee agrees to perform in accordance with the escrow instructions and to be bound by all terms thereof in all respects as if he were the original party to the escrow instructions in place of Buyer.

**SELLER:**

Western Pacific Housing, Inc., a Delaware corporation

By: LORI MILLS
ASST. VICE PRESIDENT

**BUYER:**

James A. Wilson

**ASSIGNEE:**

James A. Wilson

Sharyn Wilson

# VESTING WORKSHEET

Community: La Boheme Buyer Name(s): Wilson
Unit No.: 1135 Property Address: 3950 Ohio St, # 235

Note: Please indicate your choice by checking the appropriate selection. Please fill in the blanks completely and print names exactly as they should appear on all documents and as you will be signing your name.

**PURSUANT TO THE ABOVE REFERENCED ESCROW, ESCROW HOLDER IS INSTRUCTED TO REFLECT MY/OUR NAME(S) AND VESTING AS FOLLOWS:**

1. [X] **HUSBAND AND WIFE** (Print names exactly as they should appear on documents including loan documents)

James A. Wilson AND
Sharyn Wilson

A. (X) As Joint Tenants
B. ( ) As Community Property
C. ( ) As Community Property with right of survivorship
D. ( ) As Tenants in Common (complete interest amount below)
Each as to an Undivided_____ Interest – Percentage or Fraction (i.e., ½ or 50%)
E. ( ) Other (Please specify)________________________

2. [ ] **MARRIED MAN** -AS HIS SOLE AND SEPARATE PROPERTY
[ ] **MARRIED WOMAN** -AS HER SOLE AND SEPARATE PROPERTY

________________________________________
(Print name exactly as it should appear on documents including loan documents)

PLEASE INDICATE THE FULL NAME OF SPOUSE FOR PREPARATION OF A (Please circle one) QUIT CLAIM DEED OR INTERSPOUSAL TRANSFER DEED

________________________________________
(Print name exactly as it should appear on documents including loan documents)

3. [ ] **INDIVIDUAL** (Print name exactly as it should appear on documents including loan documents)

________________________________________

A. ( ) A SINGLE MAN (never married)
B. ( ) A WIDOWER (wife is deceased)
C. ( ) AN UNMARRIED MAN (divorced)
D. ( ) A SINGLE WOMAN (never married)
E. ( ) A WIDOW (husband is deceased)
F. ( ) AN UNMARRIED WOMAN (divorced)

AND________________________________________

A. ( ) A SINGLE MAN (never married)
B. ( ) A WIDOWER (wife is deceased)
C. ( ) AN UNMARRIED MAN (divorced)
D. ( ) A SINGLE WOMAN (never married)
E. ( ) A WIDOW (husband is deceased)
F. ( ) AN UNMARRIED WOMAN (divorced)

**ADDITIONAL VESTING IF MORE THAN ONE INDIVIDUAL:**

A. ( ) As Joint Tenants
B. ( ) As Tenants in Common
C. ( ) Other, please specify________________________

4. [ ] **TRUST** (Please confirm with your lender if they will make a loan to the trust prior to completing this form)

________________ and ________________,
(Name of Trustee) (Name of Trustee)

________________ dated ________________
(Name of Trust) (Date of Trust)

**HOW YOU HOLD TITLE TO YOUR PROPERTY CAN HAVE SERIOUS TAX CONSEQUENCES. IT IS STRONGLY RECOMMENDED THAT YOU SEEK TAX AND/OR LEGAL COUNSEL WHEN COMPLETING THIS FORM.**

James A. Wilson 10-10-2007
Buyer's Signature Date

Sharyn Wilson 10-10-07
Buyer's Signature Date
La Boheme

Vesting Worksheet
5/4/2004

# VESTING WORKSHEET

Community: La Boheme
Unit No.: ~~1135~~

Buyer Name(s): Wilson
Property Address: ~~3950 Ohio Street #235~~

Note: Please indicate your choice by checking the appropriate selection. Please fill in the blanks completely and print names exactly as they should appear on all documents and as you will be signing your name.

