Valentine S. Hoy VIII, State Bar No. 121766
John T. Brooks, State Bar No. 167793
LUCE, FORWARD, HAMILTON & SCRIPPS LLP
600 West Broadway, Suite 2600
San Diego, California 92101-3372
Telephone No.: 619.236.1414
Fax No.: 619.232.8311

Attorneys for D.R. Horton, Inc., Western Pacific Housing, Inc., and DHI Mortgage Company, Ltd.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES WILSON, REBECCA LORENZO, WAHEEDA KHAN, JORGE LOPEZ, and SUZIE KHUU, on behalf of themselves and All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>D.R. HORTON, INC., WESTERN PACIFIC HOUSING, INC. d/b/a/ D.R. HORTON, AMERICA'S BUILDINGER, DHI MORTGAGE COMPANY, LTD., L.P. and DOES 1-10,<br><br>Defendants. | Case No. 08 CV 592 BEN RBB<br><br>The Hon. Roger T. Benitez<br>Dept. 3<br><br>**EXHIBITS TO REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTIONS TO DISMISS, MOTIONS TO STRIKE, AND MOTION TO COMPEL ARBITRATION**<br><br>**EXHIBIT E**<br><br>Date: June 9, 2008<br>Time: 10:30 a.m.<br>Dept.: 3<br><br>Complaint Filed: March 28, 2008 |

Defendants D.R. Horton, Inc., Western Pacific Housing, Inc., and DHI Mortgage Company, Ltd., hereby submit the following exhibits in support of their Request for Judicial Notice in Support of Motions to Dismiss, Motions to Strike, and Motion to Compel Arbitration:

<u>Exhibit E</u>

E Purchase Agreement for plaintiff Khan.

DATED: May 5, 2008

LUCE, FORWARD, HAMILTON & SCRIPPS LLP

By: s/Valentine S. Hoy
Valentine S. Hoy
Attorneys for Defendants D.R. Horton, Inc., Western Pacific Housing, Inc., and DHI Mortgage Company, Ltd.
E-mail: vhoy@luce.com

101092364.1

# EXHIBIT E

Project: Valverde Villag
Lot/Residential Unit: 6

PURCHASE AGREEMENT
AND ESCROW INSTRUCTIONS

By and Between

**Western Pacific Housing Inc.,**
**a Delaware Corporation**

**("Seller")**

AND

WAHEEDA RASOOL KHAN &
ZOHRA KHAN

**("Buyer")**

**THIS CONTRACT CONTAINS A BINDING ARBITRATION PROVISION. YOU SHOULD CONSULT LEGAL COUNSEL WITH ANY QUESTIONS ABOUT ANY OF THE PROVISIONS OF THIS CONTRACT.**

Community: Valverde Villages
Tract: 3452
Residential Unit/Lot No.: 6

RECEIPT OF DOCUMENTS AND INFORMATION

Buyer acknowledges that it has received read and approved the following documents:

1. Final Subdivision Public Report (If Applicable)
2. Covenants, Conditions and Restrictions
3. Seller's Disclosure Statement
4. Real Estate Agency Disclosure
5. Natural Hazards Disclosure
6. Homeowner's Manual, with Maintenance Requirements contained within, Seller's Limited Warranty and Customer Care Program (Fit and Finish Warranty)
10. SB800 Booklet containing all of Civil Code Sections 755 through 945.5
11. Manufacturer's Warranties and Manufactured Products Maintenance Information (provided at walk through)
12. Affiliated Business Disclosure
13. Standard Features List
14. Plot Map
15. Common Interest Development Addendum (If Applicable)
16. VHA/FHA Addendum (If Applicable)
17. Options and Occupancy Guidelines
18. Allowance for Non-Recurring Closing Costs
19. ______________________________
20. ______________________________

BUYER AGREES TO RETAIN ALL DOCUMENTS RECEIVED IN CONNECTION WITH THE PURCHASE OF THE PROPERTY AND PROVIDE SUCH DOCUMENTS TO ANY SUBSEQUENT PURCHASER OF THE PROPERTY. Buyer acknowledges that it has received all of the documents listed above and may receive other documents provided in conjunction with the purchase of the Property (collectively, the "Documents"). Buyer shall maintain a full and complete copy of the Documents and agrees to provide any subsequent buyer with a complete copy of the Documents including, but not limited to, a copy of the Maintenance Manual provided or to be provided by Seller to Buyer, any contractual warranties provided by Seller to Buyer and a copy of all manufactured products' maintenance and limited warranty information. Buyer should instruct any subsequent buyer to provide to their subsequent buyers a complete copy of the Documents.



WK — Buyer's Initials
ZK — Buyer's Initials

Project: Valverde Villages
Lot/Residential Unit: 6

## Purchase Agreement and Escrow Instructions

**BUYER:** Walteuda Ralsoon Khan + Zohra Khan

**SELLER:** Western Pacific Housing, Inc., a Delaware Corporation

**ESCROW HOLDER:** First American Title Company, 250 Cherry Ln. #103, Manteca, CA 95337
Phone: (209)239-5918 Fax: (209)239-5878

**TITLE COMPANY:** First American Title Company

1. **AGREEMENT TO BUY AND SELL.** Buyer's signature on this document and delivery of the Deposit to Selle constitutes an **"Offer"** to purchase the Property described below. Seller's signature on this document and unrestrictec release of the Deposit to Seller constitutes **"Acceptance"** of the Offer. Upon Acceptance, Seller agrees to sell and Buye. agrees to purchase the Property on the terms and conditions set forth in this Purchase Agreement and Escrow Instructions (**"Purchase Agreement"**).

2. **ADDRESS OF PROPERTY.**

10935 Cliffside Drive Stockton, CA 95209
Street City Zip

The residence is Plan Type 2693 /Color Scheme 271 (**"Residence"**). The Property is a (check one only):

☒ **Planned Development or Standard Subdivision:**

Lot No. 6 of Tract No. 3452, as shown on a Map recorded or to be recorded in the Official Records of ________ County, California.

☐ **Condominium:**

Residential Unit No. ________, an undivided interest in the Common Area and any Exclusive Use Easements shown on the Condominium Plan.

3. **OCCUPANCY.** Buyer does ___ does not ___ intend to occupy the Property as his/her residence. If Buyer does not intend to occupy the Property as his/her residence, Buyer shall pay an Investor Premium in the amount provided in **Paragraph 4** below.

4. **PURCHASE PRICE AND ESTIMATED CASH DUE AT CLOSING.** Buyer shall pay the following:

| | | | |
|---|---|---|---|
| a. | Purchase Price | $ 469990 | |
| | Note: | The Purchase Price does not reflect options, upgrades, etc. which the parties may later agree upon. | |
| b. | Plus | Investor Premium | $ |
| c. | Less: | Estimated New Loan Amount | $ 441200 |
| d. | Less: | Secondary Financing (if any) | $ |
| e. | Equals: | **Down Payment** | $ 23290 |
| f. | Plus: | Estimated Buyer Closing Costs, Prepaid Expenses and Impounds Due at Closing | $ 15478 |
| g. | Less: | **Deposit** received from Buyer ☐ Personal Check ☐ Other Form of Payment | $ 7500 |
| h. | Equals: | **Total Estimated Cash Required from Buyer at Close of Escrow** | $ 31268 |

## The Deposit

5. **DEPOSIT.** **"Deposit"** includes all funds paid by Buyer that are applicable to the Purchase Price. Deposits will be held, and Deposits paid by check will be un-cashed, pending Acceptance. If there is no Acceptance, Buyer's Deposit shall be returned to Buyer. Upon Acceptance, if a Deposit check is returned for non-sufficient funds, Seller may, in its sole discretion, either deem this Purchase Agreement terminated, or seek replacement funds from Buyer. No interest



WK Buyer's Initials ZK Buyer's Initials

shall be payable to Buyer on the Deposit. If Seller has posted a bond, cash deposit or other security instrumer acceptable to the Department of Real Estate ("**Security**"), under the provisions of California Business and Profession Code Section 11013.2 or 11013.4 and Seller has obtained a final subdivision public report covering the Property, th Deposit shall be released by Escrow Holder to Seller at Seller's request, without further instruction from Buyer.

**Escrow Procedures and Requirements**

6. **ESCROW.**

6.1 Opening of Escrow. Within 5 days after Acceptance, Seller shall deliver this Purchase Agreement to th Escrow Holder listed above for the purpose of opening an escrow ("**Escrow**"). Escrow Holder's additional instructions ar attached as an Addendum. If any provision in the Escrow Instructions Addendum conflicts with any other provisions c this Purchase Agreement, the provisions in this Purchase Agreement control.

6.2 Buyer's Duty to Cooperate. Upon Acceptance, Seller will incur daily carrying and other cost attributable to holding the Property off the market. Accordingly, Buyer agrees to cooperate with Seller to use his/her bes efforts and to diligently take any action necessary to timely close Escrow, including without limitation, by promptl cooperating in good faith with all time frames for performance under this Purchase Agreement, including all time frame for selecting options and providing all requested documents to lender, Escrow Holder and Title Company. Buye acknowledges that Buyer's failure to so cooperate shall constitute a default under this Purchase Agreement.

6.3 Title Company and Escrow Holder. By Buyer's execution of this Purchase Agreement, Buyer anc Seller have mutually agreed to use the Title Company and Escrow Holder designated on the first page of this Purchase Agreement.

6.4 Close of Escrow; Estimated Closing Date; Closing Date.

(a) Close of Escrow. The close of escrow shall occur upon the recordation of the Grant Deeo ("**Close of Escrow**").

(b) Closing Date. Escrow shall close on ("**Closing Date**"):

☐ *[Check if Residence is already constructed]* ______________________; or

☒ *[Check if Residence is not completed]* The date set forth in the Closing Date Notice (as defined in **Paragraph 6.4(c)** below) to Buyer that the Residence is ready for occupancy. It is estimated that the Residence will be completed and that either a notice of completion will be filed or a certificate allowing occupancy of the Residence will be issued on 5/06 ("**Estimated Closing Date**").

Due to the variables in the development of the Project, the date on which Escrow actually closes may be before or after the Estimated Closing Date. Seller agrees that it will complete construction in accordance with the standards set forth in **Paragraph 8.1** on or prior to the date which is 12 months after the date of Acceptance of this Purchase Agreement, provided that Seller is in no event responsible for any delays due to events beyond Seller's control, including, without limitation, Acts of God, fire, earthquake, terrorist acts and inclement weather, shortages of labor or supplies, moratoria, inability to obtain permits or approvals, utility stoppage or shortages, financing shortages and delays caused by governmental agencies. Except for amounts that may be claimed for liquidated damages, If Escrow has not closed within 12 months after the date of Acceptance, Buyer's Deposit shall be returned to Buyer within 15 days after expiration of such 12-month period. Upon the return of the Buyer's Deposit, Seller shall not have any further obligations to Buyer under this Purchase Agreement, unless Seller is then in default under its provisions.

(c) Notice of Closing Date and Deliveries. Seller or Escrow Holder will notify Buyer (orally or in writing) of the date for the Close of Escrow at least 5 business days before the pending date for the Close of Escrow ("**Closing Date Notice**"). Buyer shall deliver to Escrow Holder all cash and all documents required to close Escrow no later than the required date for such deliveries set forth in the Closing Date Notice. If Buyer fails to close Escrow by the Closing Date by reason of a default by Buyer, Seller may make a claim for liquidated damages in accordance with the provisions of **Paragraph 10** of this Purchase Agreement. Buyer agrees to execute all other documents and to take all other actions as are necessary to close the Escrow in accordance with this Purchase Agreement.

(d) Delay in Escrow Closing. If this Escrow does not close upon the Closing Date specified in the Closing Date Notice due to Buyer's default, Seller will be harmed due to carrying costs for the Property. If Seller does not terminate this Purchase Agreement, Seller may agree to extend the Closing Date, in its sole and absolute discretion, on the condition that Buyer pay Seller's carrying costs in the amount of $_200_ per day ("**Extension Payment**"). If Seller approves an extension, Buyer shall deposit into Escrow the applicable Extension Payment, or at Seller's option, Buyer shall pay the Extension Payment at the Close of Escrow as extended by the agreement of Buyer and Seller. Acceptance of Extension Payments will not constitute a waiver by Seller of any default by Buyer in failing to close the Escrow, and Seller's rights to liquidated damages. Any Extension Payment made by Buyer shall not be applicable to the Purchase Price but, if paid prior to the Closing Date, shall be handled in the same manner as the Deposit and liquidated damages under **Paragraph 10**.

(e) Third Party Charges. If certain charges are incurred by Seller on Buyer's behalf and paid from the Deposit or other funds of Buyer held under this Purchase Agreement ("**Third Party Charges**"), such charges shall be handled in the same manner as the Deposit. Seller's estimate of the amounts of the Third Party Charges is set forth below. Because these amounts are estimates of what would be due upon termination of this Purchase Agreement prior to the Close of Escrow, these amounts may not be the actual amounts due at Close of Escrow.



WK Buyer's Initials    ZK Buyer's Initials

| | |
|---|---|
| • Credit Report | $ 75.00 |
| • Appraisal Fees: (per appraisal) | $ 350.00 |
| • Escrow Services: | $ 0 |
| • Preliminary Title Report: | $ 0 |
| • Loan Processing Services: | $ 400.00 |
| • Homebuyer's Manual, if not returned | $ 50.00 |
| • Other: | $ 0 |
| ESTIMATED TOTAL: | $ 875.00 |

(f) Completion of Residence. Seller shall complete the Residence such that the Residence is ready for occupancy by Buyer within 2 years after the date of Buyer's Offer, subject to extensions for circumstances reasonably beyond Seller's control as determined by California law. Notwithstanding any provision in this Purchase Agreement to the contrary, including but not limited to **Paragraph 10.3**, nothing herein shall limit Buyer's remedies if Seller defaults under this **Paragraph 6.4(f).**

**Financing and Loan Approval**

**7. FINANCING PROVISIONS. [Check either Paragraph 7.1 or 7.2].**

7.1 ☐ **Financing Not Required:** Buyer will provide all cash to close Escrow without obtaining a loan. Within 5 days after Buyer signs this Purchase Agreement, Buyer shall submit to Seller proof satisfactory to Seller that Buyer now has, or will have prior to Close of Escrow, cash sufficient to close Escrow. Within 3 days after any request by Seller, Buyer shall also provide evidence that sufficient funds are available for Buyer to close Escrow.

7.2 ☒ **Financing Required:** Buyer will apply and qualify for and obtain financing sufficient to close Escrow in the approximate **"Estimated New Loan Amount"** set forth in **Paragraph 4(c)**, above (**"New Loan"**). Buyer shall use his or her best efforts to qualify for and obtain institutional financing at the rates and terms available to Buyer.

(a) Loan Application. Within 5 days after Buyer's Offer, Buyer shall submit a completed loan application for the New Loan to DHI Mortgage (**"Seller's Approved Lender"**) and a lender selected by Buyer (**"Buyer's Lender"**), if any. Buyer shall advise Seller of the lender it has elected to use to close the Escrow prior to the applicable date set forth in **Paragraph 7.2(b)** below. Buyer shall take all required steps to allow prompt processing of the application for the New Loan, including fully responding to any requests from the lender(s) for documents or information within 3 days. Nothing set forth herein shall compel Buyer to accept any financing approved by Seller's Approved Lender that is not acceptable to Buyer.

(b) Buyer To Obtain Loan Approval. ***[Check appropriate box]*** **("Loan Contingency Date"):**

☐ ***Estimated Closing Date is less than 60 days:*** Within 30 days after the Offer, but not less than 15 days prior to the Estimated Closing Date, Buyer shall deliver to Seller written evidence satisfactory to Seller that Buyer has obtained final unconditional loan approval for the Estimated New Loan Amount.

☒ ***Estimated Closing Date is more than 60 days:*** Within 15 days after the Offer, Buyer shall deliver to Seller written evidence satisfactory to Seller that Buyer has obtained conditional credit approval. Within _30_days after the Offer, Buyer shall deliver to Seller final unconditional loan approval for the Estimated New Loan Amount, subject only to the lender's approval of the value of the Property through an appraisal.

7.3 **Failure to Obtain Loan Approval.** If Buyer fails to obtain loan approval as provided in **Paragraph 7.2(b)** by the Loan Contingency Date, and Buyer is not otherwise in default under this Purchase Agreement, either Buyer or Seller may terminate this Purchase Agreement and cancel Escrow, and Buyer shall receive a refund of the Deposit. Buyer's failure to terminate this Purchase Agreement within the time periods set forth above shall be deemed to be a waiver of Buyer's right to terminate this Purchase Agreement as a result of Buyer's failure to obtain financing. Buyer covenants and agrees to use his or her best efforts to qualify for and obtain financing and will comply with the time limits imposed by Seller or the lender for obtaining financing and will not take any action which will prevent or delay obtaining loan approval.

7.4 **Authorizations Given By Buyer; Re-verification.** Buyer, by execution of this Purchase Agreement, authorizes Seller to investigate Buyer's credit, including obtaining a credit report, authorizes Seller to disclose to the lender(s) information about Buyer, authorizes Seller to obtain information from the lender(s), including copies of all applications and other documents, and agrees to cooperate with Seller in obtaining information about the New Loan from the lender. Upon the request of Seller, Buyer shall provide to Seller written re-verification of its financing approvals or sufficiency of cash.

7.5 **Loan Modification.** Buyer shall not change the lender, the loan amount or the loan program after receiving the original final unconditional loan approval referenced in **Paragraph 7.2** and any failure of Buyer or its lender to close the loan on the Closing Date after obtaining the final unconditional loan approval from the lender shall constitute a default hereunder, for which Seller shall have the right to terminate this Purchase Agreement and retain Buyer's Deposit as provided in Paragraph 10 hereof.

**Construction of The Residences**

8. **CONSTRUCTION.**

8.1 Standard Residence. The Residence under construction shall be constructed in substantl conformance with the standard plan on file with and approved by the appropriate governmental authority. Seller is n building the Residence specifically for Buyer, nor to the precise specifications or design of any model home. The fixture furnishings, landscaping and other features shown in any model home are not included under this Purchase Agreeme unless specifically set forth herein. Seller reserves the right to make any changes or substitutions to the standard pla specifications, construction, materials and fixtures which are substantially equal in utility and quality to the original plar and specifications, and which meet with the approval of the appropriate governmental authorities having jurisdiction, a Seller deems necessary or desirable, without Buyer's consent.

8.2 Occupancy. Buyer shall not be entitled to possession of the Property or receive keys to the residenc until after the Close of Escrow.

8.3 Entry Upon Property. Prior to the Close of Escrow, Buyer shall not alter the Property or the Residenc install any improvements on the Property, show or advertise the Property to prospective purchasers or tenants or plac any signs at or near the Property, without the prior written consent of Seller and compliance with all requirements of Sell with respect to such entry, including signing an entry permit. All upgrades to the Property prior to the Close of Escro must be approved in writing by Seller and installed or constructed by Seller or its authorized agents, representatives ( independent contractors. If Buyer alters the Property or the Residence prior to the Close of Escrow without writte consent of Seller, Seller may immediately remove same and Buyer shall be liable for all damages caused by suc unauthorized work and changes to the Property.

8.4 Limited Warranty; Disclaimer of Implied Warranties. Buyer has received samples of the followin prior to signing this Purchase Agreement: (a) a homeowner's manual entitled "__Dr. Horton_ Homeowner's Manual an Customer Care Guide" (**"Homeowner's Manual"**) which contains Seller's 10-4-1 Limited Warranty (**"Limited Warranty"** (b) manufacturer's warranties (some or all of which may be provided at the Walk-Through). **[FMA/UA Projects: If you purchase is FHA or VA financed, Seller will also provide its Residential Warranty.]** [The Limited Warranty manufacturer's warranties, and any other express written warranty provided to you by the Seller are referred to collectivel as **"the Warranties."** The Warranties become effective upon Close of Escrow. Except for these Warranties, Seller doe not make any other representations, promises or warranties concerning the Property, including, without limitatior warranties of merchantability, fitness for a particular purpose, quality of construction or otherwise, and to the fullest exter permitted by law Buyer waives all implied warranties relating to the Property.

**I/WE HAVE READ AND UNDERSTAND THE FOREGOING PROVISIONS PERTAINING TO THE WARRANTIES ANI ACKNOWLEDGE AND AGREE THAT EXCEPT AS PROVIDED IN THE WARRANTIES, SELLER DISCLAIMS ALI OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO, THAT THE PROPERTY WA: DESIGNED AND CONSTRUCTED IN A REASONABLY WORKMANLIKE MANNER, FITNESS FOR A PARTICULAI PURPOSE, AND MERCHANTABILITY.**

WK Buyer's Initials ZK Buyer's Initials MA Seller's Initials

8.5 Buyer Walk-Through. Prior to Close of Escrow, Seller will provide Buyer with at least 72 hours notice o the date the Property is available for orientation and inspection (**"Walk-Through"**). If Buyer fails to attend the Walk Through, Seller may complete its own inspection of the Property and close escrow. If Buyer fails to attend the Walk Through, Buyer's later claims of reasonably observable deficiencies may be rejected by Seller as having occurred afte Close of Escrow and therefore not Seller's responsibility. Seller reserves the right to perform such work after the Close o Escrow.

8.6 Optional Items and Upgrades. The selection and cost of all options and upgrades shall be set forth ir an Addendum to this Purchase Agreement and/or in a separate agreement(s) between Buyer and Seller or an authorizec third party provider. The availability and prices of options and upgrades are subject to change without prior notice. Selle reserves the right to add or delete any optional items from the Seller's list of optional items at any time without prior notice to Buyer. In addition, once certain stages of the construction process are complete (**"Cut-Off Dates"**), some options anc upgrades increase in price or are no longer available. Information concerning these Cut-Off Dates and additional costs will be provided to Buyer upon request. Accordingly, Buyer shall select and pay for all options and upgrades when requested to do so by Seller. If Buyer selects options and upgrades but fails to make color, style or material selections prior to Seller's construction cut-off dates, Seller may either not install them, or install colors, styles and materials ol Seller's choice. Seller will only supply options on Seller's approved list. If Buyer fails to make any options selections, Seller shall install standard items.

8.7 Destruction of the Property Prior to Close of Escrow. If the Property is destroyed or materially damaged, other than by Buyer's act or omission, prior to the Close of Escrow, then either Buyer or Seller may terminate this Purchase Agreement and the Deposit, less any applicable Third Party Charges, shall be returned to Buyer within 15 days thereafter.

8.8 Claims Under California Civil Code Section 895 et seq. California Civil Code Section 895 et seq. (the **"Statute"**) establishes residential construction standards and provides mechanisms for resolution of claims of violations of these standards.

(a) SB 800 Booklet. A booklet containing Sections 895 through 945.5 of the Civil Code (**"SB 800 Booklet"**), which includes the Statute has been provided to Buyer by Seller. You should read the Statute carefully and

seek legal advice if you have any questions. By initialing below Buyer acknowledges that s/he has received and initiale a copy of the SB 800 Booklet.

WK ZK MA
Buyer's Initials Buyer's Initials Seller's Initials

(b) Notice of Claims. If Buyer or Buyer's successors (the "**Claimant**") claim that the Property or th Residence violates any of the Standards, Claimant must provide notice to Seller's agent under Civil Code Section 912(e The name and address of Seller's agent are available upon request from the California Secretary of State:

California Secretary of State
Special Filings
P.O. Box 942877
Sacramento, California 94277
or by telephone at (916) 653-3984

By initialing below, Buyer acknowledges and agrees that Seller has provided Buyer with access to the name and addres of the contact person for notice of any claimed violations of the Standards.

WK ZK MA
Buyer's Initials Buyer's Initials Seller's Initials

(c) Statutory Non-Adversarial Procedures. Seller has elected to use the "**non-adversaria procedures**" which are set forth in the Statute at Sections 910 through 938. Seller has recorded or will record a notice c these procedures on the Property at or prior to the Close of Escrow. According to the terms of the Statute, the non adversarial procedures will not apply if the Seller does not, or cannot comply with the requirements in the Statute. In sucl case, disputes will be resolved through mediation and, if that is not successful, then arbitration as provided in thi Purchase Agreement.

WK ZK MA
Buyer's Initials Buyer's Initials Seller's Initials

(d) Receipt of Purchase Documents. Buyer acknowledges that he or she has received or may in the future receive certain documents in conjunction with Buyer's purchase of the Property, including, but not limited to, those referenced in the Receipt of Documents. Buyer agrees to keep and maintain all such documents, to provide any subsequent buyer with all such documents, as required by the Statute, and to instruct any subsequent buyer to provide to their subsequent buyers a complete copy of all documents.

(e) Affiliated General Contractor. Seller is using an affiliated general contractor, as described in Section 911 of the Statute ("**General Contractor**"), to construct the Project. All deliveries, notices and elections set forth in this **Paragraph 8.8** are hereby deemed to apply to, and be made by General Contractor as well as Seller. All notices provided to the General Contractor shall be delivered to the address set forth in **Paragraph 8.8(b)** above.

Closing

## 9. CLOSING.

9.1 **Title**. At the Close of Escrow, title to the Property shall be conveyed to Buyer subject to: (a) standard exceptions and exclusions of the Title Policy, (b) current real property taxes, special taxes and any assessments; (c) any declarations of covenants, conditions and restrictions; (d) all other reservations, covenants, conditions, restrictions, easements, rights and rights of way of record or placed of record prior to the Close of Escrow; (e) the New Loan in favor of Buyer's lender, if any; and (f) a Notice of Non-Adversarial Procedure under California Civil Code Section 912(f). Upon the Close of Escrow, Seller shall cause to be issued a standard coverage owner's policy of title insurance ("**Title Policy**") issued by the Title Company in Buyer's favor describing the Property and with coverage in the amount of the Purchase Price and containing the exceptions described above.

9.2 **Prorations**. Real property taxes, special taxes and assessments, including assessments for any homeowners association(s), shall be prorated between Buyer and Seller as of the Close of Escrow.

9.3 **Buyer and Seller Closing Costs**. Buyer and Seller shall pay the closing costs allocated below: ***[Check appropriate boxes]***

| Buyer | Seller | Closing Costs |
|---|---|---|
| ☑ | ☐ | Escrow Fees |
| ☑ | ☐ | Title Policy |
| ☑ | ☐ | City Transfer Taxes |
| ☑ | ☐ | County Transfer Taxes |
| ☑ | ☐ | Lender's Closing Costs and Charges |

Pre-Closing Disputes

## 10. LIQUIDATED DAMAGES; ARBITRATION.

10.1 Default by Buyer. If Buyer breaches or fails to perform any of its obligations under this Purcha Agreement, Seller may provide written notice of such breach or failure to Buyer and Buyer shall have 5 days from the da of such written notice to cure such breach, except that this provision shall not apply to extend the Closing Date. If Buy fails to cure the breach within the 5 day period after Seller gives Buyer such notice, Seller may pursue its remedies for Buyer's default.

10.2 BUYER'S BREACH; LIQUIDATED DAMAGES. IF BUYER DEFAULTS UNDER ANY TERMS O PROVISIONS UNDER THIS PURCHASE AGREEMENT AND SUCH DEFAULT RESULTS IN THE FAILURE T CLOSE ESCROW OR IF BUYER IS IN DEFAULT AND SUCH DEFAULT IS A MATERIAL BREACH OF THI PURCHASE AGREEMENT, SELLER, IN ITS SOLE AND ABSOLUTE DISCRETION, SHALL BE RELEASED FRO ITS OBLIGATION TO SELL THE PROPERTY TO BUYER AND SHALL HAVE THE RIGHT TO UNILATERALL TERMINATE THIS PURCHASE AGREEMENT. IN ADDITION, SELLER MAY PURSUE ANY REMEDY AT LAW OR I EQUITY THAT IT MAY HAVE AGAINST BUYER ON ACCOUNT OF SUCH DEFAULT; PROVIDED, HOWEVER, THA BY PLACING THEIR INITIALS HERE, BUYER WK, ZK AND SELLER ______ AGREE THAT:

(a) SELLER WILL BE DAMAGED AND WILL BE ENTITLED TO COMPENSATION FOR THES DAMAGES, BUT SUCH DAMAGES WILL BE DIFFICULT TO DETERMINE AND BUYER DESIRES TO LIMIT TH AMOUNT OF DAMAGES FOR WHICH BUYER MIGHT BE LIABLE. IN ADDITION, BOTH BUYER AND SELLER WIS TO SAVE THE TIME AND MONEY INVOLVED IN A LAWSUIT OR ARBITRATION TO DETERMINE DAMAGES;

(b) AN AMOUNT NOT TO EXCEED THE DEPOSIT, SHALL CONSTITUTE LIQUIDATE DAMAGES PAYABLE TO SELLER IF BUYER DEFAULTS UNDER ANY TERMS OR PROVISIONS UNDER THI PURCHASE AGREEMENT AND SUCH DEFAULT RESULTS IN THE FAILURE TO CLOSE ESCROW OR IF BUYE IS IN DEFAULT AND SUCH DEFAULT IS A MATERIAL BREACH OF THIS PURCHASE AGREEMENT;

(c) THE PAYMENT OF SUCH LIQUIDATED DAMAGES TO SELLER SHALL CONSTITUTE THE EXCLUSIVE REMEDY OF SELLER ON ACCOUNT OF ANY DEFAULT BY BUYER, EXCEPT FOR ANY RIGHT WHICH SELLER MAY HAVE UNDER PARAGRAPH 6.4(D) OF THIS PURCHASE AGREEMENT; AND

(d) SELLER WAIVES ITS RIGHTS TO SPECIFIC PERFORMANCE OR OTHER DAMAGES.

(e) LIQUIDATED DAMAGES SHALL BE PAYABLE TO SELLER OUT OF BUYER'S DEPOSIT ACCORDING TO THE FOLLOWING PROCEDURES. TO MAKE A CLAIM OF BUYER'S DEFAULT AND DEMAND FOR LIQUIDATED DAMAGES, SELLER SHALL GIVE WRITTEN NOTICE ("SELLER'S NOTICE") BY ANY MEANS AUTHORIZED FOR SERVICE BY CODE OF CIVIL PROCEDURE SECTION 116.340 TO ESCROW HOLDER AND TO BUYER THAT BUYER IS IN DEFAULT UNDER THIS PURCHASE AGREEMENT AND THAT ESCROW HOLDER DISBURSE BUYER'S DEPOSIT(S) TO SELLER UNLESS, WITHIN 20 DAYS OF RECEIPT OF THE SELLER'S NOTICE, BUYER NOTIFIES ESCROW HOLDER AND SELLER IN WRITING THAT BUYER OBJECTS TO THE DISBURSEMENT OF LIQUIDATED DAMAGES TO SELLER (THE "BUYER'S NOTICE"). IF SELLER HAS HAD THE USE OF ANY OF BUYER'S PURCHASE MONEY UNDER AUTHORITY OF A PURCHASE MONEY BOND, SELLER SHALL IMMEDIATELY UPON MAKING SELLER'S NOTICE AND DEMAND, DESCRIBED ABOVE, TRANSMIT TO THE ESCROW HOLDER AN AMOUNT EQUAL TO ALL OF THE DEPOSITS PAID BY BUYER. IF BUYER FAILS TO GIVE BUYER'S NOTICE WITHIN THE TIME REQUIRED: (I) ESCROW HOLDER SHALL PROMPTLY REMIT THE LIQUIDATED DAMAGES AMOUNT TO SELLER, AND (II) SELLER SHALL BE RELIEVED OF ANY OBLIGATION TO SELL THE PROPERTY TO BUYER.

10.3 SELLER'S BREACH; LIQUIDATED DAMAGES. IF SELLER DEFAULTS UNDER THIS PURCHASE AGREEMENT AND FAILS TO CURE SUCH DEFAULT WITHIN 5 DAYS AFTER NOTICE THEREOF FROM BUYER, AND SUCH DEFAULT RESULTS IN THE FAILURE TO CLOSE ESCROW, BUYER, IN ITS SOLE AND ABSOLUTE DISCRETION, SHALL HAVE THE RIGHT TO UNILATERALLY TERMINATE THIS PURCHASE AGREEMENT AND PURSUE ANY REMEDY AT LAW OR IN EQUITY THAT IT MAY HAVE AGAINST SELLER; PROVIDED, HOWEVER, THAT BY PLACING THEIR INITIALS HERE, BUYER WK, ZK AND SELLER ______ AGREE THAT (A) UPON ANY SUCH DEFAULT BY SELLER, BUYER WILL BE DAMAGED AND WILL BE ENTITLED TO COMPENSATION FOR THESE DAMAGES, BUT SUCH DAMAGES WILL BE DIFFICULT TO DETERMINE AND SELLER DESIRES TO LIMIT THE AMOUNT OF DAMAGES FOR WHICH SELLER MIGHT BE LIABLE, (B) BOTH BUYER AND SELLER WISH TO SAVE THE TIME AND MONEY INVOLVED IN A LAWSUIT OR ARBITRATION TO DETERMINE DAMAGES, AND (C) UPON SUCH A DEFAULT BY SELLER, BUYER SHALL BE ENTITLED TO THE RETURN OF THE DEPOSIT PLUS AN ADDITIONAL AMOUNT PAID BY SELLER EQUAL TO THE AMOUNT OF THE DEPOSIT PAID BY BUYER UNDER PARAGRAPH 4(g) OF THIS PURCHASE AGREEMENT (COLLECTIVELY, "BUYER'S LIQUIDATED DAMAGES"). BUYER'S LIQUIDATED DAMAGES AND BUYER'S RIGHT TO TERMINATE THIS PURCHASE AGREEMENT SHALL CONSTITUTE BUYER'S SOLE AND EXCLUSIVE REMEDY FOR DAMAGES IN THE EVENT OF A DEFAULT BY SELLER WHICH RESULTS IN THE FAILURE TO CLOSE ESCROW AND BUYER SPECIFICALLY WAIVES ANY RIGHT TO BRING AN ACTION AGAINST SELLER FOR SPECIFIC PERFORMANCE. IF SELLER FAILS TO DEPOSIT AN AMOUNT EQUAL TO THE DEPOSIT PAID BY BUYER UNDER PARAGRAPH 4(g) WITHIN 20 DAYS AFTER RECEIPT OF BUYER'S NOTICE OF DEFAULT, THIS SECTION SHALL BE VOID AND OF NO EFFECT.

(a) NOTICE OF DEFAULT AND DEMAND FOR LIQUIDATED DAMAGES. BUYER SHALL GIVE WRITTEN NOTICE ("BUYER'S NOTICE") BY ANY MEANS AUTHORIZED FOR SERVICE BY CODE OF CIVIL PROCEDURE SECTION 116.340 TO ESCROW HOLDER AND TO SELLER THAT SELLER IS IN DEFAULT UNDER THE PURCHASE AGREEMENT AND THAT ESCROW HOLDER DISBURSE THE AMOUNTS DESCRIBED ABOVE TO BUYER UNLESS, WITHIN 20 DAYS OF RECEIPT OF THE BUYER'S NOTICE, SELLER NOTIFIES ESCROW HOLDER AND BUYER IN WRITING THAT SELLER OBJECTS TO THE DISBURSEMENT OF LIQUIDATED DAMAGES TO BUYER (THE "SELLER'S NOTICE"). IF SELLER FAILS TO GIVE SELLER'S NOTICE WITHIN THE TIME REQUIRED: (I) ESCROW HOLDER SHALL PROMPTLY REMIT BUYER'S LIQUIDATED DAMAGES AMOUNT

TO BUYER, AND (II) BUYER SHALL BE RELIEVED OF ANY OBLIGATION TO PURCHASE THE PROPERTY FRO SELLER.

(b) NO CONSEQUENTIAL DAMAGES. IN NO EVENT SHALL SELLER BE LIABLE FOR AN CONSEQUENTIAL DAMAGES AS A RESULT OF A DEFAULT BY SELLER UNDER THIS PURCHASE AGREEMENT

10.4 ARBITRATION OF DISPUTES. If there is an objection to a claim under Paragraph 10.2, the Depos shall only be disbursed to Seller as liquidated damages if there is a determination by a court of law that Buye has defaulted under this Purchase Agreement or, if there is an objection to a claim under Paragraph 10.3, the Buyer's Liquidated Damages shall only be disbursed to Buyer if there is a determination by a court of law tha Seller has defaulted under this Purchase Agreement; provided, however, that by initialing in the space provide below Buyer and Seller agree that the controversy, and the disposition of such funds deposited into the Escro as provided in Paragraphs 10.2 and 10.3 shall be settled by arbitration in accordance with the Commercia Arbitration Rules of the American Arbitration Association and subject to the following terms: (a) the fee t initiate the arbitration shall be borne by Seller; provided, however, that the costs of the arbitration shall be born as determined by the arbitrator; (b) the arbitrator shall be neutral and impartial and shall be appointed within 3 days after Buyer or Seller gives written notice to Escrow Holder in compliance with Paragraph 10.2(e) or 10.3(a above; (c) the arbitration shall be conducted in the County where the Property is located, unless the parties agre to another location; and (d) subject to any limitations on specific performance set forth above, the arbitrator shal be authorized to provide all recognized remedies available in law or equity for any cause of action that is th basis of the arbitration. Judgment upon the award rendered by the arbitrator(s) may be entered in any cour having jurisdiction thereof. If the dispute subject to the arbitration is whether a default has occurred under thi Purchase Agreement and there is a determination by the arbitrator that a default has occurred, Escrow shall b cancelled and the rights and duties under this Purchase Agreement shall automatically terminate, including an duty by Seller to sell the Property to Buyer or obligation of Buyer to purchase the Property from Seller. Upon determination of Buyer's default, the amount claimed as liquidated damages shall be disbursed as provide above, and any remaining Deposit shall be disbursed to Buyer; provided, however, that if the arbitrato determines that any dispute raised by Buyer as to the amount of liquidated damages claimed by Seller cannot b determined at the same time as the dispute regarding Buyer's default, the dispute as to the amount of liquidate damages shall be resolved by a subsequent arbitration in the same manner as described herein.

NOTICE: BY INITIALING IN THE SPACE BELOW YOU ARE AGREEING TO HAVE ANY DISPUTE ARISING OUT OF THE MATTERS INCLUDED IN PARAGRAPH 10.4 DECIDED BY NEUTRAL ARBITRATION AS PROVIDED BY CALIFORNIA LAW AND YOU ARE GIVING UP ANY RIGHTS YOU MIGHT POSSESS TO HAVE THE DISPUTE LITIGATED IN A COURT OR JURY TRIAL. BY INITIALING IN THE SPACE BELOW YOU ARE GIVING UP YOUR JUDICIAL RIGHTS TO DISCOVERY AND APPEAL, UNLESS SUCH RIGHTS ARE SPECIFICALLY INCLUDED IN THE "ARBITRATION OF DISPUTES" PROVISION. IF YOU REFUSE TO SUBMIT TO ARBITRATION AFTER AGREEING TO THIS PROVISION, YOU MAY BE COMPELLED TO ARBITRATE UNDER THE AUTHORITY OF THE CALIFORNIA CODE OF CIVIL PROCEDURE. YOUR AGREEMENT TO THIS ARBITRATION PROVISION IS VOLUNTARY.

