**BLUMENTHAL & NORDREHAUG**
Norman B. Blumenthal (State Bar #068687)
Kyle R. Nordrehaug (State Bar #205975)
Aparajit Bhowmik (State Bar #248066)
2255 Calle Clara
La Jolla, CA 92037
(858) 551-1223
Fax: (858) 551-1232

**GERARD & ASSOCIATES**
Robert B. Gerard, Esq. (State Bar #96296)
1516 Front St
San Diego, CA 92101
Telephone: (619) 232-2828
Facsimile: (619) 232-4219

**LAW OFFICES OF ROBERT FELLMETH**
Robert Fellmeth, Esq. (State Bar #49897)
5998 Alcala Park
San Diego, CA 92110
Telephone: (619) 260 4806
Facsimile: (619) 260 4753

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JAMES WILSON, REBECCA LORENZO, WAHEEDA KHAN, JORGE LOPEZ, and SUSIE KHUU, on Behalf of Themselves and All Others Similarly Situated<br><br>Plaintiffs<br><br>v.<br><br>D.R. HORTON, INC., WESTERN PACIFIC HOUSING, INC. d/b/a D.R. HORTON, AMERICA'S BUILDER, DHI MORTGAGE COMPANY, LTD., L.P., and DOES 1-10,<br><br>Defendants. | CASE NO. **08 cv 0592 BEN RBB**<br><br>PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS NO. 1<br><br>Judge: Hon. Roger Benitez<br>Courtroom: 3<br><br>Hearing Date: June 9, 2008<br>Hearing Time: 10:30 a.m. |

# TABLE OF CONTENTS

I. INTRODUCTION . . . . . 1

II. STATEMENT OF FACTS . . . . . 4

A. Plaintiff Khan . . . . . 4

B. Plaintiff Lopez . . . . . 5

C. Plaintiff Lorenzo . . . . . 7

D. Plaintiff Wilson . . . . . 7

E. Plaintiff Khuu . . . . . 8

III. SUMMARY OF THE COMPLAINT . . . . . 9

IV. LEGAL STANDARD FOR MOTION TO DISMISS . . . . . 11

V. TO THE EXTENT THAT TWOMBLY APPLIES TO TYING CLAIMS, PLAINTIFFS'ANTITRUST CLAIMS EASILY SATISFY TWOMBLY . . . . . 11

VI. PLAINTIFFS HAVE ADEQUATELY ALLEGED RELEVANT MARKETS . . . . . 14

VII. PLAINTIFFS PROPERLY ALLEGE THAT DEFENDANTS HAVE MARKET POWER . . . . . 15

VIII. PLAINTIFFS ADEQUATELY ALLEGE COERCION . . . . . 18

IX. RESPA DOES NOT PROTECT DEFENDANTS FROM ANTITRUST LIABILITY . . 23

X. CONCLUSION . . . . . 24

# TABLE OF AUTHORITIES

**Cases:**


Bell Atlantic Corp. v. Twombly,
__ U.S. __, 127 S.Ct. 1955 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 11, 12, 13, 14

Burgert v. Lokelani Bernice Pauahi Bishop Trust,
200 F.3d 661, 663 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Cascade Health Solutions v. PeaceHealth,
515 F.3d 883, 915 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 14, 19

Cel-Tech Comunications, inc., v. Los Angeles Cellular,
20 Cal. 4th 163 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

City of Moundridge, v. Exxon Mobil Corp.,
___ F.Supp.2d ___, 2008 WL 1735856 (D.D.C. April 16, 2008) . . . . . . . . . . . . . . . . . . 14

Collins v. Int'l Dairy Queen, Inc.,
939 F.Supp. 875, 883 (M.D.Ga.1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Cost Management Services, Inc. v. Washington Natural Gas Co.,
99 F.3d 937, 950 (9th Cir.1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Desaigoudar v. Meyercord,
223 F.3d 1020, 1021 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Eastman Kodak Co. v. Image Tech. Servs., Inc.,
504 U.S. 451 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 14, 16, 17, 18, 19

EEOC v. Concentra Health Services,
496 F.3d 773, 776 (7th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Erickson v. Pardus,
__ U.S. __ , 127 S. Ct. 2197 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Fardella v. Downey S&L Ass'n,
2001 U.S. Dist. LEXIS 6037 (N.D.Ca. May 8, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . 23

FTC v. Tenet Health Care Corp.,
186 F.3d 1045, 1052 (8th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

George Lussier Enterprises, Inc. v. Subaru of New England, Inc.,
1999 WL 1327396 (D.N.H. Dec 13, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Harrison Aire, Inc. v. Aerostar Int'l, Inc.,
316 F. Supp. 2d 186 (E.D.Pa. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Heastie v. Community Bank of Greater Peoria,
69 F.Supp. 716 (N.D.Ill. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

High Technology Careers v. San Jose Mercury News, 996 F.2d 987, 990 (9th Cir.1993) . . . . . 15

In re Intel Corp. Microprocessor Antitrust Litig., 496 F.Supp.2d 404 (D. Del. 2007) . . . . . 13

Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2 (1984) . . . . . 2, 19

Korea Kumho Petrochemical v. Flexsys America LLP, 2008 WL 686834 (N.D.Cal. March 11, 2008) . . . . . 12

MacManus v. A.E. Realty Partners, 146 Cal. App.3d 275 (1983) . . . . . 17

Moore v. Jas. H. Matthews & Co., 550 F.2d 1207 (9th Cir. 1977) . . . . . 20

Mozart Co. v. Mercedes-Benz of North America, Inc., 833 F.2d 1342 (9th Cir. 1987) . . . . . 17, 18

Newcal Industries, Inc. v. Ikon Office Solution, 513 F.3d 1038, 1045 (9th Cir. 2008) . . . . . 1, 2, 14, 16, 17

No.84 Employer- Teamster Joint Council Pension Fund v. Am. West Holding Corp., 320 F.3d 920, 938 (9th Cir. 2003) . . . . . 11

Nursing Home Pension Fund, Local 144 v. Oracle Corp., 380 F.3d 1226 (9th Cir. 2004) . . . . . 11

Red Lion Med. Safety, Inc. v. Ohmeda, Inc., 63 F.Supp.2d 1218, 1232 (E.D.Ca.1999) . . . . . 16

Re/Max Int'l, Inc. v. Realty One, Inc., 173 F.3d 995, 1019 (6th Cir. 1999) . . . . . 14

Skaff v. Meredien North America Beverly Hills, LLC, 506 F.3d 832, 845 (9th Cir. 2007) . . . . . 13

Subsolutions, Inc. v. Doctor's Assocs., Inc., 62 F . Supp. 616, 626 (D.Conn.1999) . . . . . 16

Trans World Technologies, Inc. v. Raytheon Co.,, 2007 WL 5243941 (D.N.J. Nov. 1, 2007) . . . . . 13

Tucker v. Apple Computer, Inc., 493 F.Supp.2d 1090 (N.D.Cal. 2006) . . . . . 18

United States v. Philip Morris USA, Inc., 310 F. Supp. 2d 68 (D.D.C. 2004) . . . . . 22

Virtual Maintenance, Inc. v. Prime Computer, Inc., 11 F.3d 660, 666-67 (6th Cir.1993) . . . . . 16

Weizeorick v. ABN AMRO Mortg. Group, Inc., 337 F.3d 827 (7th Cir. 2003) . . . . . 23

White Mule Co. v. ATC Leasing Co. LLC., 540 F.Supp.2d 869 (N.D.Ohio 2008) . . . . . 14

Williams v. First Government Mortgage and Investors Corp., 176 F.3d 497 (D.C. Cir. 1999) . . . . . 22

Williamson v. Gen. Dynamics Corp., 208 F.3d 1 144, 1156 (9th Cir. 2000) . . . . . 11

Wilson v. Mobil Oil Corp., 940 F.Supp. 944 (E.D.La.1996) . . . . . 17

**Statutes, Rules and Regulations:**

California Business & Professions Code §§ 16720, *et seq.*) . . . . . 9

California Business & Professions Code §§ 17200 *et seq.*) . . . . . 9

California Business & Professions Code §§ 17500, *et seq.*) . . . . . 9

Federal Rule of Civil Procedure, rule 8 . . . . . 1, 9, 13

12 U.S.C. § 2616) . . . . . 22

**Treatise**:

Charles Alan Wright, et al., FEDERAL PRACTICE AND PROCEDURE § 1202, at 89 (3 ed. 2004) . . . . . 13

## I. INTRODUCTION

Defendants' First Motion to Dismiss, which addresses Plaintiffs' third and fourth causes of action for antitrust violations under the Sherman Act and Cartwright Act must be denied because all of Defendants' arguments are without merit.

