BLUMENTHAL & NORDREHAUG
Norman B. Blumenthal (State Bar #068687)
Kyle R. Nordrehaug (State Bar #205975)
Aparajit Bhowmik (State Bar #248066)
2255 Calle Clara
La Jolla, CA 92037
(858) 551-1223
Fax: (858) 551-1232

GERARD & ASSOCIATES
Robert B. Gerard, Esq. (State Bar #96296)
1516 Front St.
San Diego, CA 92101
Telephone: (619) 232-2828
Facsimile: (619) 232-4219

LAW OFFICES OF PATRICK MISSUD
Patrick Missud, Esq. (State Bar #219614)
91 San Juan Ave.
San Francisco, CA 94112

LAW OFFICES OF ROBERT FELLMETH
Robert Fellmeth, Esq. (State Bar #49897)
5998 Alcala Park
San Diego, CA 92110
Telephone: (619) 260-4806
Facsimile (619) 260-4753

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JAMES WILSON, REBECCA LORENZO, WAHEEDA KHAN, JORGE LOPEZ, and SUSIE KHUU, on Behalf of Themselves and All Others Similarly Situated<br><br>Plaintiffs<br>v.<br><br>D.R. HORTON, INC., WESTERN PACIFIC HOUSING, INC., d/b/a D.R. HORTON, AMERICA'S BUILDER, DHI MORTGAGE COMPANY, LTD., L.P. and DOES 1-10,<br><br>Defendants. | CASE NO. 08 CV 592 BEN RBB<br><br><u>CLASS ACTION</u><br><br>DECLARATION OF THOMAS A. MYERS |

I, Thomas A. Myers, do hereby declare as follows:

1. I have personal and expert knowledge as to the facts stated in this declaration. If called as a witness, I will competently testify to the truth of the facts stated in this declaration.

2. Attached hereto as Exhibit A is a true and correct copy of my current curriculum vitae. The following is a brief summary of the qualifications set forth on my resume.

3. I am the founder, president and chairman of T.A. Myers & Co., a Denver based firm of certified public accountants and other professionals that has specialized for over 20 years in providing consulting and training to numerous lending institutions, government regulators, lending industry trade groups, and other business entities in the area of reasonable and prudent lending practices. I have testified at the request of Congress on issues relating to lending practices and fraud in the lending industry and have worked extensively with all of the lending regulatory agencies, as well as the industry, per se, throughout the United States.

4. I am the author of *Real Estate Problem Loans Workout Strategies and Procedures* and *The Problem Action Plan: A Uniform System for Managing Problem Assets*, both published by Dow Jones Irwin. I have also authored, at the request of the American Bankers Association, a text entitled *Income Property Construction Lending*, as well as numerous journal articles. In addition, I have developed a number of courses and seminars for representatives of federal agencies and lending industry trade groups including the Federal Deposit Insurance Corporation, Resolution Trust Corporation, Office of Comptroller of the Currency, Office of Thrift Supervision, Federal Reserve System, National Credit Union Administration, Federal Bureau of Investigation, U.S. Attorney's staff, United States Secret Service, American Bankers Association and the Bank Administration Institute. Seminars topics include: Loan Analysis, Mortgage Lending Fraud, Subprime Lending, Credit Card Securitizations, Income Property Lending, Evaluation of the Borrower, Real Estate Lending, Fraud in Mortgage Lending Securitizations, Advanced Commercial lending, Commercial lending Fraud, White Collar Crime, Advanced White Collar Crime, Consumer Lending Issues, Problem Loan Workouts, Loan Classification and Banking Fraud, among others. Please see my curriculum vitae (Exhibit A) and the list of cases for which I have provided testimony (Exhibit B).

5. At the request of counsel for the plaintiffs in this action, I have reviewed the documents set forth in the attached Exhibit C.

6. I have been asked by counsel for the Plaintiffs to form an opinion regarding certain aspects of the financing offered by D.R. Horton Inc's ("D.R. Horton") mortgage arm, DHI Mortgage Company ("DHI Mortgage"), to purchasers of D.R. Horton's homes by D.R. Horton's agent, Western Pacific Housing, Inc. *For purposes of this declaration I have been instructed to assume that the various allegations plead in the Complaint will ultimately be proven by the Plaintiffs*, including, among other things, that buyers were allegedly coerced into accepting financing from the Defendants at substantially above market prices or face the forfeiture of their deposits, monies paid for upgrades, and the wholesale cancellation of their purchase.

7. According to its 2007 annual report, D.R. Horton (Horton) is the nation's largest homebuilder. Horton closed on 41,370 homes in its 2007 fiscal year with an average home price of $259,200. Homebuilding composes 98% of DR Horton's consolidated revenues (about $11.3 billion). The remaining two percent is composed of "financial services" revenue, which relates to DHI Mortgage (mostly from the sale of the loans to third-party servicers). 95% of DHI Mortgage's business was on homes closed by D.R. Horton's homebuilding operations, and two-thirds of D.R. Horton's closed homes in 2007 were financed by DHI Mortgage.

