Valentine S. Hoy VIII, State Bar No. 121766
John T. Brooks, State Bar No. 167793
LUCE, FORWARD, HAMILTON & SCRIPPS LLP
600 West Broadway, Suite 2600
San Diego, California 92101-3372
Telephone No.: 619.236.1414
Fax No.: 619.232.8311

Attorneys for D.R. Horton, Inc., Western Pacific Housing, Inc., and DHI Mortgage Company, Ltd., L.P.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES WILSON, REBECCA LORENZO, WAHEEDA KHAN, JORGE LOPEZ, and SUZIE KHUU, on behalf of themselves and All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>D.R. HORTON, INC., WESTERN PACIFIC HOUSING, INC. d/b/a/ D.R. HORTON, AMERICA'S BUILDER, DHI MORTGAGE COMPANY, LTD., L.P. and DOES 1-10,<br><br>Defendants. | Case No. 08 CV 592 BEN RBB<br><br>The Hon. Roger T. Benitez<br>Dept. 3<br><br>**DEFENDANTS' REPLY IN SUPPORT OF MOTION NO. 1: TO DISMISS ANTITRUST CLAIMS**<br><br>Date: June 9, 2008<br>Time: 10:30 a.m.<br>Dept.: 3<br><br>Complaint Filed: March 28, 2008 |

# I.

# INTRODUCTION

The core issue in this motion is simple: is it a tying violation for a homebuilder to give customers 30 days to secure financing from a lender of their choice, and for the customer to agree not to change lenders after that time? The question essentially answers itself. Providing customers the right and opportunity to choose their lender is the very opposite of tying.

Nor does the customer's agreement to stick with their chosen lender after 30 days create a tying violation. That agreement didn't obligate customers to use any particular lender. All it prohibited was last minute lender changes that might threaten the agreed closing schedule – regardless of whether the chosen lender was DHI Mortgage or some other company. This non-discriminatory, vendor-neutral provision does not tie customers to DHI Mortgage; it simply requires them to make a choice of lender – any choice – and stick with it.

Faced with a contract that guarantees the right to shop around, plaintiffs rely on cases holding that market power may exist where "information costs" prevent a customer from understanding the true cost of the allegedly tied product until it becomes too expensive to switch. The problem is that the facts alleged here are not remotely similar to the cases plaintiffs rely upon. There are no "information costs" here because federal law requires defendants to specify in detail the cost of a DHI Mortgage well in advance of the 30-day deadline to commit to a lender, and customers are free to choose a lender without any "switching costs" within that same time period. Plaintiffs don't allege any facts showing otherwise.

For these reasons, and all the others below, the Court should dismiss plaintiffs' legally untenable antitrust claims.

# II.

# PLAINTIFFS' DECLARATIONS ARE INAPPROPRIATE AT THE PLEADING STAGE, AND ADD NOTHING RELEVANT IN ANY EVENT

Plaintiffs attempt to bolster their complaint with declarations from each plaintiff and a purported expert. Because reliance on facts outside the pleadings and outside the scope of judicial notice is inappropriate, defendants will limit their arguments to the facts alleged and the purchase

contracts (which plaintiffs concede are properly subject to judicial notice).

Further, plaintiffs' declarations add nothing in any event. If anything, they reinforce defendants' motion by clarifying a key ambiguity in the complaint: namely, they make clear that every representation that a plaintiff was "required" to use DHI Mortgage was made *after* the 30-day lender commitment date. At that time, Western Pacific in fact had a contractual right to insist that plaintiffs not switch lenders. As shown in the opening brief and explained below, enforcing such a *contractual* right does not supply the element of *market* power essential to a tying claim.

## III.

## BOTH *BELL-ATLANTIC* AND RULE 9(b) APPLY TO REQUIRE HEIGHTENED PLEADING

### A. *Bell-Atlantic* Applies to All Elements of Antitrust Claims, Including Tying Claims

Plaintiffs contend that the new pleading standards announced in *Bell-Atlantic v. Twombly*, 127 S.Ct. 1955 (2007), apply only to the element of conspiracy and not to any other element of antitrust claims. Plaintiffs' Opposition ("Opp."), pp. 11-12. Yet plaintiffs cite no case for this proposition. The cases actually hold the opposite. *See, e.g.*, *Perry v. Rado*, 504 F. Supp. 2d 1043, 1046 (E.D. Wash. 2007) ("the same [*Bell-Atlantic*] pleading requirements pertain to the other elements of a Section 1 [Sherman Act] claim," not just to the conspiracy element).