**PURSUANT TO THE ABOVE REFERENCED ESCROW, ESCROW HOLDER IS INSTRUCTED TO REFLECT MY/OUR NAME(S) AND VESTING AS FOLLOWS:**

1. [ ] **HUSBAND AND WIFE** (Print names exactly as they should appear on documents including loan documents)

_______________________________________ AND

_______________________________________

A. ( ) As Joint Tenants
B. ( ) As Community Property
C. ( ) As Community Property with right of survivorship
D. ( ) As Tenants in Common (complete interest amount below)
Each as to an Undivided_____ Interest – Percentage or Fraction (i.e., ½ or 50%)
E. ( ) Other (Please specify)______________________

2. [X] **MARRIED MAN** -AS HIS SOLE AND SEPARATE PROPERTY
[ ] **MARRIED WOMAN** -AS HER SOLE AND SEPARATE PROPERTY

James A. Wilson
(Print name exactly as it should appear on documents including loan documents)

PLEASE INDICATE THE FULL NAME OF SPOUSE FOR PREPARATION OF A (Please circle one) QUIT CLAIM DEED OR INTERSPOUSAL TRANSFER DEED

Sharyn L. Wilson
(Print name exactly as it should appear on documents including loan documents)

3. [ ] **INDIVIDUAL** (Print name exactly as it should appear on documents including loan documents)

_______________________________________

A. ( ) A SINGLE MAN (never married)
B. ( ) A WIDOWER (wife is deceased)
C. ( ) AN UNMARRIED MAN (divorced)
D. ( ) A SINGLE WOMAN (never married)
E. ( ) A WIDOW (husband is deceased)
F. ( ) AN UNMARRIED WOMAN (divorced)

AND_______________________________________

A. ( ) A SINGLE MAN (never married)
B. ( ) A WIDOWER (wife is deceased)
C. ( ) AN UNMARRIED MAN (divorced)
D. ( ) A SINGLE WOMAN (never married)
E. ( ) A WIDOW (husband is deceased)
F. ( ) AN UNMARRIED WOMAN (divorced)

**ADDITIONAL VESTING IF MORE THAN ONE INDIVIDUAL:**

A. ( ) As Joint Tenants
B. ( ) As Tenants in Common
C. ( ) Other, please specify______________________

4. [ ] **TRUST** (Please confirm with your lender if they will make a loan to the trust prior to completing this form)

______________________ and ______________________,
(Name of Trustee) (Name of Trustee)

______________________ dated ______________________
(Name of Trust) (Date of Trust)

AMENDED

**HOW YOU HOLD TITLE TO YOUR PROPERTY CAN HAVE SERIOUS TAX CONSEQUENCES. IT IS STRONGLY RECOMMENDED THAT YOU SEEK TAX AND/OR LEGAL COUNSEL WHEN COMPLETING THIS FORM.**

James A. Wilson 09-22-07
Buyer's Signature Date

______________________ ______________
Buyer's Signature Date

Project: La Boheme
Residential Unit: 1135

PURCHASE AGREEMENT
AND ESCROW INSTRUCTIONS AMENDMENT

**BUYER:**
James A. Wilson & Sharyn Wilson
2162 View Crest Glen
Escondido, CA 92026

**SELLER:**
Western Pacific Housing Inc., a Delaware corporation
5790 Fleet Street Suite 210
Carlsbad CA 92009
(760) 929-1600

**ESCROW COMPANY:**
First American Title Company
6005 Hidden Valley Road, Suite 160
Carlsbad, CA 92008

**TITLE COMPANY:**
First American Title company
411 Ivy Street
San Diego, CA 92101

DATE: 10-30-2007

This Purchase Agreement and Escrow Instructions Amendment ("**Amendment**") constitutes an amendment to that certain Purchase Agreement and Escrow Instructions, as modified by any previous amendments thereto ("**Purchase Agreement**"), entered into by and between Buyer and Seller, as designated below, for the purchase of the Property described in the Purchase Agreement. Any capitalized terms not otherwise defined herein shall have the meanings as set forth in the Purchase Agreement. If there is a conflict between the Agreement and the terms and provisions of this Amendment, the terms and provisions of this Purchase Amendment shall control.

1. **AMENDMENT(S).**

Buyer and Seller agree to the following terms and conditions:

The "Purchase Price" as stated in section 4(a) of the Auction Purchase Price Addendum dated September 29, 2007 is hereby amended to be $416,250.00

2. **EFFECT OF AMENDMENT.** Except as amended hereby, the Agreement is in full force and effect between the parties and all other terms and conditions remain the same.

3. **COUNTERPARTS.** This Amendment may be executed in counterparts, each of which when taken together, will constitute one fully executed original.

This Amendment has been made and executed as of the date set forth above, but will not be valid until executed by Seller's authorized officer of the company.

James A. Wilson
Buyer

Buyer

Sharyn Wilson
Buyer

Buyer

Dated: 10-30-2007

Western Pacific Housing Inc., a Delaware corporation

By:
Name: LORI MILLS
Title: ASST. VICE PRESIDENT