WE HAVE READ AND UNDERSTAND THE FOREGOING AND AGREE TO SUBMIT DISPUTES ARISING OUT OF THE MATTERS INCLUDED IN THE "ARBITRATION OF DISPUTES" PROVISION TO NEUTRAL ARBITRATION. (CODE OF CIVIL PROCEDURE SECTION 1298).

WK ZK MA

Buyer's Initials Buyer's Initials Seller's Initials

**Post-Closing Disputes**

**11. MEDIATION AND ARBITRATION OF POST-CLOSING DISPUTES.** The parties want to promptly and efficiently resolve any controversy, claim or dispute between them asserted after the Close of Escrow. Accordingly, any and all disputes arising between Buyer and Seller (including any affiliated general contractor of Seller as defined in California Civil Code Section 911) after the Close of Escrow concerning this Purchase Agreement or the Property (**"Post-Closing Dispute"**), which are not resolved under the Warranties or under the non-adversarial procedures in the Statute described in **Paragraph 8.8** above, shall be resolved in accordance with the procedures set forth below.

11.1 Mediation. Subject to **Paragraph 11.2** below, and except for actions in small claims court or Post-Closing Disputes that have already been mediated, Buyer and Seller agree to submit all Post-Closing Disputes to mediation with Judicial Arbitration and Mediation Services (**"JAMS"**), prior to commencing arbitration. The cost of mediation shall be paid by Seller, but each party shall bear its own attorneys' fees and costs.

11.2 Arbitration.

(a) Agreement to Arbitrate. Subject to **Paragraph 11.1** above, Buyer and Seller agree to resolve all Post-Closing Disputes exclusively through binding arbitration in the county in which the Property is located. This arbitration provision shall apply to Post-Closing Disputes of any kind or nature regardless of when, after the Close of Escrow, the Post-Closing Dispute first arose, or the nature of the relief sought.

(b) Waiver of Trial by Judge or Jury. By agreeing to resolve all Post Closing Disputes through binding arbitration, Buyer and Seller each give up the right to have their respective claims and defenses decided by a judge or a jury. Instead all claims and defenses will be decided by the arbitrator, or by the appeal arbitrator(s), if applicable.

(c) Rules Applicable to All Cases. The arbitration will be conducted by JAMS in accordance with the JAMS rules (**"JAMS Rules"**) then applicable to the claims presented, as supplemented by this paragraph. The following

supplemental rules shall apply to all arbitration proceedings and shall govern in the event of a conflict between the rule set forth below and the rules of JAMS Rules.

(i) *Qualifications and Appointment of Arbitrators.* The arbitrator shall be neutral, impartl and either a retired judge or a member or former member of the California State Bar with at least 15 years experience a a practicing lawyer. The arbitrator shall be selected in accordance with the JAMS Rules, but no later than 60 days after notice of claim is filed.

(ii) *JAMS Fees; Attorney Fees and Costs.* All fees charged by JAMS and the arbitrator sha be advanced by the Seller. If the Seller is the prevailing party in the arbitration, the arbitrator may, in his or her discretio and only to the extent permitted by law and the JAMS Minimum Standards of Procedural Fairness, direct the Buyer t reimburse the Seller all or part of the JAMS fee and arbitrator's fee advanced by the Seller. Each party shall bear its ow attorneys fees and costs.

(iii) *Preliminary Procedures.* If state or federal law requires the Buyer or Seller to take step or procedures before commencing an action in court, then the Buyer or Seller must take such steps or follow sucl procedures, as the case may be, before commencing the arbitration. For example, Post-Closing Disputes pursuant t California Civil Code Section 895 et. seq. as hereafter amended may be subject to the non-adversarial procedures se forth in California Civil Code Section 910 through 938, prior to the initiation of any arbitration or small claims cou proceeding against Seller. In addition, nothing contained herein shall be deemed a waiver or limitation of the provisions o California Civil Code Sections 1368.4, 1375, 1375.05 or 1375.1.

(iv) *Participation by Other Parties.* Buyer and Seller, to the extent either such party i defending a claim in the arbitration, may, if it chooses, have all necessary and appropriate parties included as parties t the arbitration.

(v) *Rules of Law.* The arbitrator must follow California substantive law, including statutes o limitations, but strict conformity with the rules of evidence is not required except that the arbitrator shall strictly conform t all laws relating to privilege and work product. The arbitrator shall be authorized to provide all recognized remedie available at law or equity for any cause of action.

**(d)** Additional Rules Applicable To Certain Cases. In any arbitration in which a claim of Buyer o Seller exceeds two hundred fifty thousand dollars ($250,000) in value, the following additional rules will supplement the JAMS Rules, and govern in the event of a conflict between the following rules and the rules set forth above, the JAMS Rules, or both.

(i) *Qualifications of Arbitrator.* In addition to the requirements of **Paragraph 11.2(c)** above, the arbitrator shall be a retired judge of the California Superior Court, a California Court of Appeal, or the California Supreme Court.

(ii) *Rules of Law.* The California Evidence Code shall apply.

(iii) *Written Decision.* Within 30 days after the hearing is closed, the arbitrator must issue a written decision. If either Buyer or Seller requests it, the arbitrator must issue a reasoned award.

**(e)** Procedure for Appeal of Certain Cases. In any arbitration in which a claim or arbitration award of Buyer or Seller exceeds five hundred thousand ($500,000) in value, Buyer and Seller hereby adopt and agree to the JAMS Optional Appeal Procedure. The following additional rules will supplement the JAMS Optional Appeal Procedure and govern in the event of a conflict between the following rules and the JAMS Optional Appeal Procedure.

(i) *Right of Appeal.* There shall be no right to appeal unless the oral evidence received by the arbitrator was preserved in a manner such that it can be converted to an accurate and reliable written transcript.

(ii) *Appellate Panel.* An appeal shall be decided by one neutral appeal arbitrator unless either party, within the time permitted for the appointment of the appeal arbitrator, elects to have the appeal decided by a panel of 3 appeal arbitrators. Any party who elects to have an appeal decided by a panel of 3 appeal arbitrators agrees to be solely responsible for the cost of having 2 additional appeal arbitrators. The sole appeal arbitrator, or at least one member of any panel of 3 arbitrators, shall have prior experience as a member of an appellate panel of the California Court of Appeal.

(iii) *Issues on Appeal.* The only issues that may be considered on appeal are: (1) the award of money was excessive; (2) the award of money was insufficient; (3) the arbitrator awarded non-monetary relief that was inappropriate; (4) a party who received non-monetary relief should have received other or additional relief. A majority of the appeal arbitrators may affirm the arbitration award or make any alternative award they find to be just, but they must not reject the arbitrator's decisions (a) that a particular party is entitled to relief of some nature or amount or (b) that a particular party is responsible to provide relief of some nature or amount.

(iv) *Expenses and Costs on Appeal.* The fees charged by JAMS and the appeal arbitrator(s) shall be advanced by the Seller, except as provided in **Paragraph 11.2(c)(ii)** above. The party who files the appeal must, at its sole expense, provide JAMS and all non-appealing parties with a certified copy of the hearing transcript, and must provide JAMS with copies of all documentary evidence and all other tangible evidence received by the arbitrator. If more than one party appeals, the appealing parties must share equally the cost of the transcript and copies of all other documentary and tangible evidence received by the arbitrator. The appeal arbitrators may, within 30 days of their determination award costs of the nature provided in the Federal Rules of Appellate Procedure. If the Seller is the prevailing party on appeal, the appeal arbitrator(s) may, in his, her or their discretion and only to the extent permitted

by law and JAMS Minimum Standards Of Procedural Fairness, include all or part of the JAMS fee and arbitrator's fe advanced by the Seller in the award of costs on appeal.

(v) *New Evidence.* The appeal arbitrators must not receive new evidence. The appe arbitrators must make their decision based only on the evidence that was presented to the arbitrator, except that th appeal arbitrators may visit any site involved in the Post-Closing Dispute.

(f) Federal Arbitration Act. Buyer and Seller acknowledge that because many of the materials an products incorporated into the home are manufactured in other states, this Purchase Agreement evidences a transactio involving interstate commerce and the Federal Arbitration Act (9 U.S.C. §1, et seq.) now in effect and as it may b hereafter amended will govern the interpretation and enforcement of the arbitration provisions of this Purchas Agreement.

(g) Final and Binding Award. The decision of the arbitrator or, if an appeal is heard, the decision o the appeal arbitrators, shall be final and binding. A petition to confirm, vacate, modify or correct an award may be filed i any court of competent jurisdiction in the county in which the Property is located, but the award may be vacated, modifie or corrected only as permitted by the Federal Arbitration Act.

11.3 Agreement to Arbitrate. BY INITIALING IN THE SPACE BELOW, BUYER AND SELLER AGREE TC HAVE ALL POST-CLOSING DISPUTES DECIDED BY NEUTRAL ARBITRATION IN ACCORDANCE WITH THE FEDERAL ARBITRATION ACT AND THE CALIFORNIA ARBITRATION ACT, TO THE EXTENT THE CALIFORNIA ARBITRATION ACT IS CONSISTENT WITH THE FEDERAL ARBITRATION ACT, AND BUYER AND SELLER ARE GIVING UP ANY RIGHTS BUYER AND SELLER MIGHT POSSESS TO HAVE THE DISPUTE LITIGATED IN A COURT OR JURY TRIAL. BY INITIALING IN THE SPACE BELOW BUYER AND SELLER ARE GIVING UP THEIR RESPECTIVE JUDICIAL RIGHTS TO DISCOVERY AND APPEAL, UNLESS THOSE RIGHTS ARE SPECIFICALLY INCLUDED IN THIS PURCHASE AGREEMENT. IF BUYER OR SELLER REFUSES TO SUBMIT TO ARBITRATION AFTER AGREEING TO THIS PROVISION, BUYER OR SELLER MAY BE COMPELLED TO ARBITRATE UNDER THE FEDERAL ARBITRATION ACT AND THE CALIFORNIA ARBITRATION ACT, TO THE EXTENT THE CALIFORNIA ARBITRATION ACT IS CONSISTENT WITH THE FEDERAL ARBITRATION ACT.

**I/we have read and understand the foregoing and agree to submit disputes to binding arbitration.**

WK ZK

Buyer's Initials Buyer's Initials Seller's Initials

**12. ADDITIONAL PROVISIONS.**

12.1 **No Contingency.** The Close of Escrow is not contingent upon the sale of any residences or other property owned by Buyer.

12.2 **Severability.** If any portion of this Purchase Agreement is declared by any court of competent jurisdiction to be invalid, illegal or unenforceable, such portion shall be deemed severed from this Purchase Agreement, and the remaining parts of this Purchase Agreement shall remain in full force and effect.

12.3 **No Waiver.** Seller's waiver of any term or provision of this Purchase Agreement shall not be construed as a waiver of any other term or provision of this Purchase Agreement, or of any subsequent performance required under this Purchase Agreement.

12.4 **Notices.** With the exception of Seller's or Escrow Holder's notice to Buyer of the Closing Date, or as otherwise expressly provided for in this Purchase Agreement or by law, all notices, instructions, demands and other communications given hereunder shall be set forth in writing and shall be personally served or delivered, pre-paid, by a recognized overnight courier, addressed to the party's and/or Escrow Holder's address set forth on the signature page of this Purchase Agreement. All such written notices, instructions, demands and other communications shall be deemed delivered upon personal delivery, or 2 business days after deposit with an overnight courier, except that if Escrow Holder has attempted to deliver a notice and Buyer and/or Seller refuses to accept same, such party shall be deemed to have received such notice. Notices of construction defect claims under the Statute shall be served upon Seller at the address specified in Paragraph 8.8(b) above.

12.5 **Successors and Assigns.** This Purchase Agreement and the rights of Buyer hereunder may not be assigned, sold, transferred or hypothecated by Buyer voluntarily, involuntarily, or by operation of law without Buyer's first having obtained Seller's written consent, which may be withheld in Seller's sole discretion. This Purchase Agreement and the rights, duties and obligations of the parties shall be binding upon and shall inure to the benefit of the successors and assigns of Seller and, subject to the preceding sentence, to the heirs, executors, administrators, successors and permitted assigns of Buyer.

12.6 **Counterparts.** This Purchase Agreement may be signed in one or more counterparts, each of which independently shall have the same effect as if it were the original, and all of which together shall constitute one and the same Purchase Agreement.

12.7 **Survival.** All obligations referred to herein to be performed at a time or times after the Close of Escrow, all provisions hereof relating to a time after the Close of Escrow, and all representations and acknowledgments contained herein, shall survive the Close of Escrow and the delivery of Seller's Grant Deed.

12.8 **Applicable Law.** This Purchase Agreement shall be construed and enforced in accordance with the laws of the State of California, except where federal law is expressly made applicable.

12.9 Broker; Seller's Exclusive Agent. Buyer represents and warrants that, except for any cooperatin broker identified on the "Disclosure Regarding Real Estate Agency Relationships" provided by Seller to Buyer, Buyer ha engaged no broker or finder in connection with this transaction, and agrees to defend and hold Seller harmless fror claims by any broker or finder inconsistent with this representation and warranty. Buyer is aware that Seller's salesperso is an agent of the Seller exclusively and acknowledges receipt of the Disclosure Regarding Real Estate Agenc Relationships.

12.10 Time is of the Essence. Time is of the essence of this Purchase Agreement and failure of Buyer t perform within the time limits described above will allow Seller to terminate this Purchase Agreement.

12.11 Addenda. The Addenda that are checked below are incorporated into this Purchase Agreement and ar part of this Purchase Agreement. Please read these carefully.

- ☒ Escrow Holder's General Escrow Instructions
- ☒ General Disclosure Addendum
- ☒ Project Specific Disclosure Addendum
- ☐ Common Interest Subdivision
- ☐ Additional Terms and Conditions Addendum
- ☒ Options and Occupancy Guidelines Addendum
- ☐ Sale of Buyer's Existing Residence Addendum
- ☐ Conditional Public Report Addendum
- ☒ Notice of Affiliated Business Arrangement Addendum
- ☐ VA/FHA Financing Addendum
- ☒ Occupancy and Principal Residence Addendum
- ☒ Real Estate Agency Disclosure
- ☒ Allowance for Closing Costs Addendum
- ☒ Natural Hazard Disclosure (PDR)
- ☒ Addendum 1
- ☐ ______
- ☐ ______
- ☐ ______

12.12 Entire Agreement. This Purchase Agreement contains the entire agreement between the parties anc the entire escrow instructions between Escrow Holder and the parties. All prior statements and representations, whether oral or written, are hereby superseded by this Purchase Agreement. The terms of this Purchase Agreement may not be contradicted by evidence of any prior agreement or contemporaneous oral agreement. Buyer and Seller further intend that this Purchase Agreement shall constitute the complete and exclusive statement of its terms. No addition or modification of any terms of this Purchase Agreement shall be effective unless set forth in writing and signed by Buyer and Seller. No sales agent or representative of Seller has authority to modify the terms of this Purchase Agreement.

12.13 Buyer Remedy Regarding Disclosures. After acceptance of this Purchase Agreement, Seller may in good faith provide additional disclosures or corrected disclosures regarding the Property. If such disclosure is material, Buyer may, prior to Close of Escrow, terminate this Purchase Agreement and receive a refund of the Deposit, provided Buyer gives Seller written notice of termination within 3 days after delivery in person, by facsimile, or 5 days after mailing, of such additional or corrected disclosure.

12.14 Offer and Acceptance. Buyer acknowledges that Buyer has carefully read and understands each and every provision of this Purchase Agreement. Execution of this Purchase Agreement by Buyer and by Seller's sales agent or representative shall constitute only receipt for the Deposit and Offer, which offer shall not be binding unless accepted by Seller, as evidenced by the execution of this Purchase Agreement by a duly authorized officer of Seller. Seller reserves the right to refuse to accept such Offer for any reason whatsoever, at its sole and absolute discretion. Buyer acknowledges that Seller's sales agents and representatives are not authorized to accept this Offer, and that receipt of the Deposit by Seller's sales agent or representative shall not constitute an Acceptance of this Offer by Seller.

12.15 Right of Buyer to Terminate Offer. Seller is hereby granting Buyer 3 days after the date of Buyer's signature set forth below, or until Acceptance, which ever occurs later, to review this Purchase Agreement and all other documents set forth on the Receipt for Documents signed by Buyer concurrently with this Purchase Agreement. During this time Buyer may terminate its Offer under this Purchase Agreement and cancel any Escrow by delivering a notice of termination to Escrow Holder and Seller by recognized overnight courier addressed to the party's and/or Escrow Holder's address set forth on the signature page of this Purchase Agreement, or by personal service. If Buyer elects to terminate its Offer and this Purchase Agreement, all of Buyer's deposits shall be refunded to Buyer within 15 days of such notice, any Escrow shall be canceled at Seller's expense and the parties shall have no further rights or obligations with respect to the Property under this Purchase Agreement. BUYER'S FAILURE TO DELIVER A NOTICE OF TERMINATION AS SET FORTH ABOVE SHALL CONSTITUTE BUYER'S ELECTION NOT TO TERMINATE THIS PURCHASE AGREEMENT UNDER THE PROVISIONS OF THIS **PARAGRAPH 12.15.**



WK Buyer's Initials    ZK Buyer's Initials

**AGENT'S RECEIPT FOR BUYER'S DEPOSIT**
(AGENT'S SIGNATURE DOES NOT CONSTITUTE SELLER'S SIGNATURE OR ACCEPTANCE OF THIS PURCHASE AGREEMENT)

Date: 12/11/05

John Costret
(Sales Agent's Signature)

**BUYER**

Waheeda Kabura Khan
(Signature)
Zohra Khan
(Signature)

(Signature)

(Signature)

Offer Date: 12/11/05

**BUYER'S PHONE NUMBERS:**
(Home) (209) 477-8391 (Work) (209) 954-58 (Extn.
(Home) (__) 477-8391 (Work) (__) ____ (Extn.
(Home) (__) ____ (Work) (__) ____ (Extn.
(Home) (__) ____ (Work) (__) ____ (Extn.)

(Buyer's Fax No.) (__) ____

**BUYER'S DESIGNATED MAILING ADDRESS:**
2828 Linnie Beck Way
(Street Address, No. / P.O. Boxes)
Stockton, CA 95209
(City, State and Zip)

**BUYER'S E-MAIL ADDRESS:**
WKhan@deltacollege.edu

**ACCEPTANCE BY SELLER**

Western Pacific Housing, Inc.
a Delaware Corporation

By: [signature]
Title:

Acceptance Date: 12-21-05

**SELLER'S DESIGNATED MAILING ADDRESS/PHONE:**
1210 Central Boulevard
(Street Address, No. / P.O. Boxes)
Brentwood, CA 94513
(City, State and Zip)

(Phone No.) (925) 634-6023
(Fax No.) (925) 634-6063



WK
Buyer's Initials

ZK
Buyer's Initials

Date: 12/11/05
Community: Valverde Villages
Lot No.: 6
Tract: 3452

**ADDENDUM NO. 1 TO**
**AGREEMENT OF PURCHASE AND SALE, DEPOSIT RECEIPT**
**AND JOINT ESCROW INSTRUCTIONS**

This Addendum No. 1 ("Addendum") is attached to and forms a part of the Agreement of Purchase and Sale, Deposit Receipt and Joint Escrow Instructions executed between Buyer and Seller ("Agreement") with respect to the property referenced above and described therein (the "Property"). Any capitalized terms not otherwise defined herein shall have the meanings as set forth in the Agreement. Buyer acknowledges the following:

1. Per purchase agreement – pg. 3-item 7.5 –pg. 6-item 10.1 – Buyer cannot change lenders after the 30 day unconditional loan approval time frame. This will result in immediate cancellation.
2. A 25% deposit of all options and upgrades will be required with the use of DHI Mortgage. A 50% deposit of all options and upgrades will be required with the use of an outside lender.
3. If an outside lender is to be used, the outside lender notice shall be signed at time of contract. An unconditional loan approval shall be provided by the outside lender with the exact verbiage used in the outside lender notice. Failure to do this within the 30 day time frame will result in immediate cancellation.

This Addendum may be executed in counterparts, each of which when taken together, will constitute one fully executed original.

This Addendum has been made and executed as of the date set forth above, but will not be valid until executed by Seller's authorized officer of the company.

[signature] 12-11-05
Buyer Date

[signature: Zohra Khan] 12-11-05
Buyer Date

**Western Pacific Housing, Inc.**
a Delaware corporation

By: [signature]
Name:
Title:
Date: 12-21-05

05/02 – (22) Blank Addendum

# D. R. HORTON, AMERICA'S BUILDER
## AFFILIATED BUSINESS ARRANGEMENT DISCLOSURE

TO: Waheeda Khan & Zohra Khan DATE: 11/28/05
[Homebuyer(s)]

COMMUNITY: Valverde Village LOT/UNIT # 6

FROM: Western Pacific Housing, Inc.,
dba D. R. Horton, America's Builder
1210 Central Blvd.
Brentwood. CA 94513
[Seller]

This is to give you notice that Seller has a business relationship with:

DHI MORTGAGE COMPANY, LTD., L.P.
1240 Central Blvd., Suite A
Brentwood, CA 94513

The nature of this business relationship is that these companies are corporate affiliates, each being wholly or partially owned by, or by a subsidiary of, the same parent corporation. Because of this relationship, this referral may provide Seller a financial or other benefit.

Set forth below is the estimated charge or range of charges for settlement services (Lender fees excluding third party fees). You are **NOT** required to use this company as a condition of your purchase of the Property from Seller. There are frequently other settlement service providers available with similar services. You are free to shop around to determine that you are receiving the best services and the best rate for these services.

| DHI MORTGAGE COMPANY, LTD., L.P. | |
|---|---|
| **Service** | **Charge or Range** |
| Loan Origination Fee: | 0 - 1% of Loan Amount |
| Underwriting Fee: | $0.00 - $395.00 |
| Loan Processing Fee: | $0.00 - $295.00 |
| | |

**NOTE: A Good Faith Estimate of all settlement charges will be provided to you at or within three business days after loan application. You may be entitled to additional builder discounts paid by Seller for the purchase of a package of discounted settlement services as set forth in the Allowance for Closing Costs Addendum to your Purchase Agreement.**

**ACKNOWLEDGMENT:**
I/we have read this disclosure form and understand that SELLER is referring me/us to purchase the above-described settlement service(s) from **DHI MORTGAGE COMPANY, LTD., L.P.** and may receive a financial or other benefit as the result of this referral.

Waheeda Kahmun Khan
Homebuyer

Homebuyer

Homebuyer

Homebuyer

10/19/05 – North Bay

Project: Valverde Villages
Lot/Residential Unit: 6

## NOTICE OF AFFILIATED BUSINESS ARRANGEMENT ADDENDUM

This Notice of Affiliated Business Arrangement Addendum (**"Addendum"**) is attached to and forms a part of the Purchase Agreement and Escrow Instructions (**"Purchase Agreement"**), executed between Buyer and Seller for the Property described in the Agreement. Any capitalized terms not otherwise defined herein shall have the meaning as set forth in the Agreement. If there is a conflict between the Purchase Agreement and the terms and provisions of this Addendum, the terms and provisions of this Addendum shall control.

**From:** Western Pacific Housing, Inc.
dba D. R. Horton, America's Builder
1210 Central Blvd.
Brentwood, CA 94513
**[Seller]**

This is to give you notice that **Seller** has a business relationship with:

DHI Mortgage Company, Ltd., L.P.
1240 Central Blvd., Suite A
Brentwood, CA 94513

The nature of this business relationship is that these companies are corporate affiliates, each being wholly or partially owned by, or by a subsidiary of, the same parent corporation. Because of this relationship, this referral may provide **Seller** a financial or other benefit.

Set forth below is the estimated charge or range of charges for settlement services (Lender fees excluding third party fees). You are **NOT** required to use this company as a condition of your purchase of the Property from **Seller**. THERE ARE FREQUENTLY OTHER SETTLEMENT SERVICE PROVIDERS AVAILABLE WITH SIMILAR SERVICES. YOU ARE FREE TO SHOP AROUND TO DETERMINE THAT YOU ARE RECEIVING THE BEST SERVICES AND THE BEST RATE FOR THESE SERVICES.

| DHI Mortgage Company, Ltd., L.P. | |
|---|---|
| **Service** | **Charge or Range** |
| Loan Origination Fee: | 0 - 1% of Loan Amount |
| Underwriting Fee: | $0.00 - $395.00 |
| Loan Processing Fee: | $0.00 - $295.00 |

**Note: A Good Faith Estimate of all settlement charges will be provided to you at or within three business days after loan application. You may be entitled to additional builder discounts paid by Seller for the purchase of a package of discounted settlement services as set forth in the Allowance for Closing Costs Addendum to your Purchase Agreement.**

**ACKNOWLEDGMENT:**

I/we have read this disclosure form and understand that **Seller** is referring me/us to purchase the above-described settlement service(s) from **DHI Mortgage Company, Ltd., L.P.** and may receive a financial or other benefit as the result of this referral.

Waheedan Khan 12-11-05
Buyer Date

Zohra Khan 12-11-05
Buyer Date



WK Buyer's Initials ZK Buyer's Initials

Property: Valverde Villages
Lot/Residential Unit: 6

## ALLOWANCE FOR CLOSING COSTS ADDENDUM

This Allowance for Closing Costs Addendum (**"Addendum"**) is attached to and forms a part of the Purchase Agreement and Escrow Instructions executed between Buyer and Seller (**"Purchase Agreement"**) for the Property described in the Purchase Agreement. Any capitalized terms not otherwise defined herein shall have the meanings as set forth in the Purchase Agreement. If there is a conflict between the Purchase Agreement and the terms and provisions of this Addendum, the terms and provisions of this Addendum shall control.

1. **ALLOWANCE.** If (i) Buyer is ready, willing, and able to close Escrow by the Closing Date and (ii) Buyer is not in default under the Purchase Agreement, and (iii) Buyer has elected to obtain financing for the purchase of Property from DHI Mortgage (**"Lender"**), Seller shall credit to Buyer at Close of Escrow an amount up to but not to exceed Five Thousand Dollars ($5,000) (**"Maximum Credit"**) to be applied towards the "Covered Expenses" (as defined below). If the amount of the Covered Expenses is less than the Maximum Credit, Buyer shall not be entitled to use the difference as credit against any other costs or expenses and such amount shall be retained by Seller.

2. **COVERED EXPENSES.** As used in this Addendum, Covered Expenses shall mean the following closing costs incurred in connection with the closing, to the extent allowed by Buyer's Lender: (i) credit report fees, (ii) owner's and lender's title policy charges, (iii) deed of trust recording fees and recording taxes, (iv) escrow fees, (v) discount points to buy down the interest rate charged by Lender for the Loan on the Property as allowed under **Paragraph 1** above and (v) other permitted Lender's fees.



WK Buyer's Initials    ZK Buyer's Initials

Project: Valverde Villages
Lot/Residential Unit: 6

## Purchase Agreement and Escrow Instructions

**BUYER:**
Walheeda Rahsoon Khan
+
Zohra Khan

**SELLER:**
Western Pacific Housing, Inc.,
a Delaware Corporation

**ESCROW HOLDER:**
First American Title Company
250 Cherry Ln. #103
Manteca, CA 95337
Phone: (209)239-5513 Fax: (209)239-5878

**TITLE COMPANY:**
First American Title Company

1. **AGREEMENT TO BUY AND SELL.** Buyer's signature on this document and delivery of the Deposit to Seller constitutes an "**Offer**" to purchase the Property described below. Seller's signature on this document and unrestricted release of the Deposit to Seller constitutes "**Acceptance**" of the Offer. Upon Acceptance, Seller agrees to sell and Buyer agrees to purchase the Property on the terms and conditions set forth in this Purchase Agreement and Escrow Instructions ("**Purchase Agreement**").

2. **ADDRESS OF PROPERTY.**

10935 Cliffside Drive Stockton, CA 95209
Street City Zip

The residence is Plan Type 2693 /Color Scheme 271 ("**Residence**"). The Property is a (check one only):

☒ **Planned Development or Standard Subdivision:**

Lot No. 6 of Tract No. 3452, as shown on a Map recorded or to be recorded in the Official Records of ____________ County, California.

☐ **Condominium:**

Residential Unit No. ________, an undivided interest in the Common Area and any Exclusive Use Easements shown on the Condominium Plan.

3. **OCCUPANCY.** Buyer does ___ does not ___ intend to occupy the Property as his/her residence. If Buyer does not intend to occupy the Property as his/her residence, Buyer shall pay an Investor Premium in the amount provided in **Paragraph 4** below.

4. **PURCHASE PRICE AND ESTIMATED CASH DUE AT CLOSING.** Buyer shall pay the following:

| | | | |
|---|---|---|---|
| a. | Purchase Price $ 469990 | | |
| | Note: | The Purchase Price does not reflect options, upgrades, etc. which the parties may later agree upon. | |
| b. | Plus | Investor Premium | $ |
| c. | Less: | Estimated New Loan Amount | $ 441200 |
| d. | Less: | Secondary Financing (if any) | $ |
| e. | Equals: | **Down Payment** | $ 23290 |
| f. | Plus: | Estimated Buyer Closing Costs, Prepaid Expenses and Impounds Due at Closing | $ 15478 |
| g. | Less: | **Deposit** received from Buyer ☐ Personal Check ☐ Other Form of Payment | $ 7500 |
| h. | Equals: | **Total Estimated Cash Required from Buyer at Close of Escrow** | $ 31268 |

## The Deposit

5. **DEPOSIT.** "**Deposit**" includes all funds paid by Buyer that are applicable to the Purchase Price. Deposits will be held, and Deposits paid by check will be un-cashed, pending Acceptance. If there is no Acceptance, Buyer's Deposit shall be returned to Buyer. Upon Acceptance, if a Deposit check is returned for non-sufficient funds, Seller may, in its sole discretion, either deem this Purchase Agreement terminated, or seek replacement funds from Buyer. No interest



WK Buyer's Initials ZK Buyer's Initials

shall be payable to Buyer on the Deposit. If Seller has posted a bond, cash deposit or other security instrumer acceptable to the Department of Real Estate ("**Security**"), under the provisions of California Business and Profession Code Section 11013.2 or 11013.4 and Seller has obtained a final subdivision public report covering the Property, th Deposit shall be released by Escrow Holder to Seller at Seller's request, without further instruction from Buyer.

**Escrow Procedures and Requirements**

6. **ESCROW.**

6.1 Opening of Escrow. Within 5 days after Acceptance, Seller shall deliver this Purchase Agreement to the Escrow Holder listed above for the purpose of opening an escrow ("**Escrow**"). Escrow Holder's additional instructions are attached as an Addendum. If any provision in the Escrow Instructions Addendum conflicts with any other provisions o this Purchase Agreement, the provisions in this Purchase Agreement control.

6.2 Buyer's Duty to Cooperate. Upon Acceptance, Seller will incur daily carrying and other costs attributable to holding the Property off the market. Accordingly, Buyer agrees to cooperate with Seller to use his/her bes efforts and to diligently take any action necessary to timely close Escrow, including without limitation, by promptly cooperating in good faith with all time frames for performance under this Purchase Agreement, including all time frames for selecting options and providing all requested documents to lender, Escrow Holder and Title Company. Buyer acknowledges that Buyer's failure to so cooperate shall constitute a default under this Purchase Agreement.

6.3 Title Company and Escrow Holder. By Buyer's execution of this Purchase Agreement, Buyer and Seller have mutually agreed to use the Title Company and Escrow Holder designated on the first page of this Purchase Agreement.

6.4 Close of Escrow; Estimated Closing Date; Closing Date.

(a) Close of Escrow. The close of escrow shall occur upon the recordation of the Grant Deed ("**Close of Escrow**").

(b) Closing Date. Escrow shall close on ("**Closing Date**"):

☐ *[Check if Residence is already constructed]* ____________________; or

☑ *[Check if Residence is not completed]* The date set forth in the Closing Date Notice (as defined in **Paragraph 6.4(c)** below) to Buyer that the Residence is ready for occupancy. It is estimated that the Residence will be completed and that either a notice of completion will be filed or a certificate allowing occupancy of the Residence will be issued on ____5/06____ ("**Estimated Closing Date**").

Due to the variables in the development of the Project, the date on which Escrow actually closes may be before or after the Estimated Closing Date. Seller agrees that it will complete construction in accordance with the standards set forth in **Paragraph 8.1** on or prior to the date which is 12 months after the date of Acceptance of this Purchase Agreement, provided that Seller is in no event responsible for any delays due to events beyond Seller's control, including, without limitation, Acts of God, fire, earthquake, terrorist acts and inclement weather, shortages of labor or supplies, moratoria, inability to obtain permits or approvals, utility stoppage or shortages, financing shortages and delays caused by governmental agencies. Except for amounts that may be claimed for liquidated damages, if Escrow has not closed within 12 months after the date of Acceptance, Buyer's Deposit shall be returned to Buyer within 15 days after expiration of such 12-month period. Upon the return of the Buyer's Deposit, Seller shall not have any further obligations to Buyer under this Purchase Agreement, unless Seller is then in default under its provisions.

(c) Notice of Closing Date and Deliveries. Seller or Escrow Holder will notify Buyer (orally or in writing) of the date for the Close of Escrow at least 5 business days before the pending date for the Close of Escrow ("**Closing Date Notice**"). Buyer shall deliver to Escrow Holder all cash and all documents required to close Escrow no later than the required date for such deliveries set forth in the Closing Date Notice. If Buyer fails to close Escrow by the Closing Date by reason of a default by Buyer, Seller may make a claim for liquidated damages in accordance with the provisions of **Paragraph 10** of this Purchase Agreement. Buyer agrees to execute all other documents and to take all other actions as are necessary to close the Escrow in accordance with this Purchase Agreement.

(d) Delay in Escrow Closing. If this Escrow does not close upon the Closing Date specified in the Closing Date Notice due to Buyer's default, Seller will be harmed due to carrying costs for the Property. If Seller does not terminate this Purchase Agreement, Seller may agree to extend the Closing Date, in its sole and absolute discretion, on the condition that Buyer pay Seller's carrying costs in the amount of $_200_ per day ("**Extension Payment**"). If Seller approves an extension, Buyer shall deposit into Escrow the applicable Extension Payment, or at Seller's option, Buyer shall pay the Extension Payment at the Close of Escrow as extended by the agreement of Buyer and Seller. Acceptance of Extension Payments will not constitute a waiver by Seller of any default by Buyer in failing to close the Escrow, and Seller's rights to liquidated damages. Any Extension Payment made by Buyer shall not be applicable to the Purchase Price but, if paid prior to the Closing Date, shall be handled in the same manner as the Deposit and liquidated damages under **Paragraph 10.**

(e) Third Party Charges. If certain charges are incurred by Seller on Buyer's behalf and paid from the Deposit or other funds of Buyer held under this Purchase Agreement ("**Third Party Charges**"), such charges shall be handled in the same manner as the Deposit. Seller's estimate of the amounts of the Third Party Charges is set forth below. Because these amounts are estimates of what would be due upon termination of this Purchase Agreement prior to the Close of Escrow, these amounts may not be the actual amounts due at Close of Escrow.

| | |
|---|---|
| • Credit Report | $ 75.00 |
| • Appraisal Fees: (per appraisal) | $ 350.00 |
| • Escrow Services: | $ 0 |
| • Preliminary Title Report: | $ 0 |
| • Loan Processing Services: | $ 400.00 |
| • Homebuyer's Manual, if not returned | $ 50.00 |
| • Other: | $ 0 |
| ESTIMATED TOTAL: | $ 875.00 |

(f) Completion of Residence. Seller shall complete the Residence such that the Residence is ready for occupancy by Buyer within 2 years after the date of Buyer's Offer, subject to extensions for circumstances reasonably beyond Seller's control as determined by California law. Notwithstanding any provision in this Purchase Agreement to the contrary, including but not limited to **Paragraph 10.3**, nothing herein shall limit Buyer's remedies if Seller defaults under this **Paragraph 6.4(f).**

Financing and Loan Approval

**7. FINANCING PROVISIONS. [Check either Paragraph 7.1 or 7.2].**

7.1 ☐ **Financing Not Required:** Buyer will provide all cash to close Escrow without obtaining a loan. Within 5 days after Buyer signs this Purchase Agreement, Buyer shall submit to Seller proof satisfactory to Seller that Buyer now has, or will have prior to Close of Escrow, cash sufficient to close Escrow. Within 3 days after any request by Seller, Buyer shall also provide evidence that sufficient funds are available for Buyer to close Escrow.

7.2 ☒ **Financing Required:** Buyer will apply and qualify for and obtain financing sufficient to close Escrow in the approximate **"Estimated New Loan Amount"** set forth in **Paragraph 4(c)**, above (**"New Loan"**). Buyer shall use his or her best efforts to qualify for and obtain institutional financing at the rates and terms available to Buyer.

(a) Loan Application. Within 5 days after Buyer's Offer, Buyer shall submit a completed loan application for the New Loan to DHI Mortgage (**"Seller's Approved Lender"**) and a lender selected by Buyer (**"Buyer's Lender"**), if any. Buyer shall advise Seller of the lender it has elected to use to close the Escrow prior to the applicable date set forth in **Paragraph 7.2(b)** below. Buyer shall take all required steps to allow prompt processing of the application for the New Loan, including fully responding to any requests from the lender(s) for documents or information within 3 days. Nothing set forth herein shall compel Buyer to accept any financing approved by Seller's Approved Lender that is not acceptable to Buyer.

(b) Buyer To Obtain Loan Approval. ***[Check appropriate box]*** **("Loan Contingency Date"):**

☐ ***Estimated Closing Date is less than 60 days:*** Within 30 days after the Offer, but not less than 15 days prior to the Estimated Closing Date, Buyer shall deliver to Seller written evidence satisfactory to Seller that Buyer has obtained final unconditional loan approval for the Estimated New Loan Amount.

☒ ***Estimated Closing Date is more than 60 days:*** Within 15 days after the Offer, Buyer shall deliver to Seller written evidence satisfactory to Seller that Buyer has obtained conditional credit approval. Within _30_days after the Offer, Buyer shall deliver to Seller final unconditional loan approval for the Estimated New Loan Amount, subject only to the lender's approval of the value of the Property through an appraisal.

7.3 **Failure to Obtain Loan Approval.** If Buyer fails to obtain loan approval as provided in **Paragraph 7.2(b)** by the Loan Contingency Date, and Buyer is not otherwise in default under this Purchase Agreement, either Buyer or Seller may terminate this Purchase Agreement and cancel Escrow, and Buyer shall receive a refund of the Deposit. Buyer's failure to terminate this Purchase Agreement within the time periods set forth above shall be deemed to be a waiver of Buyer's right to terminate this Purchase Agreement as a result of Buyer's failure to obtain financing. Buyer covenants and agrees to use his or her best efforts to qualify for and obtain financing and will comply with the time limits imposed by Seller or the lender for obtaining financing and will not take any action which will prevent or delay obtaining loan approval.