Defendants first argue that Plaintiffs fail to allege antitrust violations with sufficient particularity under Bell Atlantic Corp. v. Twombly, __ U.S. __, 127 S.Ct. 1955 (2007). Twombly held that in a price-fixing conspiracy case a plaintiff must allege "enough factual matter (taken as true) to suggest that an agreement was made[,]" and to make the inference of an illegal agreement "plausible." Twombly, 127 S.Ct. at 1965. Under Twombly, a complaint is sufficient if it "raises a reasonable expectation that discovery will reveal evidence of illegal agreement." Id. No conspiracy is alleged here so Twombly's requirement of a plausible conspiracy does not apply. As the Ninth Circuit recently held, the elements of a tying claim need not be alleged with any heightened particularity and need only satisfy Rule 8. Newcal Industries, Inc. v. Ikon Office Solution, 513 F.3d 1038, 1045 (9th Cir. 2008).

Even assuming for the sake of argument that Twombly also applies to tying claims, the complaint still alleges more than enough factual material to establish the plausibility of Defendants' tying conduct. Unlike the complaint in Twombly, which failed to allege any specific facts about the alleged price-fixing conspiracy, the complaint here alleges the operation of Defendants' anti-competitive tying scheme in painstaking detail.

Defendants next argue that Plaintiffs have failed to allege that Defendants had market power in any relevant geographic product market for the tying product (Horton's new home sales) or the tied product (mortgage loans for Horton's new home sales). In arguing that Horton lacks sufficient market power in the overall market for new homes to be liable for tying conduct, Defendants ignore the Supreme Court's decision in Eastman Kodak Co. v. Image Tech. Servs., Inc., 504 U.S. 451, 477, (1992) and its progeny.

Kodak held that the requirement of market power in a tying case is satisfied where the defendant locks the customer in by imposing information and switching costs that prevent the

customer from using an alternative source for the tying product in order to avoid having to purchase the tied product. The Complaint alleges how and in what way Defendants were able to exercise market power arising from Horton's position as home seller to prevent buyers from obtaining mortgage loans from any company other than Horton Mortgage. These detailed allegations in the Complaint easily satisfy the market power test under Kodak as most recently applied by the Ninth Circuit in Newcal Industries where market power and coercion were found to be properly alleged based on leverage from a "lock-in" on the tying product. 513 F.3d at 1051. Newcal Industries also reaffirmed the rule that the validity of the alleged relevant market and the existence of market power in that relevant market are factual issues that generally cannot be resolved on a motion to dismiss. Id. at 1052.

Finally, Defendants argue that the Complaint fails to adequately allege that buyers of Horton homes are actually coerced into obtaining a mortgage from Horton Mortgage. Defendants do not really dispute that coercion is alleged but instead simply disagree with the allegation that Plaintiffs were required to use Horton Mortgage to get their mortgage loan. As the Ninth Circuit held in Newcal Industries, the coercion element is satisfied where, as here, the plaintiffs allege that defendants were "able to force purchasers of the tying product who are locked in.... to buy the tied product." 513 F.3d at 1051.

In the most recent tying case in this Circuit, the Ninth Circuit explained that "the Supreme Court has condemned tying arrangements when the seller has the market power to force a purchaser to do something that he would not do in a competitive market." Cascade Health Solutions v. PeaceHealth, 515 F.3d 883, 915 (9th Cir. 2008) citing Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 14 (1984). Here, Defendants were able to force Plaintiffs and the Class Members to use noncompetitive loans from Horton Mortgage which is something Plaintiffs would not have done in a competitive market by cramming down Horton Mortgage loans with terms that Plaintiffs and the Class Members could not refuse without losing their new home purchase and their down payment.

Horton was able to force Plaintiffs to accept anti-competitive loans they would not have chosen in a competitive market by first requiring Plaintiffs to apply for a Horton Mortgage loan as

part of the new home purchase within five (5) days of signing the purchase contract (¶7.2) and then refusing to provide the necessary information to alternative lenders during the thirty (30) day contingency period. Finally, after the running of the 30-day contingency period (¶7.3), which renders the down-payment subject to forfeiture, Horton, relying on paragraph 7.5 of the Purchase Agreement, forced Plaintiffs to accept the Horton loan without allowing Plaintiffs to shop for a better deal with alternative lenders. Paragraph 7.5 states:

> Buyer shall not change the lender, the loan amount or the loan program after receiving the original final unconditional loan approval referenced in paragraph 7.2 [Horton Mortgage loan approval] and any failure of Buyer or its lender to Close loans on the Closing Date after obtaining the final unconditional loan approval from the lender shall constitute a default hereunder, for which Seller shall have the right to terminate the Purchase Agreement and retain Buyer's Deposit as provided in Paragraph 10, hereof.

In the opinion of Plaintiffs' consumer finance expert, Horton's cram-down loan provision in paragraph 7.5 of the purchase agreement -- which Horton uses to prevent buyers of Horton homes from using other lenders and to force buyers to use a Horton Mortgage loan without their further consent– requires home buyers to do something that no seller would ever require a buyer to do except to gain an unfair advantage for seller's affiliate lender. As Plaintiffs' finance expert explains:

> By effectively channeling the prospective buyer's mortgage business into Horton's affiliate, DHI Mortgage, through ¶7.2, the buyer was precluded, pursuant to ¶7.5, from changing the lender, the loan amount or the program once Horton's affiliate indicated approval. In my opinion, the contract language serves no economic purpose, other than to lock in the financing arrangement offered by Horton's affiliate and precludes the buyer from obtaining more advantageous financing arrangements. Based on my experience, the language in ¶7.5 is not consistent with legitimate home financing customs and practices, nor is there any economic or business justification for such language, other than to provide an unfair advantage to the Defendants. A properly competitive scenario would not prevent the buyer from, e.g. paying cash or arranging for more favorable financing, even after Horton's affiliate had provided its approval.

*See* Declaration of Thomas A. Myers ¶ 16.[1]

---

[1] Horton's interpretation of the language of paragraph 7.5 is also inconsistent with the language of Horton's Affiliated Business Arrangement Disclosure and Notice of Affiliated Business Arrangement Addendum. See e.g. RJN, Exhibit C, at WILSON 00019 [Doc. No. 7-3]. The Disclosure provides:

> You are **NOT** required to use this company [Horton Mortgage] as a condition of your purchase of the Property from **Seller**. There are frequently other settlement

As explained in greater detail herein, the controlling case law clearly require denial of this motion. The Complaint most certainly sets forth antitrust claims upon which relief can be granted.[2]

## II. STATEMENT OF FACTS

### A. Plaintiff Khan

In December of 2005, Plaintiff Khan met with sales assistants from Horton by the names of Mr. John Costello and Ms. Julie Branecki. Compl., ¶38; Khan Decl., ¶2. Plaintiff Khan paid $7,500 as a deposit towards the purchase price of her home as well as $4,739 as an upgrade deposit, and entered into a home purchase agreement with Horton. Id. At this time, Plaintiff Khan was offered a purported "discount" of $5,000 off of the closing costs if she obtained her home loan through Horton Mortgage. Compl, ¶38, Khan Decl., ¶3. As required by paragraph 7.2 of the Purchase Agreement, Plaintiff Khan then applied for a home loan with Horton Mortgage. Paragraph 7.2(a) mandates that "[w]ithin 5 days after Buyer's Offer, Buyer shall submit a completed loan application for the New Loan to DHI Mortgage (**"Seller's Approved Lender")**." Compl., ¶38; Khan Decl., ¶3.