8. Defendants admit that a deposit is required of the potential homebuyer before financing is secured. Defendants also require that Plaintiffs submit an application to DHI. According to the Purchase Agreement and Escrow Instructions. at §7.2(a): "Within 5 days of Buyer's offer, Buyer shall submit a completed loan application for the New Loan to DHI Mortgage ('Seller's Approved Lender')." Plaintiffs allege that Defendants used several tactics to coerce Plaintiffs to select the DHI Mortgage product over more competitive mortgage products.[1]

9. Defendants offered ostensibly large "discounts" on borrowers' closing costs as an incentive to choose the DHI financing option, but these discounts were illusory because the inordinately expensive financing offered by DHI wholly offset any perceived "discount" related to the

---

[1] Complaint, ¶10

closing costs, and, accordingly, provided no real economic advantage to Horton customers.[2] Further Defendants concealed the true cost of the DHI financing, depriving the consumer of the opportunity to understand the ultimate cost of the DHI loan.[3] This scheme was perpetrated on Plaintiff Rebecca Lorenzo,[4] who was baited with a $5,000 discount of home closing costs if she "chose" to finance with DHI Mortgage. Deprived of information regarding the true cost of the loan, Plaintiff Lorenzo was unreasonably pressured into accepting the DHI financing. However this loan contained inflated fees and higher than average interest rates, including an adjustable rate mortgage ("ARM") adjusting between 9.75%-10.5%.[5] These Horton loans were substantially worse in economic value than loans that could be obtained from other lending institutions in the open market.

10. According to the Complaint, Plaintiff Waheeda Khan[6] obtained alternative financing through Washington Mutual, which would have provided her with a monthly payment of approximately $1,300. The loan option provided to Plaintiff Khan by DHI would lead to payments of approximately $1,739 per month. The alternative financing through WaMu would have saved Ms. Khan approximately $439 per month, yet she was forced by Horton into accepting its anti-competitive financing. Additionally, Plaintiff Jorge Lopez[7] was forced to accept a 5-year ARM at 6.25% from Horton after purportedly finding fixed rated financing at 5.75% through an alternate lender. Regardless of the fact that a fixed rate loan is quite frequently more beneficial to a borrower over the long-term, the interest charged on the 6.75% ARM that Horton forced on Mr. Lopez was .5% (50 basis points) higher than the fixed rate loan Mr. Lopez had obtained from an alternate lender *before the ARM adjusted.* While Mr. Lopez would have been locked in at 5.75% on his fixed rate loan, he was forced to accept an ARM that would adjust (upward) after 5 years, thereby significantly increasing the already large .5% spread between what he would have paid under the fixed rate loan versus the higher, adjusted rate. Based on the above, Plaintiff's allegations that the loans offered by the Defendants were anti-

---

[2] Complaint, ¶10
[3] Complaint, ¶10
[4] According to ¶35 of the Complaint, Plaintiff Rebecca Lorenzo entered into a purchase agreement with Horton on or about January 25, 2006.
[5] Complaint, ¶36
[6] According to ¶37 of the Complaint, Plaintiff Waheeda Khan entered into a purchase agreement with Horton on or about December 11, 2005.
[7] According to ¶39 of the Complaint, Plaintiff Jorge Lopez entered into a purchase agreement with Horton on or about May 28, 2006.

competitive with unfairly high closing costs, above market fees and charges, and higher than average interest rates that were often adjustable, rather than fixed, have considerable merit.

11. Defendants also trapped borrowers into DHI financing by promising *low* closing costs, only to "bait and switch" *at the last minute*. The actual closing costs charged were significantly higher (apparently sometimes more than double) than the amounts Horton originally represented. This was the case with Plaintiff James Wilson, who was told that his closing costs would not exceed $6,000, but was informed just prior to closing that closing costs would amount to approximately $12,000.[8] Wilson eventually paid $14,000 in closing costs and an additional $4,000 in miscellaneous fees when he "accepted" DHI's terms.[9]

12. Apart from offering illusory discounts, defendants engaged in a variety of tactics to deprive defendants of their contractual right to a 30-day "free shop period."[10] The terms of the "Purchase Agreement and Escrow Instructions" between the Defendants and Plaintiff Waheeda Khan unfairly obligate the buyer to affirmatively terminate the contract at the end of the thirty days should adequate financing not be found—and impose dire consequences on the buyer should he or she not terminate the contract. According to the agreement:

> If Buyer fails to obtain loan approval as provided in Paragraph 7.2(b) by the Loan Contingency Date, and Buyer is not otherwise in default under this Purchase Agreement, either Buyer or Seller may terminate this Purchase Agreement and cancel Escrow, and Buyer shall receive a refund of the Deposit. **Buyers failure to terminate this Purchase Agreement within the time periods set forth above shall be deemed to be a waiver of Buyer's right to terminate this Purchase Agreement as a result of Buyer's failure to obtain financing.**[11] [Emphasis added]

13. As a result of this provision, Defendants frequently threatened the loss of a buyer's sizeable deposit and to cancel the sale of the home if the DHI offer was not accepted.[12] This was the case with Plaintiff Waheeda Khan, who realized that the DHI offer was inferior to a competing deal.

---

[8] Complaint, ¶34
[9] Complaint, ¶34
[10] Complaint, ¶13
[11] Purchase Agreement, ¶7.3
[12] Complaint, ¶11

However, when she approached the defendants with the alternate financing she obtained, as discussed above, she was told that this would result in the loss of her deposit of $7,500, monies paid for upgrades amounting to $4,739, and cancellation of the sale of her home.[13]

14 Defendants also utilized unreasonable tactics to frustrate the efforts of buyers who attempted to secure alternative financing. Fully aware that Plaintiffs had a contractual deadline to obtain financing, Defendants simply refused to cooperate with the alternate lenders, and—after the expiration of the so-called "30-day free shop period"—forced Plaintiffs to accept DHI financing or face the forfeiture of the deposit and the purchase of the home itself.[14] Defendants point to the terms of the contract and the aforementioned "free shop period" as an affirmative defense in this situation.[15] However, in practicality, homebuyers were not provided with the benefit of such a "free shop period." By inappropriately dragging its feet and refusing to cooperate with alternate lenders, Horton was able to stonewall its way through the "free shop period" (unbeknownst to the homebuyer) into a position where it was able to apply the draconian terms of the contract (i.e. forfeiture of the deposit and its ability to unilaterally cancel the sale of the home) thereby exerting significant pressure on the homebuyers. In these cases, buyers seemed to have two alternatives: 1) walk away from the home and the substantial sums of money they had put down; or 2) give in to Horton's self-serving tactics and "accept" the terms of the unfair DHI financing. Plaintiffs contend they were forced to accept DHI's terms rather than walk away from their already substantial investments.