Indeed, not only is *Bell-Atlantic* not limited to the conspiracy element of antitrust claims, it is not limited to antitrust claims at all (as Judge Brewster recently held). *Anticancer Inc. v. Xenogen Corp.*, 248 F.R.D. 278, 282 (S.D. Cal. 2007) (applying *Bell-Atlantic* to patent claims). Numerous courts have reached similar results.[1] It would be absurd to suggest that *Bell-Atlantic*

---

[1] *See, e.g.*, *Pace v. Swerdlow*, 519 F.3d 1067, 1075 (10th Cir. 2008) ("Although some initially argued that [*Bell-Atlantic*] is confined to the antitrust context, most courts, including our own, have since held that its effect on pleading standards is considerably broader.") (citation omitted); *Phillips v. County of Allegheny*, 515 F.3d 224, 234 (3rd Cir. 2008) ("we decline at this point to read [*Bell-Atlantic*] so narrowly as to limit its holding on plausibility to the antitrust context"); *ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 n.2 (2d Cir. 2007) (declining "to read *Bell-Atlantic's* flexible "plausibility standard" as relating only to antitrust cases" and applying *Bell-Atlantic* in an action under the Securities Exchange Act); *In re Elevator Antitrust Litigation*, 502 F.3d 47, 50 n.3 (2d. Cir. 2007) (stating that "[a] narrow view of [*Bell-Atlantic*] would have limited its holding to the antitrust context, or perhaps only to Section 1 claims; but we have concluded that [*Bell-Atlantic*] affects pleading standards somewhat more broadly" and applying *Bell-Atlantic* to claims asserted under both Section 1 and 2 of the Sherman Act);

applies to non-antitrust claims and yet does not apply to antitrust tying claims.

Nothing in *Newcal Industries, Inc. v. IKON Office Solution*, 513 F.3d 1038 (9th Cir. 2008) holds to the contrary. In fact, *Newcal* was argued and submitted in April 2007 – before *Bell-Atlantic* was decided – and so the applicability of *Bell-Atlantic* was neither briefed nor decided. It is axiomatic that "unstated assumptions on non-litigated issues are not precedential holdings binding future decisions." *Sakamoto v. Duty-Free Shoppers*, 764 F.2d 1285, 1288 (9th Cir. 1985). Where *Bell-Atlantic* has been litigated, courts have concluded that it applies to tying claims.[2]

Why does this matter? As shown in the opening brief, it makes a tremendous practical difference by ensuring that defendants are not subjected to the staggering costs of antitrust discovery unless plaintiffs' allegations can satisfy the heightened plausibility standards. Conclusory allegations are not enough; the plaintiff must back up any conclusions with "factual matter." *Bell-Atlantic*, 127 S.Ct. at 1965. If that factual matter is as consistent with legal conduct as with an antitrust violation, the complaint fails. *Id.* at 1966.

Further, *Bell-Atlantic* makes a difference here because it requires that the plausibility of allegations be judged in the context of existing law. *Id.* at 1965-66. Here, that existing law includes the extensive mortgage disclosure requirements outlined in the opening brief, including:

- The requirement to provide a borrower with a good faith estimate of closing costs within three days of receiving a loan application. 24 C.F.R. § 3500.7(a).
- The requirement to disclose the interest rate and all other required truth-in-lending disclosures within three days of the loan application. 24 C.F.R. § 226.19(a).

Read in conjunction with section 7.2 of the purchase contracts requiring customers to

---

*Goldstein v. Pataki*, 488 F. Supp. 2d 254, 289-90 (E.D.N.Y. 2007) ("The Supreme Court could have used [*Bell-Atlantic*] to announce a narrow exception to *Conley* for claims of antitrust conspiracy. Instead, however, the Court explained that Conley has been widely misunderstood . . . . The generality of this discussion strongly suggests that [*Bell-Atlantic*] applies more broadly to all civil cases rather than only to claims of antitrust conspiracy.").