7.4 **Authorizations Given By Buyer; Re-verification.** Buyer, by execution of this Purchase Agreement, authorizes Seller to investigate Buyer's credit, including obtaining a credit report, authorizes Seller to disclose to the lender(s) information about Buyer, authorizes Seller to obtain information from the lender(s), including copies of all applications and other documents, and agrees to cooperate with Seller in obtaining information about the New Loan from the lender. Upon the request of Seller, Buyer shall provide to Seller written re-verification of its financing approvals or sufficiency of cash.

7.5 **Loan Modification.** Buyer shall not change the lender, the loan amount or the loan program after receiving the original final unconditional loan approval referenced in **Paragraph 7.2** and any failure of Buyer or its lender to close the loan on the Closing Date after obtaining the final unconditional loan approval from the lender shall constitute a default hereunder, for which Seller shall have the right to terminate this Purchase Agreement and retain Buyer's Deposit as provided in Paragraph 10 hereof.

Construction of the Residence

## 8. CONSTRUCTION.

8.1 Standard Residence. The Residence under construction shall be constructed in substanti conformance with the standard plan on file with and approved by the appropriate governmental authority. Seller is nc building the Residence specifically for Buyer, nor to the precise specifications or design of any model home. The fixture furnishings, landscaping and other features shown in any model home are not included under this Purchase Agreemer unless specifically set forth herein. Seller reserves the right to make any changes or substitutions to the standard pla specifications, construction, materials and fixtures which are substantially equal in utility and quality to the original plan and specifications, and which meet with the approval of the appropriate governmental authorities having jurisdiction, a Seller deems necessary or desirable, without Buyer's consent.

8.2 Occupancy. Buyer shall not be entitled to possession of the Property or receive keys to the residenc until after the Close of Escrow.

8.3 Entry Upon Property. Prior to the Close of Escrow, Buyer shall not alter the Property or the Residence install any improvements on the Property, show or advertise the Property to prospective purchasers or tenants or plac any signs at or near the Property, without the prior written consent of Seller and compliance with all requirements of Selle with respect to such entry, including signing an entry permit. All upgrades to the Property prior to the Close of Escrov must be approved in writing by Seller and installed or constructed by Seller or its authorized agents, representatives o independent contractors. If Buyer alters the Property or the Residence prior to the Close of Escrow without writte consent of Seller, Seller may immediately remove same and Buyer shall be liable for all damages caused by suc unauthorized work and changes to the Property.

8.4 Limited Warranty; Disclaimer of Implied Warranties. Buyer has received samples of the followin prior to signing this Purchase Agreement: (a) a homeowner's manual entitled "__Dr. Horton_ Homeowner's Manual an Customer Care Guide" (**"Homeowner's Manual"**) which contains Seller's 10-4-1 Limited Warranty (**"Limited Warranty"**) (b) manufacturer's warranties (some or all of which may be provided at the Walk-Through). **[FHA/UA Projects: If you purchase is FHA or VA financed, Seller will also provide its Residential Warranty.]** [The Limited Warranty manufacturer's warranties, and any other express written warranty provided to you by the Seller are referred to collectivel as **"the Warranties."** The Warranties become effective upon Close of Escrow. Except for these Warranties, Seller doe not make any other representations, promises or warranties concerning the Property, including, without limitation. warranties of merchantability, fitness for a particular purpose, quality of construction or otherwise, and to the fullest exten permitted by law Buyer waives all implied warranties relating to the Property.

**I/WE HAVE READ AND UNDERSTAND THE FOREGOING PROVISIONS PERTAINING TO THE WARRANTIES AND ACKNOWLEDGE AND AGREE THAT EXCEPT AS PROVIDED IN THE WARRANTIES, SELLER DISCLAIMS ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO, THAT THE PROPERTY WAS DESIGNED AND CONSTRUCTED IN A REASONABLY WORKMANLIKE MANNER, FITNESS FOR A PARTICULAR PURPOSE, AND MERCHANTABILITY.**

WK ZK

Buyer's Initials Buyer's Initials Seller's Initials

8.5 Buyer Walk-Through. Prior to Close of Escrow, Seller will provide Buyer with at least 72 hours notice of the date the Property is available for orientation and inspection (**"Walk-Through"**). If Buyer fails to attend the Walk-Through, Seller may complete its own inspection of the Property and close escrow. If Buyer fails to attend the Walk-Through, Buyer's later claims of reasonably observable deficiencies may be rejected by Seller as having occurred after Close of Escrow and therefore not Seller's responsibility. Seller reserves the right to perform such work after the Close of Escrow.

8.6 Optional Items and Upgrades. The selection and cost of all options and upgrades shall be set forth in an Addendum to this Purchase Agreement and/or in a separate agreement(s) between Buyer and Seller or an authorized third party provider. The availability and prices of options and upgrades are subject to change without prior notice. Seller reserves the right to add or delete any optional items from the Seller's list of optional items at any time without prior notice to Buyer. In addition, once certain stages of the construction process are complete (**"Cut-Off Dates"**), some options and upgrades increase in price or are no longer available. Information concerning these Cut-Off Dates and additional costs will be provided to Buyer upon request. Accordingly, Buyer shall select and pay for all options and upgrades when requested to do so by Seller. If Buyer selects options and upgrades but fails to make color, style or material selections prior to Seller's construction cut-off dates, Seller may either not install them, or install colors, styles and materials of Seller's choice. Seller will only supply options on Seller's approved list. If Buyer fails to make any options selections, Seller shall install standard items.

8.7 Destruction of the Property Prior to Close of Escrow. If the Property is destroyed or materially damaged, other than by Buyer's act or omission, prior to the Close of Escrow, then either Buyer or Seller may terminate this Purchase Agreement and the Deposit, less any applicable Third Party Charges, shall be returned to Buyer within 15 days thereafter.

8.8 Claims Under California Civil Code Section 895 et seq. California Civil Code Section 895 et seq. (the **"Statute"**) establishes residential construction standards and provides mechanisms for resolution of claims of violations of these standards.

(a) SB 800 Booklet. A booklet containing Sections 895 through 945.5 of the Civil Code (**"SB 800 Booklet"**), which includes the Statute has been provided to Buyer by Seller. You should read the Statute carefully and

seek legal advice if you have any questions. By initialing below Buyer acknowledges that s/he has received and Initial a copy of the SB 800 Booklet.

WK ZK
Buyer's Initials Buyer's Initials Seller's Initials

(b) Notice of Claims. If Buyer or Buyer's successors (the "**Claimant**") claim that the Property or th Residence violates any of the Standards, Claimant must provide notice to Seller's agent under Civil Code Section 912(e The name and address of Seller's agent are available upon request from the California Secretary of State:

California Secretary of State
Special Filings
P.O. Box 942877
Sacramento, California 94277
or by telephone at (916) 653-3984

By initialing below, Buyer acknowledges and agrees that Seller has provided Buyer with access to the name and addres of the contact person for notice of any claimed violations of the Standards.

WK ZK
Buyer's Initials Buyer's Initials Seller's Initials

(c) Statutory Non-Adversarial Procedures. Seller has elected to use the "**non-adversaria procedures**" which are set forth in the Statute at Sections 910 through 938. Seller has recorded or will record a notice o these procedures on the Property at or prior to the Close of Escrow. According to the terms of the Statute, the non-adversarial procedures will not apply if the Seller does not, or cannot comply with the requirements in the Statute. In such case, disputes will be resolved through mediation and, if that is not successful, then arbitration as provided in this Purchase Agreement.

WK ZK
Buyer's Initials Buyer's Initials Seller's Initials

(d) Receipt of Purchase Documents. Buyer acknowledges that he or she has received or may in the future receive certain documents in conjunction with Buyer's purchase of the Property, including, but not limited to, those referenced in the Receipt of Documents. Buyer agrees to keep and maintain all such documents, to provide any subsequent buyer with all such documents, as required by the Statute, and to instruct any subsequent buyer to provide to their subsequent buyers a complete copy of all documents.

(e) Affiliated General Contractor. Seller is using an affiliated general contractor, as described in Section 911 of the Statute ("**General Contractor**"), to construct the Project. All deliveries, notices and elections set forth in this **Paragraph 8.8** are hereby deemed to apply to, and be made by General Contractor as well as Seller. All notices provided to the General Contractor shall be delivered to the address set forth in **Paragraph 8.8(b)** above.

Closing

**9. CLOSING.**

9.1 Title. At the Close of Escrow, title to the Property shall be conveyed to Buyer subject to: (a) standard exceptions and exclusions of the Title Policy, (b) current real property taxes, special taxes and any assessments; (c) any declarations of covenants, conditions and restrictions; (d) all other reservations, covenants, conditions, restrictions, easements, rights and rights of way of record or placed of record prior to the Close of Escrow; (e) the New Loan in favor of Buyer's lender, if any; and (f) a Notice of Non-Adversarial Procedure under California Civil Code Section 912(f). Upon the Close of Escrow, Seller shall cause to be issued a standard coverage owner's policy of title insurance ("**Title Policy**") issued by the Title Company in Buyer's favor describing the Property and with coverage in the amount of the Purchase Price and containing the exceptions described above.

9.2 Prorations. Real property taxes, special taxes and assessments, including assessments for any homeowners association(s), shall be prorated between Buyer and Seller as of the Close of Escrow.

9.3 Buyer and Seller Closing Costs. Buyer and Seller shall pay the closing costs allocated below: ***[Check appropriate boxes]***

| Buyer | Seller | Closing Costs |
|---|---|---|
| ☑ | ☐ | Escrow Fees |
| ☑ | ☐ | Title Policy |
| ☑ | ☐ | City Transfer Taxes |
| ☑ | ☐ | County Transfer Taxes |
| ☑ | ☐ | Lender's Closing Costs and Charges |

Pre-Closing Disputes

**10. LIQUIDATED DAMAGES; ARBITRATION.**

10.1 Default by Buyer. If Buyer breaches or fails to perform any of its obligations under this Purchase Agreement, Seller may provide written notice of such breach or failure to Buyer and Buyer shall have 5 days from the date of such written notice to cure such breach, except that this provision shall not apply to extend the Closing Date. If Buyer fails to cure the breach within the 5 day period after Seller gives Buyer such notice, Seller may pursue its remedies for Buyer's default.

10.2 BUYER'S BREACH; LIQUIDATED DAMAGES. IF BUYER DEFAULTS UNDER ANY TERMS OR PROVISIONS UNDER THIS PURCHASE AGREEMENT AND SUCH DEFAULT RESULTS IN THE FAILURE TO CLOSE ESCROW OR IF BUYER IS IN DEFAULT AND SUCH DEFAULT IS A MATERIAL BREACH OF THIS PURCHASE AGREEMENT, SELLER, IN ITS SOLE AND ABSOLUTE DISCRETION, SHALL BE RELEASED FROM ITS OBLIGATION TO SELL THE PROPERTY TO BUYER AND SHALL HAVE THE RIGHT TO UNILATERALLY TERMINATE THIS PURCHASE AGREEMENT. IN ADDITION, SELLER MAY PURSUE ANY REMEDY AT LAW OR IN EQUITY THAT IT MAY HAVE AGAINST BUYER ON ACCOUNT OF SUCH DEFAULT; PROVIDED, HOWEVER, THAT BY PLACING THEIR INITIALS HERE, BUYER WK, ZK AND SELLER __________ AGREE THAT:

(a) SELLER WILL BE DAMAGED AND WILL BE ENTITLED TO COMPENSATION FOR THESE DAMAGES, BUT SUCH DAMAGES WILL BE DIFFICULT TO DETERMINE AND BUYER DESIRES TO LIMIT THE AMOUNT OF DAMAGES FOR WHICH BUYER MIGHT BE LIABLE. IN ADDITION, BOTH BUYER AND SELLER WISH TO SAVE THE TIME AND MONEY INVOLVED IN A LAWSUIT OR ARBITRATION TO DETERMINE DAMAGES;

(b) AN AMOUNT NOT TO EXCEED THE DEPOSIT, SHALL CONSTITUTE LIQUIDATED DAMAGES PAYABLE TO SELLER IF BUYER DEFAULTS UNDER ANY TERMS OR PROVISIONS UNDER THIS PURCHASE AGREEMENT AND SUCH DEFAULT RESULTS IN THE FAILURE TO CLOSE ESCROW OR IF BUYER IS IN DEFAULT AND SUCH DEFAULT IS A MATERIAL BREACH OF THIS PURCHASE AGREEMENT;

(c) THE PAYMENT OF SUCH LIQUIDATED DAMAGES TO SELLER SHALL CONSTITUTE THE EXCLUSIVE REMEDY OF SELLER ON ACCOUNT OF ANY DEFAULT BY BUYER, EXCEPT FOR ANY RIGHTS WHICH SELLER MAY HAVE UNDER PARAGRAPH 6.4(D) OF THIS PURCHASE AGREEMENT; AND

(d) SELLER WAIVES ITS RIGHTS TO SPECIFIC PERFORMANCE OR OTHER DAMAGES.

(e) LIQUIDATED DAMAGES SHALL BE PAYABLE TO SELLER OUT OF BUYER'S DEPOSIT ACCORDING TO THE FOLLOWING PROCEDURES. TO MAKE A CLAIM OF BUYER'S DEFAULT AND DEMAND FOR LIQUIDATED DAMAGES, SELLER SHALL GIVE WRITTEN NOTICE ("SELLER'S NOTICE") BY ANY MEANS AUTHORIZED FOR SERVICE BY CODE OF CIVIL PROCEDURE SECTION 116.340 TO ESCROW HOLDER AND TO BUYER THAT BUYER IS IN DEFAULT UNDER THIS PURCHASE AGREEMENT AND THAT ESCROW HOLDER DISBURSE BUYER'S DEPOSIT(S) TO SELLER UNLESS, WITHIN 20 DAYS OF RECEIPT OF THE SELLER'S NOTICE, BUYER NOTIFIES ESCROW HOLDER AND SELLER IN WRITING THAT BUYER OBJECTS TO THE DISBURSEMENT OF LIQUIDATED DAMAGES TO SELLER (THE "BUYER'S NOTICE"). IF SELLER HAS HAD THE USE OF ANY OF BUYER'S PURCHASE MONEY UNDER AUTHORITY OF A PURCHASE MONEY BOND, SELLER SHALL IMMEDIATELY UPON MAKING SELLER'S NOTICE AND DEMAND, DESCRIBED ABOVE, TRANSMIT TO THE ESCROW HOLDER AN AMOUNT EQUAL TO ALL OF THE DEPOSITS PAID BY BUYER. IF BUYER FAILS TO GIVE BUYER'S NOTICE WITHIN THE TIME REQUIRED: (I) ESCROW HOLDER SHALL PROMPTLY REMIT THE LIQUIDATED DAMAGES AMOUNT TO SELLER, AND (II) SELLER SHALL BE RELIEVED OF ANY OBLIGATION TO SELL THE PROPERTY TO BUYER.

10.3 SELLER'S BREACH; LIQUIDATED DAMAGES. IF SELLER DEFAULTS UNDER THIS PURCHASE AGREEMENT AND FAILS TO CURE SUCH DEFAULT WITHIN 5 DAYS AFTER NOTICE THEREOF FROM BUYER, AND SUCH DEFAULT RESULTS IN THE FAILURE TO CLOSE ESCROW, BUYER, IN ITS SOLE AND ABSOLUTE DISCRETION, SHALL HAVE THE RIGHT TO UNILATERALLY TERMINATE THIS PURCHASE AGREEMENT AND PURSUE ANY REMEDY AT LAW OR IN EQUITY THAT IT MAY HAVE AGAINST SELLER; PROVIDED, HOWEVER, THAT BY PLACING THEIR INITIALS HERE, BUYER WK, ZK AND SELLER __________ AGREE THAT (A) UPON ANY SUCH DEFAULT BY SELLER, BUYER WILL BE DAMAGED AND WILL BE ENTITLED TO COMPENSATION FOR THESE DAMAGES, BUT SUCH DAMAGES WILL BE DIFFICULT TO DETERMINE AND SELLER DESIRES TO LIMIT THE AMOUNT OF DAMAGES FOR WHICH SELLER MIGHT BE LIABLE, (B) BOTH BUYER AND SELLER WISH TO SAVE THE TIME AND MONEY INVOLVED IN A LAWSUIT OR ARBITRATION TO DETERMINE DAMAGES, AND (C) UPON SUCH A DEFAULT BY SELLER, BUYER SHALL BE ENTITLED TO THE RETURN OF THE DEPOSIT PLUS AN ADDITIONAL AMOUNT PAID BY SELLER EQUAL TO THE AMOUNT OF THE DEPOSIT PAID BY BUYER UNDER PARAGRAPH 4(g) OF THIS PURCHASE AGREEMENT (COLLECTIVELY, "BUYER'S LIQUIDATED DAMAGES"). BUYER'S LIQUIDATED DAMAGES AND BUYER'S RIGHT TO TERMINATE THIS PURCHASE AGREEMENT SHALL CONSTITUTE BUYER'S SOLE AND EXCLUSIVE REMEDY FOR DAMAGES IN THE EVENT OF A DEFAULT BY SELLER WHICH RESULTS IN THE FAILURE TO CLOSE ESCROW AND BUYER SPECIFICALLY WAIVES ANY RIGHT TO BRING AN ACTION AGAINST SELLER FOR SPECIFIC PERFORMANCE. IF SELLER FAILS TO DEPOSIT AN AMOUNT EQUAL TO THE DEPOSIT PAID BY BUYER UNDER PARAGRAPH 4(g) WITHIN 20 DAYS AFTER RECEIPT OF BUYER'S NOTICE OF DEFAULT, THIS SECTION SHALL BE VOID AND OF NO EFFECT.

(a) NOTICE OF DEFAULT AND DEMAND FOR LIQUIDATED DAMAGES. BUYER SHALL GIVE WRITTEN NOTICE ("BUYER'S NOTICE") BY ANY MEANS AUTHORIZED FOR SERVICE BY CODE OF CIVIL PROCEDURE SECTION 116.340 TO ESCROW HOLDER AND TO SELLER THAT SELLER IS IN DEFAULT UNDER THE PURCHASE AGREEMENT AND THAT ESCROW HOLDER DISBURSE THE AMOUNTS DESCRIBED ABOVE TO BUYER UNLESS, WITHIN 20 DAYS OF RECEIPT OF THE BUYER'S NOTICE, SELLER NOTIFIES ESCROW HOLDER AND BUYER IN WRITING THAT SELLER OBJECTS TO THE DISBURSEMENT OF LIQUIDATED DAMAGES TO BUYER (THE "SELLER'S NOTICE"). IF SELLER FAILS TO GIVE SELLER'S NOTICE WITHIN THE TIME REQUIRED: (I) ESCROW HOLDER SHALL PROMPTLY REMIT BUYER'S LIQUIDATED DAMAGES AMOUNT

TO BUYER, AND (II) BUYER SHALL BE RELIEVED OF ANY OBLIGATION TO PURCHASE THE PROPERTY FROM SELLER.

(b) NO CONSEQUENTIAL DAMAGES. IN NO EVENT SHALL SELLER BE LIABLE FOR AN CONSEQUENTIAL DAMAGES AS A RESULT OF A DEFAULT BY SELLER UNDER THIS PURCHASE AGREEMENT

10.4 ARBITRATION OF DISPUTES. If there is an objection to a claim under Paragraph 10.2, the Deposi shall only be disbursed to Seller as liquidated damages if there is a determination by a court of law that Buye has defaulted under this Purchase Agreement or, if there is an objection to a claim under Paragraph 10.3, the Buyer's Liquidated Damages shall only be disbursed to Buyer if there is a determination by a court of law tha Seller has defaulted under this Purchase Agreement; provided, however, that by initialing in the space provide below Buyer and Seller agree that the controversy, and the disposition of such funds deposited into the Escrov as provided in Paragraphs 10.2 and 10.3 shall be settled by arbitration in accordance with the Commercia Arbitration Rules of the American Arbitration Association and subject to the following terms: (a) the fee to initiate the arbitration shall be borne by Seller; provided, however, that the costs of the arbitration shall be borne as determined by the arbitrator; (b) the arbitrator shall be neutral and impartial and shall be appointed within 30 days after Buyer or Seller gives written notice to Escrow Holder in compliance with Paragraph 10.2(e) or 10.3(a above; (c) the arbitration shall be conducted in the County where the Property is located, unless the parties agree to another location; and (d) subject to any limitations on specific performance set forth above, the arbitrator shal be authorized to provide all recognized remedies available in law or equity for any cause of action that is the basis of the arbitration. Judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. If the dispute subject to the arbitration is whether a default has occurred under this Purchase Agreement and there is a determination by the arbitrator that a default has occurred, Escrow shall be cancelled and the rights and duties under this Purchase Agreement shall automatically terminate, including any duty by Seller to sell the Property to Buyer or obligation of Buyer to purchase the Property from Seller. Upon a determination of Buyer's default, the amount claimed as liquidated damages shall be disbursed as provided above, and any remaining Deposit shall be disbursed to Buyer; provided, however, that if the arbitrator determines that any dispute raised by Buyer as to the amount of liquidated damages claimed by Seller cannot be determined at the same time as the dispute regarding Buyer's default, the dispute as to the amount of liquidated damages shall be resolved by a subsequent arbitration in the same manner as described herein.

NOTICE: BY INITIALING IN THE SPACE BELOW YOU ARE AGREEING TO HAVE ANY DISPUTE ARISING OUT OF THE MATTERS INCLUDED IN PARAGRAPH 10.4 DECIDED BY NEUTRAL ARBITRATION AS PROVIDED BY CALIFORNIA LAW AND YOU ARE GIVING UP ANY RIGHTS YOU MIGHT POSSESS TO HAVE THE DISPUTE LITIGATED IN A COURT OR JURY TRIAL. BY INITIALING IN THE SPACE BELOW YOU ARE GIVING UP YOUR JUDICIAL RIGHTS TO DISCOVERY AND APPEAL, UNLESS SUCH RIGHTS ARE SPECIFICALLY INCLUDED IN THE "ARBITRATION OF DISPUTES" PROVISION. IF YOU REFUSE TO SUBMIT TO ARBITRATION AFTER AGREEING TO THIS PROVISION, YOU MAY BE COMPELLED TO ARBITRATE UNDER THE AUTHORITY OF THE CALIFORNIA CODE OF CIVIL PROCEDURE. YOUR AGREEMENT TO THIS ARBITRATION PROVISION IS VOLUNTARY.

WE HAVE READ AND UNDERSTAND THE FOREGOING AND AGREE TO SUBMIT DISPUTES ARISING OUT OF THE MATTERS INCLUDED IN THE "ARBITRATION OF DISPUTES" PROVISION TO NEUTRAL ARBITRATION. (CODE OF CIVIL PROCEDURE SECTION 1298).

| WK | ZK | |
|---|---|---|
| Buyer's Initials | Buyer's Initials | Seller's Initials |

**Post-Closing Disputes**

**11. MEDIATION AND ARBITRATION OF POST-CLOSING DISPUTES.** The parties want to promptly and efficiently resolve any controversy, claim or dispute between them asserted after the Close of Escrow. Accordingly, any and all disputes arising between Buyer and Seller (including any affiliated general contractor of Seller as defined in California Civil Code Section 911) after the Close of Escrow concerning this Purchase Agreement or the Property ("**Post-Closing Dispute**"), which are not resolved under the Warranties or under the non-adversarial procedures in the Statute described in **Paragraph 8.8** above, shall be resolved in accordance with the procedures set forth below.

11.1 Mediation. Subject to **Paragraph 11.2** below, and except for actions in small claims court or Post-Closing Disputes that have already been mediated, Buyer and Seller agree to submit all Post-Closing Disputes to mediation with Judicial Arbitration and Mediation Services ("JAMS"), prior to commencing arbitration. The cost of mediation shall be paid by Seller, but each party shall bear its own attorneys' fees and costs.

11.2 Arbitration.

(a) Agreement to Arbitrate. Subject to **Paragraph 11.1** above, Buyer and Seller agree to resolve all Post-Closing Disputes exclusively through binding arbitration in the county in which the Property is located. This arbitration provision shall apply to Post-Closing Disputes of any kind or nature regardless of when, after the Close of Escrow, the Post-Closing Dispute first arose, or the nature of the relief sought.

(b) Waiver of Trial by Judge or Jury. By agreeing to resolve all Post Closing Disputes through binding arbitration, Buyer and Seller each give up the right to have their respective claims and defenses decided by a judge or a jury. Instead all claims and defenses will be decided by the arbitrator, or by the appeal arbitrator(s), if applicable.

(c) Rules Applicable to All Cases. The arbitration will be conducted by JAMS in accordance with the JAMS rules ("**JAMS Rules**") then applicable to the claims presented, as supplemented by this paragraph. The following

supplemental rules shall apply to all arbitration proceedings and shall govern in the event of a conflict between the rule set forth below and the rules of JAMS Rules.

(i) *Qualifications and Appointment of Arbitrators.* The arbitrator shall be neutral, impartia and either a retired judge or a member or former member of the California State Bar with at least 15 years experience a: a practicing lawyer. The arbitrator shall be selected in accordance with the JAMS Rules, but no later than 60 days after a notice of claim is filed.

(ii) *JAMS Fees; Attorney Fees and Costs.* All fees charged by JAMS and the arbitrator shal be advanced by the Seller. If the Seller is the prevailing party in the arbitration, the arbitrator may, in his or her discretior and only to the extent permitted by law and the JAMS Minimum Standards of Procedural Fairness, direct the Buyer tc reimburse the Seller all or part of the JAMS fee and arbitrator's fee advanced by the Seller. Each party shall bear its owr attorneys fees and costs.

(iii) *Preliminary Procedures.* If state or federal law requires the Buyer or Seller to take steps or procedures before commencing an action in court, then the Buyer or Seller must take such steps or follow such procedures, as the case may be, before commencing the arbitration. For example, Post-Closing Disputes pursuant tc California Civil Code Section 895 et. seq. as hereafter amended may be subject to the non-adversarial procedures set forth in California Civil Code Section 910 through 938, prior to the initiation of any arbitration or small claims court proceeding against Seller. In addition, nothing contained herein shall be deemed a waiver or limitation of the provisions of California Civil Code Sections 1368.4, 1375, 1375.05 or 1375.1.

(iv) *Participation by Other Parties.* Buyer and Seller, to the extent either such party is defending a claim in the arbitration, may, if it chooses, have all necessary and appropriate parties included as parties to the arbitration.

(v) *Rules of Law.* The arbitrator must follow California substantive law, including statutes of limitations, but strict conformity with the rules of evidence is not required except that the arbitrator shall strictly conform to all laws relating to privilege and work product. The arbitrator shall be authorized to provide all recognized remedies available at law or equity for any cause of action.

**(d)** Additional Rules Applicable To Certain Cases. In any arbitration in which a claim of Buyer or Seller exceeds two hundred fifty thousand dollars ($250,000) in value, the following additional rules will supplement the JAMS Rules, and govern in the event of a conflict between the following rules and the rules set forth above, the JAMS Rules, or both.

(i) *Qualifications of Arbitrator.* In addition to the requirements of **Paragraph 11.2(c)** above, the arbitrator shall be a retired judge of the California Superior Court, a California Court of Appeal, or the California Supreme Court.

(ii) *Rules of Law.* The California Evidence Code shall apply.

(iii) *Written Decision.* Within 30 days after the hearing is closed, the arbitrator must issue a written decision. If either Buyer or Seller requests it, the arbitrator must issue a reasoned award.

**(e)** Procedure for Appeal of Certain Cases. In any arbitration in which a claim or arbitration award of Buyer or Seller exceeds five hundred thousand ($500,000) in value, Buyer and Seller hereby adopt and agree to the JAMS Optional Appeal Procedure. The following additional rules will supplement the JAMS Optional Appeal Procedure and govern in the event of a conflict between the following rules and the JAMS Optional Appeal Procedure.

(i) *Right of Appeal.* There shall be no right to appeal unless the oral evidence received by the arbitrator was preserved in a manner such that it can be converted to an accurate and reliable written transcript.

(ii) *Appellate Panel.* An appeal shall be decided by one neutral appeal arbitrator unless either party, within the time permitted for the appointment of the appeal arbitrator, elects to have the appeal decided by a panel of 3 appeal arbitrators. Any party who elects to have an appeal decided by a panel of 3 appeal arbitrators agrees to be solely responsible for the cost of having 2 additional appeal arbitrators. The sole appeal arbitrator, or at least one member of any panel of 3 arbitrators, shall have prior experience as a member of an appellate panel of the California Court of Appeal.

(iii) *Issues on Appeal.* The only issues that may be considered on appeal are: (1) the award of money was excessive; (2) the award of money was insufficient; (3) the arbitrator awarded non-monetary relief that was inappropriate; (4) a party who received non-monetary relief should have received other or additional relief. A majority of the appeal arbitrators may affirm the arbitration award or make any alternative award they find to be just, but they must not reject the arbitrator's decisions (a) that a particular party is entitled to relief of some nature or amount or (b) that a particular party is responsible to provide relief of some nature or amount.

(iv) *Expenses and Costs on Appeal.* The fees charged by JAMS and the appeal arbitrator(s) shall be advanced by the Seller, except as provided in **Paragraph 11.2(c)(ii)** above. The party who files the appeal must, at its sole expense, provide JAMS and all non-appealing parties with a certified copy of the hearing transcript, and must provide JAMS with copies of all documentary evidence and all other tangible evidence received by the arbitrator. If more than one party appeals, the appealing parties must share equally the cost of the transcript and copies of all other documentary and tangible evidence received by the arbitrator. The appeal arbitrators may, within 30 days of their determination award costs of the nature provided in the Federal Rules of Appellate Procedure. If the Seller is the prevailing party on appeal, the appeal arbitrator(s) may, in his, her or their discretion and only to the extent permitted

by law and JAMS Minimum Standards Of Procedural Fairness, include all or part of the JAMS fee and arbitrator's fe advanced by the Seller in the award of costs on appeal.

(v) *New Evidence.* The appeal arbitrators must not receive new evidence. The appea arbitrators must make their decision based only on the evidence that was presented to the arbitrator, except that th appeal arbitrators may visit any site involved in the Post-Closing Dispute.

(f) Federal Arbitration Act. Buyer and Seller acknowledge that because many of the materials an products incorporated into the home are manufactured in other states, this Purchase Agreement evidences a transactio involving interstate commerce and the Federal Arbitration Act (9 U.S.C. §1, et seq.) now in effect and as it may b hereafter amended will govern the interpretation and enforcement of the arbitration provisions of this Purchas Agreement.

(g) Final and Binding Award. The decision of the arbitrator or, if an appeal is heard, the decision o the appeal arbitrators, shall be final and binding. A petition to confirm, vacate, modify or correct an award may be filed i any court of competent jurisdiction in the county in which the Property is located, but the award may be vacated, modifie or corrected only as permitted by the Federal Arbitration Act.

11.3 **Agreement to Arbitrate. BY INITIALING IN THE SPACE BELOW, BUYER AND SELLER AGREE TO HAVE ALL POST-CLOSING DISPUTES DECIDED BY NEUTRAL ARBITRATION IN ACCORDANCE WITH THE FEDERAL ARBITRATION ACT AND THE CALIFORNIA ARBITRATION ACT, TO THE EXTENT THE CALIFORNIA ARBITRATION ACT IS CONSISTENT WITH THE FEDERAL ARBITRATION ACT, AND BUYER AND SELLER ARE GIVING UP ANY RIGHTS BUYER AND SELLER MIGHT POSSESS TO HAVE THE DISPUTE LITIGATED IN A COURT OR JURY TRIAL. BY INITIALING IN THE SPACE BELOW BUYER AND SELLER ARE GIVING UP THEIR RESPECTIVE JUDICIAL RIGHTS TO DISCOVERY AND APPEAL, UNLESS THOSE RIGHTS ARE SPECIFICALLY INCLUDED IN THIS PURCHASE AGREEMENT. IF BUYER OR SELLER REFUSES TO SUBMIT TO ARBITRATION AFTER AGREEING TO THIS PROVISION, BUYER OR SELLER MAY BE COMPELLED TO ARBITRATE UNDER THE FEDERAL ARBITRATION ACT AND THE CALIFORNIA ARBITRATION ACT, TO THE EXTENT THE CALIFORNIA ARBITRATION ACT IS CONSISTENT WITH THE FEDERAL ARBITRATION ACT.**

**I/we have read and understand the foregoing and agree to submit disputes to binding arbitration.**

WK ZK

Buyer's Initials Buyer's Initials Seller's Initials

**12. ADDITIONAL PROVISIONS.**

12.1 **No Contingency.** The Close of Escrow is not contingent upon the sale of any residences or other property owned by Buyer.

12.2 **Severability.** If any portion of this Purchase Agreement is declared by any court of competent jurisdiction to be invalid, illegal or unenforceable, such portion shall be deemed severed from this Purchase Agreement, and the remaining parts of this Purchase Agreement shall remain in full force and effect.

12.3 **No Waiver.** Seller's waiver of any term or provision of this Purchase Agreement shall not be construed as a waiver of any other term or provision of this Purchase Agreement, or of any subsequent performance required under this Purchase Agreement.

12.4 **Notices.** With the exception of Seller's or Escrow Holder's notice to Buyer of the Closing Date, or as otherwise expressly provided for in this Purchase Agreement or by law, all notices, instructions, demands and other communications given hereunder shall be set forth in writing and shall be personally served or delivered, pre-paid, by a recognized overnight courier, addressed to the party's and/or Escrow Holder's address set forth on the signature page of this Purchase Agreement. All such written notices, instructions, demands and other communications shall be deemed delivered upon personal delivery, or 2 business days after deposit with an overnight courier, except that if Escrow Holder has attempted to deliver a notice and Buyer and/or Seller refuses to accept same, such party shall be deemed to have received such notice. Notices of construction defect claims under the Statute shall be served upon Seller at the address specified in Paragraph 8.8(b) above.

12.5 **Successors and Assigns.** This Purchase Agreement and the rights of Buyer hereunder may not be assigned, sold, transferred or hypothecated by Buyer voluntarily, involuntarily, or by operation of law without Buyer's first having obtained Seller's written consent, which may be withheld in Seller's sole discretion. This Purchase Agreement and the rights, duties and obligations of the parties shall be binding upon and shall inure to the benefit of the successors and assigns of Seller and, subject to the preceding sentence, to the heirs, executors, administrators, successors and permitted assigns of Buyer.

12.6 **Counterparts.** This Purchase Agreement may be signed in one or more counterparts, each of which independently shall have the same effect as if it were the original, and all of which together shall constitute one and the same Purchase Agreement.

12.7 **Survival.** All obligations referred to herein to be performed at a time or times after the Close of Escrow, all provisions hereof relating to a time after the Close of Escrow, and all representations and acknowledgments contained herein, shall survive the Close of Escrow and the delivery of Seller's Grant Deed.

12.8 **Applicable Law.** This Purchase Agreement shall be construed and enforced in accordance with the laws of the State of California, except where federal law is expressly made applicable.

12.9 Broker; Seller's Exclusive Agent. Buyer represents and warrants that, except for any cooperatin broker identified on the "Disclosure Regarding Real Estate Agency Relationships" provided by Seller to Buyer, Buyer ha engaged no broker or finder in connection with this transaction, and agrees to defend and hold Seller harmless fror claims by any broker or finder inconsistent with this representation and warranty. Buyer is aware that Seller's salesperso is an agent of the Seller exclusively and acknowledges receipt of the Disclosure Regarding Real Estate Agenc Relationships.

12.10 Time is of the Essence. Time is of the essence of this Purchase Agreement and failure of Buyer t perform within the time limits described above will allow Seller to terminate this Purchase Agreement.

12.11 Addenda. The Addenda that are checked below are incorporated into this Purchase Agreement and are part of this Purchase Agreement. Please read these carefully.

- ☒ Escrow Holder's General Escrow Instructions
- ☒ General Disclosure Addendum
- ☒ Project Specific Disclosure Addendum
- ☐ Common Interest Subdivision
- ☐ Additional Terms and Conditions Addendum
- ☒ Options and Occupancy Guidelines Addendum
- ☐ Sale of Buyer's Existing Residence Addendum
- ☐ Conditional Public Report Addendum
- ☒ Notice of Affiliated Business Arrangement Addendum
- ☐ VA/FHA Financing Addendum
- ☒ Occupancy and Principal Residence Addendum
- ☒ Real Estate Agency Disclosure
- ☒ Allowance for Closing Costs Addendum
- ☒ Natural Hazard Disclosure (PDR)
- ☒ Addendum 1
- ☐ ____________________
- ☐ ____________________
- ☐ ____________________

12.12 Entire Agreement. This Purchase Agreement contains the entire agreement between the parties and the entire escrow instructions between Escrow Holder and the parties. All prior statements and representations, whether oral or written, are hereby superseded by this Purchase Agreement. The terms of this Purchase Agreement may not be contradicted by evidence of any prior agreement or contemporaneous oral agreement. Buyer and Seller further intend that this Purchase Agreement shall constitute the complete and exclusive statement of its terms. No addition or modification of any terms of this Purchase Agreement shall be effective unless set forth in writing and signed by Buyer and Seller. No sales agent or representative of Seller has authority to modify the terms of this Purchase Agreement.

12.13 Buyer Remedy Regarding Disclosures. After acceptance of this Purchase Agreement, Seller may in good faith provide additional disclosures or corrected disclosures regarding the Property. If such disclosure is material, Buyer may, prior to Close of Escrow, terminate this Purchase Agreement and receive a refund of the Deposit, provided Buyer gives Seller written notice of termination within 3 days after delivery in person, by facsimile, or 5 days after mailing, of such additional or corrected disclosure.

12.14 Offer and Acceptance. Buyer acknowledges that Buyer has carefully read and understands each and every provision of this Purchase Agreement. Execution of this Purchase Agreement by Buyer and by Seller's sales agent or representative shall constitute only receipt for the Deposit and Offer, which offer shall not be binding unless accepted by Seller, as evidenced by the execution of this Purchase Agreement by a duly authorized officer of Seller. Seller reserves the right to refuse to accept such Offer for any reason whatsoever, at its sole and absolute discretion. Buyer acknowledges that Seller's sales agents and representatives are not authorized to accept this Offer, and that receipt of the Deposit by Seller's sales agent or representative shall not constitute an Acceptance of this Offer by Seller.