In March or April of 2006, after the thirty day contingency period had expired, Ms. Anna

---

> service providers available with similar services. You are free to shop around to determine that you are receiving the best services and the best rate for these services. (Emphasis in original.)

The Addendum provides:

> You are **NOT** required to use these companies [including Horton Mortgage] as a condition of your purchase of the Property from Seller. THERE ARE FREQUENTLY OTHER SETTLEMENT SERVICE PROVIDERS AVAILABLE WITH SIMILAR SERVICES. YOU ARE FREE TO SHOP AROUND TO DETERMINE THAT YOU ARE RECEIVING THE BEST SERVICES AND THE BEST RATE FOR THESE SERVICES. (Emphasis in the Original).

These inconsistencies with ¶ 7.5 render the meaning of ¶ 7.5 ambiguous to say the least.

[2] Please be advised that Patrick Missud, to avoid any appearance of impropriety, has formally withdrawn as co-counsel for the Plaintiffs and the putative Class. [Doc. No. 11].

Pena from Horton Mortgage informed Ms. Khan that she was required to accept certain stated loan terms from Horton Mortgage. Khan Decl., ¶4. The terms and conditions of the loan presented by Ms. Pena, however, were comprised of broker fees, interest rates, and closing costs that were so high that Plaintiff Khan decided to attempt to fund her home purchase with another lender as she thought she was free to do. Compl., ¶42, Khan Decl., ¶4. Soon thereafter, Plaintiff Khan obtained loan approval for a loan from Washington Mutual with far better terms and conditions than the loan presented to her by Ms. Pena from Horton Mortgage. Compl., ¶38, Khan Decl., ¶¶4-5.

Plaintiff Khan then informed Ms. Branecki of the loan she had obtained from Washington Mutual. In response, Ms. Branecki threatened Plaintiff Khan pursuant to the cram-down terms of paragraph 7.5 of the Purchase Agreement that if a loan from Horton Mortgage was not used, all funds paid as a deposit, including the upgrade deposit, would be forfeited and the sale of the home would be cancelled. Compl., ¶38; Khan Decl., ¶6.

While Ms. Branecki insisted that Plaintiff Khan was tied into accepting a loan from Horton Mortgage upon receiving approval for such loan from Horton Mortgage, neither Ms. Branecki nor Mr. Costello had cautioned Ms. Khan at the time the purchase agreement was signed that such a tie-in would be automatically triggered by receiving loan approval from Horton Mortgage without any right to negotiate or refuse the terms dictated by Horton Mortgage. Khan Decl., ¶7. Plaintiff Khan was especially shocked at the fact that she was tied in, by receiving loan approval from Horton Mortgage to terms she never consented to, because, at the time the threats were conveyed to her by Ms. Branecki, on or about March or April of 2006, the home was not even completed. Further, the estimated date of closing was not scheduled to occur for at least one more month in May of 2006. Khan Decl., ¶11.

**B. Plaintiff Lopez**

In May of 2006, Plaintiff Lopez met with Ms. Julie Branecki, a sales assistant from Horton. Compl., ¶40; Lopez Decl., ¶2-3. Plaintiff Lopez paid $13,500 as a deposit towards the purchase price of his home. Id. At this time, Plaintiff Lopez was also offered a purported "discount" of $10,000 off of the closing costs if he did not shop for a loan and obtained his home loan through

Horton Mortgage. Id. Plaintiff Lopez applied for a home loan with Horton Mortgage as required by paragraph 7.2 of the Purchase Agreement. Paragraph ¶ 7.2(a) mandates that "[w]ithin 5 days after Buyer's Offer, Buyer shall submit a completed loan application for the New Loan to DHI Mortgage (**"Seller's Approved Lender")**." Compl., ¶40; Lopez Decl., ¶3.

In July of 2006, after the thirty-days contingency period had expired, Ms. Candace Rivera, from Horton Mortgage, informed Mr. Lopez that he was required to accept certain stated loan terms from Horton Mortgage. Lopez Decl., ¶4. The terms and conditions of the loan presented by Ms. Rivera, however, were comprised of broker fees, interest rates, and closing costs that were so high that Plaintiff Lopez decided to use an alternate lender. Compl., ¶40, Lopez Decl., ¶5.

Plaintiff Lopez then informed Ms. Rivera of his intention to seek alternate funding. Ms. Rivera responded that Plaintiff Lopez could not refuse the Horton Mortgage loan because, if he did not use the Horton Mortgage loan as now required by paragraph 7.5 of the Purchase Agreement, all funds paid as towards the deposit would be forfeited and the sale of the home would be cancelled because of the Horton Mortgage loan approval. Compl., ¶40; Lopez Decl., ¶5.

At the time he entered into the Purchase Agreement, Plaintiff Lopez had no reason to foresee that Horton would force him into a loan with Horton Mortgage, as the Affiliated Business documents of the Purchase Agreement stated that he would not be required to use Horton Mortgage. Lopez Decl., ¶ 6-9. After receiving loan approval from Horton Mortgage, however, Ms. Branecki of Horton insisted that paragraph 7.5 of the Purchase Agreement required Plaintiff Lopez to accept the Horton Mortgage loan on terms he never agreed to accept. Mr. Lopez was especially shocked at this treatment because, as a mortgage consultant himself, he was capable of procuring a loan with a much lower interest rate and he had also never seen a provision that required a borrower to accept a loan without knowing and agreeing to the terms of the loan. Compl., ¶40; Lopez Decl., ¶9-11.

Plaintiff Lopez was coerced into accepting the Horton Mortgage loan in order to avoid losing the substantial sums he had already paid to Horton towards the purchase price of the home. Id. As a result, the language of Horton's Affiliated Party Disclosure and Addendum, which state that buyers are not required to use Horton Mortgage as their lender, was rendered meaningless by Horton

Mortgage's loan approval more than thirty days after the purchase agreement is signed, which forced Plaintiff Lopez either to accept the Horton Mortgage Loan or forfeit his down payment and new home purchase.

To add insult to injury, Plaintiff Lopez has still, to this date, not even received the promised $10,000 discount off of his closing costs that was promised to him for procuring his loan through Horton Mortgage. Lopez Decl., ¶10.

**C. Plaintiff Lorenzo**

In January of 2006, Plaintiff Lorenzo met with Ms. Julie Branecki, a sales assistant from Horton. Compl., ¶35; Lorenzo Decl., ¶2-3. Plaintiff Lorenzo paid $7,500 as a deposit towards the purchase price of her home. Id. At this time, Plaintiff Lorenzo was offered a purported "discount" of $5,000 off of the closing costs if she obtained her home loan through Horton Mortgage. Id. Plaintiff Lorenzo then applied for a home loan with Horton Mortgage as required by paragraph 7.2 of the Purchase Agreement. Paragraph 7.2(a) of the Purchase Agreement mandates that "[w]ithin 5 days after Buyer's Offer, Buyer shall submit a completed loan application for the New Loan to DHI Mortgage (**"Seller's Approved Lender")**." Compl., ¶35; Lorenzo Decl., ¶3.

Consistent with the systematic procedure used against the other named Plaintiffs, Mr. Lorenzo was also coerced into using an anti-competitive loan package consisting of a first loan, which funded eighty percent (80%) of the home purchase with an interest rate that was fixed at 1.5% for one (1) year and adjustable thereafter. The second loan funded twenty (20%) of the home purchase with an interest rate that adjusts between 9.75-10.5% upon loan approval by Horton Mortgage. Compl., ¶35; Lorenzo Decl., ¶9. After being trapped into this unaffordable loan, Plaintiff Lorenzo lives in daily fear of losing her home in foreclosure. Lorenzo Decl., ¶9.