15. This was the case for Plaintiff James Wilson,[16] who, after receiving eleventh-hour information on the exorbitant DHI closing costs (i.e. DHI was going to charge at least double what he had been quoted), obtained superior financing with Bank of America. However, Horton simply refused to cooperate with Mr. Wilson or Bank of America, and Mr. Wilson was forced to accept the inferior financing from DHI (or face the loss of his deposit and the cancellation of the sale).[17] Specifically, while Mr. Wilson was apparently able to secure a 5% fixed rate mortgage

---

[13] Complaint, ¶38
[14] Complaint, ¶13
[15] See, for example, Motion to Dismiss, p. 12
[16] According to ¶33 of the Complaint, Plaintiff James Wilson entered into a purchase agreement with Horton on or about September 29, 2007.
[17] Complaint, ¶34

with no closing costs from Bank of America,[18] DHI "offered" Wilson an interest rate of 7% plus $18,000 in closing costs and miscellaneous fees.[19] It is interesting to note this rate was a full 2% higher than the financing Mr. Wilson was able to secure through Bank of America. However, because Horton refused to cooperate with Bank of America and threatened to cancel the sale and keep the more than $20,000 in monies Mr. Wilson deposited on the home, Mr. Wilson had little choice other than to accept DHI's loan. As a result, Mr. Wilson was precluded from enjoying the significant savings the 5% interest rate offered by Bank of America would have afforded him, and was forced to pay significantly more for the home.

16. Based on my experience, the language contained in the Purchase Agreement at ¶7.5 uniquely operates to prejudice the prospective buyer's interests and exerts enormous pressure for the Horton customer to utilize the financing services of Horton's affiliate, while effectively precluding the buyer from enjoying the benefits of more favorable, competitive mortgage terms that would otherwise be available from competing financing entities. ¶7.5 reads as follows:

> Buyer shall not change the lender, the loan amount or the loan program after receiving the original final unconditional loan approval referenced in paragraph 7.2 and any failure of Buyer or its lender to close loans on the Closing Date after obtaining the final unconditional loan approval from the lender shall constitute a default hereunder, for which Seller shall have the right to terminate this Purchase Agreement and retain Buyer's Deposit as provided in Paragraph 10, hereof.

By effectively channeling the prospective buyer's mortgage business into Horton's affiliate, DHI Mortgage, through ¶7.2, the buyer was precluded, pursuant to ¶7.5, from changing the lender, the loan amount or the program once Horton's affiliate indicated approval. In my opinion, the contract language serves no economic purpose, other than to lock in the financing arrangement offered by Horton's affiliate and precludes the buyer from obtaining more advantageous financing arrangements. Based on my experience, the language in ¶7.5 is not consistent with legitimate home financing customs and

---

[18] Complaint, ¶34
[19] Complaint, ¶34

practices, nor is there any economic or business justification for such language, other than to provide an unfair advantage to the Defendants. A properly competitive scenario would not prevent the buyer from, e.g. paying cash or arranging for more favorable financing, even after Horton's affiliate had provided its approval.

17. In my opinion, DHI's relationship with D.R. Horton presented it with a significant competitive market advantage. By engaging in a variety of tactics to block Plaintiffs from obtaining alternate, superior financing, D.R. Horton created deceptive and unfair bias for its customer to choose Horton's wholly-owned lending subsidiary even though more competitive financing might otherwise be available. According to §7.3, §7.5, and §10 of the purchase agreement, as well as Defendants' own statements in its memorandum in support of its motion to dismiss,[20] Horton had the right to unilaterally retain Plaintiffs' deposits in the event of default. This ability to retain the deposited amounts granted D.R. Horton significant leverage and a superior "bargaining" position which it employed unfairly against the Plaintiffs. It is my opinion that this market power provided significant value to the defendants, who were unfairly inoculated, through their actions, from the pressures and costs of the highly competitive mortgage market by forcing a captive buyer into ostensibly "choosing" DHI's mortgage products.

18. Horton's zeal to ensure that buyers selected DHI mortgage as their lender is evidenced by Horton's own policies. Horton apparently tied its sales bonuses to "capture rates" for its mortgage subsidiary, thereby providing significant motivation to do whatever it took to ensure the buyer would "choose" DHI as the mortgage originator. This policy was so counterintuitive as to count cash sales (i.e. sales with *no need* for financing) against salesman bonuses in Horton's compensation structure.[21] Horton's own policies provided improper incentives to force homebuyers into utilizing the financing provided by DHI.