[2] *Westerfield v. Quizno's Franchise Co.*, 527 F.Supp.2d 840 (E.D. Wis. 2007) (failure to plausibly allege market power in tying case); *Siemer v. Quizno's Franchise Co.*, 2008 WL 904874, *9 (N.D. Ill. 2008) (applying *Bell-Atlantic* to impose heightened pleading requirement as to the market-definition element of a tying claim); *CBCInnovis v. Equifax Information Services LLC*, 2008 WL 320147 (S.D. Ohio 2008) (dismissing tying claim based on failure to satisfy *Bell-Atlantic* standards); *Sheridan v. Marathon Petroleum Co.*, 2007 WL 2900556 (S.D. Ind. 2007) (same).

apply for a loan from DHI Mortgage within 5 days of signing the purchase agreement, these regulations establish that each Western Pacific customer receives full and early disclosure of the costs of a DHI Mortgage loan – thus destroying plaintiffs' conclusory arguments about supposed "information costs." *See* discussion in Section V, *infra.*

**B. Rule 9(b) Independently Requires Plaintiffs to Allege the Specifics of Any Purported Deception**

In addition to the plausibilty requirements of *Bell-Atlantic*, plaintiffs must also satisfy the particularity requirements of Rule 9(b) because their claims are predicated in large part on allegedly fraudulent or deceptive conduct. Defendants' Opening Brief, p. 6; *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103-04 (9th Cir. 2003). Plaintiffs' opposition does not attempt to distinguish *Vess* nor otherwise dispute that Rule 9(b) applies.

## IV.

## PLAINTIFFS HAVE NOT PLED MARKET POWER BASED ON MARKET SHARE

Plaintiffs don't dispute that market power is an essential element of any tying claim, nor do they allege that Western Pacific has market power based on the most common measure of market power: namely, market share in the relevant market.

Indeed, plaintiffs now concede that the relevant geographic market is necessarily local, not national. Opp., p. 15. That concession renders irrelevant the only allegation remotely related to market share (that is, plaintiffs' allegation in paragraph 63 that D.R. Horton is the largest homebuilder in the United States). Even if D.R. Horton is the largest homebuilder in the United States, that says nothing about its (or Western Pacific's) market share in Stockton or San Diego – the only two markets in which plaintiffs purchased.

Because plaintiffs admit that the relevant geographic market is local, and because they have alleged no facts showing a dominant market share in Stockton or San Diego, plaintiffs have not pled market power based on market share.

///

///

///

V.

**PLAINTIFFS HAVE NOT PLED MARKET POWER UNDER *KODAK* OR *NEWCAL***

Recognizing the futility of trying to allege a dominant market share in what is clearly a competitive and fragmented homebuilding market, plaintiffs retreat to the argument that defendants have market power based on "information costs" and "switching costs." Opp., p. 17. The facts of the cases plaintiffs cite, however, don't remotely resemble the facts and contracts alleged here. Rather, the facts are much closer to those in *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430 (3rd Cir. 1997), *cert. denied* 523 U.S. 1059 (1998) – a case featured in the opening brief, but which plaintiffs conspicuously ignore.

**A. The Facts Alleged Are Not Remotely Similar to *Kodak***

Plaintiffs rely first and foremost on *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451 (1992). There, Kodak indisputably had market power – a natural monopoly, in fact – over replacement parts for its copiers, but it faced competition in the market for servicing its copiers. For years, however, Kodak did not abuse that market power to gain an advantage in the service market. Then, without warning to the customers who had already bought Kodak copiers, Kodak began to exploit its market power by refusing to supply the necessary replacement parts unless the customer also purchased overpriced Kodak service. *Id.* at pp. 456-58. Not surprisingly, the plaintiffs (competing service providers) alleged an illegal tie between the Kodak replacement parts (where Kodak had monopoly market power) and the service market. *Id.* at p. 459.