12.15 Right of Buyer to Terminate Offer. Seller is hereby granting Buyer 3 days after the date of Buyer's signature set forth below, or until Acceptance, which ever occurs later, to review this Purchase Agreement and all other documents set forth on the Receipt for Documents signed by Buyer concurrently with this Purchase Agreement. During this time Buyer may terminate its Offer under this Purchase Agreement and cancel any Escrow by delivering a notice of termination to Escrow Holder and Seller by recognized overnight courier addressed to the party's and/or Escrow Holder's address set forth on the signature page of this Purchase Agreement, or by personal service. If Buyer elects to terminate its Offer and this Purchase Agreement, all of Buyer's deposits shall be refunded to Buyer within 15 days of such notice, any Escrow shall be canceled at Seller's expense and the parties shall have no further rights or obligations with respect to the Property under this Purchase Agreement. BUYER'S FAILURE TO DELIVER A NOTICE OF TERMINATION AS SET FORTH ABOVE SHALL CONSTITUTE BUYER'S ELECTION NOT TO TERMINATE THIS PURCHASE AGREEMENT UNDER THE PROVISIONS OF THIS **PARAGRAPH 12.15.**



WK
Buyer's Initials

ZK
Buyer's Initials

**AGENT'S RECEIPT FOR BUYER'S DEPOSIT**
(AGENT'S SIGNATURE DOES NOT CONSTITUTE SELLER'S SIGNATURE OR ACCEPTANCE OF THIS PURCHASE AGREEMENT)

Date: 12/11/05

John Costiet
(Sales Agent's Signature)

**BUYER**

Waheedin Kaleem Khan
(Signature)
Zohra Khan
(Signature)

(Signature)

(Signature)

Offer Date: 12/11/05

**BUYER'S PHONE NUMBERS:**
(Home) (209) 477-8391 (Work) (209) 954-585
(Extn.)
(Home) ( ) 477-8391 (Work) ( )
(Extn.)
(Home) ( ) (Work) ( )
(Extn.)
(Home) ( ) (Work) ( )
(Extn.)

(Buyer's Fax No.) ( )

**BUYER'S DESIGNATED MAILING ADDRESS:**
2828 Lonnie Beck Way
(Street Address, No. / P.O. Boxes)
Stockton, CA 95209
(City, State and Zip)

**BUYER'S E-MAIL ADDRESS:**
WKhan@deltacollege.edu

**ACCEPTANCE BY SELLER**

Western Pacific Housing, Inc.
a Delaware Corporation

By:
Title:

Acceptance Date:

**SELLER'S DESIGNATED MAILING ADDRESS/PHONE:**
1210 Central Boulevard
(Street Address, No. / P.O. Boxes)
Brentwood, CA 94513
(City, State and Zip)

(Phone No.) (925) 634-6023
(Fax No.) (925) 634-6063



WK
Buyer's Initials

ZK
Buyer's Initials

Project: Valverde Villag
Lot/Residential Unit: 10

PURCHASE AGREEMENT
AND ESCROW INSTRUCTIONS

By and Between

**Western Pacific Housing Inc.,**
**a Delaware Corporation**

**("Seller")**

AND

Wahidda Rassoom Khan & Zohra Khan

**("Buyer")**

**THIS CONTRACT CONTAINS A BINDING ARBITRATION PROVISION. YOU SHOULD CONSULT LEGAL COUNSEL WITH ANY QUESTIONS ABOUT ANY OF THE PROVISIONS OF THIS CONTRACT.**

# LEGEND

LAST PLOTTED OR REVISED: 07/28/05

SCALE 1" = 20'

- C CABLE
- T TELEPHONE
- G GAS
- E ELECTRICAL
- TRANSFORMER BOX
- W WATER LAT/METER BOX
- S SEWER LAT/CLEAN OUT
- ELECTROLIER/STREET LIGHT
- CATCH BASIN
- FIRE HYDRANT
- PUBLIC UTILITIES EASEMENT (P.U.E.)
- MASONRY WALL
- RETAINING WALL
- WOOD FENCE
- PROPERTY LINE (P.L.)
- SWAIL
- W.C. WITNESS CORNER (W.C.)
- I.P. IRON PIPE
- AC AIR CONDITIONER PAD
- TP TELECOMMUNICATIONS PEDESTAL
- STB SURFACE TELECOMMUNICATIONS BOX
- STVP SURFACE TELECOMMUNICATIONS VAULT/PEDESTAL
- PGE SURFACE PG&E BOX
- SLB SURFACE STREET LIGHTING BOX
- STREET SIGN
- COR. CORNER OF STRUCTURE
- F.F.E. FINISH FLOOR ELEVATION
- HP HIGH POINT
- SQ.FT. SQUARE FOOTAGE
- TC TOP OF CURB
- US UTILITY SERVICES
- RELINQUISHMENTS OF ABUTTERS RIGHTS
- GB GRADE BREAK




NOTES:
1. PAD ELEVATIONS, GRADES, & UTILITIES SHOWN ARE BASED ON RECORD INFORMATION.
2. GRADE ALL DRAINAGE SWALES 1%.
3. ALL DRAINAGE SWALES AND FINISH GRADING SHALL CONFORM TO F.H.A. STANDARDS.
4. FINAL FENCE LOCATION TO BE DETERMINED BY CONTRACTOR.
5. ALL IMPROVEMENTS ARE TO BE BUILT PER CITY OF STOCKTON STANDARDS.
6. INFORMATION SHOWN ON PLOT PLANS IS TAKEN FROM A PRELIMINARY FINAL MAP.

**PRELIMINARY**
**SUBJECT TO CHANGE**

COMMUNITY NAME: VALVERDE VILLAGES AT SILVER SPRINGS
ADDRESS: CLIFFSIDE DRIVE 10935 SAN JOAQUIN COUNTY, CALIFORNIA
LIVEABLE SQ FT: 2693± GARAGE SQ.FT: 686± LOT AREA: 6000
OPTIONS:

TRACT: 3452
APN:
LOT COVERAGE:
ORIENTATION: LEFT

UE TO THE UNIQUE CONDITIONS OF THIS LOT, THE BUYER HAS WALKED AND APPROVED THE SITE. SPOT ELEVATIONS ARE APPROXIMATE. CURB DRAIN LOCATIONS AND FINAL GRADING CONDITIONS MAY VARY. THE NFORMATION ON THIS PLOT PLAN IS PROVIDED FOR YOUR CONVENIENCE AS A GUIDE TO THE GENERAL LOCATION OF THE SUBJECT PROPERTY. THE ACCURACY OF THIS PLOT PLAN IS NOT GUARANTEED, NOR IS IT A PART F ANY POLICY, REPORT OR GUARANTEE TO WHICH IT MAY BE ATTACHED. ACTUAL DIMENSIONS MAY VARY OR CHANGE WITHOUT PRIOR NOTICE DUE TO ACTUAL SITE CONDITIONS. SLOPE LOCATIONS ARE APPROXIMATE. TILITY BOXES AND TRANSFORMERS MAY BE MOVED OR ADDED AT THE DISCRETION OF THE UTILITY COMPANIES.

NAUTHORIZED CHANGES & USES: NEITHER D.R.HORTON NOR THOMPSON-HYSELL ENGINEERS WILL BE RESPONSIBLE FOR, OR LIABLE FOR, UNAUTHORIZED CHANGES TO OR USES OF THIS PLOT. ALL CHANGES TO THIS LOT MUST BE APPROVED IN WRITING BY THOMPSON-HYSELL ENGINEERS. PHOTOCOPYING AND/OR OTHER FORMS OF REPRODUCTION OF THIS PLOT MAY EFFECT ITS SCALABLE DIMENSIONS.

IOTE: THIS PLOT IS PREPARED TO SHOW THE DIMENSIONAL RELATIONSHIP FROM BUILDING FOUNDATIONS TO PROPERTY LINE, AND DIRECTION OF DRAINAGE FLOW FOR THE PURPOSE OF BUILDING PERMIT ISSUANCE ONLY.

LL FOOTPRINT INFORMATION IS SHOWN AS PROVIDED BY THE ARCHITECT ON 06/17/05 AND CHECKED AGAINST THE HARD COPY SET DATED 06/10/05 WITH THE LAST REVISION DELTA OF X AS BUILDS XX/XX/XX.

D·R·HORTON DHI NYSE
America's Builder
WESTERN PACIFIC SERIES

THOMPSON-HYSELL ENGINEERS
A DIVISION OF THE KEITH COMPANIES, INC.
1016 12TH STREET, MODESTO, CA 95354
(209) 521-8986 FAX (209) 521-9045

APPROVED:
DATE: 07/28/05
DRAWN BY: TH CHECKED BY: JD
P:\STOCKTON\278501\dwg\Plot Plans\006.dwg

[signature] 12/1/05 Zohra Khan 12/2/05
BUYER'S SIGNATURE DATE BUYER'S SIGNATURE DATE

D

# CALIFORNIA CIVIL CODE

## Sections 895 Through 945.5

Valverde Villages
Track 3452
Lot # 6

**BUYER AND SELLER HEREBY ACKNOWLEDGE THAT THIS WRITTEN COPY OF THE ABOVE TITLE OF THE CIVIL CODE WAS PROVIDED TO BUYER PURSUANT TO CALIFORNIA CIVIL CODE SECTION 912(G).**

BUYER'S INITIALS IMK
BUYER'S INITIALS ZK

SELLER'S INITIALS ______
SELLER'S INITIALS ______

Printed 11/23/2005

D·R·HORTON America's Builder

# Valverde Villages
## Plan 2693 Standard Features List

Plan 2693 (2693 s.f.)

Elevations
A = Mediterranean
B = Craftsman
C = Cottage

| Plans | Rooms | |
|---|---|---|
| Appliances | | |
| All Plans | Kitchen | 4 burner cooktop over single oven |
| All Plans | Kitchen | Microhood |
| All Plans | Kitchen | Dishwasher (White on White) |
| Cabinets | | |
| All Plans | | Melamine interiors with concealed hinges |
| All Plans | | Clear Light Oak Finish |
| All Plans | Door Style | Recessed panel |
| All Plans | Kitchen | 40+" upper cabinets; Tilt down tray below sink |
| All Plans | Master Bath | 3" Vanity Height |
| All Plans | Hall Baths | 31" Vanity Height |
| All Plans | Laundry Room | 34" Height- Upper cabinets above washer/dryer only |
| Plan 2693 | Hallway | Base and upper cabinet outside bed 3 |
| All Plans | Toe Kicks | 4 x 3 |
| Ceramic Tile | | |
| All Plans | Kitchen | Ceramic tile 6 X 6, Tight joint with 6" backsplash |
| All Plans | Entry | 12 x 12 Ceramic tile |
| All Plans | Fireplace | 12 x 12 Ceramic tile - Optional Raised Hearth |
| All Plans | Master bath | 6x6 ceramic tile with china sinks |
| Concrete Flatwork & Foundation | | |
| All Plans | Flatwork | Broom Finish |
| All Plans | Foundation | 10" PT slab |
| Cultured Marble | | |
| All Plans | Master Bath | Culture Marble Surrounds |
| All Plans | Hall Baths | Cultured Marble Vanity with Integral Sink (Bullnose edges) |
| Drainage | | |
| All Plans | | Full Drainage |
| Drywall | | |
| All Plans | | Bullnose except at windows |
| All Plans | Garage | Drywall complete with firetape @ garage, no texture |
| Electrical ( Low Voltage ) | | |
| All Plans | | Alarm pre-wire; Sensors at all operable first floor windows, exterior doors, and 2nd floor operable windows accessible by a lower roof. |
| Electrical / Lighting | | MEETS 2005 REQUIREMENTS |
| All Plans | Family Room | Ceiling Fan with Light Kit with speed control and dimmer switch (Brushed Nickel with Maple Blades) |
| All Plans | Master Bedroom | Ceiling Fan Pre-Wire |
| Plan 1840 & 2183 & 2693 (B & C Elev) | Entry | Recessed Can Light with dimmer switch |
| Plan 2463 & 2693 (A elev) | Entry | Hanging Fixture with dimmer switch (Brushed Nickel) |
| Plan 2693 | Stairwell | Hanging Fixture with dimmer switch (Brushed Nickel) |
| All Plans | Dining Room | Hanging Fixture with dimmer switch (Brushed Nickel) |
| All Plans | Porch | Fluorescent Recessed Can Light |
| All Plans | Garage | (2) Fluorescent Coach Lights @ front, 4 ft 2 light strip fluorescent fixture in garage, Pre-wire for garage door openers. |
| All Plans | Kitchen / Hallways | Recessed Can Lights |
| All Plans | Kitchen Pantry | Recessed Can Light |
| All Plans | Nook | (2) Recessed Can Light |
| All Plans | Walk In Closets | White Mushroom Fixture |
| All Plans | Laundry Room | Fluorescent White Mushroom Fixture and 220V for Dryer w/ Exhaust Fan switched separately |
| All Plans | Bath Vanities | Decorative Light Bar (over ea. Sink) Brushed Nickel Finish & fluorescent can light with occupancy sensor |
| All Plans | Hall Bath | Exhaust fan at tub / shower area, switched with light. |
| All Plans | Master Bath | Exhaust fan at tub / shower area, switched with light |
| | Bathroom Water Closet | Mushroom light fixture, exhaust fan if there is no window |
| All Plans | Secondary Bedrooms | 1/2 hot with switch (no overhead lighting) |
| All Plans | Kitchen, Family Room, All Bedrooms | Phone Outlet (1) each (CAT 5) |
| All Plans | Family Room, All Bedrooms | Cable Outlet (1) each |
| All Plans | | Decora rocker switches & dimmer switches @ specific locations |
| Fencing | | |
| All Plans | | |
| Finish Doors & Millwork | | |
| All Plans | Exterior | 3080 Fiberglass Raised 6 Panel Door |
| All Plans | Interior | Raised 6 Panel, Standard Door Height |
| All Plans | Master Bedroom | 8 ft. Raised Panel Door |
| | Half Wall | Paint Grade Wall Cap @ Standard Pony Wall locations |
| All Plans | | Wood shelf at pantry and linens |
| All Plans | | 3-1/4" colonial baseboard, door casing to be 2-1/4" colonial |
| Finish Hardware | | |
| All Plans | Front Door | Chelsea with separate deadbolt (non-panic); Antique Nickel finish |
| All Plans | Interior | Polo in Brushed Nickel ; bathroom interiors in chrome. |
| Finish Hardware / Bathroom Accessories | | |
| All Plans | All Bathrooms | Chrome - Towel Bars, Etc. |
| All Plans | Master Bath | Frameless with beveled edge medicine cabinet |
| All Plans | Hall Baths | Shower rod |
| Fireplace | | |
| All Plans | Family Rooms | 36" Direct Vent gas with log set, optional raised hearth |
| Garage Doors | | |
| All Plans | | Heavy gauge garage door |

Garage door opener
NO overhead lighting in bedrooms

Valverde Villages
Track 3452
Lot # 6

CC: Sales, Super, Ann Marie, Mark A.

Printed 11/23/2005

D·R·HORTON America's Builder

Valverde [illegible]llages

Plan 2693 Standard Features List

Plan 2693 (2693 s.f.)

Elevations
A = Mediterranean
B = Craftsman
C = Cottage

| Plans | Rooms | |
|---|---|---|
| Gutters | | |
| All Plans | | 7" Profile gutter |
| HVAC | | |
| All Plans | | Air Conditioning |
| All Plans | | Prepped for Dual Zone at single story; 2 story plans dual zone |
| Insulation | | |
| All Plans | | Per Title 24 report |
| Landscape | | |
| All Plans | | Front Yard with Automatic Irrigation drip system for shrubs |
| Masonry | | |
| | Elevation B & C | Elev. B=River rock; Elev. C=Ledgestone |
| Mirrors & Shower Doors & Wire Shelving | | |
| All Plans | Master Bath | 42" mirror over vanity - 1/4" glass Chrome frame shower door with butt glazing-clear glass and chrome towel bar |
| All Plans | Hall Bath | 42" mirror over vanity |
| All Plans | Bedrooms & Entry Closets | White wire shelving |
| Ornamental Iron | | |
| Plan 2693 | Elevation A | Iron Balcony Railing Above Entry |
| Paint | | |
| All Plans | Interior | *See Painting Spec. |
| All Plans | Exterior | Elastomeric (100% Acrylic)*See Color Matrix |
| Plumbing | | |
| All Plans | Kitchen | White on White pull out faucet |
| All Plans | Kitchen | White Porcelain over steel 2 Compartment sink |
| All Plans | Kitchen | Garbage disposal |
| All Plans | Kitchen | Pre-plumb for ice-maker. |
| All Plans | | Pre-plumb for water conditioner |
| All Plans | Master Bath | 8" wide-spread; Chrome Finish Fixtures; China Sinks |
| All Plans | Hall Bath | 4" mini-wide spread; Chrome Finish Fixtures |
| Plan 2183, 2463, 2693 | Master Bath | 5' Tub; Fiberglass Shower pan with cultured marble surrounds; Chrome Finish Fixtures; China Sink |
| All Plans | Hall Bath | Vickrell Tub/Shower combination; Chrome Finish Fixtures |
| All Plans | Master Bath | Elongated Toilet |
| All Plans | Hall Bath | Round Front Toilet |
| Plans 2183-2693 | Laundry | ~~Pre-plumb for optional laundry sink locations~~ |
| | Laundry | White "SMITTY" Pans @ upstairs Laundry Room |
| All Plans | | 50 gal. Water heater |
| All Plans | | Gas pre plumb to backyard |
| All Plans | | Gas connection to dryer |
| Roofing - Monier Life Tile | | |
| All Plans | | See Color Matrix: Villa Tile or Flat Tile per Elevation |
| Stair Rails | | |
| 2 Story | | Oak rail with paint grade spindle (no volutes) |
| Stucco | | |
| All Plans | | Texture over brown |
| Windows | | |
| All Plans | | Spectrally selective (low e squared) @ all windows |

"D.R. Horton "America's Builder" reserves the exclusive right to make any changes or substitutions at any time as D.R. Horton "America's Builder" deems necessary or desirable in the plans and specifications, construction, material, fixtures and other integrals which are of substantially equal utility and quality. Buyer is aware and acknowledges that the above referenced items are the Standard Features included and to be installed in the home (unless indicated as optional.) Buyer understands the necessity to renew the Options offered by the Builder so that they may execute the necessary documentation required to purchase their Options and Upgrades. Buyer also acknowledges that select options may only be available to a certain stage of construction completion, and therefore may not be available after the designated cut-off date. Please consult with your sales associate for further clarification.

12/11/05 [signature]
DATE SALESPERSON

12/11/05 [signature]
DATE BUYER

12/11/05 Zohra Khan
DATE BUYER

CC: Sales, Super, Ann Maria, Mark A.




6/3452

Initial

Date




## THE MONTOYA

- 5 Bedrooms, 3 Baths, 3-Car Garage
- Approx. 2,693 Sq. Ft.
- Up to Approx. 2,872 Sq. Ft

VALVERDE VILLAGES

Initial
12/11/05
Date

Community: Valverde Villages
Tract: 3452
Residential Unit/Lot No.: 6

RECEIPT OF DOCUMENTS AND INFORMATION

Buyer acknowledges that it has received read and approved the following documents:

1. Final Subdivision Public Report (If Applicable)
2. Covenants, Conditions and Restrictions
3. Seller's Disclosure Statement
4. Real Estate Agency Disclosure
5. Natural Hazards Disclosure
6. Homeowner's Manual, with Maintenance Requirements contained within, Seller's Limited Warranty and Customer Care Program (Fit and Finish Warranty)
10. SB800 Booklet containing all of Civil Code Sections 755 through 945.5
11. Manufacturer's Warranties and Manufactured Products Maintenance Information (provided at walk through)
12. Affiliated Business Disclosure
13. Standard Features List
14. Plot Map
15. Common Interest Development Addendum (If Applicable)
16. VHA/FHA Addendum (If Applicable)
17. Options and Occupancy Guidelines
18. Allowance for Non-Recurring Closing Costs
19. ______________________________
20. ______________________________

BUYER AGREES TO RETAIN ALL DOCUMENTS RECEIVED IN CONNECTION WITH THE PURCHASE OF THE PROPERTY AND PROVIDE SUCH DOCUMENTS TO ANY SUBSEQUENT PURCHASER OF THE PROPERTY. Buyer acknowledges that it has received all of the documents listed above and may receive other documents provided in conjunction with the purchase of the Property (collectively, the "Documents"). Buyer shall maintain a full and complete copy of the Documents and agrees to provide any subsequent buyer with a complete copy of the Documents including, but not limited to, a copy of the Maintenance Manual provided or to be provided by Seller to Buyer, any contractual warranties provided by Seller to Buyer and a copy of all manufactured products' maintenance and limited warranty information. Buyer should instruct any subsequent buyer to provide to their subsequent buyers a complete copy of the Documents.

Horton/SB800
Receipt of Documents and Information
28156-00007/1797673v5 [Word]
Revised 01/01/03

WK Buyer's Initials    ZK Buyer's Initials

Date: __________
Community: Valmonte
Lot No.: 6
Tract: 3452

# NON-CONTINGENT ADDENDUM

**BUYER:**

____________________

**SELLER:**
Western Pacific Housing, Inc.
a Delaware Corporation
1210 Central Blvd.,
Brentwood, CA 94513

**ESCROW COMPANY:**

First American Title Company
230 Cherry Ln. #103
Manteca, CA 95337

**TITLE COMPANY:**

First American Title Company
Office: 209.239.5513
Fax: 209.239.5878

**DATE:** __________

This Addendum to the Purchase Agreement and Escrow Instructions ("Addendum") constitutes an Addendum to that certain Purchase Agreement and Escrow Instructions, as modified by any previous Addendums thereto ("Purchase Agreement"), entered into by and between Buyer and Seller for the purchase of the property referenced above and described therein (the "Property"). Any capitalized terms not otherwise defined herein shall have the meanings as set forth in the Agreement.

1. Buyer and Seller hereby acknowledge, agree and accept, that the purchase of said property referred to on the Purchase Agreement dated: __________ is purchased and entered into as a "non-contingent" contractual agreement. Buyer agrees to provide sufficient funds (*cashier's check*) to Title, to close escrow on subject property within seven (7) days of notification of the "orientation date". or *the Seller (Western Pacific Housing) will consider the purchase terminated for "non-performance".*

   All other terms and conditions remain the same.

This Addendum may be executed in counterparts, each of which when taken together, will constitute one fully executed original.

This Addendum has been made and executed as of the date set forth above.

WK
Buyer's Initial

ZK
Buyer's Initial

Project:____________
Lot/Residential Unit:________

## GENERAL DISCLOSURES ADDENDUM

This General Disclosures Addendum ("Addendum") or "General Disclosures" is attached to and forms a part of the Purchase Agreement and Escrow Instructions executed between Buyer and Seller ("Purchase Agreement") for the Property described in the Purchase Agreement. Any capitalized terms not otherwise defined herein shall have the meanings set forth in the Purchase Agreement. If there is a conflict between the Purchase Agreement and the terms and provisions of this Addendum or General Disclosures, the terms and provisions of this Addendum or General Disclosures shall control.

The General Disclosures set forth the general information which you need to be aware of in connection with your purchase of the Property. You will also receive a disclosure which sets forth information about the specific Project in which you are purchasing the Property. Buyer is advised to review all disclosures which you receive since these disclosures may impact your decision to purchase a Residence. While Seller has endeavored to provide a comprehensive list of what may be important to you, the disclosures provided by Seller are not an exhaustive and complete list. You are encouraged and advised to conduct your own independent investigations regarding the Residence, the Project, the surrounding land uses and any other matter that may be of significance to you. All references to "Residence" in this Addendum shall refer to the entire Property, as applicable.

### A. ABOUT YOUR PURCHASE

1. Property Documents. In connection with your purchase of your new Residence, you will receive numerous disclosures and other documents, all of which are important to your decision to purchase a home. You should review all of this information very carefully.

2. Homeowners' Manuals. Buyer acknowledges that on or about the time Buyer closes Escrow, Buyer will receive a Homeowners Manual containing certain operating instructions and maintenance requirements and schedules for certain components of Buyer's Residence, including, without limitation, information relating to mold and mildew. Buyer must review and comply with any and all operating instructions, maintenance requirements and schedules for Buyer's Residence contained in such Homeowners Manual. Under California Civil Code Section 907 a homeowner is also obligated to follow all reasonable maintenance obligations. Buyer's failure to do so may reduce or defeat Seller's liability for construction defect claims pursuant to Civil Code § 895 et seq.

3. Benefit of Home Ownership. Seller is not making any representations, guarantees or warranties to you with respect to the tax benefits, investment or other benefits of home ownership, or regarding appreciation or depreciation in the value or equity which you may receive. You should make your own independent determination of all these issues before you proceed to purchase the Property.

4. Sales Price. The Seller reserves the right, at any time and without notice, to increase or decrease the sales price and/or to modify the terms and conditions of sale of other homes in the Project. For example, Seller may offer price reductions, financing incentives, reduced interest rates, decorator allowances, additional features, and other similar incentives (collectively the "incentives") to other purchasers of Residences in the Project without any obligation to offer such incentives to you and Seller shall not have any obligation or liability whatsoever to notify you of any price changes that directly or indirectly affect the value of the Property. Buyer shall not hold Seller responsible for any fluctuations in the purchase price of homes within the Project. Buyer agrees that Buyer shall have no claims against Seller for any possible change (decrease or increase) in the purchase price of homes within the Project or any other terms of purchase, including upgrades or other concessions or incentives offered by Seller to other purchasers of homes within the Project and/or the construction of any additional floor plans on any of the Lots in the Project.

Financing. Seller offers financing for your new home purchase through DHI Mortgage Company, a related entity. You may also select your lender independently. However, Seller has not reviewed or approved any lender's sales or marketing materials, and does not make any representations or warranties whatsoever regarding any matters set forth therein or your ability to obtain any financing under any particular terms. You are strongly encouraged to make your own independent evaluation of the rates and loan programs offered by all lenders. You understand that the interest rate and loan fees for the loan applied for will be determined at the time of the Close of Escrow and may be higher or lower than on the date you signed the Purchase Agreement to purchase your home. You also acknowledge that the interest rate, loan fees estimates or quotations that may have been provided to you are for illustrative purposes only and do not constitute a binding commitment. If Buyer has chosen to make a loan with a lender with whom Seller has arranged a loan commitment, the interest rate quoted may not be available unless the loan closes by a certain date. Seller is not responsible if, for any reason, including construction delays, your loan does not close on time to obtain a guaranteed rate.

5. Closing Date. Buyer acknowledges that the date specified in the Purchase Agreement for the Closing Date is only a target Closing Date. Seller does not have any responsibility in the event that Buyer elects to move out of its existing residence prior to the actual Closing Date.

6. Seller's 10.4.1. Limited Warranty. The homeowner's manual will also contain Seller's 10-4-1. Limited Warranty for your Property. This Limited Warranty is given to you in place of and in lieu of all other warranties or guarantees, written or oral, whether express or implied. The Limited Warranty provided an express limited warranty for all components of your Residence (except Manufactured Products which are covered by the manufacturer's warranties) for either 10 years, 4 years or 1 year, depending upon the component. The Limited Warranty is subject to the terms, conditions and exclusions contained in the warranty. For example, any damage caused by your failure to properly maintain your home as provided in the homeowner's manual is excluded from coverage under the Limited Warranty. YOU SHOULD READ THE LIMITED WARRANTY CAREFULLY AND SEEK LEGAL ADVICE IF YOU HAVE ANY QUESTIONS REGARDING ITS IMPACT ON THE PROPERTY YOU ARE PURCHASING.

7. DHI Mortgage Company, Ltd., L.P.. DHI Mortgage Company, Ltd., L.P. is an affiliate of Seller and may provide financing for Residences acquired within the Project. You will be required to sign a separate disclosure regarding DHI Mortgage Company's affiliation with Seller.

8. DRH Realty Company. DRH Realty Company, Inc. is an affiliate of Seller. If you elect to use DRH Realty Company, Inc. in connection with the sale of your existing home, you will be required to sign a separate disclosure.



WK ZK
BUYER'S INITIALS BUYER'S INITIALS

9. Title to Property. Prior to signing the Purchase Agreement, Buyer should consult with an attorney regarding the manner in which title to the Residence should be taken. Sales agents are prohibited by law from giving advice on this matter.

10. Agency Confirmation. The real estate agent identified on the Real Estate Agency Disclosure provided to you by Seller is both the listing agent and the selling agent for the Property, and is the agent of Seller exclusively. All sales agents and representatives employed by Seller are and shall be agents and representatives of Seller exclusively and will not be the agents or representatives of Buyer.

11. Marketing Activity. Seller may continue to market homes in your Project for sale after you move into your Residence. Seller may also use its model homes to market homes in other Projects. Seller's marketing activities may include operating a model home complex, displaying signs, balloons, flags, banners and conducting on-site events and other promotional activities. The ongoing marketing of Residences may cause you some inconvenience and may disrupt your enjoyment of your Residence.

12. Construction Activities. There may be ongoing construction surrounding the Project which may result in noise and traffic, excessive dust and dirt, restrictions of egress and ingress into and around Project or your home, erected scaffolding, building materials and debris located within and adjacent to the construction area (such as nails and screws that could affect your vehicle and bicycle tires), and parking restrictions during construction hours due to construction employee vehicles and deliveries. Further, due to the ongoing construction and sales activity, public infrastructure, public and private utilities (e.g., water, electricity, telephones, cable television, sewers, storm drains, etc.) within the Project and/or servicing your home may be temporarily interrupted and/or adversely affected. You agree to exercise extreme caution and to observe all signs which may be posted when driving through a construction zone. You also acknowledge and agree that, prior to entry onto the portions of the Project, you will be required to sign a Construction Pass. If you have any questions concerning the construction schedule for the Project, you should consult with your sales agent. However, Buyer acknowledges that any scheduling information provided is only an estimate and is subject to change.

13. Model Homes. Seller may have constructed model homes to reflect typical exterior elevations, floor plans, workmanship and methods of construction. Model homes also illustrate possibilities for future interior decoration and exterior landscaping and hardscape items. Your home will not be constructed to the precise specifications or design of any model home. The exterior elevations, architectural treatments, floor plans and colors shown on the master plot plans on display at the office of the Seller may be different than those displayed in the models. Room dimensions and electrical outlet placement may also vary from models and the Plans. The models have also been professionally decorated to show various decor ideas. Decoration items (such as furnishings, draperies, built-in shelves and lighting) and landscaping and hardscaping (such as entryways, patios and spas) are displayed only to suggest ideas to buyers. All such options and upgrades displayed in the models (including, decorator items, landscaping and hardscaping) are not included in the purchase price for your home unless expressly agreed to in writing by Seller. From time to time, due to unavailability and other production considerations, it is necessary for Seller to make substitutions of materials, appliances and other items in homes from those materials and items displayed in the models.

14. Dimensions and Square Footages are Estimates Only. Residence dimensions and square footages are approximate. You should be aware that any statement regarding the dimensions of rooms or square footages of homes or other areas are approximates only. You may not rely upon any written brochures and other sales documents or oral statements by Seller or Seller's agents regarding the exact square footage of your Residence, Lot or Unit.

15. Elevations and House Plans. In order to provide diversity for the street scene, Seller's architect may have produced more than one exterior elevation for the front, side and rear of each floor plan. Due to this and due to certain variations caused by construction techniques and methods, you may notice size, scale and proportional interior and exterior changes from the model home or other homes in the Project from your particular elevation. These may include such items as ceiling heights, sloped ceilings, veneer treatments, window locations, window types and sizes, gutter and downspouts, interior and exterior wall and roof lines, color schemes and front porch dimensions. It is the responsibility of Buyer to inspect the property and consider the differences in the elevations and other features of your Residence prior to Close of Escrow. Buyer acknowledges that he or she has had the opportunity to review the floor plan and elevation and interior details for the home he or she is purchasing, all as shown on the building plans located in the sales office. Seller may alter, add or delete any house plans for Residences to be constructed in the development.

16. No Guarantee About Development. Seller does not make any representation that the Project will be developed as proposed. Seller reserves the right, at any time and without notice, to modify its development plan for the Project, including, but not limited to, changing the style, size, square footage, density, exterior elevations, color schemes, construction schedule and/or phasing of the homes in Project. The model homes are displayed for illustrative purposes only and such display does not constitute a commitment to complete the development with the same or similar homes. Seller may also sell all or any of the property in the development to another builder, who may change the house plans, square footage, elevations, features, materials or designs of the Residences.

17. Buyer Information and As-Built Conditions. In connection with your purchase of a home in the Project, Seller may provide you with sales literature, which may include such information as elevations, lot dimensions, set-backs, house orientation, driveway locations, utility structures, rear yard dimensions, easements, etc. This information is intended for general informational purposes. There may be discrepancies between this information which is provided to you and the actual as-built conditions. If there are such discrepancies, the as-built conditions will control.

18. No Guarantee of View. Seller is not selling any Residence based upon a view. Seller does not guarantee or make any representation whatsoever concerning the view, if any, that the Property currently enjoys. Additionally, any view which a Residence may currently enjoy may change in the future for many reasons including future development, growth of trees and other landscaping and installation of improvements which may impact or impair any views.

19. Future Improvements. Each home has restrictions with regards to the ability of an Owner to install decks, patio covers and other improvements. These restrictions may be imposed by the City, County or other governmental agency having jurisdiction over the Residence. There may also be utility or other easements, set back requirements and other restrictions which may restrict your ability to add any improvements. Your Residence may also be covered by covenants, conditions and restrictions which impose additional requirements and/or require you to obtain approval of an Architectural Committee. Buyer understands that Buyer is responsible for determining whether a future improvement can be constructed.



WK ZK
BUYER'S INITIALS BUYER'S INITIALS

20. **Gove[illegible] Restrictions on Alterations of Prope[illegible]** strictions may exist with respect to utility easements and/or City or County rights-of-way on or adjacent to Buyer's property. Thus, Buyer is advised to consult the appropriate governmental department to determine whether there are any restrictions or required permits pertaining to alterations of the property before commencing any landscaping or improvements.

**B. ABOUT YOUR RESIDENCE**

21. **Front Doors**. Front doors will vary by elevation and floor plan. Standard doors included with the purchase of your home will vary in style to suit different elevations. Certain door styles, such as those distressed or antiqued for decorative accent, may differ in appearance from the doors installed on the model homes.

**Color Variations**. Paint - Buyer should confirm with his or her sales representative what interior colors will be used in the home. Regarding white walls, it must be remembered that there are many shades of white. Buyer should not assume that the home would be painted any shade of white shown in the model homes. Model interior paint colors are chosen by the model decorators and are not necessarily what will be used in your residence.

Tile – Certain tiles have a color variance from tile to tile.

Grout – Colored tile grout may be used as a decorator feature on certain tiled areas. Buyer is advised that the color/shade may vary in any area of a particular installation due to the wide variety of tiles available, job site conditions and finishing techniques. The elements of nature including, but not limited to, sun, temperature, food, or chemical reactions may, combined with the aging process, change the color of the grout in varying degrees from time to time. In the event of repairs or replacement of tile or grout in the future, the replacement grout and/or tile probably will not match the color of the original tile or tile grout. The use of colored grout may result in a discoloration, flecking, and/or cracked appearance in the ceramic tile.

Marble – Because marble is a natural material, the color and pattern of any marble installed may vary from the models or Design Center sample. Buyer is aware that there may be variations in color and pattern of the marble installed in Buyer's home.

Cabinets and Woodwork – There will be a variance in the color and grain of Buyer's cabinets and woodwork throughout the home due to the natural contrast of the wood, and stained cabinets will have additional variance due to different woods and grains. Similarly, the color of any natural wood cabinets installed may vary from the samples displayed in the Models or Design Center. Buyer is aware that the consistency in color and grain of the wood cabinets in Buyer's home is not warranted nor guaranteed.

22. **Wood Stain Color**. The wood stain finish used on your cabinets, stairs, or any wood surface may differ from the stain color in the models and, in fact, the stain color in your home may even differ from cabinet to cabinet or stair fitting to stair rail. This is due to the natural variation of color and texture of the grain in the wood itself.

23. **Variations in Natural Materials**. Natural materials such as granite and natural stone products are composed of various mineral contents and are formed over millions of years. They are products of exceptional beauty and durability. Marble is less dense and more porous than granite. Great care must be taken to prevent damage to marble and other natural stone products. Please see the manufacturer's recommendations for cleaning and maintenance. Because these are natural products, they are subject to variation in color veining, spotting, holes, cloudiness, texture and cracking. Some may vary significantly in filler and sheen. The samples are actual pieces of natural stone which indicate general color and character; however, no two pieces can be expected to match even when taken from the same box. You should view the stone prior to purchase and any questions regarding these materials must be resolved prior to installation. Oven fired and glazed tile products can have significant variations in color, especially between field and trim tile.

24. **Driveways and Garages**. The shape and dimensions of the garages and driveways for the Residences in the Project may not be standardized. Driveways may vary in size, shape and/or configuration from the model driveways. Some of the garages may require Buyer to maneuver a lengthy driveway to enter and exit the garages. Parking of vehicles in the garages may also require Buyer to maneuver a vehicle back and forth in order to enter the garage. There may be certain obstacles (i.e. pillars, your Residence, fencing, improvements, etc.) that may make it difficult to maneuver a vehicle into and out of the driveway and garage. Seller is not responsible for any damage to any Residence, landscaping, pillars, fencing or any other improvement incurred during Buyer's or Buyer's guests or visitors maneuvering of the driveway and/or parking of a vehicle in the garages. It may not be possible to maneuver certain types of vehicles on the driveways and into the garage. Not all garages will accommodate all vehicles (especially full size models and sport utility vehicles) due to the shape, size, configuration and location of the garages, driveways and Residences. Also, parking of the maximum number of cars for which a garage was designed may block or make it difficult to access any storage area (if any) in the garage or to the Residence from the garage. Buyer acknowledges that it is his or her responsibility to determine whether the size and location of car spaces in the garage of the floor plan of the Residence selected by Buyer are adequate and appropriate to park the Buyer's vehicles. The Declaration includes additional parking restrictions, please check the Declaration for additional restrictions on parking in the Project.

25. **Drywall**. Some shadowing in your drywall may occur at different times of the day or night depending upon the lighting in your home, especially on curved walls.

26. **Air Conditioning**. If your Residence includes an air conditioner and condenser, the air conditioning condenser may be located in a different area than shown in the models or on other plans or exhibits. The specific location of compressors at the Project may result in sound transmission that may affect your home.

27. **Certification of Water Heater Strapping**. Seller hereby certifies that any water heater installed by Seller for Buyer's Residence has been braced, anchored or strapped to resist falling or horizontal displacement due to earthquake motion in accordance with the provisions of §§19210 et seq. of the California Health and Safety Code.

28. **Satellite Dishes**. Satellite dish antennas may be installed and used within the Project in accordance with any CC&Rs and any other recorded restrictions and governmental requirements. However, Seller has provided no assurances or guarantees that any satellite dish or other antenna installed within the Project will remain unobstructed. You should understand that antennae signals may become obstructed by the installation and maintenance of improvements within and outside of the Project including homes, walls, fences, trees and other landscaping.