**D. Plaintiff Wilson**

In September of 2007, Plaintiff Wilson met with Mr. Brad Trembly, a sales representative from Horton. Compl., ¶33-34; Wilson Decl., ¶2-3. Plaintiff Wilson paid a total of $20,000 as a deposit towards the purchase price of his home. Id. At this time, Plaintiff Wilson was offered a purported "discount" of 2% of the purchase price off of the closing costs if he obtained his home

loan through Horton Mortgage. Id. Mr. Trembly also represented to Plaintiff Wilson that his closing costs would not exceed $4,000.

Plaintiff Wilson applied for a home loan with Horton Mortgage as required by paragraph 7.2 of the Purchase Agreement. Paragraph 7.2(a) of the Purchase Agreement mandates that "[w]ithin 5 days after Buyer's Offer, Buyer shall submit a completed loan application for the New Loan to DHI Mortgage (**"Seller's Approved Lender")**." Compl., ¶33-34; Wilson Decl., ¶5.

Within thirty (30) days of entering into the Purchase Agreement, Plaintiff Wilson obtained tentative loan commitment for a loan from Bank of America that had an interest rate of 5%. Compl., ¶34, Wilson Decl., ¶8. Despite his best efforts, however, Horton would not cooperate with the Bank of America representative. As a result, Plaintiff Wilson was prevented from obtaining the Bank of America loan. Plaintiff Wilson was forced instead to use Horton Mortgage, or else have the home sale cancelled and forfeit the down payment. Compl., ¶34; Wilson Decl., ¶7-9. The Horton Mortgage loan contained a substantially higher interest rate and more than double the amount of closing costs initially quoted by Mr. Trembly. Comp., ¶34; Wilson Decl., ¶12-13. To add insult to injury, Plaintiff Wilson never even received the promised 2% discount for using Horton Mortgage. Wilson Decl., ¶12.

**E. Plaintiff Khuu**

In July of 2007, Plaintiff Khuu met with Ms. Patricia Sugiyam, a sales assistant from Horton. Compl., ¶41-42; Khuu Decl., ¶2-3. Plaintiff Khuu paid $8,000 as a deposit towards the purchase price of her home. Id. At this time, Plaintiff Khuu was told by Ms. Sugiyam that her closing costs would not exceed $3,000. Id.

Plaintiff Khuu then applied for a home loan with Horton Mortgage as required by paragraph 7.2 of the Purchase Agreement. Paragraph ¶ 7.2(a) of the Purchase Agreement mandates that "[w]ithin 5 days after Buyer's Offer, Buyer shall submit a completed loan application for the New Loan to DHI Mortgage (**"Seller's Approved Lender")**." Compl., ¶41-42; Khuu Decl., ¶3.

In September of 2007, after the thirty-days contingency period had expired, Ms. Cynthia Brockway from Horton Mortgage, informed Plaintiff Khuu that she was required to accept certain

stated loan terms from Horton Mortgage, which included$7,000 in closing costs. At that time, Plaintiff Khuu was also told by Ms. Sugiyam that should she attempt to change lenders, the sale would not close and her deposit would be forfeited. Compl., ¶42; Khuu Decl., ¶4-5.

As a result, Plaintiff Khuu was coerced into accepting a loan with more than double the closing costs that she was prepared to pay. Compl., ¶42; Khuu Decl., ¶6-10.

## III. SUMMARY OF THE COMPLAINT

The Complaint provides notice to the Defendants of the claims asserted on behalf of the Plaintiffs and similarly situated consumers, as required by Fed. R. Civ. Proc., rule 8.[3] The Complaint is brought on behalf of the Plaintiffs and a California class with respect to the claims brought under the Cartwright Act and the Unfair Competition Law ("UCL") set forth in California Business & Professions Code §§ 16720, 17200 and 17500, *et seq.*[4] (Complaint at ¶ 1 and ¶ 48). The Complaint alleges that Defendants engaged in an anti-competitive lending scheme in order to take advantage of the market of captive, locked-in D.R. Horton, Inc. home-buyers, and that Defendants used deceptive and unfair business practices to perpetrate the scheme. (Complaint ¶¶ 1, 48).

> While home loans with far better terms and conditions than the home loans offered by Horton Mortgage were available to the Class Members from Horton Mortgage's competitors, the Defendants were able to coerce each and every Class Member to finance their home purchases through Horton Mortgage through a concerted refusal to deal with Horton Mortgage's competitors and with tied-in market power which allowed Horton to threaten the Class Members with loss of their deposits and home purchase if they did not finance their Horton home purchase through Horton Mortgage. This market power was substantially enhanced by the taking of the deposit before the exercise of Defendants' coercive market power. Given the unique nature of a real property purchase, the market power of Defendants is further enhanced as to this unique market of Horton's home sales and tied-in financing.

(Complaint ¶9 [Doc. No. 1].)

---

[3] Plaintiffs file herewith a redline version of the proposed First Amended Complaint attached as Exhibit 1 to the Declaration of Norman B. Blumenthal stating the facts supporting Plaintiffs' causes of action with even greater detail.

[4] The claim under the federal Sherman Antitrust Act is alleged on behalf of a nationwide class.

> This market power was substantially enhanced by the taking of the deposit before the exercise of Defendants' coercive market power. Given the unique nature of a real property purchase, the market power of Defendants is further enhanced as to this unique market of Horton's home sales and tied-in financing.

(Complaint ¶9 [Doc. No. 1].)

The anti-competitive and fraudulent scheme of the Defendants perpetrated on the members of the Class is described in detail throughout paragraphs 10 through 15 of the Complaint, and can be summarized as follows:

> In furtherance of their affiliated and consolidated financial relationship, Horton, as part of each purchase agreement, required each consumer seeking a loan for a Horton home purchase to apply to Horton Mortgage for the loan.... Defendants continued to combine their efforts to conceal the true cost of the mortgage product from each customer until such time as each Class Member was locked-in so that switching costs would be prohibitive. The true facts were that there was no true option to use alternative lenders, as any attempt to do business with alternative lenders was met with threats of loss of the home purchase and non-refundable deposit, along with stonewalling alternative lenders.

(Complaint ¶10 [Doc. No. 1].)

> The Defendants' market power over the home purchasers was so strong that Defendants were able to successfully coerce the Class Members to use Horton Mortgage for their loan with threats of the loss of the deposit and/or other funds paid towards the purchase price of the home for any Class Member that wanted to use an alternate lender. The purpose of these threats by Horton's sales representatives was to cause these home buyers to use Horton Mortgage for their home loan, to the exclusion of the competitive lenders, so as to eliminate all competition. For those Class members who became so dissatisfied with the loan offered by Horton Mortgage before closing, that they were willing to accept the loss of the illusory $5,000-$10,000 "discount" in order to obtain financing from another lender, Horton refused to deal with the alternate lenders and threatened to have the Class Members' deposit forfeited and the sale cancelled if Horton Mortgage was not used for the loan.

(Complaint ¶11 [Doc. No. 1].)

> The Defendants' concerted refusal to deal with other lenders and Defendants' use of market power over the home sale of this unique product and deposit loss allowed Horton Mortgage to unfairly and illegally capture a substantial percentage of the market for these financial services and deprived the Class members of an even and balanced playing field wherein all financial institutions were permitted the chance to compete fairly and honestly for the Class Members' business.... By virtue of unfairly preying on the locked-in and captive business market, Horton Mortgage was able to manufacture anti-competitive loans with unfairly high closing costs; above market fees and charges; and, higher than average interest rates and/or interest rates that were adjustable, rather than fixed...

(Complaint ¶12 [Doc. No. 1].)