---

[20] See, for example, Motion to Dismiss, p. 12-13
[21] Complaint, ¶14

19. Further, it is my opinion that D.R. Horton enriched itself by preying on borrowers with deceptive and predatory products. For instance, DHI provided 100% financing to Plaintiff Rebecca Lorenzo, which means that the Cumulative Loan to Value Ratio (an important underwriting ratio for mortgage bankers) was 100% (i.e. her home was 100% financed by DHI). Conservative lenders often require a CLTV of 80%, providing the lender with a sufficient non-leveraged collateral cushion. Ms. Lorenzo's primary loan (totaling 80% of the home value) was negative amortizing and both of the loans offered (including her "piggy back" loan totaling 20% of the home value) were ARMs. Borrowers who are offered such terms are usually subprime borrowers, a demographic which is characterized by lower levels of financial sophistication— and tend to be targets of consumer fraud and predatory lending. In addition, as noted above, even after seeking out and obtaining *fixed-rate financing* from an alternative lender, Plaintiff Lopez was forced into accepting the ARM offered by DHI.

20. If asked by Plaintiff's counsel, I am prepared to provide an analysis of damages to the plaintiff class based on a comparison of the Horton financing which was forced upon them versus the typical, more competitive financing that would have been available to the borrower based on comparable borrower statistics.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and was executed this 27th day of May, 2008 at Denver, Colorado.

Thomas A. Myers
**Thomas A. Myers**

**EXHIBIT A**

**THOMAS A. MYERS, CPA**

*President and Chairman*

**T.A. MYERS & CO.**
**Aspen Business Park**
**5400 Ward Road, Bldg. 3, Suite 150**
**Arvada, Colorado 80002**
**303 / 403-0200**

## BACKGROUND AND FORMAL EDUCATION

Thomas A. Myers has degrees in both mathematics and accounting. He is a certified public accountant and a member of the American Institute of Certified Public Accountants. T.A. Myers & Co., is a certified public accounting firm of accountants and other professionals that specialize in providing consulting and training to numerous financial institutions, government regulators, law enforcement agencies, law firms, trade groups, and other business entities.

Mr. Myers has wide experience in providing consulting and training services to virtually every segment of the financial services industry covering a broad spectrum of topics including reasonable and prudent industry practices, director's and officer's liability and commercial and mortgage lending fraud. T.A. Myers & Co. has developed comprehensive policies, procedures and analyses for financial institutions and their regulators regarding numerous subjects including complex syndicated lending, commercial and mortgage lending (including servicing and securitization), merger and acquisition financing, financial statement manipulation, problem asset classification and problem asset workouts.

Mr. Myers recently served as a special adviser to a committee of federal banking regulators charged with the preparation of an industry "white paper" promulgated by the federal regulators entitled "The Detection, Investigation and Deterrence of Mortgage Loan Fraud Involving Third Parties". Mr. Myers recently presented a seminar on "Fraud in Subprime Mortgage Securitizations" at the Advanced White-Collar Crime School for federal banking regulators in Washington, DC. He was also selected by the Federal Financial Institutions Examination Council to develop and present a series of seminars on "Loan Syndications" for selected examiners from all of the federal banking regulatory agencies dealing with loans ranging from $20 million to in excess of $1 billion in size. These presentations were attended by some of the top regulatory personnel in the country.

In recent years Mr. Myers has developed and presented a seminar on "Public Company Fraud" dealing

with, among other things, financial statement manipulation, accounting irregularities, and the omission of material facts by corporate insiders, to representatives of all the federal banking regulatory agencies and others. In connection with the development of the seminar, Mr. Myers researched literally hundreds of SEC cases (including banks and nonbanks) involving accounting irregularities and other 10b-5 omissions. Jack Newton, Ph.D., the director of the Federal Financial Institutions Examination Council wrote as follows: "You were the lead designer and developer of the *Syndicated Loan Seminar*, as well as the primary lecturer. Your ideas have had a broad impact on the development of the Advanced White Collar Crime Conference, and your presentation on '*Public Company Fraud*' was groundbreaking. Attendees have always recognized your timely content, excellent organization, and fascinating presentations by granting ratings that place you among our very highest rated speakers."

Mr. Myers has written two authoritative texts on problem loan identification and asset management: "The Problem Loan Action Plan: a Uniform Methodology for Dealing with Problem Assets"; and "Real Estate Problem Loans," both published by Dow Jones Irwin. In addition he has authored "The Income Property Construction Lending Manual" published by the American Bankers Association (the largest trade group for American bankers) and has authored numerous articles on the subject of lending and problem loans.

Mr. Myers has been the chairperson for more then a dozen national conferences on problem assset management, in addition to three national conferences chaired for the federal regulators on the same subject. He authored and taught a week-long course for the Office of Thrift Supervision on the subject of asset workouts. This highly rated course was presented on numerous different occasions over several years. Completion of a weeklong course developed and presented by Mr. Myers called "Loan Analysis" was required by the Office of Thrift Supervision for its examiners to obtain the "Certified Thrift Examiner" status.

Mr. Myers was identified as a key person by the Office of Thrift Supervision ("OTS") to assist in developing their program of training for examiners dealing with problem asset classification. He was retained to provide case studies and written materials for a program on problem asset classification administered by the OTS to its examiners on a nationwide basis. He was also engaged to train OTS examiners and made more than 40 presentations nationally on the subject of problem asset classification. On various occasions the Federal Home Loan Bank System hired Mr. Myers to consult regarding problem asset classifications and to assist individual savings institutions with developing policies regarding problem asset administration.

Mr. Myers has trained representatives from all of the federal banking regulatory agencies including the Office of Comptroller of Currency, the Federal Deposit Insurance Corporation and various Federal Reserve

Banks on issues relating to reasonable and prudent mortgage lending practices, bank fraud and problem asset identification and analysis. T.A. Myers & Co. has recently prepared a seminar on financial statement manipulation and accounting shenanigans.