Kodak argued that despite its monopoly, it did not really have market power in the replacement parts market because it did not have market power in the *initial* ("primary") market for new copier sales. Kodak argued that if it tried to increase prices on replacement parts or service contracts, customers would simply refuse to purchase Kodak copiers. Thus, competition in the primary market would make it impossible for Kodak to abuse its market position in the derivative replacement parts market (or so Kodak argued). *Id.* at 465.

The Supreme Court refused to adopt the blanket rule urged by Kodak that competition in a primary market necessarily ensures competition in all derivative, secondary markets (such as the derivative markets for replacement parts and service). In rejecting that rule, the court observed

that there were plausible reasons why competition in the primary market for copiers would not prevent Kodak from raising prices for replacement parts and service. These reasons included "information costs" – meaning that it is difficult for purchasers to predict total "lifecycle" pricing of both the copier and years of parts and service. *Id.* at p. 473. To do so, a customer would have to "acquire a substantial amount of raw data and undertake sophisticated analysis" of factors such as the relative breakdown frequency of competing copiers, future pricing and availability of replacement parts, length of downtime, etc. *Id.* The court further observed that once a customer had purchased a copier, the high cost of switching to a competing copier company gave Kodak leverage to overcharge for parts and service. *Id.* at 466.

The facts alleged here, however, are not analogous to those in *Kodak*. Unlike *Kodak*, plaintiffs don't allege that Western Pacific had anything like monopoly power in the supposed tying market. Nor do plaintiffs allege anything like the "information costs" associated with predicting long term costs of owning and servicing complex durable goods. To the contrary, as explained in the opening brief and section III(A) above, there is probably no industry that has stricter requirements about up front disclosure of prices than the mortgage lending industry. Finally, the contract here expressly provides buyers a reasonable time (30 days) to choose a lender with no "switching costs" whatsoever. In short, plaintiffs do not allege *any* market characteristic or cost that precludes them from shopping for and choosing any lender of their choice during the 30-day free shop period.

**B. <u>The Facts Alleged Closely Track *Queen City Pizza*</u>**

The facts alleged here more closely track *Queen City Pizza*, 124 F.3d 430. There, the court held that a defendant's *contractual* power to require a customer to use a certain product was not a substitute for *market* power – and thus could not support a tying claim.

In *Queen City Pizza*, the plaintiffs were Domino's Pizza franchisees. They had entered franchise agreements with Domino's that obligated them to buy pizza ingredients only from Domino's, the franchisor. The plaintiffs alleged that Domino's had market power over them by virtue of the franchise agreement, and that the contractual obligation to purchase only Domino's pizza ingredients therefore constituted an illegal tie. *Queen City Pizza*, 124 F.3d at 433-34.

The court rejected this argument, reasoning that Domino's power stemmed from its *contractual* rights rather than from power in any *market*, and that such contractual power does not support a tying claim:

> [W]here the defendant's "power" to "force" plaintiffs to purchase the alleged tying product stems not from the market, but from plaintiffs' contractual agreement to purchase the tying product, no claim will lie.

*Queen City*, 124 F.3d at 443.

Further, *Queen City* distinguished *Kodak* on precisely this ground: "Unlike the plaintiffs in *Kodak*, plaintiffs here must purchase pizza products from Domino's Pizza not because of Domino's market power over a unique product, but because they are bound by contract to do so." *Id.* at 441. Other cases likewise hold that "power" derived from contractual rights does not constitute the market power necessary to state a tying claim:

> Economic power derived from contractual arrangements . . . has nothing to do with market power, ultimate consumers' welfare, or antitrust.

*United Farmers Agents Ass'n, Inc. v. Farmers Ins. Exchange*, 89 F.3d 233, 236-37 (5th Cir. 1996) (internal citation and quotation omitted); *see also Newcal*, 513 F.3d at 1048 (same); *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1476 (9th Cir. 1997) (holding it is improper to define a market based on contractual obligations).

So it is here. Plaintiffs do *not* allege that it was Western Pacific's *market* power in the home sales market that compelled them to use DHI Mortgage. To the contrary, plaintiffs concede that they had the contractual right to select the lender of their choice during the 30-day free shop period. The only "coercion" plaintiffs allege is contractual: namely, that Section 7.5 of their purchase contracts "forced" them not to change lenders after the 30-day free shop period. Because that contract provision at most gives Western Pacific certain *contract* power – rather than market power – plaintiffs simply haven't stated a tying claim.