29. **Building Code Changes**. Periodically, governing agencies change building codes and other requirements; therefore, as construction proceeds, future homes may be constructed differently in order to meet

these updated or revised ...ons. Seller reserves the right to change e... s, designs, or other elements of the construction process at its sole discretion.

30. Electrical Outlets in Garage. The Uniform Building Code adopted in California requires that electrical outlets in garages be provided with ground fault Interrupter circuits. These circuits are not intended for use with any appliances, especially refrigerators, freezers and aquariums or on any service that an interruption of electrical power would cause a problem. Seller strongly recommends that purchaser not use garage circuits for appliances or for any service (such as freezers) that would be harmed by an interruption of electrical power. Seller cannot be held responsible for the contents of appliances which are damaged because of the ground fault interrupter switches shutting off power, nor can we be held responsible for damage to the appliance units themselves. Please check with an electrician for further information.

31. Fencing. You should be aware of what fencing or walls have been or will be constructed surrounding your Residence, if any, and the fences you will be required to maintain. The exact size, type and location of your fence or wall will be determined at the time of fencing installation.

32. Concrete Products. Cracks will occur in your stucco and plaster exterior. This is normal in all cementitious materials. Certain elevations incorporate a "smooth trowel" plaster finish. You should be aware that this finish is particularly susceptible to cracking. Cracking does not affect the structural integrity of your home and is part of the natural look of stucco and plaster. Poured on grade concrete is prone to a certain amount of cracking as it cures over time. Such cracks can be minimized by scoring, but they cannot be completely avoided.

33. Utilities. Buyer shall be responsible for initiating the commencement of any service from a utility company such as water, electricity, telephone and cable television (if available) upon or after the Closing Date. If Seller receives any bills for utilities that are attributable to the period after the Close of Escrow, Buyer shall reimburse Seller for such payments within ten (10) days after receipt of a statement from Seller. Seller is not affiliated with the cable company or with any other utility companies (i.e., water, gas, electricity, telephone service, etc.), and has no control over the rates or the services furnished, or the water pressure available at your Residence. Seller does not make any representations as to when or if cable services will be available nor as to the quality of television reception or cable services. Seller has no control over timing of meter sets once final inspection has been performed. Seller also has no control over the location and placement of public utility structures and facilities. All locations of the utility structures and facilities are final, and the Owners shall not tamper, move or damage these structures and facilities. Please check with your sales representative to determine whether any utility structures or facilities are located within or in the vicinity of the Residence you are purchasing.

34. Drainage. If you remove, modify or otherwise alter the established drainage patterns or devices on your Residence, you may cause significant and permanent damage to your Residence and/or other Residences, including but not limited to, damage to the foundation of your Residence or adjacent slopes. You should take precautions by using licensed professionals (e.g., landscape architects, civil engineers, geotechnical engineers, general contractors, etc.) to assure that improvements such as walkways, landscaping, patios, decks, planters, etc. are constructed so as not to alter the established drainage of your Residence. Seller shall not be responsible for any modifications or changes to the established drainage for the Property.

35. Cross Unit Drainage Facilities. There may be cross unit drainage facilities in your yard area. If so, you are responsible for maintaining and cleaning any cross unit drainage facilities situated within your yard to prevent any obstruction and blockage.

36. Soils/Geology. A soils and geological report for this subdivision is on file with the City or County in which the Property is located, and upon request, a copy will be made available in the sales office for Buyer's review. In order to minimize the possibility of moisture intrusion into the soils of the Property, Buyer agrees not to alter the grading and not to alter any drainage devices on the Property. Buyer acknowledges that drainage devices may be located underground which may not be visible to or otherwise disclosed to Buyer. Before constructing any improvements on the Property (including, without limitation, additions, retaining and other walls, landscaping, exterior concrete flat work, swimming pools and spas), Buyer agrees to obtain the recommendations and guidance of appropriate qualified experts as to whether any special design and construction criteria should be employed.

37. Professional Design of Improvements. Before you begin any grading, excavating, filling or constructing any improvements to your Residence (e.g., pools, spas, planters, sidewalks, decks, patios, patio covers, landscaping, etc.), you should engage the services of a qualified, licensed professional and you should take necessary precautions in designing and installing such improvements to avoid damage to your home and other improvements which may result from existing soils conditions. You should also obtain a geology report prior to constructing a swimming pool or spa. Too often a homeowner's contractor will utilize a standardized set of calculations and construction plans that are not specifically designed for pools and spas that are to be built at the top or toe of a slope or on expansive soils. These conditions require special design considerations.

38. Fire Prevention. Your home may be equipped with a fire sprinkler system to aid in the detection and control of residential fires. Fire sprinkler systems require routine maintenance by each homeowner to ensure the system is functioning properly. Smoke detectors have been installed in all homes in accordance with the requirements of the local agency. Smoke detectors must be maintained by Buyer and backup batteries replaced in accordance with manufacturer's recommendations provided to you at the orientation. Emergency contact is not automatically made when a smoke alarm is sounding, so Buyer is charged with calling the proper emergency number upon the occurrence of an emergency.

39. Mold and Mildew. Mold is a type of fungus which occurs naturally in the environment and is necessary for the natural decomposition of plant and other organic material. It spreads by means of sharing in microscopic spores borne on the wind, and is found everywhere life can be supported. Residential home construction is not, and cannot be, designed to exclude mold spores. If the growing conditions are right, mold can grow in your Residence.

Whether or not Buyer experiences mold growth depends largely on how Buyer manages and maintains Buyer's Residence. Buyer will need to take actions to prevent conditions which cause the mold or mildew. It is the responsibility of each Buyer to ensure that it has taken the necessary precautions to prevent mold from becoming a problem in such Buyer's Residence. This is part of the responsibility of home ownership. Buyer agrees to assume responsibility for the steps outlined in the Section of the Homeowner's Manual entitled "Mold Prevention" to prevent, detect or treat mold or to reduce the adverse effects of mold. Buyer further acknowledges that if there is any water damage or water intrusion to Buyer's Residence, Buyer will take immediate action to prevent conditions which cause mold or mildew to develop. Buyer will also immediately notify Seller of such water intrusion if Buyer believes that the problem may have been caused by Seller.



WK ZK
BUYER'S INITIALS BUYER'S INITIALS

40. Anim[illegible] ase check your Declaration about the limit[illegible] restrictions on the keeping of animals in your Residence or within the Project.

## C. ABOUT YOUR NEIGHBORHOOD

41. Schools. Buyer acknowledges that Buyer has conducted his or her own investigation of the present and future availability of school facilities, and has made his or her decision to purchase the Property in reliance on such investigation, and not upon any representation made by Seller or Seller's agents. Due to the rate of population change, the School Districts may find it necessary to change boundaries and designated schools periodically, prior to or after the Close of Escrow. Seller has no control or responsibility for any such change(s) should one or more occur.

42. Non-Disclosure Of Neighbor's Plans. During the course of the purchase of their homes, some buyers disclose information to Seller regarding their potential plans for their homes, (e.g., landscape, hardscape, add-ons, repainting plans, etc.) and/or information about their personal lifestyles (e.g., pets, interests, hobbies, etc.) Seller will not disclose such information to prospective neighbors. Should you wish to obtain any information about your prospective neighbors, Seller will, upon your written request, attempt to place you in contact with your prospective neighbors, but makes no warranty that Seller will be able to do so or that the information which you may obtain will be accurate.

43. Adjoining Land Uses. Buyer may have received written disclosures which depict the current and proposed land uses for the properties which adjoin the Project. Land uses are subject to change, and consequently, Seller cannot guarantee whether any information so disclosed is current. Also, land planning and zoning matters are complex and therefore the information which may have been supplied by Seller is not complete. If Buyer is concerned about the type of development that may occur on the adjoining properties, Buyer should discuss nearby land uses with the City/County Planning Department and otherwise conduct his or her own investigation of those matters.

## D. ENVIRONMENTAL HAZARDS/GOVERNMENTAL REQUIREMENTS

44. Disposal of Toxic and Other Substances. Water that enters a storm drain flows directly to natural sources of water, including waterways, creeks, drains, rivers, lakes and that erosion has an impact on the environment. Unlike the water in the sewer system in the Residence which is being purchased by Buyer, which flows to wastewater treatment plants, water that enters a storm drain flows directly, without any treatment, to waterways, creeks, streams, rivers, lakes and/or oceans. Accordingly, the National Pollution Discharge Elimination System, the Regional Water Quality Control Board Orders covering the Project, and the policies and ordinances of the City prohibit discharging anything other than natural rain water into storm drainage systems, including gutters and streets which drain into storm drains. Toxic chemicals or hydrocarbon compounds such as gasoline, motor oil, antifreeze, solvents, paints, paint thinners, wood preservatives, fertilizers, lawn clippings, yard waste, detergents, pet waste, and other such materials and pollutants shall not be discharged into any street, public or private, gutters, or into storm drains or storm water conveyance systems. Buyer further acknowledges that the disposal of such pollutants and materials into a storm drain system may result in significant penalties and fines and that Buyer may be responsible for any activities by Buyer's contractors (e.g., painters, landscapers, etc.) who dispose of such pollutants from Buyer's Residence, Lot or Unit into a storm drain system. Use and disposal of pesticides, fungicides, herbicides, insecticides, fertilizers, and other such chemicals shall meet all federal, state, and City requirements and requirements of any other governmental agencies having jurisdiction over the Property. All Buyers within the Project are required to comply with such restrictions. Buyers are encouraged to consult with the City or County, other governmental authorities, and the refuse hauler in the area of the Project concerning the proper disposal of any toxic or hazardous materials. Dumping any such materials into sewers, gutters or storm drains is against the law.

45. Earthquake and Earthquake Insurance. Your home is not warranted against damage due to earthquakes. Each Owner is responsible for conducting his or her own investigation, if any, regarding the potential for earthquakes. If Buyer elects to obtain earthquake insurance for Buyer's Residence, Buyer is advised to contact their own earthquake insurance carrier.

46. Flooding. Buyer acknowledges that Buyer's Residence is not werranted against damage due to floods. Buyer is responsible to conduct Buyer's own investigation regarding the potential for floods. Buyer is advised to review the Natural Hazard Disclosure provided by Seller.

47. Drought. The continued availability of water at current levels is not within the control of Seller. Past drought conditions have caused the water district to severely limit the water supply to landscaping and other nonessential usages. Due to fluctuating conditions, the amount of available water may be reduced in the future. Seller makes no representations about continued water availability.

48. Air Quality. Buyer is advised and acknowledges that each home is constructed using hundreds of components made of natural and/or man-made materials and that any material or combination of materials could cause an allergic reaction. Seller has no control over individual allergic reactions and Buyer hereby takes responsibility for testing the air quality within the home to ascertain whether or not the materials/components affect Buyer, Buyer's family members, or other occupants.

49. Gases. The aging process of the soil and other elements created by nature, as well as manmade building materials, many times create unwanted and undesired gases and other contaminants in homes, both new and used. Also, since the increased awareness and need for energy conservation, the UBC (specifically the energy Title 24 standards), have created homes which allow less outside air infiltration and therefore trap these unwanted gases in different degrees depending on how each person lives within his/her residence. Measurements of such unwanted gases (such as Radon) are reported to be in the air we breathe and can affect our health, and as such Seller recommends frequent airing of Buyer's residence by simply opening the windows to introduce outside air that is uncontaminated by such trapped gases. By making such a recommendation, Seller does not undertake any obligations to Buyer in regard to the effects that any such contaminants may have on Buyer, Buyer's family, or other occupants of Buyer's home.

50. Proposition 65 Warning. The Safe Drinking Water and Toxic Enforcement Act of 1986, also known as Proposition 65, requires that all businesses (including all builders of residential homes) provide a warning to the public of the dangers of potential harm by exposure to chemicals known to the State of California to cause cancer or birth defects. As of April 16, 2004, the State of California had listed more than 700 such chemicals known

to cause cancer or reproc toxicity. Buyer acknowledges that Buyer has seen, read and understood the Prop 65 warning sign in Seller's sales office pertaining to the homes in this development.

WARNING: THIS AREA CONTAINS CHEMICALS KNOWN TO THE STATE OF CALIFORNIA TO CAUSE CANCER, BIRTH DEFECTS OR OTHER REPRODUCTIVE HARM.

The United States Environmental Protection Agency, the California Air Resources Board, and other agencies have measured the presence of formaldehyde in the indoor air of homes in California. Levels of formaldehyde that present a significant cancer risk have been measured in most homes. Formaldehyde is present in the air because it is emitted by a wide variety of building materials and home products purchased by the builder from material suppliers. These materials include carpeting, pressed wood products, insulation, plastics, and glues.

Materials included in the construction of this house will expose you to formaldehyde, a substance known to the State of California to cause cancer.

The homes in this development have not been tested. It is not feasible to test every home to ascertain the level of formaldehyde present. Most homes that have been tested elsewhere do contain formaldehyde, although the concentrations vary from home to home with no obvious explanation for the differences. One of the problems is that many suppliers of building materials and home products do not provide information of chemical ingredients to the builders. In the absence of specific information on these homes, we believe that a warning is necessary.

In addition, the home that you are purchasing may contain one or more other chemicals known to the State of California to cause cancer or other reproductive harm. Because the development and construction of a home involves numerous contractors, subcontractors and trades, and numerous types of materials are incorporated into a completed home, it is impossible to accurately isolate all of the chemicals which may have been used in the manufacturing of materials or which might be contained in the various materials incorporated into a home.

Seller is willing to share information it has obtained and will provide, upon request, a list of known material suppliers which may be contacted for further information, and whether any inquiry has been made by Seller. You may also contact the California Building Industry Association (916-445-6951), or the State of California Office of Environmental Health Hazard Assessment (916-445-6900), which is the administrative agency for Proposition 65.

51. <u>Notice Of Access To Database Regarding The Location Of Sex Offenders</u>. In compliance with applicable California law, Seller hereby gives the following notice to you:

<u>Notice</u>: The California Department of Justice, sheriff's departments, police departments serving jurisdictions of 200,000 or more and many other local law enforcement authorities maintain for public access a data base of the locations of persons required to register pursuant to paragraph (1) of subdivision (a) of Section 290.4 of the Penal Code. The database is updated on a quarterly basis and a source of information about the presence of these individuals in any Project. The Department of Justice also maintains a Sex Offender Identification Line through which inquiries about individuals may be made. This is a "900" telephone service. Callers must have specific information about individuals they are checking. Information regarding Projects is not available through the "900" telephone service."

Seller has not and will not check for any offenders in this area.

## TAXES, SPECIAL TAXES AND ASSESSMENTS

52. <u>Real Property Taxes</u>. Your purchase of the Property constitutes a "change in ownership" for real property tax assessment purposes, which will trigger a reassessment of your Residence by the County Tax Assessor. The result will be a real property tax increase based upon the purchase price of the Property, effective as of the date of Close of Escrow. After the Close of Escrow, you will receive and are responsible for paying any supplemental real property tax bill ("Supplemental Assessment") covering the tax increase attributable to you for the period from the Close of Escrow to the following June 30. Buyer hereby acknowledges and agrees that neither Seller nor any of its authorized agents, representatives, employees or sales persons have made any representations or warranties regarding the amount of the Supplemental Assessment or the assessed value. Should Buyer have any questions or concerns relating to the Supplemental Assessment, Buyer agrees, prior to the Close of Escrow, to consult with the County Assessor or Buyer's legal or other advisors to satisfy such questions or concerns.

53. <u>Assessments</u>. Your Residence may be subject to special taxes and assessments for community facilities districts, landscaping and lighting districts and other purposes. You should review all of your sales information carefully to understand all of the taxes and assessments you may be obligated to pay.

## GENERAL

54. <u>Mandatory Alternative Dispute Resolution</u>. The Declaration includes certain provisions which require certain disputes between the Owners and/or any homeowners association with the Seller and related parties to be resolved through mandatory alternative dispute resolution procedures. By using such procedures to resolve disputes, there will be no jury trials awarded in connection with the disputes resolved under these procedures. Construction defect claims other than claims under the Warranties will be subject to the non-adversarial procedures set forth in Civil Code Section 910 through 938 in lieu of the mediation process described in the Agreement.

55. <u>Changes in Governing Documents</u>. Modifications may be made to the Governing Documents you received and in the rights of certain parties including the homeowners in the Project as a result to accommodate the requirements of certain governmental and quasi-governmental agencies, including without limitation the FHA, VA, FNMA, FHLMC, and GNMA federally sponsored mortgage guarantee entities, the California Department of Real Estate and Seller.

56. <u>Buyer Obligation To Investigate</u>. Nothing contained herein is intended to be a complete disclosure of all facts, which Buyer may wish to consider in buying a home in the Project. Buyer is still obligated to conduct his/her own full investigation of all facts relevant to him/her in deciding where and when to buy. Buyer is hereby advised to seek the advice of independent tax, legal, and financial consultants.

57. <u>Disclosure To Subsequent Purchasers</u>. When Buyer sells his/her home, Buyer is required to provide to the subsequent purchaser(s) any documents provided in conjunction with the original sale of the house, including, but not limited to, information that Buyer has regarding the home, the Project, and overall Community, the

information set forth in t... any other disclosures provided by Seller to ...er and any other information that may be of value to the subsequent purchaser(s), including, but not limited to, the CC&Rs.

58. Terms And Definitions. All capitalized terms not otherwise defined herein shall have the meanings set forth in the Agreement.

BUYER FURTHER ACKNOWLEDGES THAT BUYER HAS REVIEWED ALL OTHER DOCUMENTS PROVIDED BY SELLER TO BUYER IN CONNECTION WITH THE PROJECT. THIS DISCLOSURE CONTAINS INFORMATION THAT HAS A LEGAL IMPACT ON THE PURCHASE OF YOUR PROPERTY. YOU ARE ADVISED TO HAVE THIS REVIEWED BY AN ATTORNEY. BUYER'S INITIALS AT THE BOTTOM OF EACH PAGE ARE EVIDENCE OF BUYER'S REVIEW AND APPROVAL OF EACH MATTER CONTAINED ON THAT PAGE.

Project: Valverde Villages
Lot/Residential Unit: 6

ESCROW INSTRUCTIONS ADDENDUM

This Escrow Instructions Addendum ("**Addendum**") is attached to and forms a part of the Purchase Agreement and Escrow Instructions between Seller and Buyer (the "**Purchase Agreement**") for the purchase by Buyer of the Property described in the Purchase Agreement and constitutes instructions to the Escrow Holder identified on the first page of the Purchase Agreement. Any capitalized terms not otherwise defined in this Addendum shall have the meanings set forth in the Purchase Agreement.

1. **GOOD FUNDS.** In accordance with 12413.1 of the California Insurance Code, no title insurance company or controlled escrow holder can disburse funds from an escrow account until such funds have been collected, i.e., are "good funds". Consequently, the funds required from Buyer and any Lender to be deposited immediately prior to the Close of Escrow must be in the form of a wire transfer or cashier's check. Any other form of check deposited will be subject to a 3 to 7 day clearance period prior to the Close of Escrow and the disbursement of funds may delay the closing. If any check submitted to the Escrow Holder is dishonored for payment, Escrow Holder is authorized to notify all principals and/or their respective agents of such nonpayment.

2. **ADDITIONAL FEES.** Each party shall reimburse Escrow Holder for any special messenger, courier, express mail or bank wire fees incurred on their behalf. The fees agreed to be paid for Escrow Holder's services are for ordinary and usual services only, and should there be any extraordinary or unusual services rendered by Escrow Holder, the parties herein agree to pay reasonable compensation to Escrow Holder for same. The fees charged by Escrow Holder for services from third party providers may include a "mark up" over the direct cost of such services to reflect the averaging of direct, administrative and overhead charges of Escrow Holder for such services.

3. **ADDRESS OF RECORD.** All documents and funds due the parties are to be mailed to the addresses set out in the Purchase Agreement, unless otherwise instructed. Buyer's address following the Close of Escrow shall be deemed to be the new property address unless Escrow Holder is notified to the contrary by Buyer. Buyer and Seller's signatures on any documents and/or instructions pertaining to this Escrow indicate Buyer and Seller's unconditional approval of same. The parties authorize you to destroy these instructions and records in this Escrow at any time after 10 years from the date of Close of Escrow.

4. **DEPOSIT OF FUNDS.** All funds received in this Escrow shall be deposited with other escrow funds in an escrow trust account or accounts of Escrow Holder, with any financial institution insured by a federal agency of the United States Government ("**Depository Institution**"). The Depository Institution may be an affiliate of Escrow Holder. Any funds deposited in this Escrow are insured only to the limit provided by the Federal Deposit Insurance Corporation. The maintenance of such escrow accounts with some Depository Institutions may result in Escrow Holder's being provided with an array of bank services, accommodations or other benefits by the Depository Institution. Escrow Holder or its affiliates also may elect to enter into other business transactions with or obtain loans for investment or other purposes from the Depository Institution. Said funds will not earn interest unless the instructions otherwise specifically state that funds shall be deposited in an interest bearing account and Escrow Holder may charge a reasonable fee for establishing such an account. All disbursements shall be made by Escrow Holder's check unless otherwise instructed in writing. Escrow Holder is authorized to transfer any Buyer's funds on deposit under any reservation instrument executed by Buyer to this Escrow for credit to the Buyer's account.

5. **NOTICE OF CANCELLATION.** If for any reason this Escrow cannot be closed within the period of time set forth in the Purchase Agreement, Escrow Holder shall nevertheless close it as soon as possible thereafter unless notice of cancellation is given by either party. Any notice of cancellation affecting this Escrow, for whatever reason and whenever given, may be given only in writing delivered to Escrow Holder. On receipt of such notice, Escrow Holder shall within 3 business days mail one copy to the other party. Except for demand of cancellation pursuant to any liquidated damages provision in the Purchase Agreement, unless written objection thereto shall be received by Escrow Holder as provided in the Purchase Agreement, Escrow Holder is authorized to comply with any instructions in such notice and to cancel the Escrow upon payment of Escrow Holder's cancellation charges. In the event written objection is received within the time stated or in the event conflicting claims are made upon Escrow Holder in this Escrow, Escrow Holder may refuse to take further action hereunder and may interplead the parties in any court of competent jurisdiction, in which case Escrow Holder shall be entitled to its costs as further provided in **Paragraph 17** below.

6. **PROPERTY TAX INFORMATION.** The Property may be presently assessed with other property and that the real property taxes, special taxes and assessments may not be segregated by the time this Escrow closes. If the real property taxes, special taxes and assessments are segregated and a tax bill is issued for the Property prior to the Close of Escrow, at the Close of Escrow, Escrow Holder shall prorate the above-mentioned taxes based on the most-recent tax bill for the Property. If no segregated tax bill is issued for the Property prior to the Close of Escrow, then Escrow Holder shall prorate the same based upon Seller's determination of the amount of real property taxes, special taxes and assessments applicable to the Property for the then-current fiscal year, which Seller shall submit to Escrow Holder in writing prior to the Close of Escrow. All prorations and adjustments are to be made on the basis of a 30 day month. Escrow Holder and Seller are not liable or responsible for the accuracy or adequacy of the figures provided by Seller to be used for these proration purposes.

7. **SUPPLEMENTAL TAXES.** Any supplemental assessment billing will be sent to Buyer directly by the County Tax Assessor and will be in addition to the normal tax installments. Buyer shall have the sole responsibility for the payment of all taxes and assessments, if any, related to the period after the Close of Escrow shown on supplemental tax bill. The supplemental tax bill is payable in accordance with the instructions contained therein. If the supplemental taxes are not paid before the date they become delinquent, a penalty will be due. If Buyer has an impound account for tax purposes, Buyer is aware that monthly payment to such account may be increased to reflect the increase in tax liability as indicated on the supplemental tax bill. Escrow Holder is not responsible for determining if Buyer's Lender's request for



MK ZK
Buyer's Initials Buyer's Initials

impound funds is sufficient to include payment of contemplated supplemental taxes and it will be the responsibility of Buyer to contact its Lender with regard to payment of those supplemental taxes.

8. **NO WITHHOLDING.** Section 1445 of the INTERNAL REVENUE CODE provides that a transferee of a U.S. real property interest must withhold tax if the transferor (i.e., Seller) is a foreign person. Similarly, §§ 18622, 18805 and 26131 of the California REVENUE AND TAXATION CODE provide that a transferee of a California real property interest must withhold tax if the funds from the transferee are to be disbursed either to a transferor with a last known address outside of the State of California or to the financial intermediary of the transferor, if the transferor is a non-resident of California. To inform Buyer that withholding of tax is not required in connection with this transaction, Seller certifies that (a) Seller is not a foreign corporation, foreign partnership, foreign trust or foreign estate, and (b) Seller's known street address and its principal place of business are both within the State of California. Buyer and Seller acknowledge that Escrow Holder has provided notice of these provisions, and, in light of the representations of Seller made herein, that Escrow Holder will take no action regarding the withholding.

9. **AUTHORIZATION TO FURNISH COPIES.** Escrow Holder shall furnish a copy of this Purchase Agreement, any amendments hereto, closing statements and/or any other documents deposited in the Escrow to Seller, to Buyer, the Lender, and/or Buyer's attorney, upon request of Seller, of Buyer, the Lender or Buyer's attorney, as the case may be.

10. **INSURANCE POLICIES.** In all matters relating to insurance, Escrow Holder may assume that each policy required to be obtained by Buyer is in force and that the necessary premium has been paid. Escrow Holder is not responsible for obtaining fire, hazard or liability insurance for Buyer, unless Escrow Holder has received specific written instructions to obtain such insurance prior to Close of Escrow from the Buyer or Buyer's lender.

11. **TAXPAYER IDENTIFICATION NUMBER REPORTING AND DISCLOSURE.** Federal law requires Escrow Holder to report Seller's taxpayer identification number ("TIN"), forwarding address, and the gross sales price to the Internal Revenue Service ("IRS"). To comply with the USA PATRIOT Act, certain taxpayer identification information (including, but not limited to, the TIN) may be required by Escrow Holder from certain persons or entities involved (directly or indirectly) in the transaction prior to closing. Federal and state laws require that certain forms include a party's TIN and that such forms or copies of the forms be provided to the other party and to the applicable governmental authorities. Parties to a real estate transaction involving seller-provided financing are required to furnish, disclose, and include the other party's TIN in their tax returns. Escrow Holder is authorized to release a party's TINs and copies of statutory forms to the other party and to the applicable governmental authorities in the foregoing circumstances. The parties agree to hold Escrow Holder harmless against any fees, costs, or judgments incurred and/or awarded because of the release of their TIN as authorized herein.

12. **RETENTION OF FUNDS.** If for any reason funds are retained in Escrow following the closing, Escrow Holder may deduct a monthly charge therefrom for its acting as custodian thereof. If there is no action taken on the Escrow within 6 months after the Close of Escrow, Escrow Holder's agency obligation shall terminate at Escrow Holder's option, and all documents, monies or other items held by Escrow Holder in the Escrow shall be returned to the party or parties depositing the same, subject to Escrow Holder's obligation to retain the records set forth in **Paragraph 3.**

13. **PRELIMINARY CHANGE OF OWNERSHIP FORM.** Buyer is required to furnish a Preliminary Change of Ownership form with the Grant Deed and the County Recorder may charge a penalty if the form is not filed or is unacceptable. Escrow Holder will furnish the required form to Buyer, but will not accept responsibility for its acceptance or rejection.

14. **ESCROW HOLDER NOT LIABLE.** Escrow Holder shall not be liable for the sufficiency or correctness as to form, content, manner of execution or validity of any instruments or reports deposited in this Escrow or ordered by Escrow Holder as an accommodation to the parties, or as to identity, authority or rights of any person executing the same or for failure to comply with any of the provisions of any agreements or other instruments filed herein and referred to herein. Escrow Holder shall not be concerned with any matters relating to construction, warranties or other agreements made between Buyer and Seller over which Escrow Holder has no control and/or which agreements may survive Close of Escrow.

15. **DEMANDS.** Escrow Holder shall pay at the Close of Escrow, from Seller's funds, any demand for reconveyance, releases or satisfactions of any encumbrances of record and any taxes, payment and/or release which are necessary to place title in condition to close this Escrow.

16. **SUPPLEMENTAL INSTRUCTIONS.** Any amended, supplemental or additional escrow instructions shall be subject to the conditions contained in this Addendum and must be in writing signed by Buyer and Seller and delivered to Escrow Holder. Such supplemental instructions may be executed in counterparts.

17. **CONFLICTING DEMANDS OR DISPUTES.** If conflicting demands or notices are made or served upon Escrow Holder or any controversy arises between the parties hereto or with any third party growing out of or relating to this Escrow, Escrow Holder shall have the absolute right to withhold all further proceedings in this Escrow until receipt of satisfactory written notice of the settlement of the controversy by agreement of the parties hereto, or by final judgment of an arbitrator or court of competent jurisdiction and/or Escrow Holder may interplead the parties in any court of competent jurisdiction. All parties to this Escrow hereby jointly and severally promise and agree to pay promptly on demand, as well as to indemnify Escrow Holder and hold Escrow Holder harmless from and against, all litigation and interpleader costs, damages, judgments, attorney's fees, expenses, obligations and liabilities of every kind which, in good faith, Escrow Holder may incur or suffer in connection with or arising out of this Escrow unless Escrow Holder is found or adjudged to have engaged in willful misconduct or negligence. Buyer and Seller shall each bear their respective attorneys' fees and costs. Notwithstanding any of the foregoing provisions of this **Paragraph 17,** and in accordance with DRE Regulation 2791(c)(4)(C), only Seller and not Buyer shall indemnify and hold Escrow Holder harmless from any claim by Buyer arising out of payment of purchase money (as defined in DRE Regulation 2791(a)) to Seller pursuant to a waiver by Buyer of the right to a determination of default by a court or arbitrator.



MK ZK
Buyer's Initials Buyer's Initials

If Escrow Holder is an independent licensed escrow company:

THIS ESCROW COMPANY IS LICENSED BY THE CALIFORNIA DEPARTMENT OF CORPORATIONS UNDER LICENSE NO. 2286.

If Escrow Holder is a title company:

ESCROW HOLDER CONDUCTS ESCROW BUSINESS UNDER CERTIFICATE OF AUTHORITY NO. 2286 ISSUED BY THE CALIFORNIA DEPARTMENT OF INSURANCE.



WK Buyer's Initials ZK Buyer's Initials

# D.R. HORTON

# 10·4·1 LIMITED WARRANTY

Homeowner

## 10-YEAR STRUCTURAL WARRANTY

## 4-YEAR SYSTEMS WARRANTY

## 1-YEAR FIT AND FINISH WARRANTY

BUYER ACKNOWLEDGES THAT THIS WARRANTY WAS PROVIDED TO BUYER BEFORE SIGNING THE PURCHASE AGREEMENT AND ESCROW INSTRUCTIONS, THAT BUYER HAD THE OPPORTUNITY TO READ, AND HAS READ AND UNDERSTANDS THE SCOPE, TERMS, CONDITIONS, EXCEPTIONS AND EXCLUSIONS CONTAINED IN THIS WARRANTY. THIS WARRANTY IS THE ONLY WARRANTY EXPRESS OR IMPLIED, THAT IS APPLICABLE TO THE PROPERTY BEING PURCHASED BY BUYER.

BUYER'S INITIALS WK
BUYER'S INITIALS ZK

Valverde Villages
Track 3452
Lot # 6

This Warranty is not an Enhanced Protection Agreement, as defined by California Civil Code Section 901.

D.R. Horton 10-4-1 Limited Warranty
Copyright 2004 D.R. Horton, Inc.

D

Date: 12/11/05
Community: Valverde Villages
Lot No.: 6
Tract: 3452

**ADDENDUM NO. 1 TO**
**AGREEMENT OF PURCHASE AND SALE, DEPOSIT RECEIPT**
**AND JOINT ESCROW INSTRUCTIONS**

This Addendum No. 1 ("Addendum") is attached to and forms a part of the Agreement of Purchase and Sale, Deposit Receipt and Joint Escrow Instructions executed between Buyer and Seller ("Agreement") with respect to the property referenced above and described therein (the "Property"). Any capitalized terms not otherwise defined herein shall have the meanings as set forth in the Agreement. Buyer acknowledges the following:

1. Per purchase agreement – pg. 3-item 7.5 –pg. 6-item 10.1 – Buyer cannot change lenders after the 30 day unconditional loan approval time frame. This will result in immediate cancellation.
2. A 25% deposit of all options and upgrades will be required with the use of DHI Mortgage. A 50% deposit of all options and upgrades will be required with the use of an outside lender.
3. If an outside lender is to be used, the outside lender notice shall be signed at time of contract. An unconditional loan approval shall be provided by the outside lender with the exact verbiage used in the outside lender notice. Failure to do this within the 30 day time frame will result in immediate cancellation.

This Addendum may be executed in counterparts, each of which when taken together, will constitute one fully executed original.

This Addendum has been made and executed as of the date set forth above, but will not be valid until executed by Seller's authorized officer of the company.

[signature] 12-11-05
Buyer Date

**Western Pacific Housing, Inc.**
a Delaware corporation

By:__________

Zohra Khan 12-11-05
Buyer Date

Name:__________
Title:__________
Date:__________

D

RECORDING REQUESTED BY:

WHEN RECORDED MAIL TO:

D.R. Horton, Inc.
1210 Central Blvd.
Brentwood, CA 94513
Attn: Robert Selders

SPACE ABOVE RESERVED FOR FILING STAMP

# DECLARATION OF COVENANTS, CONDITIONS AND RESTRICTIONS, AND RESERVATION OF EASEMENTS FOR ASHLAND STATION/VALVERDE VILLAGE

**Subdivision No. 3452**

Valverde Villages
Track 3452
Lot # 6

WK
INITIAL
12-11-05
DATE

**SECTION 7 OF THIS DECLARATION CONTAINS A BINDING ARBITRATION PROVISION IN ACCORDANCE WITH THE FEDERAL ARBITRATION ACT, AND A WAIVER OF THE CONSTITUTIONAL RIGHT TO A JURY. YOU SHOULD CONSULT LEGAL COUNSEL WITH ANY QUESTIONS ON THESE OR OTHER PROVISIONS OF THIS DECLARATION.**

WPH
STANDARD CC&RS FORM
31096-00001/1940486 vi

2/24/04

**D. R. Horton, America's Builder**

1:17:33 PM

**Ashland Station**
(209) 404-8116
**Breakdown of Loan**

Salesperson John Costello

| Plan & Homesite | |
|---|---|
| Plan Name | **The Springfield 2538** |
| Homesite | |
| Address | |

| Loan Information | |
|---|---|
| Loan Name | **30 year fixed** |
| Interest Rate | **6.250** |
| Term | **30** |

| Pricing | | Monthly Payment | | Estimated Cash | |
|---|---|---|---|---|---|
| Base Price | 464,990 | Payment | 2,720 | Down Payment (5.009%) | 23,290 |
| Homesite Premium | | Property Taxes | 484 | Loan Fee (1.000%) | 4,417 |
| Elevation Premium | | Homeowner's Insurance | 96 | Miscellaneous Closing Costs | 4,500 |
| **Total Price** | 464,990 | **Estimated Payment** | 3,300 | Prepaid Interest (30 days) | 2,301 |
| Less Down Payment (5.009%) | 23,290 | | | Property Taxes (6 months) | 2,904 |
| **Loan Amount** | 441,700 | | | Homeowner's Ins (14 months | 1,356 |
| | | | | **Estimated Cash Required** | 38,768 |

The information supplied here is to assist you in selecting a financing plan suitable to your financial situation. It is not intended to be an offer. Calculations are deemed reliable based on current data and rates, but cannot be guaranteed. Your rate will be the rate in effect at closing. Exact figures can be provided only at closing.
Property taxes are estimated at 1.25% of the selling price.
Insurance is estimated at $2.5 per $1000 of the selling price.
Prices and terms are subject to change without notice.

**Financing Provided By**

Date Prepared: February 21, 2005

Project: Ashland Station – Valverde Villages
Lot/Resident Unit: 6

## PROJECT SPECIFIC DISCLOSURES ADDENDUM

This Project Specific Disclosures Addendum ("Addendum") or "Project Specific Disclosures" is attached to and forms a part of the Purchase Agreement and Escrow Instructions executed between Buyer and Seller ("Purchase Agreement') for the Property described in the Purchase Agreement. Any capitalized terms not otherwise defined herein shall have the meanings set forth in the Purchase Agreement. If there is a conflict between the Purchase Agreement and the terms and provisions of this Addendum or Project Specific Disclosures, the terms and provisions of this Addendum or Project Specific Disclosures shall control.

### INTRODUCTION

The Project Specific Disclosures set forth the general information which you need to be aware of in connection with your purchase of Property within this Project. You will also receive a disclosure which sets forth the general information, your purchase and about the Property. Buyer is advised to review all disclosures which you receive since these disclosures may impact your decision to purchase a Residence. While Seller has endeavored to provide a comprehensive list of what may be important to you, the disclosures provided by Seller are not an exhaustive and complete list. Seller has no control over much of the information covered in this Addendum, and information is subject to change without notice. Since individual sensitivities may vary with respect to conditions at or nearby the Project, Buyers are encouraged and advised to conduct their own independent investigations regarding the Residence, the Project, the surrounding land uses and any other matter that may be of significance to you. The following information concerning the Project is accurate only as of the date of this statement, which is set forth above. Buyers should verify the information contained herein by contacting the individuals, agencies or firms identified for the most up-to-date information.

All distances mentioned herein are approximations only and, to the extent that such distances are material to Buyer, Buyer should independently verify such distances. All references to "Residence" in this Addendum shall refer to the entire Property, as applicable.

### PROJECT GOVERNANCE

1. <u>Standard Subdivision with Architectural Review by Seller and Thereafter, Individual Homeowner Enforcement of Declaration</u>. The Residence which you are purchasing is situated in what is commonly referred to as a standard subdivision. While there is Declaration of Covenants, Conditions and Restrictions of Ashland Station/Valverde Village (**"Declaration"**) which has been recorded against your Property and other residences within the Ashland Station/Valverde Villages Project, THERE IS NO HOMEOWNERS ASSOCIATION IN THE PROJECT. The Declaration imposes certain use restrictions on all of the Lots subject to the Declaration. It also creates certain easements. Buyer should review the Declaration carefully. Since there is no homeowners association, if an Owner of a Lot in the Project desires to enforce the restrictions set forth in the Declaration against another Owner, the Owner must bring a legal action against the other Owner, which may include bringing an action for an injunction to enforce the restrictions in the Declaration. Seller may, but is not required to, enforce the restrictions in the Declaration.

Under the Article 6.3 of the Declaration, Seller has the right, but not the obligation, to require Owners in the Project to obtain Seller's consent and submit plans prior to the installation of certain exterior structural improvements such as landscaping, hardscaping, trellises, patio cover, decks, spas, room additions, changes in grading or elevation and other similar improvements installed by an Owner which are further described in the Declaration as the "Outdoor Improvements."

Seller's review rights will terminate after Seller conveys the last Lot in the Project to an Owner. Declaration provide that Seller retains architectural review for one (1) year. Under the Declaration, Seller may choose to waive its review rights at any time.