The Class is defined as follows:

> As to Counts 1, 2 & 4, this is a class action filed on behalf of all California residential mortgage borrowers who, within four (4) years of the filing of this Class Action Complaint, purchased a home from Horton and received a mortgage loan for such purchase that was originated, processed and/or brokered by Horton Mortgage, wherein the borrower(s) financed their purchase through Horton Mortgage (the "Class"). Upon information and belief, the scope of this class definition, including its temporal scope, may be further refined after discovery of Defendants' books and records. As to Count 3, this Class Action is brought on behalf of all residents of the United States who purchased a home located in the United States from Horton, during the four (4) years prior to the filing of this Complaint and through the end of the Class Period as shall be determined by the Court, and who received a mortgage loan for such purchase that was originated, processed, and/or brokered by Horton Mortgage.

(Complaint ¶48 [Doc. No. 1].)

## IV. LEGAL STANDARD FOR MOTION TO DISMISS

A motion to dismiss for failure to state a claim should be denied unless it "appears beyond doubt that the plaintiff cannot prove any set of facts that would entitle him or her to relief." Nursing Home Pension Fund, 380 F.3d 1226, 1229 (9th Cir. 2004); Williamson v. Gen. Dynamics Corp., 208 F.3d 1 144, 1156 (9th Cir. 2000). In considering a motion to dismiss, the court accepts the plaintiff's allegations as true and construes them in the light most favourable to the plaintiff. Desaigoudar v. Meyercord, 223 F.3d 1020, 1021 (9th Cir. 2000); Burgert v. Lokelani Bernice Pauahi Bishop Trust, 200 F.3d 661, 663 (9th Cir. 2000). The sufficiency of the complaint must be determined considering the allegations in their entirety and viewing all facts in complaint as a whole. See No.84 Employer-Teamster Joint Council Pension Fund v. Am. West Holding Corp., 320 F.3d 920, 938 (9th Cir. 2003).

## V. TO THE EXTENT THAT TWOMBLY APPLIES TO TYING CLAIMS, PLAINTIFFS' ANTITRUST CLAIMS EASILY SATISFY TWOMBLY

In Twombly, the Supreme Court held that in a price-fixing conspiracy case under Section 1 of the Sherman Act a plaintiff must allege "enough factual matter (taken as true) to suggest that an agreement was made[,]" and to make the inference of an illegal agreement "plausible." Twombly, 127 S.Ct. at 1965. The Supreme Court held that a complaint is sufficient if it "raises a reasonable expectation that discovery will reveal evidence of illegal agreement." Id. The complaint in Twombly alleged an agreement to fix prices based on defendants' parallel pricing conduct which the

Supreme Court held was insufficient to establish the plausibility of an illegal price-fixing conspiracy plausible. Id. at 1970.

The unsupported price-fixing conspiracy held deficient in Twombly is a far cry from specific facts alleged concerning the tying conduct alleged in this case. Accordingly, Twombly's holding that a price-fixing case must allege facts that make an illegal conspiracy plausible does not apply here because an illegal conspiracy is not an element of a tying claim.[5]

Defendants ignore Newcal Industries, Inc. v. Ikon Office Solution, 513 F.3d 1038 (9th Cir. 2008), a case decided after Twombly which is directly contrary to Defendants' argument. In Newcal the Ninth Circuit reversed the dismissal of a tying claim and held:

> In order to state a valid claim under the Sherman Act, **a plaintiff must allege that the defendant has market power within a "relevant market." That is, the plaintiff must allege both that a "relevant market" exists and that the defendant has power within that market. There is no requirement that these elements of the antitrust claim be pled with specificity**. See Cost Management Services, Inc. v. Washington Natural Gas Co., 99 F.3d 937, 950 (9th Cir.1996). An antitrust complaint therefore survives a Rule 12(b)(6) motion unless it is apparent from the face of the complaint that the alleged market suffers a fatal legal defect.[6]

513 F.3d at 1045.

Even if the Twombly plausibility standard applied to the elements of a tying claim, the standard would be easily satisfied by the complaint in this case. Unlike the complaint in Twombly where the plaintiffs sought to infer the existence of a price-fixing conspiracy among competitors based solely on the existence of parallel pricing which could well have been the result of independent action, here the antitrust violation is not based on inference but instead on specific allegations detailing the implementation and operation of Defendants' tying scheme. *See* Complaint ¶¶ 1, 9-18, 22-46.

---

[5] Defendants cite no authority that Twombly requires that the elements of a tying violation be alleged with any heightened particularity. In fact Korea Kumho Petrochemical v. Flexsys America LLP, 2008 WL 686834 (N.D.Cal. March 11, 2008), which Defendants cite, ruled that Twombly does not require "precision" in alleging market power in a relevant market. Id at *9. Here, Plaintiffs certainly allege sufficient facts in support of their "assertions of market power to suggest that those assertions are plausible." Id.

[6] Emphasis added and internal citations omitted unless otherwise indicated.

The Twombly Court was careful to point out that the opinion did not change the Rule 8 pleading standards: "We do not require heightened fact pleading of specifics . . . ." Twombly, 127 S.Ct. at 1965. To underscore this point, in Erickson v. Pardus, __ U.S. __ , 127 S. Ct. 2197 (2007), the Supreme Court, citing Twombly, held: "Specific facts are not necessary, the statement [of a claim] need only give the defendant *fair notice* of what the . . . claim is and the grounds upon which it rests." Erickson, 127 S.Ct. at 2200 (internal quotations omitted; emphasis added).

In Skaff v. Meredien North America Beverly Hills, LLC, 506 F.3d 832, 845 (9th Cir. 2007), the Ninth Circuit construed Twombly and found that "the Supreme Court has repeatedly instructed us not to impose such heightened standards in the absence of an explicit requirement in a statute or federal rule" The Ninth Circuit held:

> Today, '[t]he only function left to be performed by the pleadings alone is that of notice.' Rule 8's concluding admonishment that '[a]ll pleadings shall be so construed as to do substantial justice' confirms the liberality with which we should judge whether a complaint gives the defendant sufficient notice of the court's jurisdiction Thus, to satisfy *Twombly*, a plaintiff need allege only 'enough facts to state a claim to relief that is plausible on its face.'"

506 F.3d 832 quoting and citing Charles Alan Wright, et al., FEDERAL PRACTICE AND PROCEDURE § 1202, at 89 (3 ed. 2004), Twombly, and Erickson).[7]

"Of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" Twombly, 127 S.Ct. at 1965. Thus, a complaint need plead only "enough factual matter (taken as true) to suggest that an agreement was made," which "simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." Id. As the Seventh Circuit recently held, Twombly recognizes "two easy-to-clear hurdles" under Rule 8: (i) plaintiffs must provide fair notice to defendants of their claims; and (ii) plausibly suggest that they have a right to relief, which rises

[7] See also In re Intel Corp. Microprocessor Antitrust Litig., 496 F.Supp.2d 404, 408 n.2 (D. Del. 2007) (court read Twombly as applying a "flexible plausibility standard" in declining to dismiss most of the indirect purchaser antitrust claims at issue); Trans World Technologies, Inc. v. Raytheon Co.,, 2007 WL 5243941, at * 4 (D.N.J. Nov. 1, 2007) ("[a]s long as the complaint alleges that the alleged co-conspirators had a plausible reason to participate in the conspiracy, the complaint is sufficient").

above a "speculative level." EEOC v. Concentra Health Services, 496 F.3d 773, 776 (7th Cir. 2007); see also Twombly, 127 S.Ct. at 1964-65, 1973 n.14; City of Moundridge, v. Exxon Mobil Corp., ___ F.Supp.2d ___, 2008 WL 1735856 at *3-4 (D.D.C. April 16, 2008).

Because the complaint plausibly establishes Plaintiffs' right to relief and gives Defendants more than adequate notice of the claims asserted, Defendants claim that the complaint is insufficient under Twombly must be rejected.