Mr. Myers has also developed and taught numerous courses and seminars dealing with, among other things, commercial fraud, fraudulent conveyances and the detection of concealed assets, for various law enforcement entities, including the:

- Federal Bureau of Investigation
- U.S. Secret Service
- U.S. Department of Justice

In the late 1980s, Mr. Myers was the one of seven industry experts invited by the chairman of the House Of Representatives Banking Committee to appear before the committee and critique President Bush's proposal for revising the banking regulations. Included in the seven were the Chairman of the AICPA, the President of the AICPA, the Chairman of a "Big Eight" accounting firm, and the former Chief Accountant of the Federal Home Loan Bank Board. Mr. Myers' presentation to the Committee, which included, among other things, a discussion of fraud and problem lending was described by Committee Chairman, Henry Gonzalez, on the congressional record, as "very eloquent."

In addition to lecturing, writing and consulting to the industry, Mr. Myers is also sought for his opinion in litigation regarding financing and/or commercial fraud matters. He has testified as an expert in litigation matters in both federal and state courts throughout the United States and Puerto Rico regarding, among other things, directors and officers liability, fraud in banking, reasonable and prudent lending practices, securities fraud and regulatory compliance.

## CONGRESSIONAL REPORT

At the request of Congressman LaFalce, Mr. Myers prepared a comprehensive report dealing with the liability of professionals from various disciplines for losses to lending institutions resulting from fraud and/or negligent acts. This paper addressed the actions of officers and directors, legal counsel, independent auditors, appraisers, mortgage brokers, real estate brokers and others.

## OTHER TRAINING

Mr. Myers has been a frequent lecturer in Washington, D.C. at the Income Property Lending School and at the Advanced White Collar Crime School presented by the Federal Financial Institutions Examination Council. He has provided extensive lending and related training for representatives from every major lending industry trade group and regulatory agency in the country, including:

- Office of the Comptroller of the Currency
- Federal Deposit Insurance Corporation
- Numerous Federal Reserve District Banks
- Office of Thrift Supervision
- National Credit Union Administration
- Federal Bureau of Investigation (fraud)
- United States Secret Service (fraud)
- U.S. Attorney General's Office (fraud)
- American Bankers Association
- U.S. League of Savings Institutions
- Resolution Trust Corporation
- Bank Administration Institute

**COURSES DEVELOPED FOR UNITED STATES AGENCIES AND INDUSTRY TRADE GROUPS**

*(The majority of these courses were/are part of an ongoing curriculum and have been presented by Mr. Myers on numerous occasions.)*

Federal Financial Institutions Examinations Council

- Complex Public Company Fraud and Stock Manipulation (1 day)
- Broadly Syndicated Loans and Derivative Structures (3 days)
- Income Property Lending (1 day)
- White Collar Crime and Fraud (1 day)
- Accounting for Problem Loans (½ day)

Office of Thrift Supervision

- Asset Classification (3 days)
- Problem Loan Workouts (5 days)
- Loan Analysis (5 days)
- Real Estate Lending (5 days)

Federal Bureau of Investigation

- Commercial Lending Fraud (3 hours)

United States Secret Service

- Savings and Loan Industry Fraud (3 hours)

U.S. League of Savings Institutions

- Problem Loan Workouts (1 day)
- Construction Lending (1 day)

American Bankers Association

- Construction Lending (1 day)

Resolution Trust Corporation

- Supervising the Asset Management Contractor (2 days)

U.S. Department of Justice

- Bank Fraud (1 day)

National Credit Union Administration

- Advanced Commercial Lending (2 days)

## PUBLICATIONS

Mr. Myers has authored:

- *Real Estate Problem Loans; Workout Strategies and Procedures*, published by Dow Jones-Irwin, Inc. (1990).
- *The Problem Loan Action Plan; A Uniform System for Managing Problem Assets*, published by Dow Jones-Irwin, Inc. (1990).
- *Income Property Construction Lending Manual*, published by the American Bankers Association (1987).
- "A Regulatory Examination Guideline for Commercial Real Estate and Development," a chapter in *FHLBS Regulatory Handbook: Service Corporations*, prepared on behalf of the Office of Regulatory Affairs (1989).
- A six-part series on problem assets and loan workouts published by the *National Thrift News* (1986).
- "Acquisition, Development and Construction Lending," an article for *The Examiner*, official publication of the Society of Financial Examiners (1986).
- "Asset Classification Regulation," a management treatise on problem asset classification prepared on behalf of the U.S. League of Savings Institutions (1985).

- *The Foreign Investment in Real Property Tax Act*, published by the Canadian Institute of Chartered Accountants (1983).
- *U.S. Tax Update*, published by the Canadian Institute of Chartered Accountants (1982).
- *Tax Planning for Canadian Investment in the United States*, published by the Canadian Institute of Chartered Accountants (1981).

## VIDEOS, RECORDINGS, AND CONGRESSIONAL TESTIMONY

- Video produced by the *National Thrift News* on problem loan workouts.
- Video produced by the Federal Reserve Bank of Kansas City on "Fraud in the Lending Industry."
- Video produced by the U.S. Attorney General's Office on "Fraud in the Thrift Industry."
- Expert testimony, at the request of the Chairman of the United States House of Representatives Banking Committee, on issues relating to lending industry problems.

## PERSONAL INFORMATION

Mr. Myers has been listed as a biographical subject in Who's Who of Emerging Business Leaders, Who's Who in Finance and Industry, Who's Who in America and Who's Who in the World. He has received the Certificate of Appreciation awarded by the Federal Financial Institutions Examination Counsel (FFIEC) "for significant contributions in meeting the overall objectives of the Federal Financial Institutions Examination Counsel." The FFIEC is a quasi-governmental organization mandated by Congress to provide professional education for all of the federal banking regulatory agencies.