### C. ***Newcal* Confirms that This Case is Governed by *Queen City*, not by *Kodak***

Plaintiffs also rely heavily on *Newcal*, 513 F.3d 1038, but *Newcal* in fact supports defendants. Indeed, *Newcal* confirms that contract power is not the same as market power, and that contract power alone cannot support an antitrust claim:

> [T]he law prohibits an antitrust claimant from resting on market *power* that arises solely from contractual rights that consumers knowingly and voluntarily gave to the defendant (as in *Queen City Pizza* and *Forsyth*). *Newcal*, 513 F.3d at 1048 (emphasis in original).

Nor is that the only guidance *Newcal* provides. Like *Queen City Pizza*, *Newcal* also expressly distinguishes *Kodak* based on the distinction between market power and contract power:

> The critical distinction between *Eastman Kodak* and the two circuit court opinions [*Queen City Pizza* and *Forsyth*] was that the Kodak customers did not knowingly enter a contract that gave Kodak the exclusive right to provide parts and services for the life of the equipment. . . . Equally critically, the Supreme Court found that market imperfections, including information and switching costs, prevented consumers from discovering, as they were shopping for equipment, that the Kodak brand would include a de facto commitment to consume only supracompetitively priced Kodak-brand service contracts. *Newcal*, 513 F.3d at 1048.

The facts alleged here likewise distinguish this case from *Kodak* for each of the reasons identified as critical in *Newcal*: (i) plaintiffs knowingly entered a contract that obligated them to commit to a lender after 30 days, (ii) plaintiffs do not and cannot allege "information costs" inherent in the market, because federal law requires full advance disclosure of all mortgage costs, and (iii) plaintiffs cannot allege "switching costs" because they could freely choose among competing lenders during the 30-day free shop period. In short, because the only power plaintiffs complain of is Western Pacific's enforcement of its *contractual* right to prohibit eleventh-hour lender shopping, plaintiffs cannot state a tying claim.

## VI.

## PLAINTIFFS HAVE NOT ALLEGED A COERCED TIE-IN IN ANY EVENT

Independently, even setting aside the missing element of market power, plaintiffs' opposition underscores their failure to allege the second essential element of an illegal tie-in: coerced purchase of the defendant's tied product.

In every case plaintiffs cite in support of the coercion element (Opp., pp. 18-20), the tying arrangement coerced the plaintiff to purchase the defendant's tied product. For example, in *Kodak* the plaintiffs were compelled to purchase Kodak-brand parts, and in *Tucker v. Apple Computer*, 493 F.Supp.2d 1090 (N.D. Cal. 2006) the plaintiffs were compelled to purchase Apple-brand digital music.

Here, in contrast, the only thing the contract requires is that plaintiffs commit to *some* lender – not necessarily DHI Mortgage – within 30 days of the agreement. In other words, the only thing plaintiffs were "coerced" to do was not to drag their feet on financing and to stick with whichever lender they select. Plaintiffs do not cite – nor has defendants' research found – any case that finds an illegal tying arrangement based upon such a vendor-neutral requirement.

## VII.

## <u>THE PROPOSED AMENDED COMPLAINT FARES NO BETTER</u>

Perhaps anticipating dismissal of their complaint, plaintiffs submit a proposed amended complaint, but the amended complaint doesn't cure anything.

Indeed, plaintiffs don't add a thing to any of the actual fact allegations about each plaintiff's transaction. *See* Proposed First Amended Complaint, ¶¶ 34-43. Thus, all the facts that compel a dismissal of the current complaint – including the fact that the only thing "compelling" the use of DHI Mortgage was plaintiffs' voluntary contractual obligation to commit to a lender within 30 days – remain unchanged.