If Seller approves of a particular architectural feature for use on a Lot in the Project, Seller may disapprove of the same feature for another Lot. Buyer may not rely upon Seller's approvals or disapprovals for other Lots in the preparation of implementation of Buyer's plans for Buyer's Lot.

**UPON THE TERMINATION OF SELLER'S LIMITED REVIEW RIGHTS, THE DECLARATION PROVIDES FOR NO OTHER ARCHITECTURAL REVIEW IN THE PROJECT.**

If the future Owners desire to establish an architectural review committed in the Project, it would require an amendment to the Declaration which is governed by Section 6.11 of the Declaration. If such amendment is recorded and an architectural review committee is established by the Owners, Buyer understands and acknowledges that any Owner who serves as a member of such architectural committee is not protected under any liability insurance or directors' and officers' insurance coverage that might



WK Buyer's Initials ZK Buyer's Initial

customarily be purchased by a homeowners association in a common interest development. Additionally, members of such a committee are not indemnified from and against any liability that may be imposed upon such members in connection with any claim to which such members may be made to a party due to actions taken as a member of the architectural review committee.

## OTHER MANDATORY DISCLOSURES

2. **Insulation**. Insulation will be installed in the Residence in accordance with applicable governmental requirements. Insulation to be installed will be as follows:

| Area Insulated | Type of Insulation | Thickness | Manufacturer R-Value of Insulation |
|---|---|---|---|
| Exterior Walls of Living area (excluding garage): | Owens Corning | 3 ½" | R – 13 UF |
| Common Walls (If applicable): | Owens Corning | 3 ½" | R – 13 UF |
| Interior Walls (optional): | Owens Corning | 3 ½" | R – 13 UF |
| Ceilings: | Owens Corning | 10 ½" | R - 30 |

The higher the R-value, the greater the insulating power. Other areas of the Residence may contain insulation type materials; however, these materials have no influence on the thermal effectiveness of the Residence. However, insulation may be of lesser thickness and R-value than indicated in certain areas where the design and or construction of the Residence do not permit greater thickness. Examples of such locations where the thickness and R-value may vary include locations where the studs are placed in the walls, at corners and windows where the roof trusses attached to outside walls. These figures and insulation characteristics are based upon information from the manufacturer, installer and/or supplier of the insulation and Seller hereby disclaims all responsibility or liability for the accuracy thereof.

## PROJECT SPECIFIC DISCLOSURES

3. **Abandoned Water Well**. An abandoned water well was located on or near Residences in lots1, 11, 12, & 13. The well was filled based on recommendations of soils engineer and standard procedures of the state of California. Buyers of these Residences may request a copy of the Certificate of Abandonment from the San Joaquin County Environmental Health Department if they have any questions concerning the capping of these wells.

4. **Agricultural Use**. Areas within the vicinity of the Project may be used for agricultural purposes. Such agricultural uses will result in certain nuisances, including noise, odors, dirt, manure, livestock, pesticides, chemicals and other nuisances that are associated with agricultural operations. Seller has no control over the type or expansion of agriculture operations.

5. **Airborne Substance**. Particulate matter (such as dust, dirt, soot, smoke, and sand), mercury and asbestos can be suspended in the air for long periods of time and may be driven by wind. Some particles are large or dark enough to be seen as soot or smoke. Others are so small that individually they can only be detected with an electron microscope. Particulate matter comes from a variety of sources including from the natural environment or from made-made sources such cars, trucks, buses, factories, construction sites, tilled fields, unpaved roads, stone crushing and the burning of woods. As with other pollutants, the extent and nature of the health effects of airborne substances will depend on many factors including level of exposure and length of time exposed. Eye and respiratory tract irritation, headaches, dizziness and visual disorders are the most common symptoms. Some airborne substances are known to cause cancer in humans. Also, particulate matter driven by wind may cause aesthetic damage to property, such as shipping, stains and damage to stonework and other porous materials. Although such conditions may exist at the Community, Seller has made no investigation to determine the extent or nature of such airborne substances and particulate matter at the Community, and makes no representation or warranty as to their presence or their effects on humans or the environment.

6. **Air Quality**. Buyer is advised and Buyer acknowledges that each Residence is constructed using hundreds of components made of natural and/or man-made materials and that any material or combination of materials could cause an allergic reaction. Seller has no control over individual allergic reactions.

7. Assessment Districts and Special Tax Districts. The Project is located within the Lighting & Landscaping Assessment District No. 96-2 which was formed to maintain, among other things, public landscaping and lighting. The costs of these improvements will be allocated among the new homes in the area of benefit, and be collected each year with Buyer's property taxes. The annual assessment for 06-07 tax year is $157.35. Please refer to Attachment #1. The project is also located within a Storm Drain Maintenance District. The costs to maintain the improvements will be allocated among the new homes in the Area of Benefit and be collected each year with the Buyer's property taxes. The annual assessment Storm Drain Benefit District estimate for 06-07 tax year is $51.50. Please refer to Attachment #2.

8. Potential Increases to Assessment District Fees and Taxes. Buyer understands and accepts that homeowner fees and taxes for financing assessment districts (including, but not limited to, lighting and maintenance districts, landscape maintenance districts, water facilities districts, community facilities districts, school facilities districts, special tax assessments, and any such similar assessment district fees and taxes, if any, whether disclosed in this Disclosure Addendum, any attached addenda at the end of this Disclosure Addendum, any supplemental Disclosure Addendums, or otherwise disclosed to Buyer) may potentially increase beyond any current established fees, taxes and annual percentage increases disclosed to Buyer, and any such increases could be excessive and significant in the event of circumstances beyond Seller's control, such as energy shortages, increases in energy costs, changes in service providers, increases in the costs to maintain facilities, or other significant environmental or economic changes.

If the fees and taxes collected by an assessment district are insufficient to pay for the costs to maintain the facilities, it is possible that, pursuant to the terms of the Declaration and/or the assessment districts, homeowners could vote to increase the assessments to pay for the increased costs. If Seller and other developers own lots in the Project at the time of any such vote, pursuant to the terms of the Declaration and/or the assessment districts, Seller and other developers may have the right, but not the obligation to vote.

If assessments are not increased to cover the increased costs, it is possible that services or facilities paid for by the assessments could be left without maintenance, not serviced, turned off or even removed from the Project altogether. For example, if a lighting and maintenance district does not collect sufficient fees to cover the increasing cost of electricity due to the energy crisis, and if the homeowners do not vote to increase the assessment fees, it is possible that street lights within the Project may be limited to shorter time periods or turned off, or the street lights may be removed altogether by the facilities provider.

In all such events, the loss of such services or facilities may negatively impact the valuation of homes and safety, and otherwise adversely affect the Project. Seller has no control over any circumstances such as energy shortages, increases in energy costs, changes in service providers, increases in the costs to maintain facilities, other significant environmental or economic changes. Therefore, Buyer understands and accepts that Seller will have no liability whatsoever arising out of or in connection with any such loses, regardless of whether or not Seller had a right to vote in favor of or against increased fees or taxes, or whether or not Seller exercised its voting rights.

9. Available Documents. The following documents are available at Seller's North Bay-Sacramento Division for Buyer's review: Recorded Subdivision Map; improvement plans; landscaping plans; rough grading plans; soils reports; preliminary title report; architectural plans; development plans; Conditions of Approval; CC&Rs; Public Report and homeowner association documents. Please contact the Sales Office if you would like to make an appointment to review some or all of these documents.

10. Basketball Hoops. No basketball standards or fixed sports or play apparatus shall be installed or attached to the front of any dwelling or garage or be erected in any yard without prior approval of the Architectural Committee. Any portable basketball standards shall be subject to the Association Rules and the Architectural Guidelines.

11. Brass Plumbing/Light Fixtures/Hardware. Although the manufacturers apply the finest protective coatings available to the plated surface of their products, chrome, brass, bronze or other finishes have their limitations. In time, the protective lacquer may deteriorate from exposure to weather, perspiration, cleaning agents, frequency of use and other factors. Tarnishing or excessive wear of these finishes is a normal process which is unavoidable. Subject to California Civil Code section 895 et seq., these finishes cannot be guaranteed and products will not be repaired or replaced under the manufacturer's warranties for tarnishing or wear of finishes.



MK Buyer's Initials ZK Buyer's Initial

D

12. Carpet. Buyer is advised that lighter colored carpets have a tendency to show signs of air filtration (dirt and dust build-up at the perimeter areas of the carpet and under doorways). This process is due to normal occurrences caused by solid particulates carried by air. Buyer acknowledges receipt of this information and understands and agrees that no warranty claims for air filtration will be covered by Seller. Carpet seams will be made by qualified professionals using the best practices of the trade. Seams will be located out of heavy traffic areas whenever possible. Most carpet manufactured today is produced in 12-foot widths and requires seaming. Roll sizes will affect seam layout. Seams cannot be guaranteed to be "invisible" and results will vary depending on carpet textures and lighting situations. Some seams may show peaking characteristics. Changes in temperatures may affect seams as well, and seams may be more obvious at certain times than others because of this. A carpet seam that has been joined together with hot melt tape, then stretched, will naturally peak.

13. Cell Phone Reception. Buyer acknowledges that Seller has no control over the quality of cell phone reception in the vicinity of the Project or at Buyer's Residence.

14. Earthquake Zone Information. The Community is located in one of the most seismically active regions in the United States. The Community is in the County of San Joaquin. All of the County is categorized in earthquake Zone 3 as that zone is defined in the Uniform Building Code in effect at the time that original building plans were approved. Zone 3 is the low probability of the four earthquake probability zones. Should an earthquake occur, the structural design of the homes at the Community are not designed to eliminate damage to the buildings, but only to minimize the probability of collapse of the building. It is advisable to carry earthquake insurance and some mortgage lenders are currently requiring earthquake insurance to repair damage to the building in the event of an earthquake. Buyer is advised to contact the City of Stockton for information relating to fault zones within the vicinity of the subdivision.

15. Easement. Buyer's Residence may be subject to easements and/or rights in favor of utility companies, public agencies and/or other persons or entities. These easements and rights may include access onto Buyer's Residence by utility companies or public agencies for purposes of installing, constructing, inspecting, maintaining and repairing their facilities which are customary for residential developments (including, but not limited to, water lines, sewer lines, electrical lines and facilities, natural gas pipelines, telephone lines and facilities, cable television lines, street lights, clustered mailboxes, traffic signs, and fire hydrants). These facilities may be located above ground or below ground. In either case, these facilities may restrict the use and type of improvements Buyer can make to Buyer's Residence, and the utility companies and public agencies may have the right to remove improvements made by Buyer on their easement without any obligation to repair or restore them. Seller cannot control the location of these facilities. The location of a utility company's and/or a public agency's facilities is subject to change without notice. Buyer should confirm the as-built location of all facilities affecting Buyer's Residence at the time of Buyer's walk through inspection. Buyer understands and agrees that all as-built locations are final. Additionally, Buyer should review the title report for Buyer's Residence to determine what easements and/or other rights, if any, affect Buyer's Residence.

16. Specific Easements. Buyer has read and approved the Preliminary Title Report for the Property. Additional easements and other matters of record may also be included in the subdivisions after the date of this Disclosure Statement that could affect the Residence purchased by Buyer. The following items are not intended to be an all-inclusive list of easements and matters of record and is not intended to be a comprehensive review of such items listed. Seller specifically refers Buyers to the Preliminary Title Report prepared in connection with Buyer's purchase of the Property as to the existence and location of easements and other matters of record affecting Buyer's Property. Buyer agrees to accept such easements and other matters of record as part of the purchase of the Property.

Soundwall Maintenance Easement: Buyer is aware that all lots adjacent to soundwalls have a (3'") foot wide S.M.E. on either the rear, side or corner of the lot.

Public Utility Easements (PUE): Buyer is aware that all lots have a (10') foot wide PUE in all front yards that are contiguous to a street.

Slope Easement: Buyer is aware that lots have either a (7' or 12') foot wide slope in the rear yards of lots 264 – 269, 201 – 210.

17. Electrical Pedestals, Transformers and Vaults. Buyer acknowledges that utility agencies may be installing above ground secondary electrical boxes in the front side yards between each Residence at the common property line. Buyer is aware that certain lots and possibly Buyer's lot will contain above ground pedestals to provide television and telephone service; above ground electrical transformers and various vaults required for service to Buyer's lot and surrounding community.

18. **Electricity Shortage, Increased Costs and Delays.** Buyer understands and accepts that California may face a serious statewide electricity shortage which resulted in significant increases in the costs for energy and utilities, as well as rolling black-outs, service interruptions, service and maintenance problems from the utilities providers, and other related inconveniences such as delays in the establishment of electricity and utility services, bankruptcy filings by utilities providers and delays in the issuance of certificates of occupancy. Such interruptions and inconveniences could occur again in the future. Buyer understands and accepts that such shortages and delays may, in turn, cause delays in the Close of Escrow. Furthermore, Buyer recognizes and accepts that the electricity shortage, increased costs and delays are not isolated to California and may, directly or indirectly, affect other states in which Seller builds.

Seller has no control or influence over the electricity shortage, increased costs, delays or any related problems and Buyer understands and accepts that Seller shall have no responsibility or liability for any such problems or delays, including, but not limited to, any delays in the close of escrow. Buyers should contact the utilities providers and their local, state and federal governmental agencies for further information.

19. **Elevation and Color.** By executing below, Buyer hereby acknowledges that you are aware of and agree to the elevation and color scheme of the Property, which you are buying. The elevation and color scheme are as follows: ELEVATION [ C ] COLOR SCHEME: [ 371 ]

20. **Energy Conservation (Title 24): Air Conditioning Disclaimer.** Heating and cooling units installed in the Residences are designed to meet guidelines for the State of California's Title 24. This is an energy conservation law which is designed to help reduce the overall use of energy in Buyer's Residence. The Title 24 law describes the amount of cooling capacity as well as the minimum efficiency ratings for each geographical location in the State. In complying with Title 24, the optional cooling units installed in Buyer's Residence are designed to maximum efficiency. Due to the Title 24 geographical requirements, on extremely warm days, Buyer's inside room temperature may be warmer than Buyer's thermostat selection. This is due to design restrictions imposed by Title 24 and not to any design or installation defect of Seller or its contractor. Care should be taken to keep all objects including, but not limited to sticks, toys, fingers or other debris from entering the vents or any other openings on the air conditioning equipment placed outside the Residence. Children should not play or otherwise come near the air conditioning equipment.

21. **Energy Conservation (Title 24): Hot Water Disclaimer.** Due to compliance with the energy-saving requirements in the State of California's Title 24, it may take a few minutes for hot water to reach the faucet in Buyer's Residence. Title 24 is an energy conservation law which is designed to help reduce the overall use of energy in Buyer's Residence. Any delay in the production of hot water to Buyer's faucet is due to design restrictions imposed by Title 24 and not due to any design or installation defect of Seller or its contractor.

22. **No Enhanced Protection Agreement.** Neither the Homebuyer's Guide, Limited Warranty nor any other transaction document contemplated herein, including, without limitation, the provisions of this Disclosure Statement, are intended, or shall be interpreted, to be an Enhanced Protection Agreement as defined in California Civil Code Section 895 et. seq.

23. **Megan's Law.** The California Department of Justice, Sheriff's Department, police departments serving jurisdictions of 200,000 or more, and many other local law enforcement authorities maintain for public access a database of the locations of persons required to register pursuant to paragraph (1) of subdivision (a) of Section 290.4 of the Penal Code. The database is updated on a quarterly basis and a source of information about the presence of these individuals in any neighborhood. The Department of Justice maintains a website at: www.meganslaw.ca.gov. This information includes the names of offenders, known alias, a photograph, physical description, date of birth, criminal history, and other information. The Department of Justice may also maintain a Sex Offender Line through which inquires about individuals may be made. This is a "900" telephone service. Callers must have specific information about individuals they are checking. Information regarding neighborhoods is not available through the "900" telephone service.

24. **Environmental Advocacy Groups.** From time to time, groups of individuals may make their presence known for the project advocating environmental changes, and sometimes verbally protesting the development of our projects. We bring this to your attention so that you will be fully

informed that these events may occur and the potential consequences that, while unlikely, may follow therefrom. Seller makes no representation or warranty, and expressly disclaims against liability or any future action taken by such advocacy groups, or Seller's decision or inability to complete the intended development of the project.

25. Exterior Paint. Great care and consideration has gone into selecting the exterior colors for your Residence. The color schemes have been pre-selected. Even though Seller strives to match the color of your Residence to the color chart in the sales office, variations may occur. In addition, colors can change over time due to exposure to the elements and may appear different in different light. Seller reserves the right to revise the designated color schemes at its sole discretion.

26. Fencing and Walls: Homeowner-maintained. Fences and walls within the Project will vary from Residence to Residence depending on the location of the particular Residence, sound attenuation requirements, safety standards, and other factors. Buyer acknowledges Buyer has reviewed the fencing and is aware of the approximate location, materials used, and approximate dimensions of the fencing being installed and the Residence as shown on Plot Plan for the specific lot. Buyer acknowledges that Buyer does not have the right to select a particular fence or wall, but should review the fence or wall, planned for the Residence with the sales representatives.

Under the terms of the Declaration, each Buyer shall be responsible to maintain, repair and replace any fencing or wall within the Residence.

Maintenance, repair, and replacement of fences between Residences is the responsibility of the Buyers of such Residences. Buyer acknowledges that any changes Buyer wishes to make to the fencing or walls on or adjacent to the Residence must be approved in advance by the Architectural Committee.

27. Fencing May Not Be On the Property Line. Buyer is hereby advised and informed that the grading lines, fences and walls installed by Seller may not coincide with the lot lines of Buyer's Residence. The fence plan is diagrammatic and is only intended to show the type of fencing on a particular Residence and the approximate location. Often, fences and walls are intentionally offset from property lines to accommodate slope conditions, drainage patterns, common area or open space restrictions, or for other reasons. Actual dimensions from lot lines to a Residence may also vary from those shown on the plot plans for a particular Residence.

28. Fire Station: Permanent. A fire station is situated at McNabb Street near Thornton Road in Spanos Park. This fire station may create noise, traffic congestion and other nuisances. Seller has no control over the fire station and whether it will continue to operate as a fire station. There is no representation made about Buyer's safety merely by the presence of the fire station.

29. Floor Noises. During construction of your Residence, great efforts were made to insure that all floor joists and subfloor sheeting are nailed off completely. Due to temperature variations plus normal expansion and contraction due to seasoning of the lumber in your Residence, the second-story floor may at some time develop small squeaking and/or noisy areas. Such noises are unavoidable and beyond Seller's control.

30. Flooring. The purchase price of your Residence includes the installation of standard flooring. You may upgrade your flooring through the designated design studio. If you choose to upgrade flooring outside of the designated design studio, you may only do so after the close of escrow. IF YOU CHOOSE TO USE AN OUTSIDE FLOORING COMPANY, THERE WILL BE NO CREDIT GIVEN AND YOUR LENDER MAY REQUIRE A HOLDBACK TO ENSURE THAT FLOORING IS INSTALLED FOR THE RESIDENCE.

31. Freeways/Highways. Portions of the Project are located within one mile of Interstate 5. In addition, there are other regional, local arterial and interior roads in the vicinity of the Project that may cause noise within the Project or traffic congestion on the roadways including Thornton Road and Eight Mile Road near the Project. These road system improvements are subject to modifications, approvals, and improvements made by the State or County. For example, alignments may be changed, proposed extensions may be deleted or changed and roadway improvements within the vicinity of the Project may be added. Owners may experience noise from use of these roads as well as other problems associated with traffic congestion in the area of the Project.

32. **Future Adjacent Land Uses**. Seller makes no representations about future land uses on adjacent or nearby properties. Plans for redevelopment of any adjacent property could have an effect on the Project. Seller does not control the land use or zoning of the adjacent properties. Because general plans and zoning are subject to change, we encourage Buyer to check with the Planning Department or any other appropriate City of Stockton Department regarding proposed land uses in the surrounding vicinity of the Project. There are parcels adjacent to the project to the northwest which have zoning designations of high density residential and commercial offices. The property to the southwest will be developed as a gated private community of 35 custom lots. Other uses to the west may be developed for commercial in the future based on current zoning.

33. **Grading of Residence**. Residences will be or have been graded in general compliance with the grading plans. Buyer acknowledges that the field conditions, including the existence of rock, may cause changes to the siting of the Residence and size of pad or yard dimensions. Seller, in its sole discretion, will use reasonable efforts to site the Residence in general compliance with the grading plans/plot plans.

34. **Supplemental Information Regarding Grading of Residence**. Seller will not be responsible for the drainage characteristics, subsurface moisture or erosion of the Community in the event of any changes to the grade, whether through the installation of landscaping or otherwise. Buyer agrees not to make any changes to the grade or the lot without the advice of a competent professional, and if applicable, the Architectural Committee established for this Community and in accordance with the ordinances or regulations of any governmental agency. Buyer understands that failure to adequately landscape the Residence may result in erosion and resulting changes in the drainage patterns of the Residence. Buyer further understands that any change in the drainage pattern of Residence of the adjacent properties may have a significant impact on the structural integrity of a home or cause erosion or subsidence of surrounding land.

35. **Gutters**. Roof gutters and downspouts may be installed by Buyer to improve drainage subject to obtaining any approvals required under the Declaration. Roof gutters and down spouts should be tied into an area drain system or diverted to swales that will drain into the roadways, if permitted.

36. **Heavy Furnishings or Equipment in the Residence**. Prior to installation or transportation of any heavy furnishings or equipment into the Residence, Buyer should consult with a structural engineer or other qualified professional to confirm that the heavy furnishings or equipment will not exceed the structural design of the Residence and that the flooring system, whether on second story floors or first story floors, will not be overloaded, damaged or otherwise adversely affected by such heavy furnishings or equipment. Heavy furnishing or equipment include, without limitation, water beds, safes, weight benches, heavy exercise equipment, large fish tanks and pool tables. Seller will not be responsible for any damages, loss or injury arising out of or in connection with Buyer's heavy furnishings or equipment.

37. **Interpretation of Legal Documents**. Sales Managers and other of Seller's personnel are not authorized to explain, interpret or modify the Purchase and Sale Agreement of any other legal documents covering or pertaining to the purchase of the Residence, including, without limitation, this Statement. Buyer represents to Seller that Buyer, in making a decision to purchase a Residence, has not received or relied upon explanations, interpretations or modifications made by sales managers, sales representatives or other of Seller's personnel.

38. **Landscaping and Permits**. Seller will install landscaping in the front yard area on the Residence. Buyer is responsible for landscaping the backyard areas on Buyer's Residence within twelve (12) months after the Close of Escrow on Buyer's Residence as provided in the Declaration. Seller recommends that Buyer landscape the yard areas as soon as possible to prevent erosion or damage resulting from rain, wind and other environmental influences.

39. **Lease of Dwellings**. Buyer understands that Seller reserves the right to lease other properties in the Community in which the Residence is located.

40. **Mailboxes**. Mailboxes in the Project are clustered in groups pursuant to the requirements of the U.S. Postal Service and installed by Seller. Seller has no control over the placement of the clustered mailboxes, either initially or in the future. Buyer is responsible to maintain the mailbox

key. The mailboxes are centrally located to serve several residences. Placement and design for the mailboxes has been determined by guidelines, which include street grade, distance from intersections, convenient parking locations, nuisance reductions, number of boxes, lighting and aesthetics. In some cases, the Postal Service will not deliver to the subdivision until there are a certain number of homeowners moved into their new homes.

41. **Mineral/Water Rights**. Buyer will not own the mineral, oil and gas rights under Buyer's land below a depth of 500 feet. The owner of these subsurface mineral rights, and the overlying and other water rights, will not have a right to surface entry from Buyer's property. The reservation of these rights is shown on the legal description of the Project in the overall preliminary title report which is available for review in the sales office. Buyer's title report and underlying title exceptions will provide a fuller description of the limitations, if any, on Buyer's mineral, oil and/or water rights.

42. **Moisture**. A difference in elevation occurs between the garage and the house slab. Moisture caused by landscaping irrigation, heavy rain or soil placed against the foundation may cause effervescence to develop. Commercial products are available for the removal of efflorescence. Buyer acknowledges that such conditions may result during times of excessive moisture exposure, and that it is Buyer's sole responsibility to remove any efflorescence that might develop.

43. **Supplemental Mold and Mildew Prevention**. In an effort to keep you satisfied with your new home, and to protect your home well into the future, Seller provides you this disclosure concerning mold growth and prevention. Mold is a naturally occurring substance that exists indoors and outdoors and functions to degrade organic material. Mold cannot exist without two simple ingredients: organic material and, most importantly, moisture. Household items that frequently form the basis of common household mold include: rotten food, wood, paper, drywall, carpet, garbage, or over use of humidifiers. Due to the growing implementation of energy efficiency requirements, modern homes allow for less ventilation of air and water than they ever did in the past. As a result, homeowners must perform routine maintenance and properly ventilate your new home in order to control the levels of moisture that exists within your home, and to keep humidity levels inside your home consistent with outside levels. Please see your homeowners' manual for more details as to how to prevent uncontrolled mold growth. For more information regarding mold and/or the potential health effects of mold exposure, visit the U.S. Environmental Protection Agency mold web site at www.epa.gov/iaq/pubs/moldresources.html, or the U.S. Centers for Disease Control and Prevention at www.cdc.gov and search for the keyword "mold."

44. **Move-In and Occupancy**. Due to the fact that you may not have your utilities activated and you may want to make certain personalized improvements to your new home, Seller recommends for you to be prepared to make alternative or contingent living arrangements for a minimum of 2 weeks after the close of escrow on your Residence. Your future residence may or may not be ready for occupancy the day your deed records and you may need to make necessary arrangements to protect your living situation for such period of time. Buyer is aware that Buyer may not begin construction activity, place personal property in the Residence or cause any improvements, such as flooring or window covering, to be installed prior to the close of escrow.

45. **Noise from Amenities**. Residences in the vicinity of Project amenities such as entry gates, tot lots, and recreation facilities will likely experience higher than normal noise from pedestrian traffic and other disturbances associated with the use of these facilities. Buyer acknowledges that noise generated from the use of Project amenities are not within Seller's control.

46. **Noise from Busy Street**. The Project is located in the vicinity of Eight Mile Road and Thornton Road. Buyer may experience noise from the use of the street as well as other problems associated with traffic congestion in the area of the Project. Buyer is responsible for investigating noise levels in and around the Project and acknowledges such noise is beyond Seller's control.

47. **Non-Warrantable Conditions**. Buyer has read, understood and received a copy of Seller's Non-Warrantable Conditions as outlined in Attachment No. 3 of this Disclosure, which highlights some of the non-warrantable conditions affecting the Residence, but is not comprehensive of all non-warrantable conditions. See your Limited Warranty for further information.

48. **Rolled Driveways**. The transition between the driveway on the Residences and the street is a rolled curb. Unlike other driveways where the curb is removed along the width of the driveway

allowing for a seamless transition between the driveway and street, rolled curb are continuous along the entire street edge. Buyers driving low profile vehicles are encouraged to enter their driveway at a slow speed to prevent damage to their vehicles. It is your responsibility to determine whether the driveway for your Residence is satisfactory and to verify that the height of the curb will provide adequate clearance for your vehicle before Close of Escrow.

49. **Sound Attenuation Walls.** Sound attenuation walls constructed out of masonry block have been built on or near the property line of Residences located along Eight Mile Road and Thornton Road. These sound attenuation walls were constructed in accordance with a sound study and the City of Stockton's requirements to minimize noise from the adjacent street. You may not alter or modify the sound wall without the approval of City. Buyer is advised to visit the Project and the area at various times of day to assess Buyer's sensitivity to noise levels there.

50. **Owner Occupancy.** Buyer acknowledges that Seller is striving to provide home ownership opportunities for people who intend to purchase and occupy their home as their primary residence in order to encourage a stable community of owner-occupied residences. Buyer has represented to Seller that it is purchasing the Residence as its principal residence. While Seller has established a policy regarding its goal of selling homes to individuals who will occupy their homes as their primary residence, Seller cannot be certain that every owner within the Project will in fact occupy their home. Additionally, Seller is not making representations or warranties to Buyer or any other Owner at the Project that it will enforce any policy that may have been established by Seller in connection with the sales of residences to owners for their primary residence.

51. **Park.** There will be a park site located on Wave Crest Drive is owned by the City of Stockton. Typical park amenities include playground, passive and active use areas. Seller does not guarantee completion of the park or any completion date. As a result, the Project may be subject to lighting, noise, traffic and other nuisances. Seller has no control over the use of the park or its hours of operation and makes no representations or warranties as to whether the park will continue to be used by the City for recreational facilities or any other uses. For further information, contact the City of Stockton Parks and Recreation Department at 209-937-8206.

52. **Parking Per Declaration.** Buyer is required to park vehicle(s) in his/her garage. Buyer acknowledges that he/she has been advised to read the use restrictions set forth in the Declaration carefully before determining to purchase a Residence, and to contact a sales representative if Buyer has any questions. In particular, Buyer should review the provisions of the Declaration that limit and restrict the parking of trailers, boats, and motor vehicles within the Project.

53. **RV Parking: Not Permitted on Lot.** No Owner shall park, store or maintain a recreational vehicle (including, but not limited to, camper unit, motor home, trailer, boat trailer, or other reasonably similar vehicle), unless such vehicle is parked along the side of, or in the rear of a Residence, and is reasonably screened from view of all adjacent Residences with screening materials approved by the Architectural Committee.

54. **Plot Plans.** Plot plans, improvement plans and other documents and information regarding the Residence and the Community contain dimensions that are approximate. YOU ARE STRENUOUSLY ADVISED TO CAREFULLY REVIEW THE PLOT PLAN AND FINAL SUBDIVISION MAP. THE PLOT PLAN IS AN APPROXIMATION OF SOME OF THE FEATURES OF THE PROPERTY (SUCH AS THE APPROXIMATE LOCATION OF BOUNDARIES, FENCES, UNDERGROUND PIPES, GRADES, ELEVATIONS, SETBACKS, ETC.). THE FINAL SUBDIVISION MAP IS ANOTHER SOURCE OF INFORMATION THAT MAY DIFFER FROM THE PLOT PLAN. BOTH MAY ILLUSTRATE FEATURES THAT MATERIALLY AFFECT THE VALUE, MARKETABILITY OR DESIRABILITY OF THE PROPERTY, OR MAY SIGNIFICANTLY LIMIT YOUR ABILITY TO FULLY USE THE PROPERTY. AFTER REVIEWING THE SAME AND PHYSICALLY INSPECTING THE PROPERTY, IF YOU HAVE ANY CONCERNS REGARDING THE PROPERTY OR THESE FEATURES, YOU ARE ADVISED TO CONSULT WITH A SURVEYOR, ENGINEER OR OTHER PROFESSIONAL BEFORE SIGNING A CONTRACT TO PURCHASE. YOUR PURCHASE OF THE PROPERTY IS AN ACKNOWLEDGEMENT THAT YOU ARE SATISFIED WITH THE PROPERTY AFTER MAKING THIS INQUIRY AND AFTER HAVING AN OPPORTUNITY TO CONSULT WITH APPROPRIATE PROFESSIONALS. NEITHER ARE A SUBSTITUTE FOR A PHYSICAL INSPECTION, SURVEY OR FURTHER INVESTIGATION OF THE PROPERTY. THE PLOT PLAN IS PROVIDED AS A COURTESY TO YOU. IT IS A CONCEPTUAL RENDERING FOR YOUR INFORMATION ONLY. IT IS NOT GUARANTEED TO BE COMPLETE OR ACCURATE. THE FEATURES DEPICTED THEREIN ARE SUBJECT TO CHANGE WITHOUT NOTICE.



WK ZK
Buyer's Initials Buyer's Initial

55. Plumbing. If drain lines become clogged, this may result in possible damage and inconvenience, and therefore must be maintained open and free-flowing at all times by Buyer. In addition, the plumbing drain lines have been routed above ground through the walls and ceiling in your Residence. Buyer may experience some noise due to the location of these pipes.

56. Post-Tension Concrete System. Due to expansive soil conditions, Buyer's Residence may be built using a post-tension concrete system ("System"). The System involves placing steel cables under high tension in the concrete slab located beneath the Residence. Therefore, any attempt to alter or pierce the foundation (e.g., sawing, cutting or drilling) could damage the integrity of the System and/or cause serious injury or damage to persons and personal property. Subject to California Civic Code Section 895 et seq., Seller shall not be responsible for any damage or injury resulting from or arising in connection with the alteration of the slab or foundation of any Residence in the Project. By acceptance of a deed to a Residence, Buyer agrees that: (i) Buyer shall not cut into or otherwise tamper with the System; (ii) Buyer shall not knowingly permit or allow any other person to cut into or tamper with the System so long as Buyer owns any interest in the Residence; (iii) Buyer shall disclose the existence of the System to any person who rents, leases or purchases Buyer's Residence; and (iv) Buyer shall indemnify, defend, and hold Seller, and its officers, employees, contractors and agents harmless from and against any and all claims, damages, losses or other liability (including attorneys' fees and costs) arising from any breach of this covenant. Buyers acknowledges that he/she will not be able to install a floor safe.

57. Power Lines or Power Substation. Underground electric transmission and distribution lines and transformers are located in and around the Project. The lines and transformers are owned, operated and maintained by Pacific Gas & Electric Company (PG&E). Power lines and transformers produce extremely low-frequency electromagnetic fields ("ELF-EMF") when operating. Please note that the size, nature, voltage and location of such underground electric transmission and distribution lines and transformers or overhead power lines are not within Seller's control and are subject to change. For some time, there has been speculation in the scientific community about health risks associated with living near ELF-EMF sources.

In 1992, the U.S. Congress authorized the Electric and Magnetic Fields Research and Public Information Dissemination Program ("EMF-RAPID Program") in the Energy Policy Act. The Congress instructed NIEHS, National Institutes of Health ("NIH") and the U.S. Department of Energy ("DOE") to direct and manage a program of research and analysis aimed at providing scientific evidence to clarify the potential for health risks from exposure to ELF-EMF. After review and analysis of the existing data, NIEHS reported to Congress on May 4, 1999, the following"

- "The scientific evidence suggesting that ELF-EMF exposures pose any health risk is weak."
- "Virtually all of the laboratory evidence in animals and humans and most of the mechanistic work done in cells failed to support a causal relationship between exposure to ELF-EMF at environmental levels and changes in biological function or disease status."
- "The NIEHS does not believe that other cancers or non-cancer health outcomes [from ELF-EMFs] provides sufficient evidence of a risk to currently warrant concern."

In California, the State Public Utilities Commission and the Department of Health Services are conducting an ongoing, joint research program initiated in 1989 to examine the possible health effects of exposure to electric and magnetic fields from electric power facilities. Their findings may determine whether regulatory action is warranted to reduce any health hazard.

Seller recognizes and discloses to Buyer that (a) no definitive research has said that ELF-EMF exposure is entirely safe; (b) ELF-EMF's impact on humans will undoubtedly continue to be an area of public concern; and (c) advocacy groups of different scientific orientations have opposing views on this subject with some arguing that ELF-EMFs are entirely safe and others arguing that there are correlations between ELF-EMF presence and serious diseases.

As a result, Seller hereby discloses that transmission lines may create health risks and may have financial or other adverse impacts on the homes or residents within the Project. In addition, there is a risk that certain pacemaker heart implant devices may not operate properly when in close proximity to certain electric power lines. The susceptibility of different types of pacemaker devices to electro-magnetic interference should be discussed with a physician.

Seller does not render an opinion or endorse any particular study, even including the NIEHS study. Seller's quotations of some portions of the NIEHS report do not represent an exhaustive description of the NIEHS report. Copies of the entire NIEHS study are available http://library.niehs.nih.gov/ or http://www.niehs.nih.gov/emfrapid/.

The NIEHS report contains a list of references, including an extensive bibliography, for potential buyers to consider for additional research. Indeed, more than 300 studies regarding these issues were reviewed by the NIEHS in the course of its study and are described in the report. Seller urges interested Buyers to

research and review the literature available on the subject and to reach their own conclusions of safety as related to ELF-EMF exposures.

By signing this Disclosure Addendum, Buyer acknowledges that Buyer has reviewed the particular sections of the disclosure regarding electromagnetic fields and Buyer's acknowledgement constitutes Buyer's waiver and release of Seller, its affiliates, parent companies, subsidiaries, employees, officers and directors from any loss, damage or claim whatsoever in any way related to exposure to ELF or EMFs.

Therefore, by executing a copy of this Disclosure Addendum, Buyer expressly acknowledges and agrees that Seller shall have no responsibility for any costs, expenses, liabilities or obligations of any kind or nature whatsoever arising out of or in any way related to the transmission lines. For further information please contact the Customer Service Division of PG&E.

[See Attachment No. 4]

58. <u>Public Transportation</u>. Public bus service is currently made available through the San Joaquin Regional Transit District, which has one inter-city route near the Project. Although the service described was available as of the date of this Disclosure Addendum, it is subject to cancellation or change. For schedules, fares and further information, please contact San Joaquin Regional Transit District, 1533 E. Lindsey Street, Stockton, CA 95202, (209) 943-1111.

59. <u>Railroad</u>. The Ashland Station/Valverde Villages Project is located one mile from the railroad tracks. There are nuisances including, but not limited to, noise and traffic related to the use of the railroad. The railroad operates on a twenty-four hour basis and some of this activity may be heard in Buyer's Residence. The noise from the railroad includes, but is not limited to, bells and whistles. Buyer acknowledges that Seller has no control over the schedules or operations of either the train and makes no representation that such services will continue to operate at any specific level. Buyer should satisfy himself or herself that noise and other nuisances associated with the railroad station are acceptable to Buyer.

60. <u>Recreational Facilities</u>. The Project includes recreational facilities consisting of neighborhood park ("Recreational Facilities"). The use of these Recreational Facilities may cause noise, night light, the errant flight and/or entry of items of play and other disturbances to Buyers. Buyers living near the Recreational Facilities will likely experience higher than normal pedestrian traffic and other disturbances associated with the use of these facilities.

61. <u>Roof: Damage to Tiles and Colors</u>. Roof tiles can be damaged if walked on. Subject to California Civil Code Section 896 et. seq., Seller will not be responsible for roof tile damage or roof leaks which are the result of abusive use or individuals walking on the tiles. The roofing material and appearance has been selected by consultants to accompany the color of the Residence. The color of the roof tiles can be altered as a result of exposure to sunlight. The color consistency of the roof tiles cannot be guaranteed due to natural variations in the raw materials used or resulting in the manufacturing process The roofing chosen is specific for each individual Residence, and cannot be changed. Selected roofing samples are available in the sales office.

62. <u>Sales Representative Authority</u>. Buyer hereby acknowledges that the Sales Representatives have no authority to modify the terms of any sales documents, unless reviewed and approved by the Seller's Authorized Representative. Buyer should not rely on any representation made by Sales Representatives which are inconsistent with the sales and disclosure documents that comprise the Purchase and Sale Agreement. Buyer acknowledges that Seller has not made any material representations which are not in written form.