## VI. PLAINTIFFS HAVE ADEQUATELY ALLEGED RELEVANT MARKETS

As the Ninth Circuit held in Cascade Health Solutions, *supra*:

> A tying arrangement is a device used by a seller with market power in one product market to extend its market power to a distinct product market. To accomplish this objective, the seller conditions the sale of one product (the tying product) on the buyer's purchase of a second product (the tied product). Tying arrangements are forbidden on the theory that, if the seller has market power over the tying product, the seller can leverage this market power through tying arrangements to exclude other sellers of the tied product. The Supreme Court has developed a unique per se rule for illegal tying arrangements. For a tying claim to suffer per se condemnation, a plaintiff must prove: (1) that the defendant tied together the sale of two distinct products or services; (2) that the defendant possesses enough economic power in the tying product market to coerce its customers into purchasing the tied product; and (3) that the tying arrangement affects a "not insubstantial volume of commerce" in the tied product market

515 F.3d at 912.

Despite their posturing, Defendants are unable to argue that Plaintiffs fail to allege relevant markets; Defendants real argument is that they disagree with the relevant markets defined in the Complaint. See Defs' Br. 7, n. 4. Such disagreement as to the proper relevant market definition cannot be resolved at this stage of the case. While conceding that Plaintiffs have adequately alleged relevant product markets for the tying and tied products at issue, Defendants argue that Plaintiffs have failed to allege relevant geographic markets.

"Determination of the relevant geographic market is highly fact sensitive." FTC v. Tenet Health Care Corp., 186 F.3d 1045, 1052 (8th Cir. 1999). Accordingly, the proper geographic market usually cannot be determined until after discovery. White Mule Co. v. ATC Leasing Co. LLC., 540 F.Supp.2d 869 (N.D.Ohio 2008); Kodak, *supra*, 504 U.S. at 482.

In Newcal Industries, Inc., the Ninth Circuit held that the validity of the relevant market alleged by plaintiff as well as the existence of market power within the relevant market are better suited for summary judgment or trial than a motion to dismiss where the truth of plaintiffs' allegations is assumed. 513 F.3d at 1045, 1052. The Ninth Circuit held that the relevant market issue generally cannot be determined on motion to dismiss because "the validity of the 'relevant market' is typically a factual element rather than a legal element" Id. at 1045 citing High Technology Careers v. San Jose Mercury News, 996 F.2d 987, 990 (9th Cir.1993) (holding that the market definition depends on "a factual inquiry into the 'commercial realities' faced by consumers").

Defendants' argument that they do not have nationwide market power because a majority of the new homes in the nation are not sold by Horton, purposefully misses the point. The relevant geographic market from the perspective of each victim nationally is local, and consists of the narrow neighborhood where that home is situated. The elasticity of demand permitting the substitution of another product for the tying product – beyond the homes of the defendant, is limited by considerations ranging from distance to work to school district inclusion. Horton dominates the local markets in which Horton builds subdivisions and discovery is required for Plaintiffs to formulate a detailed geographic market analysis and definition. *See* Re/Max Int'l, Inc. v. Realty One, Inc., 173 F.3d 995, 1019 (6th Cir. 1999) ("real-estate brokerage services are relatively localized, even if they are larger than those the plaintiffs posit, and that there have been actual, sustained adverse effects on competition in those areas where one defendant or both predominate. Therefore, the plaintiffs have sustained their burden at this stage of proceedings despite the lack of reasonable and detailed market analysis.")

## VII. PLAINTIFFS PROPERLY ALLEGE THAT DEFENDANTS HAVE MARKET POWER

Plaintiffs allegations of Horton's market power are also adequate. Defendants were able to coerce each and every Class Member to finance their home purchases through Horton Mortgage through a concerted refusal to deal with Horton Mortgage's competitors and with tied-in market

power which allowed Horton to threaten the Class Members with loss of their deposits and home purchase if they did not finance their Horton home purchase through Horton Mortgage. Defendants' market power was substantially enhanced by the taking of the deposit before the exercise of Defendants' coercive market power and by forcing buyers to accept Horton Mortgage Loans without the buyer's consent or ability to shop. Given the unique nature of a real property purchase, the market power of Defendants is further enhanced as to this unique market of Horton's home sales and tied-in financing. (Complaint ¶8).

Defendants have market power because new homes in residential developments are unique products characterized by unique desirability, geographic location and high switching costs, which lock-in the purchaser. (Complaint ¶45). Defendants' power in the localized markets for new home sales is substantial and is buttressed by the nature of new homes as a set of unique commodities subject to such purchase. Id. It is further enhanced by consumer reliance in committing to the purchase with a deposit prior to transaction completion and before coercive imposition of the tied product. Such market power has effectively forced consumers into the purchase of an unwanted tied product from Horton Mortgage in an arrangement for the mutual benefit of all Defendants. (Complaint ¶45).

Kodak held that the requirement of market power in the market for the tying product is satisfied where the defendant locks the customer in by imposing information and switching costs that prevent the customer from using an alternative source for the tying product to avoid having to purchase the tied product. 504 U.S. at 477.

The Complaint alleges that Defendants had market power to force purchasers of Horton homes (tying product) to either accept Horton Mortgage loans (tied product) without consenting to the terms of those loans or lose their down payment. By the time, the buyer learns of the very unattractive terms of the Horton Mortgage loan the buyer could not refuse the Horton Mortgage loan or shop for more favorable financing. These allegations easily satisfy the market power test under Kodak as most recently applied by the Ninth Circuit in Newcal Industries 513 F.3d at 1047-52.

Other cases that have followed Kodak in finding tying violations where the market power

element is satisfied by a lock-in similar to the one alleged in this case include Virtual Maintenance, Inc. v. Prime Computer, Inc., 11 F.3d 660, 666-67 (6th Cir.1993) (holding that plaintiff had stated valid tying claim based on allegations of lock-in and switching costs); Red Lion Med. Safety, Inc. v. Ohmeda, Inc., 63 F.Supp.2d 1218, 1232 (E.D.Ca.1999) (denying defendant's motion for summary judgment on plaintiff's Kodak-based tying claim because plaintiffs presented sufficient evidence of information costs and "lock-in"); Subsolutions, Inc. v. Doctor's Assocs., Inc., 62 F . Supp. 616, 626 (D.Conn.1999) (concluding that plaintiff franchisees had stated a Kodak lock-in claim based on factual allegations relating to information costs and timing); Collins v. Int'l Dairy Queen, Inc., 939 F.Supp. 875, 883 (M.D.Ga.1996) (denying summary judgment to defendants because, *inter alia*, plaintiff-franchisees had produced evidence of switching costs and resultant lock-in effect); Wilson v. Mobil Oil Corp., 940 F.Supp. 944, 947-48, 953-54 (E.D.La.1996) (denying motion to dismiss and concluding that plaintiff-franchisees had stated a Kodak lock-in claim based on allegations of information and switching costs); George Lussier Enterprises, Inc. v. Subaru of New England, Inc., 1999 WL 1327396 (D.N.H. Dec 13, 1999).

Defendants simply ignore Kodak, Newcal Industries and all the other cases that have followed Kodak in holding that the market power requirement in tying cases is satisfied where, as here, purchasers of the tied market do not learn of the coercive tie until after selecting the tying product after they have been locked in by substantial switching costs. Instead, Defendants rely on Mozart Co. v. Mercedes-Benz of North America, Inc., 833 F.2d 1342 , 1346 (9th Cir. 1987) to argue that market power for a tying claim can only exist (1) where the seller holds “a patent or similar monopoly;” (2) “when the seller’s share of the market is high;” or (3) when the seller offers “a unique product that competitors are not able to offer.”[7] Horton’s reliance on Mozart is misplaced because

---

[7] Plaintiffs allege that Defendants’ market power is bolstered by the fact that each parcel of real property is unique. Defendants argue, without any supporting authority, that real property is not unique enough to support a claim of market power under Mozart. Defendants argument, is directly contrary to the holding of MacManus v. A.E. Realty Partners, 146 Cal. App.3d 275 (1983), which considered the same issue in upholding a tying claim under the Cartwright Act. In MacManus, the California Court of Appeal reversed an order sustaining a demurrer to a tying claim alleging home sales as the tying product and escrow services as the tied product.