Mr. Myers has lectured to such organizations as the University of Colorado at Denver and the Colorado Free University on the subject of "Success With Integrity." His firm, T.A. Myers & Co., also authored and sponsored the widely acknowledged Imagine Program on Alternatives to Violence which has been disseminated without charge in school districts throughout the country. He has served as an unpaid board member for Qualife, a large cancer support group organization. He is married and has three children. His hobbies include surfing and mountain biking. In the past, he has won both the prestigious Winter Park and Thunder Valley Mountain Bike Racing Series, in his age group and come in second at the Colorado State Mountain Biking Championships. He has also competed at the World Masters Mountain Biking Championships held in Quebec, Canada.

## SUMMARY OF EDUCATIONAL MATERIALS, SPEECHES AND PRESENTATIONS BY THOMAS A. MYERS

Mr. Myers has provided educational material to representatives from the following organizations and delivered over 250 instructional seminars and/or chaired conferences on the following topics.

**TOPICS**

Directors' and Officers' Liability
Merger and Acquisition Financing
Collateralized Debt Obligations
Lead Agent Due Diligence
Subprime Mortgage Originations
Problems with EBITDA
Fraud in Leveraged Buyouts
Financial Statement Manipulation
Fraud Investigation Techniques
Stock Manipulation and Insider Trading
Fraud in Banking
Consumer Lending Fraud
Mortgage Force Placed Insurance
Truth in Lending Violations
RESPA Issues
Check Fraud
Document Preparation Fee Scam
Unfair and Deceptive Acts and Practices
Mortgage Lending Fraud
Problem Loan Issues
Thrift Fraud
Thrift Accounting Issues
Liability in the Thrift Industry
Shared National Credits
Automobile Yield Spread Premiums
Auto Collateral Protection Insurance
Loan Syndications
Debtor/Creditor Workouts
Public Company Fraud
Equity Skimming
New Developments in Lender Liability
Case Studies in Lender Liability
Professional Fraud
Borrower Fraud Analysis
Real Estate Case Studies
Problem Loan Workout Seminar
Commercial Loan Analysis Seminar
Advanced Commercial Loan Analysis
Commercial Real Estate Lending Fraud
Real Estate Fraud
Income Property Lending
Current Accounting Issues
Analyzing Developer's Financial Wherewithal
Construction Lending
Fraud in Commercial Lending
Real Estate Lending Seminar
Problem Asset Analysis and Administration
Problem Hotel Workshop
Asset Classification Seminar
Real Estate Lending Seminar
Fraud in Commercial Lending
Possible Recovery of Funds Relating to Failure of Federally Insured Deposition Institutions
Role of Independent Auditor in Preventing Failure of Thrift Institutions
Problem Asset Disposition
Problem Assets
Money Desk Management
Accounting for Problem Loans
Loan Participation Issues
Real Estate Asset Classification
Forbearance for Problem Loan Institutions
R-41C Appraisal Methodology
Distressed Real Estate Conference

**ORGANIZATIONS**

Nat'l Association of Consumer Advocates
U.S. House of Representatives' Committee on Banking
United States Secret Service Agency
Federal Savings and Loan Insurance Corp.
Federal Deposit Insurance Corporation
Federal Bureau of Investigation
Resolution Trust Corporation
U.S. Attorney's Office
National Association of Attorneys General
Federal Home Loan Bank System
U.S. Department of Justice
National Credit Union Association
Pacific Southwest Bank
Office of Thrift Supervision
Federal Financial Institutions Examination Council
California Savings and Loan League
Attorney General's Office, Kern Cty , CA
Federal Home Loan Bank of Topeka
Federal Home Loan Bank Office of Education
Kansas League of Savings Institutions
Federal Home Loan Bank of San Francisco
Society of Financial Examiners
National Association of State S&L Supervisors
Federal Home Loan Bank of New York
New York City Dept of Consumer Affairs
New York State Banking Commission
Federal Home Loan Bank of Cincinnati
Office of Attorney General, Columbus, OH
Arkansas League of Savings Institutions
Office of the Comptroller of the Currency
Federal Reserve Board
U.S. League of Savings Institutions
Office of Regulatory Policy, Oversight & Supervision
University of California-Irvine
Consumer Affairs, Jacksonville, FL
Consumer Protection, Dade County, FL
Missouri League of Savings Institutions
Houston League of Savings Institutions
Texas Savings and Loan League
American Bankers Association
University of Denver Graduate Program
Arizona Bankers Association
Attorney General's Office, Apache Cty, AZ
Attorney General's Office, Navajo Cty, AZ
American Bankers Assoc National School
Texas Society of Certified Public Accountants
Attorney General's Office, Edinburg, TX
Institute of Financial Education
REO Managers Association
Colorado Dept. of Interstate Commerce
Lodging Unlimited
REO Managers Clinic
California State Savings and Loan
Federal Reserve Bank of Kansas City
Carteret Savings Bank
Washington Savings League

* * * * * * *

Attorney General's Office, Vancouver, WA
Prosecutor's Office, King County, WA
North Carolina Savings & Loan League
Turnaround Management Association
American Institute of Certified Public Accountants
Consumer Credit Counseling, Warwick, RI
Consumer Affairs, Mercer County, NJ
National Consumer Law Center
Governor's Office of Citizens Assistance, Springfield, IL
Consumer Affairs, Palm Beach County, FL
Consumer Credit, Oklahoma City, OK
District Attorney's Office, Philadelphia, PA
Telecommunications & Consumer Service, Fairfax, VA
Attorney General's Office, Cheyenne, WY

# Exhibit B

## Expert Testimony Given Since 1996

## By

## Thomas A. Myers

**(Given either at trial or in depositions.)**

1. Jefferson Plaza II Limited Partnership, et al v. First American Bank of Maryland, et al, Circuit Court, Montgomery County, Maryland, Case No. 82434 (Consolidated with Case No. 76526).