Nor does plaintiffs' attempt to cure their geographic market allegations fare any better. The new geographic allegation – that "Horton dominates the local markets in which it builds subdivisions" – is so palpably absurd that it raises Rule 11 concerns. No one who has lived in San Diego can believe for an instant that any single builder – much less Horton – dominates. As one court explained in applying the new *Bell-Atlantic* pleading standards, "[a]lthough plaintiff need not necessarily quantify [defendant's] market share with precision, Plaintiff must assert some *facts* in support of its assertions of market power that suggest those assertions are plausible." *Korea Kumho Petrochemical v. Flexsys America LP*, 2008 WL 686834, *9 (N.D. Cal. 2008) (emphasis in original). Just as in the current complaint, the proposed amended complaint still includes no facts making plausible this conclusory assertion of dominance.

Apparently recognizing the absurdity of alleging market power in San Diego or Stockton as a whole, plaintiffs try to narrow the geographic market even further to "the homes of the defendant" in each "narrow neighborhood where that home sits." *See* Proposed First Amended Complaint, ¶ 46. If this were a plausible market definition, then every single homebuilder would,

by definition, be a monopolist! But the Court isn't required to accept such a ridiculously narrow market definition that limits the market to a single subdivision. Rather, a market definition may be rejected at the pleading stage if it "clearly does not encompass all interchangeable substitute products." *Queen City Pizza*, 124 F.3d at 436; *accord*, *Westerfield*, 527 F. Supp. 2d 840, 857 (same). Because there are clearly substitute products for D.R. Horton homes – including other new homes within a reasonable distance, as well as the far larger supply of resale homes – the Court should reject as a matter of law any attempt to limit the geographic market to D.R. Horton's own subdivisions.

## VIII.

## CONCLUSION

*Bell-Atlantic* was intended to ensure that complaints are not mere exercises in wishful thinking. Before moving to expensive discovery, plaintiffs must plead enough actual facts to make it plausible to conclude that an antitrust violation occurred. Here, where (i) the contracts expressly guarantee the right to choose among lenders, (ii) the contracts are vendor-neutral with respect to the requirement to commit to a lender after 30 days, and (iii) extensive disclosure laws ensure that customers receive full cost information, plaintiffs' allegations are not only implausible but are flatly refuted. The Court should accordingly dismiss plaintiffs' antitrust claims.

DATED: June 2, 2008

LUCE, FORWARD, HAMILTON & SCRIPPS LLP

By: s/Valentine S. Hoy VIII

Valentine S. Hoy VIII
Attorneys for Defendants D.R. Horton, Inc., Western Pacific Housing, Inc., and DHI Mortgage Company, Ltd., L.P.
E-mail: vhoy@luce.com

101097265.2

Valentine S. Hoy VIII, State Bar No. 121766
John T. Brooks, State Bar No. 167793
LUCE, FORWARD, HAMILTON & SCRIPPS LLP
600 West Broadway, Suite 2600
San Diego, California 92101-3372
Telephone No.: 619.236.1414
Fax No.: 619.232.8311

Attorneys for D.R. Horton, Inc., Western Pacific Housing, Inc., and DHI Mortgage Company, Ltd.

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JAMES WILSON, REBECCA LORENZO, WAHEEDA KHAN, JORGE LOPEZ, and SUZIE KHUU, on behalf of themselves and All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>D.R. HORTON, INC., WESTERN PACIFIC HOUSING, INC. d/b/a/ D.R. HORTON, AMERICA'S BUILDER, DHI MORTGAGE COMPANY, LTD., L.P. and DOES 1-10,<br><br>Defendants. | Case No. 08 CV 592 BEN RBB<br><br>The Hon. Roger T. Benitez<br>Dept. 3<br><br>**PROOF OF SERVICE**<br><br>Complaint Filed: March 28, 2008 |

I, the undersigned, declare as follows:

I am employed with the law firm of Luce, Forward, Hamilton & Scripps LLP, whose address is 600 West Broadway, Suite 2600, San Diego, California 92101-3372. I am over the age of eighteen years, and am not a party to this action.

On June 2, 2008, I served the following:

**DEFENDANTS' REPLY IN SUPPORT OF MOTION NO. 1: TO DISMISS ANTITRUST CLAIMS**

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **Norman B Blumenthal**
  norm@bamlawlj.com, bam@bamlawlj.com

**Manual Notice List**

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

☐ (No manual recipients)

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed at San Diego, California on June 2, 2008.

Tamara Siemers

Tamara Siemers

101092070.1