63. <u>School: Existing Site</u>. There is a high school located to the west of the site approximately one eight of a mile on Thornton Road. Seller makes no representation whether this site will continue to be used as a elementary school. There are fields at the elementary school which may be used for sports activities and other school. The fields may be lighted at night. There may be noise, traffic and other congestion resulting from the use of the school site (John Muir Elementary School, Christa McAuliff Middle School and Bear Creek High School). Owners in the Project may be impacted by noise, lights, traffic and other impacts. For more information, please contact the Lodi School District at (209) 331-7218.

64. **Security System**. An electronic home security system may be installed in Buyer's new home. The security system is marketed by a subcontractor to Seller. Seller disclaims any knowledge of the design, manufacture, installation or operation of the electronic home security system and disclaims all warranties, either expressed or implied, with respect to the home security system, including all implied warranties of merchantability and fitness for a particular purpose; in no event shall Seller be liable to Buyer for any damages directly or indirectly resulting from claims arising out of or in connection with the use or performance of the system; and Seller shall not be liable for any special, incidental or consequential damages even if Seller has been advised of the possibility of such damages. Employees of Seller are not authorized agents of the manufacturer of the electronic home security system and therefore any representations by such Seller employees should be disregarded.

It is the responsibility of Buyer to carefully review the specifications of any electronic security system to be installed in Buyer's Residence, including basic coverage areas, features and system use. Buyers are urged to carefully review the operation procedures and the limited warranty for the security system provided by the manufacturer. Special attention should be directed to those paragraphs which limit the liability of manufacturer. Moreover, all arrangements for system activation, links (if any) to security services or public safety organizations are solely the responsibility of Buyer. Any and all questions regarding the design, manufacture, installation, service or limitations on liability of the system should be directed to the subcontractor.

65. **Sight Distance Requirements**. The City of Stockton Municipal Code imposes certain restrictions on locations of walls and landscaping that must comply with sight distance requirements. There may also be sight distance requirements at the public intersection and/or some driveways. Please refer to Buyers' plot plan to determine Buyer's Residential Lot's sight distance requirements (if any).

66. **Soil Conditions**. Most of Northern California has soil types known to be expansive in nature. These expansive soils are analyzed by the soils engineer who recommends a foundation design that will accommodate the actions of this particular type of soil. Soils within the Project will impact Buyer's Residence. Portions of the Project may have different soils types and conditions. A copy of the soils reports are on file with City of Stockton. Buyer should take the soil type into consideration when designing and installing hardscape and landscape improvements and take necessary precautions in such installations to avert causing damage to existing improvements (e.g. Buyer's Residence) as well as any improvements Buyer may install.

The soil contains soil with a moderately plastic silty clay expansion potential, all recognized by the Uniform Building Code. Consideration should be taken, prior to constructing any structures within the Project, that these expansive soil conditions exist. Swimming pools, concrete flatwork, retaining walls, fencing, etc. and any structure foundations will require additional design considerations prior to construction to withstand the expansive soil conditions.

67. **Solar Energy Systems**. All Owners shall have the right to place and maintain on their Residence, equipment and facilities related to the installation and maintenance of individual solar heating systems. The installation and maintenance of any individual solar heating system by Buyer shall be subject to all applicable City ordinances and zoning regulations, the Uniform Building Code and associated ordinances. California has a strong public policy in favor of solar heating systems and may restrict Buyer's free and unfettered enjoyment of Buyer's Residence if it conflicts with the solar heating needs of an adjoining Residence, including the location and height of trees on Buyer's Residence. Buyer must obtain written approval from the Architectural Committee prior to installation of a solar heating system and comply with reasonable restrictions placed on the solar heating system by the Architectural Committee, subject to the provisions of California Civil Code Sections 714 and 714.1, as same may be amended time to time.

68. **Staingrade Wood Disclosure**. Due to changes which have been mandated by the California Air Quality Management Board (AQMD) in the materials that painting subcontractors use, the painting industry is experiencing problems with certain materials. Of primary concern at this time are the stains they are allowed to use for natural woods including cabinets, mantels, and handrails. All manufacturers have had to reformulate their stains to meet the requirements of the AQMD, and the formulations they have developed no longer work in the same manner as the earlier stain. As a result, painting subcontractors are not longer able to match natural woods such as handrails to pre-finished kitchen cabinets. Painters can achieve only a reasonable approximation of the cabinet color. Neither Seller nor the painter can accept responsibility for creating exact matches on different types and finishes of woods. Buyer acknowledges and agrees that there may be differences in stain colors on all wood materials.

69. **Storm Water Pollution Protection Program.** In 1972, the Federal Water Pollution Control Act (aka the Clean Water Act) was amended to provide that the discharge of pollutants to waters of the United States from any source is unlawful unless the discharge is subject to a permit from the applicable governing authorities. In 1990, the U.S. Environmental Protection Agency published regulations to protect such waters by requiring a permit for the discharge of pollutants into storm water as a result of construction activities. Construction projects that encompass one (1) or more acres of soil disturbance are prohibited unless the discharge is subject to a permit issued by the Regional Water Quality Control Board (RWQCB). The Seller has developed and implemented a Storm Water Pollution Protection Program (SWPPP) to minimize the discharge of soil into the bay and to maintain compliance with the RWQCB regulations. As such, the RWQCB may, from time to time, inspect the Project (and your land) to ensure that Seller is in compliance with its SWPPP. Because construction is ongoing, and inspections may occur during your ownership of your new residence, you will need to provide Seller and/or the RWQCB with reasonable access from time to time to facilitate such inspections. Seller will endeavor to provide you with reasonable advance notice to such inspections and need for access as it may arise. In addition, Seller has incorporated features in the construction of your residence to minimize soil disturbance, which may include, for example, the use of efficient irrigation systems. You are required to maintain your residence and irrigation systems so as to enable Seller to remain in compliance with the SWPPP. Further, as a new homeowner, the regulations of the U.S. Environmental Protection Agency and RWQCB may apply to any improvements that you undertake at the residence. Before commencing construction, please contact the RWQCB and the local building authorities to ensure that any construction activity that you undertake will be in compliance with these authorities.

70. **Street: Public Streets.** Buyer acknowledges and agrees that all streets within the Project are public, and may not be one hundred percent (100%) complete prior to the Close of Escrow for Buyer's Residence. Buyer further acknowledges and agrees that Seller shall only be required to complete such streets as required by the City.

71. **Subdrains.** There is a subdrain located in Buyer's yard area. The Buyer is responsible for maintaining and cleaning any subdrain located within Buyer's yard to prevent obstruction and blockage.

72. **Surrounding Uses.** There are many different land uses currently occurring in the vicinity of the Project, including residential and educational uses. All of these uses generate pedestrian and automobile traffic and may generate noise in the vicinity of the Project in the evening and at night.

73. **Swimming Pools.** Some of the lots in the Community where the Residence is located may be made up of cut or fill over natural soil. Some of these lots may contain rock, which may make it difficult to excavate for an in-ground swimming pool. Seller makes no warranty or assurance with reference to the Residence being able to accept such a pool. Seller recommends the use of an outside consultant if you need clarification with regard to the Residence being able to accept a swimming pool. The homeowner should check with the local utility company and government agency for any regulations or permit required, and for compliance with a Storm Water Pollution Protection Program, if required.

74. **Traffic Signal.** Seller is responsible for the construction and installation of a traffic signal at the intersection of Thornton Road and Eight Mile Road. Buyer understands that, until said traffic signal is installed, Buyer and Buyer's Residence and guests may be inconvenienced by traffic. Seller makes no representations or warranties as to when said signal may be installed.

75. **Trash Collection at Residence.** Buyer is responsible for the payment of trash services for Buyer's Residence. Each Buyer may need to purchase individual plastic trash container(s), which shall be stored inside Buyer's garage or behind the side yard fence, except for the day when the trash will be picked up. No Buyer shall permit or cause any trash to refuse to be kept on any portion of the Project other than the receptacles customarily used for it. Seller's representative will provide Buyer with the telephone number of the trash company servicing this area. Trash shall be set out only on specific days in accordance with the trash pickup schedule of the service provider and in accordance with the rules and regulations and Declaration. If the City adopts an automated trash removal system, Buyer will be required to use automated containers and shall be responsible for any loss or damage to such containers.

76. **Underground Utilities.** All utilities servicing Buyer's Residence are underground including, but not limited to, water, sewer, gas, electric, cable and telephone.

77. **Vacant Land**. The property to the north of the project site is currently vacant with no improvements. There may be dust, debris and other nuisances associated with such use.

78. **View Not Part of Value**. No Residence is assured of the existence, quality or unobstructed continuation of any particular view, and any view from the Residences that may exist upon the closing is not intended as part of the value of the Residence.

79. **Walkways**. Buyer is aware that the models are shown with decorative finished walkways. Buyer understands that the Residence will have standard finished concrete driveways and some walkways (absent decorative bands). Buyer also acknowledges that concrete can cure with different coloration.

80. **Water District**. The Project is located in the City of Stock Department of Municipal Services. Buyer acknowledges that Seller has no control over the water district.

81. **Water Softeners**. Buyer is advised that he/she is subject to the rules and regulations of the City of Stockton Department of Municipal Services regarding the use of water softeners. For further information regarding regulations, call (209) 937-8779.

82. **Weather Conditions**. The Project is located in an area where the following weather conditions are known to occur: heat, cold and rain. Buyer's Property is not warranted against damage due to inclement weather. The Buyer should obtain homeowners insurance to provide coverage for loss due to inclement weather.

83. **Wind**. All of Central California is subject to periods of high winds. Wind speeds in the Project may exceed that experienced in other areas of the surrounding region. Buyer must ensure that any structures or other improvements are constructed or designed to withstand high winds. Buyer is advised to consult with experienced architects and engineers in the design and specification of any structures or Improvements that Buyer plans to add to Buyer's Residence or Residence, as well as obtaining approval of your design from the Architectural Committee.

84. **Window Tinting**. The manufacturer of dual glazed windows will not warrant these windows if a tinting has been added to them. Tinting causes heat gain between the glass panels which may result in the failure of the window. Such failure can result in water intrusion, cracks in the glass, or in extreme cases, the dual glass unit can explode. Subject to California Civil Code Section 895 et seq., you understand and agree that neither Seller nor the manufacturer of the windows and/or doors in your home will be responsible for any repairs or replacement of any windows or door which have been tinted in any manner whatsoever. Certain tinting manufacturers provide independent warranties.

85. **Wiring for DSL, Internet and/or Similar Communication Services**. If wiring for a Digital Subscriber Line ("DSL"), high-speed internet access and/or similar communication services is offered as an option for Residences in the Project, Buyer understands and accepts that selection of this option only equips the Residence with the capacity to receive such services. Seller does not provide DSL or other similar services; such services will be provided, if at all, by an unrelated third party service provider over which Seller has no control. Accordingly, the availability of DSL, high-speed internet and/or communication services to Buyer upon move-in or at anytime in the future is not guaranteed. Further if, and when such services are provided, Seller cannot guarantee the continuity, speed or quality of services delivered. If Buyer is interested in selecting the wiring option, Buyer is strongly urged to directly contact the phone company, cable company and/or other communications service providers that serve area in which the Property is located to ascertain the availability and quality of any such services.

86. **Wooden Doors**. Wooden doors may be used in many places in the Residence. Because wood is a natural product, it is subject to deterioration caused by many environmental factors, including

direct sunlight, wind and rain, in order to maintain the appearance and function of the doors, it will be a necessary homeowner maintenance item to frequently caulk and repaint or re-varnish them. It is important that this is done using quality materials, as once deterioration has begun, it is very difficult to reverse. This maintenance is not a warranty item.

87. <u>Oak Trees</u>. Buyer is aware that there are several Oak trees on individual lots and within the park area, the City of Stockton requires conservation of those trees and damage, alteration or removal of said trees must comply with the Municipal Code. In order to insure the protection of Oaks in the subdivision, a Protection and Maintenance Guideline is attached for those lots with Oak Trees. For further information contact the City of Stockton at (209) 937-8266. (See Attachment #3)

WESTERN PACIFIC HOUSING, INC.
GENERAL DISCLOSURE STATEMENT

ATTACHMENT NO. 1

## Consolidated Landscape Maintenance Assessment District No. 96-2 City of Stockton, California

Buyer is aware that the project is located within the Lighting and Landscaping Assessment District 96-2, which was formed to maintain among other things public landscaping and lighting. The initial assessment per lot is $157.35 per tax year. This amount will be collected each year with the Buyer's property taxes. This amount may change as noted in Item #8 of the Project Specific Disclosures Addendum.



WK
Buyer's Initials

ZK
Buyer's Initial

WESTERN PACIFIC HOUSING, INC.
GENERAL DISCLOSURE STATEMENT

ATTACHMENT NO. 2

## Storm Drainage Maintenance District No. ____
## City of Stockton, California

Buyer is aware that the project is located within the Storm Drainage Maintenance District ____, which was formed to maintain among other things storm drainage. The initial assessment per lot is $51.50 per tax year. This amount will be collected each year with the Buyer's property taxes. This amount may change as noted in Item #8 of the Project Specific Disclosures Addendum.

WESTERN PACIFIC HOUSING, INC.
GENERAL DISCLOSURE STATEMENT

ATTACHMENT NO. 3

# PROTECTING AND MAINTAINING OAKS

Silver Springs
Stockton CA

PREPARED FOR
Western Pacific Housing
1210 Central Boulevard
Brentwood, CA 94513

PREPARED BY
HortScience, Inc.
4125 Mohr Ave., Suite F
Pleasanton CA 94566

March 2005

This document may be reproduced and distributed by Western Pacific Housing for Silver Springs. Permission from HortScience, Inc. is required for reproduction for other uses.
©HortScience, Inc. 2005. All rights reserved.



WK
Buyer's Initials

ZK
Buyer's Initial

## SILVER SPRINGS
## Homeowner's Guide to Protecting and Maintaining Oaks



One of the outstanding features of Silver Springs is the stand of mature and young valley oaks in the landscape. The valley oak is deciduous, meaning it loses its leaves in the winter. Leaves are dark green, paler beneath, lobed and 2-4" long (see illustration, right). The bark is dark grey and deeply furrowed. These native oaks were sown naturally from acorns of nearby trees. They established and grew in balance with the amount of rainfall and groundwater that was available, and the nutrients both held in the soil, and recycled through fallen, decomposing leaves.

Oaks are sensitive to changes in their environment. While we may minimize changes to the site during development, they cannot be avoided. Nor do the changes cease when construction ends, but continue for the life of the trees as we incorporate the trees into our landscapes and daily activities.

This booklet has been prepared to help you care for the oaks on you property. It provides guidelines for you, the homeowner, and other professionals like landscape architects and contractors who will help you design, install and maintain your landscape. It is recommended that the homeowner follow these guidelines to protect any existing trees either on or adjacent to their property.

The City of Stockton may require you to obtain a permit to trim or remove any existing trees from your property. Fifteen (15) trees (#356-360, 362 and 364–372) were preserved at Silver Springs. Nine (9) valley oaks (#357, 359, 360, 362, 365 and 367 - 370) met the "Heritage Tree" criteria as defined by Stockton's ordinance (16" and larger in diameter of certain oak species). *Note:* #365 and 369 are offsite but included because they were near the property line. We caution all homeowners to check with the City prior to trimming or removing any existing tree regardless of size.

### Protecting your Oak

The key to promoting tree health and vigor is protecting it from damage. Once damage is done to your tree, there is no way to repair it. There are many professionals involved in designing and constructing your home and landscape. We need all of their cooperation in protecting the oaks from unnecessary damage. If oak tree preservation is a priority to you, it must become a priority to anyone providing a service for your property.

Remember that any activity on your property that requires digging into the soil can affect the health and stability of nearby oaks. Some examples are:

- Installation of drain lines
- Installation of landscape irrigation and lighting
- Construction of patios, decks, walkways
- Installation of pools, spas, ponds
- Fine grading to create mounds, swales
- Construction of fences, walls, gazebos
- Rototilling to incorporate soil conditioners
- Digging holes for planting

Furthermore, grade changes that cause water to be directed towards oaks, or that cover the roots with additional soil (fill) will have very detrimental effects on your tree. It is important to keep the original soil level around the tree and make sure water does not stand around it. As little as 6" of fill can harm the tree.

***Root Structure of Oaks***

Protection of the root area of an oak tree is the single most important aspect of tree preservation. Without roots, the tree cannot absorb water and mineral nutrients vital for growth. In addition, a healthy root system physically supports the tree.

To plan for tree protection it is important to understand the structure of the oak root systems, because we cannot protect the roots if we do not know where they are. Most people think of oaks as being deep-rooted trees with a long taproot. Unfortunately, that is not the case. Roots can only grow where there is adequate air and moisture for their survival. These conditions occur predominantly in the top 3' of soil.

About 90% of the roots of oaks at this site can be expected to occur within the top 3' of soil, and about 70% of these are within 6-18" of the surface (Fig. 1). When the shallow nature of the root system is understood, it is easy to see how digging 12-18" deep trenches to install irrigation lines can cause major root injury.

Another misconception is that tree roots only occupy the area beneath the tree canopy (within the dripline). Actually, roots extend beyond the dripline for some distance.

***Design and Construction around your Oak***

The more site change that occurs around an oak, the greater care must be taken in protecting and maintaining it. The trees become less drought tolerant, and more prone to developing pest and disease problems. This is particularly true for the valley oak, which are less drought and construction impact tolerant than its relative, the coast live oak. The degree of damage to a tree caused by construction depends on the severity of the impacts (e.g. how much of the roots are injured) and the initial health and age of the tree. Therefore, preservation efforts must begin with an evaluation of the individual tree and some assessment of its ability to adjust to an altered environment. As you begin planning your site improvements, such as landscaping, pools and patios, consider soliciting advice from a consulting arborist on how best to protect and manage your tree.

When designing uses around the oaks consider the following:

1. All the trees within the development area of your property are accurately surveyed and plotted on the site plan. We cannot plan for their preservation if we do not know exactly where they are! Include the driplines on all the plans as well.

2. Avoid entry into the dripline of an oak tree whenever possible. For vigorous trees it may be possible to encroach within the dripline, but maintain at least the area half way from the trunk to the dripline free from any encroachment, and only on one side of the tree. Encroachment includes soil fills, cuts, trenches, paving or structures.

3. Maintain natural grade around the trees. If you have excess soil from grading your lot or digging a pool, do not put it around the trees. As little as 6" of soil can kill oaks.

4. It is important to avoid redirecting water by altering natural drainage. Simply put, *do not direct drainage water toward oaks.*

5. Avoid installing impervious paving, such as concrete, within the dripline of trees whenever possible. Pervious paving materials can be used (e.g. uncemented brick), but they should be placed on grade to avoid excavation normally required to place base material under the pavement. Compaction of the soil under the bricks also should be avoided. Paving should be limited to less than a third of the soil area within the dripline.

6. Where structures must encroach beneath a tree, consider using footings or foundations that avoid having to dig continuous trenches (e.g. pier foundations with the grade beam above grade or pier on grade for wood decks).
7. **The singe most important thing you can do to protect your trees it to place a temporary fence around that area near the construction area.** This excludes activity around the trees that can compact the soil, injure roots and damage the trunk and limbs. No equipment, materials, excess soil or trash should be placed under trees within the fenced area. The fencing should be in place before any type of equipment is allowed on your lot, and remain until all construction activity is completed.
8. Tree Protection Zones were established around each tree preserved during construction. These areas would remain uncompacted and unchanged at the existing ground elevation. No grading, excavation, construction or storage of materials shall occur within the Tree Protection Zone. No underground services including utilities, sub-drains, water or irrigation lines shall be placed in the Tree Protection Zone. *Note*: some exceptions were made for hand excavation of utilities and other improvements in the public right-of way. The following Tree Protection Zones measured from the trunk in all directions and affected lots are as follows.

| Lot # | Tree species and tree # | Tree Protection Zone (radius from trunk) | Lots adjacent to trees |
|---|---|---|---|
| 124 | Calif. black walnut #356 | 15' on northwest towards house, 20' all other sides. | 103 |
| 124 | Valley oak #357 | 10' on west, 20' all other sides. | 125 |
| 176 | Valley oak #371 | 10' on all sides. | Waterford Estates |
| 176 | Valley oak #372 | 15' on all sides. | Waterford Estates |
| 177 | Valley oak #370 | 25' on all sides. | 178 and Waterford Estates |
| Waterford Estates | Valley oak #369 | 25' on all sides. | 178 and 179 |
| 179 | Valley oak #368 | 20' on all sides. | Waterford Estates |
| 179 | Valley oak #367 | 40' on all sides. | 180 and Waterford Estates |
| 180 | Valley oak #366 | 15' on all sides. | Waterford Estates |
| Waterford Estates | Valley oak #365 | 30' on all sides. | 181 |
| 184 | Valley oak #358 | 10' on east, 20' all other sides. | 185 |
| 187 | Valley oak #364 | 20' on all sides. | 186 |
| 196 | Valley oak #362 | 35' on all sides. | 187 and 195 |
| 199 | Valley oak #360 | 20' on all sides. | 195 and 198 |
| 200 | Valley oak #359 | 20' on all sides. | 184 and 199 |

Figure 1: The most important thing you can do to enhance the health and stability of your oak is to protect it from damage. Design your landscape to provide undisturbed space around the tree and keep all equipment and materials from beneath the canopy.



## Landscaping Around Oaks

Our native oaks are adapted to conditions of cool, wet winters and warm, dry summers. They are accustomed to a period of prolonged drought in the summer months. They are intolerant of heavy irrigation during this period. Installation of new landscapes around oaks must recognize and respect this fact. Lawn, flowers, ivy, azaleas, ferns or other plantings requiring frequent watering are inappropriate around oaks. Even so, attractive landscapes can be created around your trees.

The best treatment under oaks is to place a thick layer of organic mulch such as bark or wood chips. Alternatives are rock or cobble mulches that can simulate dry streambeds. Make sure there is surface drainage away from the base of the trunks so that water does not flow to the base of the trees.

If you do decide to plant under oaks, select species that are under 4' tall when mature, shade tolerant and will require irrigation no more than once a month. Do not plant within 10' of the trunk. Some planting suggestions are listed in Table 1.

Design your irrigation system with the tree in mind. Maintain an area within 10' of the trunk tree from any irrigation. If you install plants outside that dry zone, create a berm around the plant to contain water. The well can be irrigated by hand. If you prefer an automatic system, use drip, micro-sprinklers or bubblers that wet a small area around each plant. However, you must give careful consideration to how the irrigation system is laid out to avoid damaging roots during installation.

The best way to minimize damage to the oaks is to avoid laying irrigation lines within the dripline. If you chose to plant in that area and want to install an irrigation system, consider laying the pipe on the surface rather than in trenches that cut through the roots. The pipes can be covered with deep mulch. If you must place pipe underground within the dripline of the tree, dig the trenches by hand so that woody roots can be left intact. Dig a tunnel under the roots and thread the pipe underneath. In this way, the roots that transport water and minerals to your tree will continue to function.

As you design your landscape, consider planting more oaks. They fit in well with your environment, are adapted to the site, and are easy to care for. Vigorous, nursery-grown oaks have a growth rate similar to many common landscape trees. Use them to augment your landscape scheme. Oak species to consider are the valley oak and the evergreen interior live oak and coast live oak.

The following are general guidelines for landscaping around oaks:

1. The best treatment under oaks is a thick layer of organic mulch, such as bark, wood chips or leaf litter. Prunings may be chipped by the arborist and left beneath the canopy. Alternatives include use of rocks or cobbles. In all cases, drainage must be away from the trunk.

2. Use wood decking on piers rather than patios under the driplines of trees. Allow at least 1' clearance between the deck and tree trunk.

3. If you choose to plant under your oaks, select plants that are shade and drought tolerant (no more than one irrigation per month). No plants should be installed within 10' of the trunk of the tree. A list of species appropriate for use under oaks is listed in Table 1.

4. Irrigation systems must be very carefully designed to avoid trenching through roots. No irrigation lines shall be placed under the driplines of existing oaks. Only infrequent irrigation (once a month, maximum) is compatible with oaks.

5. If lawns or other frequently irrigated planting are to be used, place them outside the driplines of oaks, and ensure that runoff will not enter the dripline.

6. When planning landscape irrigation, route all irrigation trenches outside the driplines of oaks. Make sure that the area within 10' of the trunk is not wetted during operation of the system. Also, direct runoff away from oaks.

7. Planting young oaks is highly recommended. Coast live oak (*Quercus agrifolie*), valley oak (*Q. lobata*) and Interior live oak (*Q. wislizenii*) are the species that are appropriate for your site.

## Maintenance of Oaks in the Landscape

Native oaks have survived for decades in a system that provides the right balance of water, elements, light, etc. Even though we try to design appropriately around oaks, the balance that nature has provided is interrupted. The trees become a maintenance responsibility.

The primary maintenence requirements of oaks are pruning, mulching, pest and disease control, and in some cases, irrigation end fertilization.

### *Pruning*

Mature oaks seldom need much pruning. It is important to maintain as much foliage as possible to supply the tree with adequate food for growth and maintenance. Your trees were pruned prior to the start of construction.

Oaks are pruned to enhance their health and structural stability, and to provide clearance beneath their crowns. Removal of dead, dying, diseased and weak branches enhances tree health and reduces the potential for failure of a branch.

Topping and stubbing off branches are not appropriate pruning methods for any tree, particularly oaks. Avoid stripping out the interior foliage. Excessive pruning to expose the branch structure of oaks is very damaging. As a general guide, remove no more than 25% of the foliage of the tree. Previously shaded branches that are exposed to the sun are easily damaged from sunburn. Pruning to reduce the weight on heavy horizontal limbs should remove small diameter branches (less than 3"), and retain foliage along the length of the branch.

Trees need to be inspected annually to evaluate structural stability and need for pruning. Most old oaks have considerable amount of decay in the trunk and major branches. They need to be inspected regularly by a professional to determine if weight needs to be removed from weak areas to reduce the risk of branch or trunk failure.

Pruning and cabling should be undertaken by qualified arborist. Tree pruning companies must carry the California State Contractors License for Tree Services (#C61/D49). Any pruning should be performed by a Certified Arborist or Tree Worker and adhere to the Best Management Practices for Pruning (International Society of Arboriculture, 2002).



Buyer's Initials ZK Buyer's Initial

*Irrigation*

Supplemental irrigation may be needed for trees whose root systems have been impacted. However, oaks are accustomed to dry summer conditions and tend to develop fatal root diseases if irrigated frequently during the summer.

For trees that would benefit from extra water, we suggest extending the period of natural rain while preserving the annual summer drought. We do so by irrigating in late spring (May and June) and early fall (September - October). However, no irrigation should take place in July and August.

Irrigation should wet the top 2 - 3' of soil. We suggest creating basins to contain irrigation water on flat sites (Fig. 2), or using slow drip emitters or soaker hoses on sloped sites (Fig. 3). Soaker hoses can be allowed to run overnight. Check the depth of water penetration with a shovel.

Under no circumstances should trees be irrigated within 10' of the trunk. Irrigating frequently around the trunks of mature oaks during the summer leads to development of root diseases that can kill the tree.




Fig. 2: Construct earthen berms to create watering basins around trees on flat ground. An inner berm keeps water away from the trunk.




Fig. 3: For trees on slopes, soaker hoses placed in concentric rings can be used to provide supplemental water. Mulch can be placed over the hoses.

### *Pest Management*

Oaks should be inspected regularly for disease and insect pests. While treatment is not normally required for these problems, pest infestations may reduce the overall health of the trees. Careful water management (see above) can avoid most disease problems. In most cases oaks do not require regular treatment for pests and diseases. While there are many insects commonly associated with oaks, they usually do little permanent damage.

An exception is the newly identified disease sudden oak death. Affected trees turn brown and die suddenly. The cause is the fungus *Phytophthora*. At this time valley oak has not been identified as susceptible nor has the disease been found in San Joaquin County. The disease is being studied intensely. For up to date information about the disease refer to the web site www.suddenoakdeath.org.

The insect pest you are most likely to experience is the oak moth. The larval stage of this insect feeds on oak leaves. Although the damage is unattractive, it will not kill the tree. In addition, pest populations are cyclic, so some years you may see many insects, while other years there are very few. Treatments may be warranted for aesthetic reasons, but are not necessary for tree health. Therefore, we do not recommend spraying for oak moth on a routine basis, but only when populations are high and you find the pest or its damage annoying. If you wish to treat an oak moth problem on your tree we suggest you contact the University of California Cooperative Extension office at (209) 468-2085 for advice.

### *Fertilization*

Oaks do not normally require annual fertilization if the leaf litter is allowed to accumulate under the canopy. As the leaves decompose, they return nutrient elements to the trees.

If you routinely remove the natural leaf litter, then plan to fertilize your oak every two to three years. A slow-release fertilizer that provides only nitrogen is the best material to use. Apply the material at a rate of 1 pound actual nitrogen per 1000 ft² of open soil under the dripline plus 10' beyond. Spread the fertilizer evenly on the soil within the dripline of the tree plus 10' beyond (where possible). Apply in the late winter before the rains end.

### *Mulching*

Oaks benefit from a layer of thick organic mulch beneath the canopy. The mulch helps retain surface soil moisture, moderates temperatures, and provides nutrients for the tree as it decomposes. Mulch material can be purchased at garden centers. You can also have brush from prunings chipped and left under the trees. Allow the natural leaf litter to accumulate within the mulched area as well. Mulch should be maintained at a maximum thickness of 4-6".

## Conclusions

The oak trees on your property are a valuable asset to you, the community, and the environment. But they require on-going care, specific to their needs. Trees change over time and need to be inspected regularly to evaluate their health and structural condition. This booklet has provided some guidelines for providing for the basic needs of your native oaks.

**Table 1. Plants appropriate for use under native oaks**

| | |
|---|---|
| ***Shrubs*** | |
| Carpentena | *Carpanteria californica* |
| Wild lilac | *Ceanothus* species |
| Western redbud | *Cercis occidentalis* |
| Mountain-mahogany | *Cercocarpus betuloides* |
| Santa Cruz Island buckwheat | *Eriogonum arborescens* |
| Island bush snapdragon | *Galvezia speciosa* |
| Silk-tassel bush | *Garrya elliptica* |
| Mahonias | *Mahonia* species |
| Gooseberries | *Ribes* species |
| San Diego wild sage | *Salvia clevelandii* |
| Coastal white sage | *Salvia leucophylla* |
| Snowberry | *Symphoricarpos sp.* |
| ***Ground Covers*** | |
| Wolly yarrow | *Achlellea tomentosa* |
| Manzanita | *Arctostaphylos* |
| Carmel creeper | *Ceanothus griseus* var. *horizontalis* |
| Hoover ceanothus | *Ceanothus maritimus* |
| Australian fuchsia | *Correa* sp. |
| Rock rose | *Cissus* sp. |
| Compact Oregon grape | *Mahonia aquifolium* 'Compacta' |
| Creeping mahonia | *Mahonia repens* |
| Catalina currant | *Ribes viburnifolium* |
| ***Evergreen Herbaceous Plants*** | |
| Winter-blooming bergania | *Bergania crassifolia* |
| Buckwheat | *Eriogonum umbelatum* v. *polyanthum* |
| Giant alum root | *Heuchera maxima* |
| California Iris | *Iris douglasiana* and hybrids |
| Monkey flower | *Mimulus aurantiacus* |
| Beard tongue | *Penstemon sp.* |
| ***Deciduous or Annual Herbaceous Plants*** | |
| Clarkia | *Clarkia* species |
| Chinese houses | *Collinsia heterophylla* |
| Shooting stars | *Dodecalheon clevelandii* |
| Poppies | *Eschscholzia* species |
| Baby blue eyes | *Nemophila Menziesii* |
| Evening primrose | *Oenothera* species |
| Blue-eyed-grass | *Sisrinchium bellum* |
| California wild fuchsia | *Zauschneria californica* |
| ***Bulbs*** | |
| Blue dicks | *Brodiaea* species |
| Mariposa lilies | *Calochortus* species |
| Leopard lily | *Lilium pardinalinum* |
| Common trillium | *Trillium chloropetalum* |

*Received by:* *Date:*

*Address:* *Lot #:*



Buyer's Initials Buyer's Initial

**WESTERN PACIFIC HOUSING, INC.**
**GENERAL DISCLOSURE STATEMENT**

**ATTACHMENT NO. 4**

## What You Can Do

THE CPUC's 1993 DECISION (D.93-11-013) addressed possible EMF health effects from electric utility facilities. In a situation of scientific uncertainty and public concern, the CPUC felt it appropriate for utilities to take no-cost and low-cost measures where feasible to reduce EMF exposure from new or upgraded utility facilities. You, too, may want to take no-cost and low-cost measures to reduce your EMF exposure at home and at work.

Research studies have not produced a consensus about any health benefits from changing the way people use electrical appliances. But, if you feel reducing your EMF exposure would be beneficial, you can increase your distance from electric appliances and/or limit the amount of time you use appliances at home or at work.

For instance, you can place phone answering machines and electric clocks away from the head of your bed. Increasing your distance from these and other appliances such as televisions, computer monitors and microwave ovens can reduce your EMF exposure.

You can also reduce your EMF exposure by limiting the time you spend using personal appliances such as hair dryers, electric razors, heating pads and electric blankets. You may also want to limit the time you spend using electric cooking appliances.

You can locate the sources of EMF in your work environment and spend break time in lower-field areas.

It is not known whether such actions will have any impact on your health.

### For More Information

Call Pacific Gas and Electric Company for a free information package or home/business measurement at 1-800-743-5000.

Call the California Department of Health Services at (510) 622-4500 or visit http://www.dhs.cahwnet.gov/~emf/

Visit the U.S. EMF RAPID Program Web page http://www.niehs.nih.gov/emfrapid

Visit the CPUC EMF Policy Web page: http://www.cpuc.ca.gov/divisions/energy/environmental/emf/emfopen.htm

October 1999

# Understanding EMF
## ELECTRIC AND MAGNETIC FIELDS

Questions have been raised about the possible health effects of 60-Hertz (power frequency) electric and magnetic fields (EMF), which are found wherever you have electric power. This brochure contains information that will help you understand the EMF issue, plus practical tips you can use if you want to reduce your exposure at home and at work.

[illegible]

**Reviewed by:**
California Public Utilities Commission
California Department of Health Services

Pacific Gas and Electric Company

## Can EMF Harm Your Health?

ELECTRIC AND MAGNETIC FIELDS ARE PRESENT wherever electricity flows—around appliances and power lines, and in offices, schools and homes. Many researchers believe that if there is a risk of adverse health effects from usual residential exposures to EMF, it is probably just at the detection limit of human health studies; nonetheless, the possible risk warrants further investigation. The varying results from epidemiological studies linking estimated EMF exposures with childhood leukemia and one kind of leukemia in adult workers are consistent with a weak effect. Laboratory experiments have shown that EMF can cause changes in living cells. It is not clear whether these changes suggest any risk to human health.

The results from many research studies will be reported by both national and California EMF research programs to determine if EMF poses any health risk. Given the uncertainty of the issue, the medical and scientific communities have been unable to determine that usual residential exposures to EMF cause health effects or to establish any standard or level of exposure that is known to be either safe or harmful.

## What Is Being Done about EMF in California?

IN 1993, A CALIFORNIA PUBLIC UTILITIES COMMISSION DECISION (D.93-11-013) created an EMF research and information program. This program is managed by the California Department of Health Services (CDHS) and funded by utility ratepayers. The purpose of the program is to perform research and policy analysis, and provide education and technical help to benefit Californians. Input to the CDHS is provided by a Stakeholders Advisory Consultant Group (SAC) with representatives of the public, consumer groups, health and scientific experts, and labor and utility representatives. More input can come from state agencies, consultants and special interest groups during the open-forum discussion periods at the SAC meetings. These meetings are open to the public. CDHS will write a final report on its findings at the conclusion of the EMF program. You can get information about the California EMF Program by calling CDHS at (510) 622-4500 or from their Web site http://www.dhs.cahwnet.gov/~emf/

## What Is the EMF RAPID Program?

THE FEDERAL GOVERNMENT HAS ALSO CONDUCTED EMF research as part of a $45-million research program, managed by the National Institute of Environmental Health Sciences. This program, known as the EMF RAPID (Research and Public Information Dissemination) Program, submitted a final report to the U.S. Congress on June 15, 1999. The report concludes that:

- "The scientific evidence suggesting that EMF exposures pose any health risk is weak."
- "EMF exposure cannot be recognized as entirely safe because of weak scientific evidence that exposure may pose a leukemia hazard."
- The power industry should continue its current practice of siting power lines to reduce exposures and continue to explore ways of educating both the public and providers of electricity about ways to reduce exposures.

Copies of the report can be found on the EMF RAPID home page, http://www.niehs.nih.gov/emfrapid or by mail: EMF-RAPID Program, NIEHS, P.O. Box 12233, Mail Drop EC-16, Research Triangle Park, NC 27709.

**Magnetic Fields at Home**
[illegible]

| | 1.2" away | 12" away | 39" away |
|---|---|---|---|
| Microwave Oven | [illegible] | [illegible] | [illegible] |
| Clothes Washer | [illegible] | [illegible] | [illegible] to 2 |
| Electric Range | [illegible] | [illegible] | [illegible] |
| Fluorescent Lamp | [illegible] | [illegible] | [illegible] to 3 |
| Hair Dryer | [illegible] | [illegible] | [illegible] to 3 |
| Television | [illegible] | [illegible] to 20 | [illegible] 0.1 to 2 |

[illegible]

**Magnetic Fields Outside**
[illegible]

| | |
|---|---|
| Distribution Lines | [illegible] |
| Transmission Lines | [illegible] |

Property: Valverde Villages
Lot/Residential Unit: 6

## ALLOWANCE FOR CLOSING COSTS ADDENDUM

This Allowance for Closing Costs Addendum (**"Addendum"**) is attached to and forms a part of the Purchase Agreement and Escrow Instructions executed between Buyer and Seller (**"Purchase Agreement"**) for the Property described in the Purchase Agreement. Any capitalized terms not otherwise defined herein shall have the meanings as set forth in the Purchase Agreement. If there is a conflict between the Purchase Agreement and the terms and provisions of this Addendum, the terms and provisions of this Addendum shall control.

1. **ALLOWANCE.** If (i) Buyer is ready, willing, and able to close Escrow by the Closing Date and (ii) Buyer is not in default under the Purchase Agreement, and (iii) Buyer has elected to obtain financing for the purchase of Property from DHI Mortgage (**"Lender"**), Seller shall credit to Buyer at Close of Escrow an amount up to but not to exceed Five Thousand Dollars ($5,000) (**"Maximum Credit"**) to be applied towards the "Covered Expenses" (as defined below). If the amount of the Covered Expenses is less than the Maximum Credit, Buyer shall not be entitled to use the difference as credit against any other costs or expenses and such amount shall be retained by Seller.