**Mozart was decided five years before the United States Supreme Court decided Kodak.** Moreover, in Mozart the Ninth Circuit was gave examples of factors establishing market power and never said that such examples were exclusive. See 833 F.2d at 1346. Defendants' position that Mozart limits the means by which market power can be established is intellectually dishonest and ignores the important developments in tying law beginning with Kodak

Accordingly, Plaintiffs' allegations of market power are most certainly sufficient.

## VIII. PLAINTIFFS ADEQUATELY ALLEGE COERCION

Plaintiffs allege that they were coerced by Defendants into using Horton Mortgage as their lender and include detailed allegations stating exactly how this coercion occurred in general, and specifically for each of the Plaintiffs. *See, e.g.*, Compl. ¶¶33-42. In Newcal, the Ninth Circuit recently upheld the sufficiency of coercion allegations where the plaintiff alleged that the defendant had "been able to force purchasers of the tying product who are locked in at the end of the original term of the cost-per-copy lease by the Flexed IKON Contract to buy the tied product[.]" 513 F.3d at 1051-52. The Ninth Circuit's holding that the allegation of coercion in NewCal was sufficient to withstand a motion to dismiss, *a fortiori*, requires denial of Defendants' motion to dismiss because here the allegations of coercion are far stronger and more detailed than the conclusory allegations held sufficient in Newcal.

In Kodak, the Supreme Court held that coercion existed where the seller of the tying product [new home] made it more difficult for the buyer to choose an alternative tied product [new home mortgage] and that coercion could exist even where it is possible to purchase the products separately. Kodak, *supra*, 504 U.S. at 458. In Kodak, independent service organizations (ISOs) began servicing

---

MacManus held that the market power requirement was satisfied for pleading purposes where it was alleged that the homes were marketed as a "unique product 'custom designed by award winning architects " Id. at 287. This ruling by a California court on market power for a Cartwright Act tying claim is controlling with respect to the Fourth Cause of Action and the court's reasoning is also persuasive with respect to the Third Cause of Action under Sherman Act.

copying and micrographic equipment manufactured by Kodak. Kodak then adopted policies to limit the availability of parts to ISOs and to make it more difficult for them to compete with Kodak in servicing Kodak equipment. The ISOs sued, claiming, *inter alia*, that Kodak had violated Section 1 of the Sherman Act by tying parts and service together. The Supreme Court allowed the tying claim notwithstanding that customers could purchase parts or services separately. Id. at 463. It was no barrier to the ISOs' antitrust claim that "[a]t least some consumers would purchase service without parts, because some service does not require parts, and some consumers, those who self-service for example, would purchase parts without service." Id.

In Tucker v. Apple Computer, Inc., 493 F.Supp.2d 1090 (N.D.Cal. 2006), Judge Ware followed Kodak in denying a motion to dismiss a tying claim under the Sherman Act and Cartwright Act, rejecting defendant's argument that coercion had not been properly alleged:

> Case law is clear that "some modicum of involuntariness or coercion is essential to the existence of a per se illegal tie-in." *Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534, 540 (9th Cir. 1983) (partially overruled on other grounds). However, there is no requirement that individual purchaser plaintiffs must allege coercion at the individual level, rather than at the market level, to state a Section 1 tying claim. In the Ninth Circuit, "[**t]he essence of an antitrust tying violation** is not the seller's unilateral refusal to deal with a buyer who refuses to buy the tied product, but **the use by the seller of its 'leverage' to force a purchaser to do something that he would not do in a competitive market**." *Murphy v. Business Cards Tomorrow, Inc.*, 854 F.2d 1202, 1204 (9th Cir. 1988) (partially overruled on other grounds), quoting *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 14 n.20, 104 S. Ct. 1551, 80 L. Ed. 2d 2 (1984). Applying these standards, the Court finds that Plaintiff has satisfactorily alleged coercion.

Id. at 1097.

Plaintiffs meet this test because they allege that Defendants used their leverage and market power to force Plaintiffs to use a mortgage loan with much less favorable terms than those available from other lenders which is something Plaintiffs certainly would not do in a competitive market. Compl. ¶ 12.

The Ninth Circuit recently addressed the coercion element in Cascade Health Solutions, where it reversed summary judgment in favor of defendants on a tying claim and recognized that "the Supreme Court has condemned tying arrangements when the seller has the market power to force a purchaser to do something that he would not do in a competitive market." Cascade Health Solutions

v. PeaceHealth, 515 F.3d 883, 915 (9th Cir. 2008) citing Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 14 (1984). Defendants argued that coercion did not exist because the bundled discounts defendants offered to steer customers to the tied product did not actually require them to purchase the tied product. The Ninth Circuit held that even if defendants did not force every customer to buy the tied product "'coercion may be implied from a showing that an appreciable number of buyers have accepted burdensome terms, such as a tie-in'" 515 F.3d at 914 quoting Moore v. Jas. H. Matthews & Co., 550 F.2d 1207, 1217 (9th Cir. 1977).

> [T]here is no doubt that PeaceHealth's practice of giving a larger discount to insurers who dealt with it as an exclusive preferred provider may have coerced some insurers to purchase primary and secondary services from PeaceHealth rather than from McKenzie. We conclude that, as a whole, the evidence shows genuine factual disputes about whether PeaceHealth forced insurers either as an implied condition of dealing or as a matter of economic imperative through its bundled discounting, to take its primary and secondary services if the insurers wanted tertiary services.

515 F.3d at 914.

Defendants other arguments that coercion is unsatisfied are also without merit. First, Defendants assert that the coercion claim is contrary to the express terms of Defendants' contracts which do not require purchasers of Horton homes to use loans from Horton Mortgage. Defs.' Br. at pp. 10-11. That argument cannot succeed, however, because Plaintiffs allege that they were coerced into using Horton Mortgage by Horton's systematic conduct aimed at preventing Plaintiffs and the Class Members from using any other lender. Antitrust coercion has never been limited to the terms of a contract.

Defendants executed a scheme of coercing locked in home buyers to accept uncompetitive loans from Horton Mortgage with an array of unscrupulous and deceptive business practices. In fact, Defendants even went so far as to pressure Horton sales representatives into trying to capture 100% of Horton's home sales for Horton Mortgage by penalizing Horton sales representatives for funding home purchases with cash sales. *See* Insider E-mail, attached as Exhibit 2 to Blumenthal Decl. This represents just one element of the entire scheme of coercion that was instituted by Horton, for the sole purpose of forcing Horton home buyers to use loans from Horton Mortgage. Horton also foreclosed Plaintiffs' ability to shop by misleading Plaintiffs both before and after the first thirty (30)

days.

With regard to Plaintiff Wilson, Horton employed delay tactics to force Plaintiff Wilson into a loan from Horton Mortgage. Contrary to Defendants characterization of Plaintiff Wilson's tying claim as "vague allegations," Plaintiff Wilson alleges several details that, when taken together, state a tying claim with sufficient specificity. First, Plaintiff Wilson alleges that he was prepared to fund his home purchase with a loan from Bank of America with an interest rate of 5%, but was forced by Defendants' practices to accept a loan from Defendants with an interest rate of 7%. Compl. ¶ 34; Wilson decl., ¶13. Plaintiff Wilson also specifically names Brad Trembly, the sales representative who was instrumental in coercing him into accepting an anti-competitive loan product. Id. By failing to cooperate with Bank of America, Defendants forced Plaintiff Wilson to accept an anti-competitive Horton Mortgage loan. Defendants can point to no right, contractual or otherwise, that would justify these delay tactics. Moreover, there can be no doubt that Defendants were acting coercively by more than doubling the closing costs of Plaintiff Wilson and the other Plaintiffs, once the cram-down of the Horton Mortgage loan was executed. Id.

Plaintiff Lopez was subjected to essentially the same treatment. Compl., ¶40. Contrary to Defendants' representations, Plaintiff Lopez was, in fact, misled and deceived about both the cost of the Horton Mortgage loan, as well as his freedom to shop, compare rates, and use a lender that offers the best rates for his home loan. In his case, both Julie Branecki from Horton, as well as Candace Rivera, from Horton Mortgage, threatened that any use of an alternate lender would result in the forfeit of Plaintiff Lopez' deposit and the cancellation of the sale of the home. Lopez, Decl., ¶10. Plaintiff Khuu also suffered from similar threats. Compl., ¶42; Khuu Decl., ¶8.