2. Cabana Limited Partnership v. Greyhound Real Estate Finance Company, et al, United States District Court, District of South Carolina, Columbia Division, Civil Action No. 3:90-644-16.

3. Public Hearing; Re: Bank of Boston Corporation. Securities and Exchange Commission, Division of Enforcement, Washington, D.C., A.P. File No. 3-8270.

4. Resolution Trust Corporation v. Clement H. Hall, et al., United States District Court, District of Kansas, Case No. 92-2085-V.

5. Fourwinds Development, Inc. et al. v. First Community Bank, Inc. et al., Circuit Court of Mercer County, West Virginia, Civil Action No. 92-CV-1696-K.

6. Commerce Bank, N.A. v. Kenneth McIlvaine et al., Chancery Division, Gloucester County, Superior Court of New Jersey, Civil Action Docket No. F-6117-93.

7. Resolution Trust Corporation v. Jones Boat Yard, Inc. et al., Circuit Court, 11th Judicial Circuit, Dade County, Florida, Consolidated Cases No. 92-15122-CA(27) and 92-15337-CA(27).

8. William L. McLaughlin et al. v. The Community Bank, et al., District Court, Dickinson County, Kansas, Case No. 92-C-66.

9. United States of America v. Richard L. Burns, et al., United States District Court, Southern District of California, Criminal Case No. 931446.

10. Michael W. Walker et al. v. First Commercial Bank et al., Chancery Court, Second Division, Pulaski County, Arkansas, Civil Action No. 90-56.

11. Union National Bank of Pittsburgh v. Mobile Diagnostech, Inc., et al., Court of Common Pleas of Allegheny County, Pennsylvania, Case No. G.D. 89-16967.

12. William Appleton, Trustee for First Ohio Securities Company v. First National Bank of Ohio, et al., United States District Court, Northern District of Ohio, Case No. 5:91CV609.

13. Arthur Alan Wolk v. Jefferson Bank, et al., United States District Court, Eastern District of Pennsylvania, Case No. 94-CV-5096.

14. Club 93, Inc. v. 1st Security Bank of Idaho, N.A., United States District Court for the District of Nevada, Case No. CV-N-94-00787-HDM.

15. Banca del Sempione v. Provident Bank of Maryland, et al., United States District Court of Maryland, Civil Action No. B-91-3179.

16. National Westminster Bank, USA v. Amper, Politziner and Mattia, et al., United States District Court for the District of New Jersey, Civil Action No. 92-3441

17. Encore International, et al. v. Draper Bank and Trust, et al., Third Judicial District Court, Salt Lake County, UT, Civil Action No. 930903394CV.

18. First Savings Bank of Hegewisch f/k/a First Federal Savings of Hegewisch v. Deloitte & Touche f/k/a Deloitte Haskins & Sells v. Vincent Ginalski, et al., Circuit Court of the Eighteenth Judicial District, DuPage County, Wheaton, Illinois, Case No. 93 L 0025.

19. James Ralston v. Chrysler Credit Corporation and Chrysler Insurance Company, Case No. 90-3433, Common Please Court of Lucas County, Ohio.

20. Menola Baymon v. General Motors Acceptance Corporation, Circuit Court for the County of Humphries, Mississippi, Civil Action No. 95-0072.

21. Excel Communications, Inc., et al. v. Linden Wood, et al., American Arbitration Association, No. 711810016896.

22. Alexander, et al. v. Fidelity Financial Services, et al., Circuit Court of Clairborne County, Mississippi, Civil Action No. 97-0190.

23. Foothill Capital Corporation v. Dimeling, Schreiber & Park, et al., United States District Court for the Western District of Texas, Austin Division, Civil Action No. 97-CA-146.

24. Thomas Pearson, et al. v. Component Technology Corporation, United States District Court for the Western District of Pennsylvania, Civil Action No. 94-293 ERIE.

25. Jonray A Hilton, et al. v. Bank of America, et al., United States District Court, Third Judicial District, Henderson County, TX, Case No. 97-28.

26. Rolling Brook Associates, L.P. et al. v. Commerce Bank N.A. et al., Civil Action Docket Number L- 1820-92, Law Division, Gloucester County, in the Superior Court of New Jersey.

27. Brooks K. Hanson and Ed's Army Navy Supply Store v. First Security Bank of Utah, Civil No. 950906078 CN, Third Judicial District Court of Salt Lake County, Utah.

28. Jayne A. Briseno, et al. v. American Savings Bank, Case No. 774773, Superior Court of California, Orange County.

29. James E. Oliver, et al. v. Fidelity Financial Services, et al., Case No. 98-0104, Circuit Court of Jefferson County, Mississippi.

30. Roy McCardell, et al. and Paula Haasl v. Citicorp Savings, et al., Case No. 753549-7, Superior Court of California, Alameda County.

31. Anthony Zugich, et al. v. Wells Fargo Bank, Case No. 990622, Superior Court of the State of California, San Francisco County.

32. Hawkeye Steel Products, Inc. v. Pilot Grove Savings Bank, Case No. Lala 04138, Iowa District Court for North Lee County.

33. Tonya L. Krause, et al. v. The Huntington National Bank, Case No. 98-00750-CP, State of Michigan Circuit Court for Kent County.