2. **COVERED EXPENSES.** As used in this Addendum, Covered Expenses shall mean the following closing costs incurred in connection with the closing, to the extent allowed by Buyer's Lender: (i) credit report fees, (ii) owner's and lender's title policy charges, (iii) deed of trust recording fees and recording taxes, (iv) escrow fees, (v) discount points to buy down the interest rate charged by Lender for the Loan on the Property as allowed under **Paragraph 1** above and (v) other permitted Lender's fees.



WK Buyer's Initials ZK Buyer's Initials

Project: Valverde Villages
Lot/Residential Unit: 6

## NOTICE OF AFFILIATED BUSINESS ARRANGEMENT ADDENDUM

This Notice of Affiliated Business Arrangement Addendum (**"Addendum"**) is attached to and forms a part of the Purchase Agreement and Escrow Instructions (**"Purchase Agreement"**), executed between Buyer and Seller for the Property described in the Agreement. Any capitalized terms not otherwise defined herein shall have the meaning as set forth in the Agreement. If there is a conflict between the Purchase Agreement and the terms and provisions of this Addendum, the terms and provisions of this Addendum shall control.

**From:** Western Pacific Housing, Inc.
dba D. R. Horton, America's Builder
1210 Central Blvd.
Brentwood, CA 94513
**[Seller]**

This is to give you notice that **Seller** has a business relationship with:

DHI Mortgage Company, Ltd., L.P.
1240 Central Blvd., Suite A
Brentwood, CA 94513

The nature of this business relationship is that these companies are corporate affiliates, each being wholly or partially owned by, or by a subsidiary of, the same parent corporation. Because of this relationship, this referral may provide **Seller** a financial or other benefit.

Set forth below is the estimated charge or range of charges for settlement services (Lender fees excluding third party fees). You are **NOT** required to use this company as a condition of your purchase of the Property from **Seller.** THERE ARE FREQUENTLY OTHER SETTLEMENT SERVICE PROVIDERS AVAILABLE WITH SIMILAR SERVICES. YOU ARE FREE TO SHOP AROUND TO DETERMINE THAT YOU ARE RECEIVING THE BEST SERVICES AND THE BEST RATE FOR THESE SERVICES.

| **DHI Mortgage Company, Ltd., L.P.** | |
|---|---|
| **Service** | **Charge or Range** |
| Loan Origination Fee: | 0 - 1% of Loan Amount |
| Underwriting Fee: | $0.00 - $395.00 |
| Loan Processing Fee: | $0.00 - $295.00 |

**Note: A Good Faith Estimate of all settlement charges will be provided to you at or within three business days after loan application. You may be entitled to additional builder discounts paid by Seller for the purchase of a package of discounted settlement services as set forth in the Allowance for Closing Costs Addendum to your Purchase Agreement.**

**ACKNOWLEDGMENT:**

I/we have read this disclosure form and understand that **Seller** is referring me/us to purchase the above-described settlement service(s) from **DHI Mortgage Company, Ltd., L.P.** and may receive a financial or other benefit as the result of this referral.

[signature] 12-11-05
Buyer Date

Zohra Khan 12-11-05
Buyer Date

D.R. Horton (North Bay)
Notice of Affiliated Business Arrangement Addendum
28156-8/1852323.2 Revised 10/19/05

[initials] Buyer's Initials ______ Buyer's Initials

Project: Valverde Villages
Lot/Residential Unit: 6

## OPTIONS AND OCCUPANCY GUIDELINES ADDENDUM

This Options and Occupancy Guidelines Addendum (**"Addendum"**) is attached to and forms a part of the Purchase Agreement and Escrow Instructions executed between Buyer and Seller (**"Purchase Agreement"**) for the Property described in the Purchase Agreement. Any capitalized terms not otherwise defined herein shall have the meanings set forth in the Purchase Agreement. If there is a conflict between the Purchase Agreement and the terms and provisions of this Addendum, the terms and provisions of this Addendum shall control.

In order to assist Buyer with Buyers purchase of the Residence and to expedite the timely completion of the same, Buyer herein agrees to act in accordance with and adhere to the following guidelines and final due dates.

1. Correspondence. Buyer shall direct all correspondence and communication to Seller's on-site sales representative ("Sales Representative").

2. Construction Changes and Options. The final due date for selection of options and allowable construction changes is SEVEN (7) days after the agreement is executed by the Buyer. The final due date for selection of options and construction changes is: 12-9-05.

   a. Sales Representative has a comprehensive list of available options and allowable construction changes. No options or construction changes will be permitted other than those listed. Buyer shall direct all questions regarding construction changes and options to a Sales Representative. Buyer agrees not to approach any field personnel or subcontractors with construction changes. Seller reserves the right to deny any options and upgrades.

   b. Any construction changes or options shall be selected and submitted on Seller's option forms, prepared by Sales Representative, signed by Buyer and PREPAID by Buyer, on or before the Final Due Date above. If Seller has not received a deposit for options ordered, the option request shall automatically be canceled and Seller shall not be required to perform the work.

3. Interior Selections. The final due date for interior selections is TWENTY-ONE (21) days after the agreement is executed by the Buyer ("Final Due Date") The Final Due Date for interior selections is: 12/30/05

   a. Buyer agrees to make an appointment with the flooring company designated below and to finalize all interior selections by the final due date. Buyer shall allow at least two (2) hours for the appointment to make carpet, linoleum, entry, counter top tile, and tile grout selections.

   b. All Buyer-requested options and upgrades must be in writing by way of customer selection sheet or change order and signed by a Sales Representative. Workers in the field are not authorized to make changes in construction without written approval from the main office. Any verbal agreements between Buyer and Sales Representative must be confirmed in writing by way of a change order immediately with a copy to the Buyer. Seller shall not be responsible for any verbal agreements made, that are not properly documented and approved.

   c. Buyer's failure to finalize interior selections by the Final Due Date will result in Buyers selections being limited to the standard selections offered by Seller.

   d. From time to time, a manufacturer will discontinue certain products. If this should happen, our Sales Representative (and/or decorator) will contact Buyer to re-select the item that has been discontinued.

   e. A $250 non-refundable fee will be charged for selections made by Buyer after the initial selection appointment. In the event the changes are not accomplished, any funds paid by Buyer, except for the $250 non-refundable fee mentioned above, will be returned and Seller will be released from any and all responsibility for those changes.

   f. A $50 administration and services fee will be charged if Buyer cancels the purchase of the Residence after color selection has been made and construction has started.

   g. All deposits required for options and upgrades will be for 25 percent (25%) of the total cost of the options and upgrades with the use of DHI and 50 percent (50%) with the use of an outside lender. Deposits are non-refundable if Buyer's purchase is cancelled. However, Seller will make a bona fide effort to resell your selections to a subsequent buyer. If and to the degree Seller is successful in selling these selections, your deposits may be refunded when there has been a close of escrow to a subsequent buyer.

WK ZK
Buyer's Initials Buyer's Initials

| | |
|---|---|
| FLOORING COMPANY: | CAMPBELLS |
| | 825 CHADBOURNE ROAD<br>FAIRFIELD, CA. 94533 |
| DESIGNER: | SARAH SANDOVAL |
| PHONE NUMBER: | 707-432-2389 |

19500063.2 Revised 1/19/2005

WK ZK
Buyer's Initials Buyer's Initials

4. Financing Options and Upgrades. Buyer has the option of financing upgraded interior selections and certain construction options (collectively "Upgrades") by adding the value of the Upgrades into Buyer's New Loan. If Buyer intends to include Upgrades in the New Loan, Buyer shall contact the Sales Representative immediately. An addendum to the Purchase Agreement must be prepared by the Sales Representative in order to effect a mortgage inclusion for the Upgrade selections. Buyer is advised that loan appraisers generally allow full value for Upgrades such as floor coverings and that full value may not be given for other Upgrades. Buyer is aware that most loan appraisers will allow no value increase for any type of window coverings. If Buyer is including Upgrades in Buyer's New Loan, Buyer's prepaid option deposit will be credited to Buyer at Close of Escrow.

BUYER AGREES TO WAIVE ANY MORTGAGE INCLUSION THAT CAUSES BUYER TO BECOME UNABLE TO QUALIFY FOR A LOAN.

5. Insurance. If Buyer is obtaining financing the Residence, Buyer shall contact Buyer's insurance company thirty (30) days prior to the Estimated Closing Date to secure the necessary insurance coverage. Buyer shall instruct Buyer's insurance agent to contact the Escrow Holder in order to determine Buyer's Lender requirements for insurance coverage on the Residence. Buyer shall obtain the required insurance which shall be evidenced by an appropriate policy submitted no later than thirty (30) working days before the Estimated Closing Date.

6. Utilities. Buyer is to notify all utility companies of ownership change at least five (5) working days prior to the Close of Escrow.

| | |
|---|---|
| (GAS) | **PG&E 800-743-5000** |
| (PHONE) | **SBC 800-310-2355** |
| (CABLE TV) | **Comcast 800-266-2278** |
| (GARBAGE) | **City of Stockton 209- 937-8295** |
| (WATER) | **City of Stockton 209- 937-8295** |

7. Useful Contact Information. Below is useful contact information for your community services for the Project.

| | |
|---|---|
| ELEMENTARY SCHOOL DISTRICT | **Lodi School District 209-331-7218** |
| HIGH SCHOOL DISTRICT | **Lodi School District 209-331-7218** |
| CHANBER OF COMMERCE | **209-547-2770** |
| FIRE DEPARTMENT (NON-EMERGENCY) | **209-937-8801** |
| POLICE DEPARTMENT (NON-EMERGENCY) | **209-937-8377** |

8. Occupancy. BUYER WILL BE ALLOWED TO MOVE INTO THE RESIDENCE ONLY AFTER THE CLOSE OF ESCROW. It is extremely important that Buyer coordinate the move in date with the Escrow Holder, Buyer's Lender and Sales Representative. Buyer shall allow at least three (3) working days from the date Buyer signs loan documents to the recording of the grant deed. Buyer understands that signing Buyer's loan documents does not constitute legal transfer of title. Legal title transfers to the Buyer when the GRANT DEED HAS RECORDED.

9. Selling Your Present Home. If Buyer is selling the home Buyer is currently living in, Buyer acknowledges the challenges in coordinating the completion of the Residence and the close of escrow on Buyer's present home. Buyer is aware that they should plan on making interim housing arrangements until the Residence is completed. If Buyer decides to attempt to move only one time, Buyer should arrange to lease back Buyer's present home after it closes escrow until the Residence is completed. Buyer is aware that a lease back must be negotiated at the time Buyer is accepting an offer to purchase Buyer's present home.



WK Buyer's Initials ZK Buyer's Initials

REVISED 4/14/06

# FINAL AMENDMENT

5-4-06 [initials]

D·R·HORTON® DHI NYSE
America's Builder
WESTERN PACIFIC SERIES

The following terms and conditions are hereby incorporated into and made a part of the Purchase Agreement and Receipt for Deposit dated 12-11-05.

Property Address: 10935 Cliffside Dr Stockton Ca 95209

LOT #: 6 PLAN: 2693 CL271 COMMUNITY: Valverde Villages

The Buyer(s), Waheeda & Zohra Khan and the Seller, Western Pacific Housing, Inc., hereby agree to the following terms and conditions:

**Base purchase price:** $ 464,990

**Lot premium:** $ -0-

**Upgrade total:** $ 19,019

**Flooring:** $ 12,934

**Rough:** $ 6,085

**Spec:** $ -0-

**Other** $ -0-

LESS Sales Concession $< 65 > WK ZK

**TOTAL purchase price:** $ ~~484,009~~ 483,944

[initials] 5/04/06

☒ Non-Recurring / ☐ Recurring Closing Cost Credit $ 5,000 if using DHI MTG

**Additional Terms & Conditions:**

**DEPOSIT INFORMATION**

| | | | | |
|---|---|---|---|---|
| INITIAL: | Ck# 1345 | $ 7,500 | Date: 12/11/06 | Upgrade: Ck# |
| Upgrade: | Ck# 1367 | $ 4,739 | Date: | Upgrade: Ck# |
| Upgrade: | Ck# | $ | Date: | Upgrade: Ck# |

0• C
464,990• +
12,934• +
6,085• +
65• −
483,944• *

**BUYER AGREES AND UNDERSTANDS THAT NO CHANGES TO UPGRADES WILL BE ACCEPTED AFTER THIS FORM IS SIGNED.**
( WK ) ( ZK ) Initial Here

**The undersigned hereby acknowledge receipt of a copy of this Final Amendment.**

[signature] 4-14-06 [signature] 5-4-06
Buyer Signature Date Western Pacific Housing, Inc. (Seller) Date

Zohra Khan 4-14-06 Julie Branchi 4/14/06
Buyer Signature Date Sales Agent Date

Distribution: ☐ Sales ☐ Lender ☐ Lot File

2/24/05 – (VI) Final Amendment to Optional Items Upgrades Amendment (4pgs)

Project: Valverde Villages
Lot/Residential Unit: 10

OPTIONAL ITEMS AND UPGRADES AMENDMENT

BUYER: Waheeda Khan, Zohra Khan

SELLER: Western Pacific Housing Inc, a Delaware corporation

ESCROW COMPANY: First American Title

DATE: 4/14/06

This Optional Items and Upgrades Amendment ("**Amendment**") constitutes an amendment to that certain Purchase Agreement and Escrow Instructions, as modified by any previous amendments thereto ("**Purchase Agreement**"), entered into by and between Buyer and Seller for the purchase of the Property described in the Purchase Agreement. Any capitalized terms not otherwise defined herein shall have the meanings as set forth in the Purchase Agreement.

1. **OPTION ITEMS.** Buyer hereby orders from Seller all of the optional items ("**Option Items**") set forth on Schedule "1" attached hereto and incorporated herein, for installation on the Property prior to the Closing Date under the Purchase Agreement. Subject to the provisions of **Paragraph 3** below, Seller reserves the right to add, delete or change the price of any Option Item(s) at any time without prior notice to Buyer. In addition, once certain stages of the construction process for the Property ("**Cut-Off Dates**") have been completed, certain Option Items will increase in price or may not be available for purchase by Buyer. Seller only agrees to provide those Option Items and prices offered at the date this Amendment is fully executed by both Seller and Buyer. All Option Items must be approved in writing by Seller and installed or constructed by Seller or its authorized agents, representatives or independent contractors. If Buyer and Seller agree to cancel, add, or change any Option Item(s), Buyer shall execute a replacement and/or additional Amendment.

2. **OPTION DEPOSIT.** Buyer shall pay concurrently with Buyer's signature of this Amendment the sum of $ 4739 as the "Option Deposit." Seller and Buyer acknowledge and agree that the Option Deposits constitute "purchase money" under California Law. If Buyer completes the purchase of the Property, the Option Deposit received shall be applied against Buyer's required down payment on the total purchase price of the Property and improvements thereto. Seller shall have no obligation to order any Option Item until this Amendment is fully executed and Buyer has paid to Seller the Option Deposit. Failure to pay the Option Deposit may result in missing the Cut-Off Dates and higher costs for or unavailability of an Option Item as described above. If the Option Items are added to Buyer's loan or are an incentive under the Purchase Agreement, the Option Deposit paid to Seller by Buyer will be credited to Buyer at the Close of Escrow. In the event that Buyer does not deliver written evidence of Buyer's Lender's approval of including all or any portion of the cost of the Option Items in Buyer's Loan by the time period set forth in the Purchase Agreement, Buyer shall immediately pay to Seller cash in the amount of the balance due for the Option Items, or Seller shall have the right to return Buyer's Option Deposit for such unavailable or delayed Option Item and install standard items or finishes instead. Notwithstanding the foregoing, if Buyer executed the Purchase Agreement under a Conditional Public Report, the Option Deposit shall be paid to Escrow Holder instead of Seller as provided above. Upon the issuance of a Final Subdivision Public Report by the California Department of Real Estate, if Seller has posted the bond or other security referenced in the Purchase Agreement, then Seller shall be entitled to request that Escrow Holder release the Option Deposit to Seller, without further instructions of Seller or Buyer.

3. **UNAVAILABILITY OR DELAY OF OPTION ITEMS.** If Buyer has selected any Option Item which Seller later determines is not available, or cannot be delivered on a timely basis and Seller determines that such delay is expected to delay the Closing Date, Seller shall deliver notice to Buyer ("**Seller's Notice**"). Once Buyer has received Seller's Notice, Buyer shall within the time period set forth in such notice to either (i) select an alternative Option Item, or (ii) cancel the order for such Option Item and receive a refund from Seller in the amount of the Option Deposit. Seller's inability to obtain or to timely obtain any Option Item, or Buyer's failure to select an alternative Option Item as provided above shall in no event entitle Buyer to terminate the Purchase Agreement or to cancel Escrow. If Buyer fails to select either of the alternatives provided above within the time period set forth in Seller's Notice, Seller shall have the unilateral right to return Buyer's Option Deposit for such unavailable or delayed Option Item and install standard items or finishes instead.

4. **REFUNDABILITY OF PAYMENTS. If the Close of Escrow does not occur as provided in the Purchase Agreement, all payments made under this Amendment shall be refunded, unless, as of the date of such termination, such failure to close is due to Buyer's default as specified in the Purchase Agreement and Seller has ordered, initiated construction of or installed any Option Items and any refund due Buyer will be adjusted to deduct all costs of such ordering, construction or installation, which amount shall be retained by Seller. Seller's rights to retain payments made**

by Buyer for Option Items shall be pursuant to the additional liquidated damage provision executed by Buyer as provided below.

5. **ADDITIONAL LIQUIDATED DAMAGES.** If the Close of Escrow does not occur due to Buyer's default after Seller has processed this Amendment and has ordered, initiated construction of or installed any Option Items purchased by Buyer hereunder, Seller will be damaged as a result thereof and, by placing their initials here, Buyer WK, ZK and Seller [initials] agree that the liquidated damages provision set forth below shall govern.

5.1 If the Close of Escrow does not occur as provided above, Seller will be damaged and will be entitled to compensation for these damages, but such damages will be extremely difficult and impractical to ascertain, therefore Buyer desires to limit the amount of damages for which Buyer might be liable should Buyer breach the Purchase Agreement or this Amendment. In addition, both Buyer and Seller wish to avoid the costs and lengthy delays which would result if the Seller filed a lawsuit or arbitration to collect its damages for breach of the Purchase Agreement or this Amendment; and

5.2 If the Close of Escrow does not occur as provided above, in addition to the other deposit amounts retained by Seller under the Purchase Agreement, the Option Deposit paid by Buyer hereunder for Option Items that have been ordered, are under construction or have been installed by Seller shall be deemed to constitute a reasonable estimate of Seller's damages under the provisions of Section 1675 of the California Civil Code and shall be deemed liquidated damages payable to Seller. If such amounts, together with any other funds deposited by Buyer that are payable by Buyer to Seller as liquidated damages, exceed the amount of three percent (3%) of the Purchase Price (adjusted to include the cost of all Option Items set forth herein), the parties acknowledge and agree that Seller shall be permitted to retain and not be required to refund to Buyer amounts paid by Buyer pursuant to this Amendment because these amounts have been paid by Seller to third parties for Option Items requested by Buyer and are not recoverable by Seller and, therefore, constitute a reasonable estimate of Seller's damages. If any such amounts are then held by Seller, all such amounts shall be transmitted by Seller to Escrow Holder immediately upon Seller's delivery of the written notice to Escrow Holder described in Paragraph 10 of the Purchase Agreement and shall thereupon be handled according to the procedures set forth in such section. Any disputes arising with respect to the disposition of such amounts shall be resolved in accordance with Paragraph 10 of the Purchase Agreement; and

5.3 Seller's sole and exclusive remedy in such event shall be the payment of such liquidated damages to Seller.

6. **PAYMENT TERMS.** Buyer's check made payable to Seller in the amount of $ 4739 for the Option Deposit accompanies this order (Check No. 1367).

Total charges for the Option Items shall be paid from Escrow closing funds by means of:

☐ Additional cash down payment for the balance of such charges

☐ Proceeds of Buyer's Loan (subject to the provisions of **Paragraph 3** above)

☐ The terms of any amendment to the Purchase Agreement providing for the payment by Seller of all or any portion of such total charges

All amounts held by Seller outside of Escrow shall be covered by the surety bond required under the Purchase Agreement. A fully executed copy of this Amendment shall be provided to Escrow Holder.

7. **EFFECT OF AMENDMENT.** Except as amended hereby, the Purchase Agreement is in full force and effect between the parties and all other terms and conditions remain the same.

8. **COUNTERPARTS.** This Amendment may be executed in counterparts, each of which when taken together, will constitute one fully executed original.



WK Buyer's Initials ZK Buyer's Initials

**The Seller is not responsible for any option order and/or modification other than those specified above, submitted to and approved by Seller.**

This Amendment has been made and executed as of the date set forth above.

RECEIPT FOR OPTION DEPOSIT:

Date: 4/14/06

Sales Representative: Julie Barnech
(Signature is NOT acceptance by Seller)

ACCEPTANCE:

Western Pacific Housing, Inc., a Delaware Corporation

Buyer

Zohra Khan

Buyer

By:
Name:
Title:

5-4-06

# OPTION SUMMARY

Page i
Date 4/07/06
Time 15:54:45

D·R·HORTON® DHI NYSE
America's Builder

Division
Western Pacific Housing-North Bay Division
1210 Central Boulevard
Brentwood, CA 94513
Phone:(925) 634 6023 Fax:(925) 634 6166

| Project | Job Description | Tract | Lot | Plan | Loan Type | Lot Address |
|---|---|---|---|---|---|---|
| 61510000 | Valverde Village .PJ | 3452 | 0006 | 2693 | Unassigned | 10935 Cliffside Drive |

| Buyer # | Name | Contact Information | Total Option Order |
|---|---|---|---|
| 513527 | KHAN, Waheeda Kalsoom & Zohra | (209) 477-8391 (209) 954-5838 | $6,085.00 |

| | Option Number | Description | Qty | Unit Price | Sales Price |
|---|---|---|---|---|---|
| ADD | 1 | XTRACHGP POS Extra Charge After Cutoff | 65 | 1.00 | 65.00 |
| SAME | 2 | CB2001.3 OAK CABINETS WITH RAISED PANEL DOORS @ STANDARD AREAS | 1 | 1,505.00 | 1,505.00 |
| SAME | 3 | ELF001.3 MASTER BEDROOM CEILING FAN & LIGHT KIT - BRUSHED NICKEL | 1 | 245.00 | 245.00 |
| SAME | 4 | ELF200.3 CEILING FAN & LIGHT KIT - INCLUDES BLOCK & WIRE (PER DIAGRAM) BRUSHED NICKEL<br>Color: (@ BED ROOMS 2,3, 4 & LIVING R | 4 | 600.00 | 2,400.00 |
| SAME | 5 | ELU000.3 LOW VOLTAGE OPTIONS | 625 | 1.00 | 625.00 |
| SAME | 6 | EL0004.3 DEDICATED 110V INTERIOR DUPLEX WITH 20 AMP CIRCUIT<br>Color: (@ GARAGE) | 1 | 215.00 | 215.00 |
| SAME | 7 | GD0001.3 GARAGE DOOR OPENER WITH 2 TRANSMITTERS | 1 | 410.00 | 410.00 |
| SAME | 8 | HV0030.3 MAXAIRE GOLD FILTER | 1 | 250.00 | 250.00 |
| SAME | 9 | TE0011.4 MASTER CHANGE TO OBSCURE SHOWER ENCLOSURE WITH CHROME TRIM | 1 | 75.00 | 75.00 |
| SAME | 10 | TE2002.4 BATH #2 ADD OBSCURE TUB/SHOWER ENCLOSURE - CHROME TRIM | 1 | 295.00 | 295.00 |
| | | | | TOTAL: | $6,085.00 |

## CONDITIONS OF OPTION/CHANGES

1. All Option/Changes are subject to approval of builder
2. All requests for Option/Changes are subject to the following:
   a. A cash payment in the full amount for all requested Option/Changes that cannot be included in the Homeowner's Mortgage Loan.
   b. A cash deposit for all requested Option/Changes that can be included in the Homeowner's Mortgage Loan.
3. Cash deposit and/or cash payments in full are refundable only in the event the Builder disapproves all or a portion of the Option/Changes requested. The portion of the Option/Change disapproved by the Builder will be refundable to the Homeowner at the time of disapproval by the Builder.
4. Homeowner understands that Builder will incur costs and expenses in meeting this order and that in the event Buyer defaults hereunder, damages will be difficult or impossible to asses at the time, therefore all cash payments in full and/or cash deposits paid to Builder for Option/Changes are not refundable if for any reason the Homeowner is unable to consummate the purchase of this home.
5. Builder will endeavor to incorporate requested Option/Changes into construction of home. If for any reason the Option/Changes are not included, Builder's responsibility is limited to the refunding of the selling price of the Option/Change.
6. Work will not commence until cash payment or deposit has been received by Builder plus a signed copy of this Change Order Agreement by Buyer.
7. Previously selected options may be cancelled prior to cut off for a fee of $150 per occurrence.

## ACCEPTANCE AND APPROVALS

I/We hereby request the following changes or options to be made at our expense and have read and agree to the conditions stated above.

_______________________, SELLER PURCHASER _______________________

BY _______________________ PURCHASER _______________________
SALES REPRESENTATIVE DATE

_______________________
CONSTRUCTION DATE

D

CAMPBELL'S

## SELECTION SHEET

Diagram must accompany all selections

| | | | | |
|---|---|---|---|---|
| 1/15/2006 | VALVERDE | | DR HORTON | |
| DATE | PROJECT | | BUILDER | |
| KHAN, WAHEEDA | | 209-477-8391 | | |
| BUYERS NAME | | HOME PHONE | WORK PHONE | |
| | | | | |
| CURRENT ADDRESS | | | | |
| | | 6 | 2693 | S. SANDOVAL |
| JOB ADDRESS | | LOT NO. | PLAN NO. | DESIGNER |

| | GROUP | AREA | MFG | QUAL / NAME | COLOR | |
|---|---|---|---|---|---|---|
| C | i | STD AREAS | SHAW HF | NEW WORLD HG063 | CARAMEL FROST 00201 | $ 1,859 |
| A | | | | | | |
| R | | | | | | |
| P | | | | | | |
| E | | | | | | |
| T | | | CARPET TO VINYL TRANSITION: ☐ GOLD ☐ SILVER<br>Please include color change charge if applicable | | | |

| | GROUP | AREA | MFG | QUAL / NAME | WEIGHT | |
|---|---|---|---|---|---|---|
| P | 1 | STD AREAS | CARPENTER | 7/16" | 6LB | $ - |
| A | | | **INCL IN CPT PRICE** | | | |
| D | | | | | | |

| | GROUP | AREA | MFG | QUAL / NAME | COLOR / PATTERN # | |
|---|---|---|---|---|---|---|
| V | STD | KIT/NK/PNT | MANNINGTON | VEGA II | 3517 | $ - |
| I | STD | LAUNDRY | MANNINGTON | VEGA II | 3517 | $ - |
| N | STD | BATH 2 | MANNINGTON | VEGA II | 3517 | $ - |
| Y | STD | BATH 3 | MANNINGTON | VEGA II | 3517 | $ - |
| L | STD | MA W/C | MANNINGTON | VEGA II | 3517 | $ - |

WINDOW COVERINGS
(Please see window coverings order form for details) WINDOWS TOTAL $ 5,277

| | PRODUCT(S) | QUANTITY | | | |
|---|---|---|---|---|---|
| W | | | | CPT/PAD/VINYL/WOOD SUBTOTAL | $ 1,859 |
| I | SOMNER VERTICALS(PC4) | 21(WINDOWS 1-21) | $5,277 | TILE TOPS & SURROUNDS SUBTOTAL | $ 5,798 |
| N | AIDEN WHITE 7704771 | **INCL. SGD @ NOOK | | TILE & MARBLE FLOORS SUBTOTAL | $ - |
| D | | | | WINDOW COVERINGS (on loan) | $ 5,277 |
| O | | | | CHANGE FEE $250 PER ITEM | $ - |
| W | | | | TOTAL | $ 12,934 |
| S | | | | DEPOSIT | $ - |
| | | | | BALANCE DUE | $ 12,934 |

We have been advised that carpet color, ceramic tile and grout color and vinyl color may vary from color of sample due to dye lots, Mfg. lots & fading. These characteristics are beyond the control of Campbell's Carpets, the builder, and or their suppliers, installers and subcontractors. When you sign this contract, you are obligating yourself to accept and not expect anything that is not stated on this contract.
THERE WILL BE A $250 PROCESSING FEE FOR EACH CHANGES MADE TO THIS CONTRACT AND/OR SUPPORTING DOCUMENTATION.

X [signature] 1-15-06 X Zohra Khan 1-15-06
HOMEOWNER DATE HOMEOWNER DATE

[signature] 1/15/06
SELECTION COORDINATOR DATE

JB 1/29/06 KS 1-30-06

D·R·HORTON® DHI Listed NYSE
America's Builder
WESTERN PACIFIC SERIES

# FINAL AMENDMENT

The following terms and conditions are hereby incorporated into and made a part of the Purchase Agreement and Receipt for Deposit dated 12-11-05.

Property Address: 10935 Cliffside Dr Stockton Ca 95209

LOT #: 6 PLAN: 2693 COMMUNITY: Valverde Villages

The Buyer(s), Waheeda Khan & Zohra Khan and the Seller, Western Pacific Housing, Inc., hereby agree to the following terms and conditions:

**Base purchase price:** $ 464,990

**Lot premium:** $ 0

**Upgrade total:** $ 18,954

- **Flooring:** $ 12,934
- **Rough:** $ 6,020
- **Spec:** $ 0
- **Other** $ 0

**LESS** ______ $< 0 >

**TOTAL purchase price:** $ 483,944

☒ **Non-Recurring** / ☐ **Recurring Closing Cost Credit** $ 5,000 if Using DHI Mtg

**Additional Terms & Conditions:** ______

**DEPOSIT INFORMATION**

| | | | | |
|---|---|---|---|---|
| INITIAL: | Ck# 1345 | $ 7500 | Date: 12/11/06 | Upgrade: Ck# |
| Upgrade: | Ck# 1367 | $ 4,739 | Date: 1/16/06 | Upgrade: Ck# |
| Upgrade: | Ck# | $ | Date: | Upgrade: Ck# |

0• *
464,990• +
12,934• +
6,020• +
483,944• *

**BUYER AGREES AND UNDERSTANDS THAT NO CHANGES TO UPGRADES WILL BE ACCEPTED AFTER THIS FORM IS SIGNED.**

( WK )( ZK ) **Initial Here**

**The undersigned hereby acknowledge receipt of a copy of this Final Amendment.**

Waheeda Kalsum Khan 1-16-06
Buyer Signature Date

Western Pacific Housing, Inc. (Seller) Date

Zohra Khan 1-16-06
Buyer Signature Date

Julie Bronecki 1/16/06
Sales Agent Date

Distribution: ☐ Sales ☐ Lender ☐ Lot File

Project: Valverde Villages
Lot/Residential Unit: 10

## OPTIONAL ITEMS AND UPGRADES AMENDMENT

BUYER: Waheeda Khan
Zohra Khan

SELLER: Western Pacific Housing Inc
a Delaware corporation

ESCROW COMPANY: First American Title

DATE: 1-16-06

This Optional Items and Upgrades Amendment (**"Amendment"**) constitutes an amendment to that certain Purchase Agreement and Escrow Instructions, as modified by any previous amendments thereto (**"Purchase Agreement"**), entered into by and between Buyer and Seller for the purchase of the Property described in the Purchase Agreement. Any capitalized terms not otherwise defined herein shall have the meanings as set forth in the Purchase Agreement.

1. **OPTION ITEMS.** Buyer hereby orders from Seller all of the optional items (**"Option Items"**) set forth on Schedule "1" attached hereto and incorporated herein, for installation on the Property prior to the Closing Date under the Purchase Agreement. Subject to the provisions of **Paragraph 3** below, Seller reserves the right to add, delete or change the price of any Option Item(s) at any time without prior notice to Buyer. In addition, once certain stages of the construction process for the Property (**"Cut-Off Dates"**) have been completed, certain Option Items will increase in price or may not be available for purchase by Buyer. Seller only agrees to provide those Option Items and prices offered at the date this Amendment is fully executed by both Seller and Buyer. All Option Items must be approved in writing by Seller and installed or constructed by Seller or its authorized agents, representatives or independent contractors. If Buyer and Seller agree to cancel, add, or change any Option Item(s), Buyer shall execute a replacement and/or additional Amendment.

2. **OPTION DEPOSIT.** Buyer shall pay concurrently with Buyer's signature of this Amendment the sum of $ 4,139 as the "Option Deposit." Seller and Buyer acknowledge and agree that the Option Deposits constitute "purchase money" under California Law. If Buyer completes the purchase of the Property, the Option Deposit received shall be applied against Buyer's required down payment on the total purchase price of the Property and improvements thereto. Seller shall have no obligation to order any Option Item until this Amendment is fully executed and Buyer has paid to Seller the Option Deposit. Failure to pay the Option Deposit may result in missing the Cut-Off Dates and higher costs for or unavailability of an Option Item as described above. If the Option Items are added to Buyer's loan or are an incentive under the Purchase Agreement, the Option Deposit paid to Seller by Buyer will be credited to Buyer at the Close of Escrow. In the event that Buyer does not deliver written evidence of Buyer's Lender's approval of including all or any portion of the cost of the Option Items in Buyer's Loan by the time period set forth in the Purchase Agreement, Buyer shall immediately pay to Seller cash in the amount of the balance due for the Option Items, or Seller shall have the right to return Buyer's Option Deposit for such unavailable or delayed Option Item and install standard items or finishes instead. Notwithstanding the foregoing, if Buyer executed the Purchase Agreement under a Conditional Public Report, the Option Deposit shall be paid to Escrow Holder instead of Seller as provided above. Upon the issuance of a Final Subdivision Public Report by the California Department of Real Estate, if Seller has posted the bond or other security referenced in the Purchase Agreement, then Seller shall be entitled to request that Escrow Holder release the Option Deposit to Seller, without further instructions of Seller or Buyer.

3. **UNAVAILABILITY OR DELAY OF OPTION ITEMS.** If Buyer has selected any Option Item which Seller later determines is not available, or cannot be delivered on a timely basis and Seller determines that such delay is expected to delay the Closing Date, Seller shall deliver notice to Buyer (**"Seller's Notice"**). Once Buyer has received Seller's Notice, Buyer shall within the time period set forth in such notice to either (i) select an alternative Option Item, or (ii) cancel the order for such Option Item and receive a refund from Seller in the amount of the Option Deposit. Seller's inability to obtain or to timely obtain any Option Item, or Buyer's failure to select an alternative Option Item as provided above shall in no event entitle Buyer to terminate the Purchase Agreement or to cancel Escrow. If Buyer fails to select either of the alternatives provided above within the time period set forth in Seller's Notice, Seller shall have the unilateral right to return Buyer's Option Deposit for such unavailable or delayed Option Item and install standard items or finishes instead.

4. **REFUNDABILITY OF PAYMENTS. If the Close of Escrow does not occur as provided in the Purchase Agreement, all payments made under this Amendment shall be refunded, unless, as of the date of such termination, such failure to close is due to Buyer's default as specified in the Purchase Agreement and Seller has ordered, initiated construction of or installed any Option Items and any refund due Buyer will be adjusted to deduct all costs of such ordering, construction or installation, which amount shall be retained by Seller. Seller's rights to retain payments made**



WK Buyer's Initials ZK Buyer's Initials

by Buyer for Option Items shall be pursuant to the additional liquidated damage provision executed by Buyer as provided below.

5. **ADDITIONAL LIQUIDATED DAMAGES.** If the Close of Escrow does not occur due to Buyer's default after Seller has processed this Amendment and has ordered, initiated construction of or installed any Option Items purchased by Buyer hereunder, Seller will be damaged as a result thereof and, by placing their initials here, Buyer WK, ZK and Seller ________ agree that the liquidated damages provision set forth below shall govern.

5.1 If the Close of Escrow does not occur as provided above, Seller will be damaged and will be entitled to compensation for these damages, but such damages will be extremely difficult and impractical to ascertain, therefore Buyer desires to limit the amount of damages for which Buyer might be liable should Buyer breach the Purchase Agreement or this Amendment. In addition, both Buyer and Seller wish to avoid the costs and lengthy delays which would result if the Seller filed a lawsuit or arbitration to collect its damages for breach of the Purchase Agreement or this Amendment; and

5.2 If the Close of Escrow does not occur as provided above, in addition to the other deposit amounts retained by Seller under the Purchase Agreement, the Option Deposit paid by Buyer hereunder for Option Items that have been ordered, are under construction or have been installed by Seller shall be deemed to constitute a reasonable estimate of Seller's damages under the provisions of Section 1675 of the California Civil Code and shall be deemed liquidated damages payable to Seller. If such amounts, together with any other funds deposited by Buyer that are payable by Buyer to Seller as liquidated damages, exceed the amount of three percent (3%) of the Purchase Price (adjusted to include the cost of all Option Items set forth herein), the parties acknowledge and agree that Seller shall be permitted to retain and not be required to refund to Buyer amounts paid by Buyer pursuant to this Amendment because these amounts have been paid by Seller to third parties for Option Items requested by Buyer and are not recoverable by Seller and, therefore, constitute a reasonable estimate of Seller's damages. If any such amounts are then held by Seller, all such amounts shall be transmitted by Seller to Escrow Holder immediately upon Seller's delivery of the written notice to Escrow Holder described in Paragraph 10 of the Purchase Agreement and shall thereupon be handled according to the procedures set forth in such section. Any disputes arising with respect to the disposition of such amounts shall be resolved in accordance with Paragraph 10 of the Purchase Agreement; and

5.3 Seller's sole and exclusive remedy in such event shall be the payment of such liquidated damages to Seller.

6. **PAYMENT TERMS.** Buyer's check made payable to Seller in the amount of $ 4739 for the Option Deposit accompanies this order (Check No. 1367).

Total charges for the Option Items shall be paid from Escrow closing funds by means of:

- ☐ Additional cash down payment for the balance of such charges
- ☐ Proceeds of Buyer's Loan (subject to the provisions of **Paragraph 3** above)
- ☐ The terms of any amendment to the Purchase Agreement providing for the payment by Seller of all or any portion of such total charges

All amounts held by Seller outside of Escrow shall be covered by the surety bond required under the Purchase Agreement. A fully executed copy of this Amendment shall be provided to Escrow Holder.

7. **EFFECT OF AMENDMENT.** Except as amended hereby, the Purchase Agreement is in full force and effect between the parties and all other terms and conditions remain the same.

8. **COUNTERPARTS.** This Amendment may be executed in counterparts, each of which when taken together, will constitute one fully executed original.



WK Buyer's Initials    ZK Buyer's Initials