As a result, the possibility for Plaintiffs to actually determine if they were receiving the best rate and lowest fees was nonexistent, because the Plaintiffs were never given the chance to actually compare the rate and fees of the Horton Mortgage loan to other rates and fees. Plaintiffs' Declarations, ¶¶3-8.

Defendants also argue that by foreclosing Plaintiffs' freedom to shop, pursuant to paragraph 7.5 of the Purchase Agreement, Defendants were properly asserting a contractual right. For example,

Defendants assert that Plaintiffs could lawfully be bound to accept a loan from Horton Mortgage after loan approval was given by Horton Mortgage. This interpretation, however, is in direct conflict with the Affiliated Business Arrangement Disclosure document, contained in the Purchase Agreements, which discusses Horton's affiliation with Horton Mortgage and states:

> You are **NOT** required to use this company [Horton Mortgage] as a condition of your purchase of the Property from **Seller**. There are frequently other settlement service providers available with similar services. You are free to shop around to determine that you are receiving the best services and the best rate for these services. (Emphasis in original)

[Doc. No. 7- (RJN, Exhibit C, at WILSON 00019)].

A clear ambiguity is, therefore, created by the inclusion of both Paragraph 7.5 and the Affiliated Business Arrangement Disclosure. Upon being told that "[y]ou are **NOT** required to use [Horton Mortgage] as a condition of your purchase," Plaintiff Khan and Plaintiff Lopez would have no reason to believe that they could not use a loan with better terms and conditions for their home purchase, as long as such funding was obtained before closing.

Instead, Plaintiff Khan was told that she was bound to accept the high broker fees, high interest rates, and high closing costs of the Horton Mortgage loan. Khan Decl., ¶6. As a result of these coercive acts, her opportunity to use the loan offered to her by Washington Mutual was completely foreclosed to her, even though her home had not even been completely built and closing was not scheduled to occur for at least another month. Id. at ¶11.

While Defendant may assert a purported contractual right to treat Plaintiff Khan in this manner, this conduct is clearly in conflict with the statement in the Affiliated Business Disclosure quoted above, as well as the Notice of Affiliated Business Arrangement Addendum, which is also included in the Purchase Agreement and further reiterated the freedom to shop as follows:

> You are **NOT** required to use these companies [including Horton Mortgage] as a condition of your purchase of the Property from Seller. THERE ARE FREQUENTLY OTHER SETTLEMENT SERVICE PROVIDERS AVAILABLE WITH SIMILAR SERVICES. YOU ARE FREE TO SHOP AROUND TO DETERMINE THAT YOU ARE RECEIVING THE BEST SERVICES AND THE BEST RATE FOR THESE SERVICES. (Emphasis in Original).

Nevertheless, Ms. Julie Branecki, a sales assistant with Horton, informed Plaintiff Khan that if the Horton Mortgage loan was not used, all funds theretofore paid as a deposit would be forfeited

and the sale of the home would be cancelled. Khan Decl. at ¶11.

Coercion is amply alleged. The fact that Defendants factually dispute coercion does not support their motion to dismiss. Coercion, like relevant market definition and market power is an inherently fact bound issue determination of which should await summary judgment or trial.

## IX. RESPA DOES NOT PROTECT DEFENDANTS FROM ANTITRUST LIABILITY

Defendants also argue that they should be immune from antitrust liability because Plaintiffs do not allege that Defendants violate the Real Estate Settlement Procedures Act ("RESPA") Defs. Br. Pp. 3, 11. According to Defendants, they should be free to violate antitrust laws as long as they do not also violate RESPA. This is simply not the law, as compliance RESPA regulations simply does not preempt or provide a safe harbor for federal antitrust law. RESPA, a federal regulatory statute, clearly cannot preempt federal antitrust law. *C.F.* United States v. Philip Morris USA, Inc., 310 F. Supp. 2d 68, 70 (D.D.C. 2004).

RESPA cannot even preempt a state statute unless the state statute prohibits conduct that is required by the federal statute. Williams v. First Government Mortgage and Investors Corp., 176 F.3d 497, 500 (D.C. Cir. 1999); Heastie v. Community Bank of Greater Peoria, 69 F.Supp. 716, 721 (N.D.Ill. 1988).[8] Accordingly, the fact that Defendants' conduct may not violate RESPA would not even preempt a state antitrust law claim because RESPA does not require Defendants to commit the anti-competitive tying conduct. RESPA also does not preempt UCL claims. Fardella v. Downey S&L Ass'n, 2001 U.S. Dist. LEXIS 6037, *7 -*11 (N.D.Ca. May 8, 2001). Nor do defendants have any implied immunity from antitrust law. *See* Harrison Aire, Inc. v. Aerostar Int'l, Inc., 316 F. Supp. 2d 186, 205-213 (E.D.Pa. 2004). There is also no safe harbor for Defendants under Cel-Tech Comunications, inc., v. Los Angeles Cellular, 20 Cal. 4th 163 (1999) because the conduct alleged

[8] 12 U.S.C. § 2616, provides that RESPA "does not annul, alter, or affect, or exempt any person subject to the provisions of this chapter from complying with, the laws of any State with respect to settlement practices, except to the extent that those laws are inconsistent with any provision of this chapter, and then only to the extent of the inconsistency…."

in the complaint is not expressly authorized by any federal or state statute. See 20 Cal. 4th at 182.

At bottom, whether Defendants violate RESPA is beside the point because it is not an issue in the antitrust claims asserted here. RESPA outlaws splitting unearned closing fees with third parties (See Weizeorick v. ABN AMRO Mortg. Group, Inc., 337 F.3d 827, 831 (7th Cir. 2003)) which is not what is alleged in this case.

## X. CONCLUSION

Plaintiffs respectfully urge this Court to view this case through the prism of consumer sovereignty which is the touchstone of antitrust law. Market outcomes in a free market system are supposed to be dictated by informed and free consumer choice. The choice is supposed to be bottom-up determined, not top-down coerced. Our capitalist system is supposed to reward those who please consumers and eliminate those who do not. Horton's tying violation harms honest competition in the now critical home finance market and makes Horton Mortgage the undeserving victor -- not based on free consumer choice, but based on market power exercised by the seller who has gained (and manipulated the market to so gain) an anti-competitive advantage in a tying product. The violation here is of particular concern because of the special nature of both of these product markets. Antitrust law does not ignore the reality of consumer demand and volition, and here we have coercion applied to consumers in the midst of the most precious and substantial purchase they will make in a lifetime. Such coercion impedes free choice in the second (tied) product.

Antitrust tying law requires that every product must stand on its own. Sellers cannot lawfully use market power for one product to compel the purchase of a second product against the will of the buyer. The second market must compete for buyers on its own merits. A seller cannot lawfully disadvantage buyers (and competitors seeking those buyers' business) through coerced leverage from the first (tying) product.

The Defendants' acts as alleged in the Complaint strike at the heart of both the prohibition on anti-competitive tying – and to the intent of the Sherman Act and Cartwright Act generally. For the foregoing reasons, Plaintiffs respectfully submit that this Court should deny Defendants' motion to

dismiss the antitrust causes of action.

BLUMENTHAL & NORDREHAUG

DATED: May 27, 2008

By: *s/Norman B. Blumenthal*
Norman B. Blumenthal, Esq.

Robert Gerard, Esq.
GERARD & ASSOCIATES
1516 Front Street
San Diego, California 92101

Robert Fellmeth
LAW OFFICES OF ROBERT FELLMETH
5998 Alcala Park
San Diego, CA 92110

Attorneys for Plaintiffs

K:\D\NBB\Wilson v. DR Horton\Motion to Dismiss\p-opposition to MTD ANTITRUST-FINAL.wpd