34. Kristine Cowles, et al. v. Bank West, Case No. 98-06859-CP, State of Michigan Circuit Court for Kent County.

35. Boyer, et al. v. Sears Roebuck & Co., Civil Action No. 97-CIV-3411, United States District Court for the Eastern District of Pennsylvania.

36. Mary E. Peterson, et al. v. PNC Mortgage Corporation of America, Case No. 97-915-CIV-J-20A, United States District Court for the Middle District of Florida, Jacksonville Division.

37. Harry Gibson, et al. v. World Savings and Loan Association, Case No. 762321, California Superior Court, Orange County.

38. Eugene Borman, et al. v. First Union/First Fidelity Bank, N.A., Civil Action No. L-8897-96, Superior Court of New Jersey, Camden County.

39. Maxson Automatic Machinery v. The Washington Trust Company, Civil Action No. WC97-046, Rhode Island Superior Court.

40. Roxane Afanador v. H&R Block Tax Services, Case No. CV767677, Superior Court of California, Santa Clara County.

41. Gary Jeffrey and Caroline Leasing v. W.B. Swope and McDowell County National Bank, Civil Action No. 1:95-1015, United States District Court for the Southern District of West Virginia at Bluefield.

42. Tri-G, Inc. v. Burke, Bosselman & Weaver and Kenneth E. North, Circuit Court of the Nineteenth Judicial Circuit, McHenry County, Illinois, Civil Action No. 95LA369.

43. Susan K. Geller v. Onyx Acceptance Corporation, Superior Court of the State of California, County of San Diego, Case No. 728614.

44. Wells Fargo Business Credit, Inc. v. Winternitz, Inc., civil case No. 99- C-1340, in the United States District Court Eastern District of Wisconsin.

45. Geoffrey Boehm Chocolates, Inc. v. Allegheny Valley Bank of Pittsburgh, Case No. 97-20734 MBM, in the United States Bankruptcy Court for the Western District of Pennsylvania.

46. Danny Ford, et al. v. GMAC, Civil No. 4-00CV00887WRW, United States District Court for the Eastern District of Arkansas, Western Division.

47. First Federal Bank v. Dovenmuehle Mortgage, Inc., Case Number CV-00-C-1420-W, United States District Court for the Northern District of Alabama Western Division.

48. In Re BankAmerica Corp. Securities Litigation, MDL No. 1264, United States District Court Eastern District of Missouri Eastern Division.

49. Beaudreau v. General Motors Acceptance Corporation, Civil No. 2000-186-IV, Circuit Court of Sevier County, Tennessee at Sevierville.

50. Kimberly Keeton Spence v. RJ & RJ, Inc., Civil Action No. 01-01468-CA, Circuit Court, Fourth Judicial Circuit for Duval County, Florida.

51. Tri-G, Inc. v. Burke, Bosselman & Weaver, No. 95LA369, Circuit Court of the Nineteenth Judicial Circuit, McHenry County, IL.

52. United States of America v. Lorenzo Muñoz Franco, Criminal No. 95-386-DRD, United States District Court for the District of Puerto Rico.

53. Michael and Barbara Austin v. Lehman Brothers, Inc., et al. Case No. SA CV 01-971, United States Bankruptcy Court, Central District of California, Santa Ana Division.

54. Austern Trust Dated 7/11/94, Barry M. Austern and Susan L. Austern, Trustees, on behalf of DPL, Inc. v. Peter H. Forster, et al., Case No. A0207067, Court of Common Pleas, Hamilton County, Ohio.

55. Adkins v. Washington Mutual Bank FA, Case No. GIC 819546, Superior Court of California, County of San Diego.

56. Thomas Levitan, et al. vs. John B. McCoy, et al., Case No. 00-C-5096, In the United States District Court for the Northern District of Illinois Eastern Division.

57. Charles F. Comstock, et al. vs. Washington Mutual Bank, et al., Case No. GIC 820803, in the Superior Court of the State of California for the County of San Diego.

58. In Re Metris Companies, Inc. Securities Litigation, Civil Action No. 02-CV-3677 , in the United States District Court for the District of Minnesota.

59. Surgical Services, Inc., et al. v. Judith E. Cremeans, fka Judith E. Backos, et al., Case No. 483677, In the Court of Common Pleas for Cuyahoga County, Ohio.

60. Tony Jensen and Karen Jensen v. Hinshaw & Culbertson, et al., Case No. 01-26693-CA-32, In the Circuit Court of the 11th Judicial Circuit In and For Miami-Dade County, Florida.

61. F&A Federal Credit Union v. DM Federal Credit Union, et al., Case No. C20042896, In the Superior Court of the State of Arizona In and For the County of Pima.

62. Jill Bound and Lawrence M. Bound, et al. v. Guaranty Bank and Trust Company and Martin Moore, Case No. 2005cv4400, in the District Court for the City and County of Denver, Colorado.

63. Stephen G. Lingis, et al. v. Motorola, Inc., et al., Case 03C5044, United States District Court, Northern District of Illinois Eastern Division.

**EXHIBIT C**

"Purchase Agreement and Escrow Instructions by and Between Western Pacific Housing Inc., a Delaware Corporation ('Seller') AND Waheeda Ralsom Khan and Zahra Khan ('Buyer.')" Dated December 11, 2005.

"James Wilson, et. al. v. D.R. Horton, Inc., et. al. Memorandum of Points and Authorities in Support of Motion No. 1: All Defendants' Motion to Dismiss Antitrust Claims." Filed, June 9, 2008.

"James Wilson, et. al. v. D.R. Horton, Inc., et. al. Original Complaint." Filed, March 28, 2008.